1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TENNESSEE
2                            GREENEVILLE

3
   UNITED STATES OF AMERICA,   .  DOCKET NO. CR-2-19-14
4                               .
         GOVERNMENT,            .
5                               .
            VS.                 .  GREENEVILLE, TN
6                               .  APRIL 24, 2019
   XIAORONG YOU,                .  9:13 A.M.
7                               .
         DEFENDANT.             .
8                               .
   .   .   .   .   .   .   .   .   .
9

10

11          TRANSCRIPT OF DETENTION/MOTION HEARING
          BEFORE THE HONORABLE CLIFTON L. CORKER
12            UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2    FOR THE GOVERNMENT:       U.S. DEPARTMENT OF JUSTICE
                               OFFICE OF U.S. ATTORNEY
3                              TIMOTHY CURTIS HARKER, AUSA
                               220 WEST DEPOT STREET, SUITE 423
4                              GREENEVILLE, TN 37743

5                              U.S. DEPARTMENT OF JUSTICE
                               MATTHEW R. WALCZEWSKI, AUSA
6                              950 PENNSYLVANIA AVENUE N.W.
                               ROOM 3509
7                              WASHINGTON, D.C. 20530

8    FOR THE DEFENDANT:        JESSEE & JESSEE
                               THOMAS C. JESSEE, ESQ.
9                              412 EAST UANAKA AVENUE
                               JOHNSON CITY, TN 37601.
10
                               COLLINS SHIPLEY, PLLC
11                             COREY B. SHIPLEY, ESQ.
                               128 SOUTH MAIN STREET, SUITE 102
12                             GREENEVILLE, TN 37743

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:           KAREN J. BRADLEY
                               RPR-RMR
23                             U.S. COURTHOUSE
                               220 WEST DEPOT STREET
24                             GREENEVILLE, TN 37743

25   PROCEEDINGS RECORDED BY DCR, TRANSCRIPT PRODUCED BY
     COMPUTER.

1          (CALL TO ORDER OF THE COURT AT 9:13 A.M.)

2               THE CLERK:  2:19-CR-14, UNITED STATES OF

3    AMERICA VERSUS XIAORONG YOU.

4               THE COURT:  ALL RIGHT.  WE HAVE A COUPLE OF

5    MATTERS WE HAVE TO TAKE UP, I GUESS, BEFORE WE GET INTO

6    THE DETENTION ISSUE.  FIRST, YOU ALL HAVE SENT A

7    PROTECTIVE ORDER THAT YOU WANT THE COURT TO SIGN, IS THAT

8    IN AGREEMENT WITH EVERYBODY?

9               MR. JESSEE:  YES, YOUR HONOR.

10               THE COURT:  I KNOW IT HAS SOME PROVISIONS ABOUT

11    WHERE YOU HAVE TO GO TO REVIEW THE EVIDENCE IN JOHNSON

12    CITY; IS THAT RIGHT?

13               MR. HARKER:  THAT'S CORRECT, YOUR HONOR.

14               THE COURT:  BUT ALL THE TERMS HAVE BEEN AGREED

15    UPON AND THEY'RE ACCEPTABLE TO THE DEFENDANT AND THE

16    UNITED STATES?

17               MR. JESSEE:  THEY'RE TOTALLY UNACCEPTABLE, BUT

18    IT'S THE BEST WE CAN DO UNDER THE CIRCUMSTANCES; SO, YES,

19    WE DO WANT THE ORDER ENTERED.

20               THE COURT:  YOU DO WANT THE ORDER ENTERED,

21    OKAY, ALL RIGHT, BECAUSE WE CAN HAVE IT -- I MEAN, WE CAN

22    ADDRESS ANY DISPUTE.

23               MR. JESSEE:  THE BIGGEST PROBLEM IS WITH TRADE

24    SECRETS, WE'RE GOING TO HAVE TO GO OUT TO THE FBI OFFICE

25    TO EVEN LOOK AT THEM, WE CAN'T BRING THEM OUT.  DEPENDING

1   ON THE OUTCOME OF TODAY, WE'VE GOT ANOTHER PROBLEM IF

2   SHE'S INCARCERATED.

3           THE COURT:  OKAY.

4           MR. JESSEE:  EXCUSE ME, I CAN'T TAKE HER TO THE

5   FBI BUILDING, SO I DON'T THINK I WOULD BE VERY EFFECTIVE

6   AS COUNSEL IF I CAN'T LET HER SEE THE EVIDENCE.

7           THE COURT:  OKAY.

8           MR. JESSEE:  SO WE NEED TO THINK ABOUT THAT.

9           THE COURT:  YEAH, THAT COULD BE --

10          MR. JESSEE:  YOUR HONOR, I THINK UNDER THE

11  CIRCUMSTANCES IT'S A FAIR ORDER.

12          THE COURT:  OKAY.  ALL RIGHT.  THEN I'LL HAVE

13  THAT ENTERED TODAY THEN ON THAT.

14          THE OTHER IS THE MOTION TO CONTINUE, DO YOU

15  WANT TO BE HEARD ON THAT, GET YOU A NEW TRIAL DATE HERE?

16          MR. JESSEE:  YOUR HONOR, OUR CONCERN IS

17  MR. SHIPLEY AND I LITERALLY JUST GOT IN THE CASE.  WE HAVE

18  NOT NOR LOS ANGELES COUNSEL NOR DR. YOU HAS SEEN THE TRADE

19  SECRETS, THEY'RE NOT AT THE FBI OFFICE YET.  WE'LL HAVE TO

20  HIRE AN EXPERT FOR SURE, AND THE ORDER CONTEMPLATES THAT

21  THE EXPERT WILL BE PRECLUDED FROM CERTAIN WORK FOR A

22  PERIOD OF ONE YEAR, SO I, RESPECTFULLY, I NEED AS MUCH

23  TIME AS WE CAN GET TO GET THIS READY KNOWING HOW HARD IT

24  IS TO GET EXPERTS ANYHOW AND THEN FIND ONE THAT'S WILLING

25  TO NOT WORK WITH SOME OF THESE COUNTRIES FOR A YEAR AND

1   JUST GETTING IN IT -- ALTHOUGH THE CASE HAS BEEN AROUND

2   TWO MONTHS, NOBODY HAS SEEN THE TRADE SECRETS EXCEPT THE

3   GOVERNMENT.

4           MR. SHIPLEY:  AND, YOUR HONOR, JUST TO

5   SUPPLEMENT THAT, JUST TO BE QUITE FRANK WITH THE COURT, I

6   THINK THAT, I MEAN, IT'S SOMETHING WE'LL DEFINITELY HAVE

7   TO ADDRESS TODAY AS WELL WITH REGARD TO THE TRIAL DATE,

8   BUT AT THIS TIME IF THE COURT WOULD ALLOW THE ISSUE

9   REGARDING DETENTION FIRST.  THE REASON I SAY THAT IS,

10  JUDGE, I THINK THAT GOING INTO THE DECISION OF WHEN THAT

11  TRIAL SHOULD BE, I THINK THAT THE FACT OF THE ISSUE WITH

12  WHETHER OR NOT MS. YOU IS INCARCERATED OR SHE'S NOT

13  INCARCERATED COULD HAVE AN EFFECT AS WELL ON THE TIME

14  PERIOD WE'RE GOING TO NEED TO GET READY FOR TRIAL.

15          THE COURT:  YOU MEAN YOU MIGHT WANT A LONGER

16  TIME THAN DECEMBER OR --

17          MR. SHIPLEY:  NO, JUDGE.  I GUESS WHAT I'M

18  SAYING IS I KNOW AFTER SPEAKING WITH MR. HARKER, AND

19  THERE'S A BIT OF A DISCONNECT, I GUESS, I'LL CALL A

20  DISCONNECT WITH REGARD TO HOW MUCH TIME WE ARE REQUESTING

21  AND HOW MUCH TIME THE GOVERNMENT IS REQUESTING, BUT I

22  THINK IT COULD --

23          THE COURT:  WELL, THEY DIDN'T FILE A MOTION TO

24  CONTINUE; DID THEY?

25          MR. SHIPLEY:  NO, JUDGE; AND IT'S SOMETHING

1   THAT, AND HE AND I WERE JUST SPEAKING ABOUT THAT WITH

2   REGARD TO THE TIME FRAME OF THAT, BUT IT'S JUST, I'M JUST

3   RELATING TO THE COURT HER STATUS, DR. YOU'S STATUS OF

4   BEING INCARCERATED OR NOT INCARCERATED COULD AFFECT WHEN

5   WE CAN COME TO AN AGREEMENT AND PRESENT TO THE COURT OF

6   WHEN WE CAN BE READY FOR TRIAL.

7           THE COURT:  OKAY.  WELL, DO YOU -- I MEAN, WHAT

8   DO YOU WANT TO BE -- WHAT DO YOU WANT ME TO DO TODAY WITH

9   YOUR MOTION TO CONTINUE, DO YOU WANT YOUR CASE CONTINUED

10  OR YOU DON'T?

11          MR. JESSEE:  WE DO.

12          MR. SHIPLEY:  WE DO, JUDGE.

13          THE COURT:  OKAY.  I GUESS THE QUESTION IS WHEN

14  DO YOU WANT IT CONTINUED TO, AND THE ANSWER TO THAT IS YOU

15  DON'T KNOW?

16          MR. JESSEE:  WELL, AS WE EXPLAINED, YOUR HONOR,

17  I DON'T HAVE AN IDEA OF -- WITH OUR EXPERT AND DR. YOU

18  HAVING TO BE AT THE FBI BUILDING TO SEE THESE DOCUMENTS,

19  AND SHE'S INCARCERATED, WE MAY NEED A LONGER PERIOD OF

20  TIME THAN IF SHE'S NOT INCARCERATED; BUT IF YOU'RE GOING

21  TO PUT IT IN DECEMBER, THEN I THINK IF YOU PUT THE TRIAL

22  IN DECEMBER, WE CAN, IF IT BECOMES UNWIELDY, WE CAN COME

23  BACK AND SAY WE'RE JUST HAVING PROBLEMS LOOKING AT

24  DOCUMENTS.

25          THE COURT:  WELL, ABSOLUTELY; AND I WOULD HOPE,

1  WE WOULD PROBABLY NEED TO MONITOR THAT SITUATION AS WE GO

2  FORWARD AND AS, YOU KNOW, YOU ALL ARE DEVELOPING THE CASE

3  AND DOING YOUR DUE DILIGENCE.

4            YES, SIR, MR. HARKER.

5            MR. HARKER:  YOUR HONOR, LET ME JUST CLARIFY

6  SOME THINGS HERE.  THIS CASE IS NOTHING LIKE THAT LARGE

7  HEALTH CARE FRAUD CASE THAT HAS BEEN PLAGUED WITH A

8  CERTAIN LEVEL OF COMPLEXITY AND A LARGE VOLUME OF

9  DOCUMENTS.  THE GOVERNMENT IS GOING TO PUT ON A WITNESS

10  TODAY THAT IS GOING TO SHOW THE COURT AND THE DEFENDANT

11  THAT THE EVIDENCE OF CULPABILITY IS, FRANKLY, OVER-

12  WHELMING, AND THE ONLY ISSUE THAT THE DEFENSE AT THIS

13  POINT FOR PURPOSES OF DISCUSSING A MOTION TO CONTINUE HAS

14  RAISED IS WHETHER OR NOT THE ITEMS THEMSELVES ARE TRADE

15  SECRETS.  I THINK AFTER TODAY'S PRESENTATION THROUGH THE

16  WITNESS'S TESTIMONY THAT QUESTION WILL BE LARGELY

17  ADDRESSED.  NEVERTHELESS, IT'S THE GOVERNMENT'S POSITION

18  THAT IF THE DEFENSE IS GOING TO ASK FOR A CONTINUANCE

19  UNTIL DECEMBER, THAT IF THAT DATE IS NOT LONG ENOUGH FOR

20  THEM TO PROCEED TO TRIAL, THEN THE AMOUNT OF TIME THAT

21  WILL HAVE ELAPSED FROM INDICTMENT UNTIL TRIAL IN DECEMBER

22  WILL ACTUALLY EXCEED THE TOTAL AMOUNT OF TIME THAT THE

23  GOVERNMENT SPENT INVESTIGATING THE CASE.

24            NOW, I WOULD ALSO POINT OUT WE'VE ALREADY

25  TURNED OVER THE MAJORITY OF THE CASE FILES, ALL THE CHAT

MESSAGES, THE AUDIO AND VIDEO -- EXCUSE ME, AUDIO AND TEXT
MESSAGES, ALL DOCUMENTS THAT ARE NOT ALLEGEDLY TRADE
SECRETS, ALL NON-HIGHLY CONFIDENTIAL MATERIAL, WE'VE
TURNED ALL THAT STUFF OVER. WE'VE TURNED OVER ALL THE
INTERVIEW REPORTS. THEY CAN REVIEW THAT AND MAKE A
DETERMINATION AS TO WHETHER ALL OF THE ELEMENTS OF THE
OFFENSE ARE MET, OTHER THAN THE ISSUE OF WHETHER OR NOT
THERE ARE TRADE SECRETS PROBABLY WITHIN TWO WEEKS.

ON TOP OF THAT, YOUR HONOR, ON MAY 7TH THE
GOVERNMENT HAS ALREADY OFFERED AND THE DEFENSE HAS AGREED
TO ATTEND A REVERSE PROFFER. SO THE GOVERNMENT'S POSITION
IS THIS CASE CAN PROCEED TO TRIAL VERY QUICKLY. DECEMBER
IS, OUR POSITION IS WE SHOULD SET IT FOR SOMETIME EARLIER,
MAYBE SEPTEMBER; AND IF THEY NEED ADDITIONAL TIME, THEN
THEY CAN REQUEST ADDITIONAL TIME; BUT I AM, OF COURSE,
CONCERNED, YOUR HONOR, ABOUT ANOTHER MATTER PUSHING INTO
EARLY 2020 AND CONFLICTING WITH THAT OTHER LARGE TRIAL
THAT'S GOING TO GO; AND IF THE DEFENSE IS SEEKING THIS
TIME TO DELAY THE TRIAL, THIS IS AT, ENTIRELY AT THEIR
REQUEST AND THEY'RE TAKING A RISK THAT THIS COULD POTEN-
TIALLY BE A TRIAL AT A MUCH LATER DATE THAN DECEMBER.

THE COURT: ALL RIGHT. WHY DON'T WE DO THIS
THEN, WHY DON'T WE JUST, BASED ON WHAT YOU'VE SAID AND
WHAT MR. SHIPLEY AND MR. JESSEE SAID, GO AHEAD AND PROCEED
TO THE DETENTION HEARING, THEN YOU GUYS MAY FEEL

1   DIFFERENTLY OR IT MAY OR MAY NOT HAVE ANY IMPACT; BUT THEN

2   WE CAN JUST READDRESS THE MOTION TO CONTINUE AFTER THE

3   DETENTION HEARING, AND, AND YOU GUYS CAN CAUCUS AND DECIDE

4   WHAT YOU WANT TO DO, HOW YOU WANT TO PROCEED, AND WE'LL

5   GIVE YOU SOME MORE TIME, OBVIOUSLY.  YOU'RE JUST GETTING

6   INVOLVED IN THE CASE, THE CASE ISN'T GOING TO BE TRIED IN

7   JUNE, YOU'RE NOT GOING TO BE ABLE TO GET READY BY THEN,

8   BUT THEN WE CAN TALK ABOUT WHEN YOU WANT IT AND I CAN GET

9   YOU SOME EARLIER DATES, IF YOU WANT THAT, FROM JUDGE

10  GREER, OKAY.

11           MR. JESSEE:  THAT WILL BE FINE.

12           THE COURT:  IS THAT OKAY?

13           MR. JESSEE:  YEAH, LET'S --

14           THE COURT:  OKAY.  ALL RIGHT.

15           ALL RIGHT.  THIS IS A CASE IN WHICH THERE IS NO

16  PRESUMPTION OF DETENTION, AND SO THE BURDEN IS ON THE

17  UNITED STATES TO PROVE THAT SHE'S EITHER A DANGER TO THE

18  COMMUNITY OR A RISK OF FLIGHT.  I HAVE REVIEWED THE

19  PRETRIAL SERVICES REPORT.  HAVE YOU ALL HAD A CHANCE TO

20  TAKE A LOOK AT THAT, MR. HARKER?

21           MR. HARKER:  YES, YOUR HONOR.

22           THE COURT:  AND, MR. JESSEE, HAVE YOU HAD A

23  COPY, DO YOU HAVE A COPY OF THAT?

24           MR. JESSEE:  WE DO.

25           THE COURT:  ALL RIGHT.  IT RECOMMENDS --

1   ATTACHED TO IT A PRETRIAL SERVICES REPORT FROM MICHIGAN

2   WHICH RECOMMENDED RELEASE.

3            MR. JESSEE:  YES, YOUR HONOR; AND THE FRONT

4   PAGE IS THE SUMMARY FROM HERE WHICH IS TOTALLY INACCURATE

5   FACTUALLY.

6            THE COURT:  OKAY, AND, LIKE YOU MENTIONED, IT

7   HAD, THE FRONT PAGE OF IT INDICATES SOME OTHER THINGS AND

8   THAT THE PRETRIAL SERVICES, PROBATION OFFICER RECOMMENDS

9   DETENTION HERE; BUT, IN ANY EVENT, IT IS THE BURDEN ON THE

10  UNITED STATES TO PROVE THESE THINGS UP, SO.

11           MR. JESSEE:  YOUR HONOR, ONE OF THE THINGS I'M

12  CONCERNED ABOUT IS WE HAVE NOT SEEN -- HE'S GETTING READY

13  TO DO A DOG AND PONY SHOW OVER TRADE SECRETS THAT HAS

14  NOTHING TO DO WITH THIS HEARING AS SUCH TODAY BECAUSE THIS

15  IS ABOUT IS SHE A FLIGHT RISK OR A DANGER TO SOCIETY, AND

16  CERTAINLY TO ANTICIPATE, GIVEN THE FACT HE JUST SAID IT,

17  THAT HE'S GOING TO GO THROUGH HIS WHOLE CASE IN CHIEF, IS

18  IRRELEVANT AS TO THOSE TWO ELEMENTS.

19           THE COURT:  WELL, ONE OF THE ELEMENTS IS NATURE

20  AND CIRCUMSTANCES OF THE OFFENSE AND --

21           MR. JESSEE:  THEY ACCUSED HER OF STEALING TRADE

22  SECRETS.  IT'S NOT ROCKET SCIENCE IN TERMS OF WHAT SHE'S

23  ACCUSED OF.  I MEAN, A SIMILAR CASE JUST THIS WEEK IN

24  D.C., TRADE SECRETS, SAME THING, MAN GOT OUT OF FEDERAL

25  CUSTODY ON THE SAME REPORT AS THE MICHIGAN REPORT,

1   IDENTICAL, $100,000, AND HE'S BACK OUT.  WHAT'S DIFFERENT

2   IN TENNESSEE?

3           THE COURT:  OKAY.  ALL RIGHT.  WELL, THAT'S AN

4   INTERESTING POINT.

5           MR. HARKER, DO YOU WANT TO CALL YOUR FIRST

6   WITNESS?

7           MR. HARKER:  YES, YOUR HONOR.

8           LET ME JUST BRIEFLY RESPOND TO THAT.  ANOTHER

9   ISSUE THAT'S RELEVANT FOR PURPOSES OF THE DETENTION

10  HEARING IS THE STRENGTH OF THE CASE BECAUSE STRENGTH OF

11  THE CASE GOES TO LIKELIHOOD OF CONVICTION, AND LIKELIHOOD

12  OF CONVICTION GOES TO SENTENCING GUIDELINES, AND

13  SENTENCING GUIDELINES IN THIS CASE GOES TO FLIGHT RISK.

14  THE DEFENDANT IS AN EXTRAORDINARY FLIGHT RISK AND A DANGER

15  TO PROPERTY.

16          YOUR HONOR, THE GOVERNMENT CALLS SPECIAL AGENT

17  BILL LECKRONE WITH THE FBI; AND BEFORE I BEGIN, THIS IS MY

18  COLLEAGUE FROM THE DEPARTMENT OF JUSTICE, NATIONAL

19  SECURITY DIVISION, MATT WALCZEWSKI.

20          THE COURT:  OKAY.  WELCOME TO GREENEVILLE.  ARE

21  YOU FROM WASHINGTON?

22          MR. WALCZEWSKI:  YES, SIR.

23          THE COURT:  WELCOME TO EAST TENNESSEE.

24          MR. WALCZEWSKI:  THANK YOU, SIR.

25          THE COURT:  ALL RIGHT.  IS THE RULE REQUESTED?

1          MR. HARKER:  I DON'T THINK THAT'S NECESSARY,

2     YOUR HONOR.

3               THE COURT:  OKAY.

4               MR. JESSEE:  ARE YOU JUST CALLING HIM?

5               MR. HARKER:  YEAH.

6               MR. JESSEE:  BECAUSE I DO REQUEST THE RULE IF

7     ANYBODY ELSE IS GOING TO TESTIFY.

8               THE COURT:  YOU DID REQUEST THE RULE?

9               MR. HARKER:  WE DON'T HAVE ANY OTHER WITNESSES.

10              MR. JESSEE:  HE DOESN'T HAVE ANY OTHER

11    WITNESSES.

12              THE COURT:  DO YOU HAVE ANY WITNESSES?

13              MR. JESSEE:  I HAVE ONE, YOUR HONOR.

14              THE COURT:  OKAY.  ARE THEY IN THE COURTROOM?

15              MR. JESSEE:  NO, SHE'S IN THE WITNESS ROOM.

16              THE COURT:  OKAY.  ALL RIGHT.

17         WILLIAM LECKRONE, GOVERNMENT'S WITNESS, SWORN

18              MR. HARKER:  AND, YOUR HONOR, IF I COULD -- I

19    HAVE SEVERAL EXHIBITS THAT I WANT TO GO THROUGH WHICH GO

20    TO ALL THE ISSUES THAT ARE RELEVANT TODAY.  THIS IS NOT

21    THE WHOLE CASE, THIS IS ABOUT FLIGHT RISK AND ABOUT DANGER

22    TO PROPERTY, BUT THE STRENGTH OF THE CASE IS RELEVANT; AND

23    IF I COULD, I'D LIKE TO HAND YOUR HONOR A COPY OF THOSE

24    EXHIBITS AND HAND A COPY TO THE WITNESS.  I THINK THAT

25    WILL FACILITATE THE TESTIMONY AND MAKE IT GO FASTER.  I'VE

1    ALSO PROVIDED A COPY TO THE DEFENSE.

2              THE COURT:  OKAY.  ALL RIGHT.

3    DIRECT EXAMINATION

4    BY MR. HARKER:

5    Q.    SPECIAL AGENT LECKRONE, IF YOU COULD STATE AND SPELL

6    YOUR FULL NAME FOR THE RECORD, PLEASE.

7    A.    MY NAME IS WILLIAM LECKRONE, L E C K R O N E.

8    Q.    WHERE ARE YOU CURRENTLY EMPLOYED?

9    A.    I'M EMPLOYED BY THE FBI IN KNOXVILLE, TENNESSEE.

10   Q.    WHICH SECTION OF THE FBI ARE YOU EMPLOYED BY?

11   A.    THE NATIONAL SECURITY BRANCH SPECIFIC TO THE

12   COUNTERINTELLIGENCE SECTION.

13   Q.    HOW LONG HAVE YOU BEEN THERE?

14   A.    SINCE MAY 2012.

15   Q.    WERE YOU INVOLVED IN THE INVESTIGATION OF

16   DR. XIAORONG YOU?

17   A.    YES.

18   Q.    AND LIU XIANGCHEN?

19   A.    YES.

20   Q.    WERE YOU THE LEAD AGENT IN THAT INVESTIGATION?

21   A.    YES.

22   Q.    WHEN DID THAT INVESTIGATION BEGIN?

23   A.    APPROXIMATELY JULY 2018.

24   Q.    AS PART OF THAT INVESTIGATION DID YOU OBTAIN SEARCH

25   WARRANTS?

1   A.    YES.

2   Q.    DID YOU AND OTHER AGENTS CONDUCT INTERVIEWS OF A

3   NUMBER OF WITNESSES?

4   A.    YES.

5   Q.    AND AS A RESULT OF THAT INVESTIGATION, WERE YOU

6   ULTIMATELY INVOLVED IN THE ARREST OF THE DEFENDANT IN

7   MICHIGAN?

8   A.    YES.

9   Q.    AND DID YOU INTERVIEW HER AT THAT TIME?

10  A.    YES, I DID.

11  Q.    NOW, I'M GOING TO PUT ON THE OVERHEAD PROJECTOR WHAT

12  I'M CALLING EXHIBIT NUMBER 1.  THERE'S A BLOWN-UP COPY OF

13  THIS TO YOUR RIGHT THERE, AGENT LECKRONE.  HAVE YOU HAD AN

14  OPPORTUNITY TO LOOK AT ALL THESE ENTRIES AND CONFIRM THAT

15  THEY ARE ACCURATE?

16  A.    YES, I HAVE.

17  Q.    AND IS EACH ONE OF THESE DIFFERENT ENTRIES, DOES IT

18  CORRESPOND TO AN ITEM OF EVIDENCE THAT YOU OBTAINED AS

19  PART OF THE INVESTIGATION?

20  A.    YES.

21  Q.    SO JUST BRIEFLY, WE WON'T GO THROUGH ALL OF THESE

22  RIGHT NOW, BUT WE'LL GO THROUGH THEM THROUGH YOUR TESTI-

23  MONY, THE RED, WHAT DOES THAT INDICATE, THE RED BOXES?

24  A.    THE RED INDICATES SPECIFIC TIMES OR DATES WHERE

25  MS. YOU TRAVELED.

Q.   AND THE BLUE -- AND IN PARTICULAR TRAVELED TO WHICH

LOCATION?

A.   TO CHINA.

Q.   THE BLUE, ARE THOSE VARIOUS TEXT MESSAGES OR

SUMMARIES OF TEXT MESSAGES AND VOICE MAIL MESSAGES THAT

WERE OBTAINED AS PART OF THE INVESTIGATION?

A.   THEY ARE.

Q.   AND THE GRAY, DOES THAT CORRESPOND TO EVENTS THAT

UNFOLDED THAT YOU DISCOVERED AS PART OF THE INVESTIGATION?

A.   YES.

Q.   AS PART OF THE INVESTIGATION WERE YOU ABLE TO

DETERMINE WHERE DR. YOU WORKED DURING HER TWO MOST RECENT

STINTS OF EMPLOYMENT?

A.   YES.

Q.   AND WHERE WAS THAT?

A.   DR. YOU WORKED AT THE COCA-COLA COMPANY, I BELIEVE

IT'S 2012 UP TO LATE AUGUST 2017, AT WHICH TIME SHE WAS

PART OF WHAT WAS CONSIDERED A, CALLED A LEAN CENTER CUT

INITIATIVE.  COCA-COLA DOWNSIZED, AND DR. YOU LOST HER

JOB, AND SHE WAS HIRED AT EASTMAN CHEMICAL UNTIL JUNE

2018.

Q.   DID SHE START AT EASTMAN CHEMICAL AROUND LATE

AUGUST, EARLY SEPTEMBER 2018 --

A.   YES.

Q.   -- 2017?

A.    YES.

Q.    AND CONTINUED THERE UNTIL WHEN?

A.    JUNE 22, 2018.

Q.    WHAT SPECIAL TYPES OF SKILLS, JUST VERY GENERALLY, DID DR. YOU HAVE THAT CAUSED BOTH COCA-COLA AND EASTMAN TO WANT TO HIRE HER?

A.    DR. YOU IS WELL EDUCATED, HAS A PH.D. IN POLYMER ENGINEERING, I BELIEVE; AND SPECIFICALLY AT COCA-COLA SHE WORKED ON A PROJECT TO PICK OR SELECT A BISPHENOL-A NON-INTENDED PRODUCT THAT'S UTILIZED TO LINE THE COATINGS OF BEVERAGE CONTAINERS.  SHE WORKED ON THAT PROJECT AT COCA-COLA AND THEN WAS HIRED TO DO THE SAME AT EASTMAN CHEMICAL COMPANY.

Q.    AND WE'LL COME BACK TO SOMETHING YOU JUST MENTIONED, BISPHENOL-A, IN A SECOND, BUT WHAT IS THIS, EXHIBIT NUMBER 2?

A.    THIS IS THE RESUME OF THE DEFENDANT, MS. YOU.

Q.    WAS IT THE RESUME THAT SHE USED TO GET THE JOB AT EASTMAN CHEMICAL?

A.    YES.

Q.    SO IT DOESN'T DEPICT HER EASTMAN EMPLOYMENT ON HERE, ALTHOUGH SHE WAS EMPLOYED AT EASTMAN; IS THAT CORRECT?

A.    THAT IS CORRECT.

Q.    IF YOU COULD READ THE HIGHLIGHTED SECTION AT THE TOP THERE.

1  A.    SUMMARY OF QUALIFICATIONS INCLUDE HIGHLY EFFECTIVE

2  ORGANIC AND POLYMER CHEMIST WITH BROAD CAPABILITIES IN

3  FORMULATION, ORGANIC SYNTHESIS, DISPERSION, FOOD/BEVERAGE

4  PACKAGING AND INGREDIENTS AS WELL AS YEARS EXPERIENCE

5  DEVELOPING POLYMERS, COATINGS, ADHESIVES, EMULSIONS, FOOD/

6  BEVERAGE PACKAGING AND PRODUCTS.   PROVEN ABILITY TO

7  RAPIDLY TRANSFORM MARKET CONCEPTS INTO HIGHLY PROFITABLE

8  PRODUCTS.

9  Q.    AND ON THE NEXT PAGE OF HERE ON EXHIBIT 2, WHERE WAS

10 DR. YOU EDUCATED AND WHAT DEGREE DID SHE OBTAIN AT THE

11 HIGHEST LEVEL?

12 A.    SHE HAS A PH.D. SHE EARNED IN 1999 IN POLYMER

13 SCIENCE AND ENGINEERING, EMULSION POLYMERS INSTITUTE &

14 CENTER FOR POLYMER SCIENCE AND ENGINEERING AT LEHIGH

15 UNIVERSITY IN BETHLEHEM, PENNSYLVANIA.

16 Q.    BASED ON YOUR INVESTIGATION IS IT FAIR TO SAY THAT

17 DR. YOU HAS EXTENSIVE EXPERIENCE WITH WHAT'S CALLED

18 BISPHENOL-A, OR BPA, AND BISPHENOL-FREE OR BPA-FREE

19 POLYMER TECHNOLOGY, COATINGS TECHNOLOGY?

20 A.    YES.

21 Q.    SO BRIEFLY FOR THE COURT, WHAT IS BPA AND ITS

22 ALTERNATIVE BPA-FREE BASED UPON WHAT YOU LEARNED IN YOUR

23 INVESTIGATION?

24 A.    BPA, IT'S A POLYMER COMPOUND BASICALLY UTILIZED TO

25 LINE THE INSIDE OR COAT FOOD AND BEVERAGE CONTAINERS.   IT

1  WAS USED FOR A NUMBER OF YEARS SUCCESSFULLY, DESIGNED TO

2  MINIMIZE THE IMPACT THAT THE PRODUCT WITHIN THE CONTAINER

3  HAD ON THE CAN OR THE CONTAINER, AS WELL AS THE CONTAINER

4  CONTAMINATING THE FOOD PRODUCT THAT'S WITHIN.

5  Q.    YOU'RE NOT AN EXPERT IN BPA OR BPA-FREE; ARE YOU?

6  A.    NO, I AM NOT.

7  Q.    AS PART OF YOUR INVESTIGATION DID YOU LEARN AT SOME

8  POINT WHETHER OR NOT THE MARKET WANTED TO SHIFT FOR SOME

9  REASON FROM BPA TO BPA-FREE COATINGS?

10  A.    YES.

11  Q.    AND WHAT DID YOU LEARN?

12  A.    APPROXIMATELY 2011 THE FRENCH LED THE CHARGE IN

13  MOVING AWAY FROM BPA LINED PRODUCTS AND REQUIRED THAT A

14  NEW PRODUCT BE USED, AND THUS THE EVOLUTION OF BPA-FREE OR

15  BPA NON-INTENDED, AND IT WAS BASED OFF OF PERCEIVED HEALTH

16  CONCERNS THAT MIGHT BE ASSOCIATED WITH BPA.  CALIFORNIA

17  WOULD LATER FOLLOW SUIT IN WHAT IS CALLED PROPOSITION 65

18  INITIATIVE.

19  Q.    IS THIS SIGNIFICANT OR INSIGNIFICANT FROM AN

20  ECONOMIC PERSPECTIVE, THE DEVELOPMENT OF BPA-FREE

21  TECHNOLOGY?

22  A.    I WOULD LEARN THAT THIS IS AN EXTREMELY SIGNIFICANT

23  TECHNOLOGY AND A DEVELOPMENT, BEEN TOLD THAT IT IS

24  ESTIMATED AROUND $3 BILLION A YEAR INDUSTRY.

25  Q.    BASED ON YOUR INVESTIGATION WERE COCA-COLA AND

1   EASTMAN CHEMICAL INTERESTED IN THIS TYPE OF TECHNOLOGY?

2   A.    YES, THEY WERE.  IN FACT, THE ENTIRE INDUSTRY IS

3   INTERESTED IN COMING UP WITH THE BEST CAN COATING PRODUCT

4   THAT THEY CAN DEVELOP.

5   Q.    WHILE DR. YOU WORKED AT COCA-COLA, WAS COCA-COLA

6   ENGAGED WITH OR DID IT HAVE AGREEMENTS WITH OTHER

7   COMPANIES FOR THE PURPOSES OF DEVELOPING RESEARCH AND

8   TECHNOLOGY IN THE BPA-FREE SPACE?

9   A.    COCA-COLA DID.  THEY HAD, THEY HAD TO MEET THE TIME

10  LINE SET BY THE FRENCH, WHICH PUT A HUGE EMPHASIS ON

11  DEVELOPING THIS TECHNOLOGY QUICK, FAST AND IN A HURRY; SO

12  THEY WENT OUT AND CAME TO AGREEMENTS WITH THE INDUSTRY TO

13  HAVE THE INDUSTRY'S GEN 1 AND GEN 2 BPA-NI PRODUCTS SENT

14  TO COCA-COLA FOR TESTING AND ANALYSIS TO LATER BE UTILIZED

15  IN COCA-COLA PRODUCTS.

16  Q.    SO COCA-COLA WANTED THIS BPA-FREE TECHNOLOGY?

17  A.    THEY WANTED IT AND THEY NEEDED IT.  THEY REQUIRED --

18  THE LAW WOULD REQUIRE THEM TO HAVE A BPA-FREE PRODUCT TO

19  PUT THEIR PRODUCT IN TO SELL IN FRANCE.

20  Q.    AS PART OF THAT PROCESS OF ENTERING INTO AGREEMENTS

21  WITH OTHER COMPANIES, DID COCA-COLA ENTER INTO

22  NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS?

23  A.    YES.

24  Q.    AS A RESULT OF THOSE AGREEMENTS, DID THOSE COMPANIES

25  IN FACT SHARE WHAT THEY CLAIM ARE TRADE SECRETS WITH

1  COCA-COLA?

2  A.    YES.

3  Q.    AND FOR PURPOSES OF THE INVESTIGATION AND THE

4  INDICTMENT, WHICH COMPANIES SHARED TRADE SECRETS WITH

5  COCA-COLA TO ALLOW COCA-COLA TO ADVANCE RESEARCH AND

6  DEVELOPMENT IN THIS AREA?

7  A.    SOME OF THOSE COMPANIES INCLUDE DOW CHEMICAL,

8  VALSPAR, WHICH IS A SUBSIDIARY OF SHERWIN-WILLIAMS, BASF,

9  TOYOCHEM, PPG AND OTHERS.

10  Q.    AKZONOBEL AS WELL?

11  A.    YES.

12  Q.    AND ALL THOSE COMPANIES ARE IDENTIFIED BY PSEUDONYMS

13  IN THE INDICTMENT; IS THAT RIGHT?

14  A.    THAT IS CORRECT.

15  Q.    SO THE NONDISCLOSURE AGREEMENTS THAT YOU MENTIONED

16  THAT COKE ENTERED INTO WITH THESE VARIOUS COMPANIES, HAVE

17  YOU OBTAINED COPIES OF THOSE TYPES OF AGREEMENTS FROM

18  COCA-COLA?

19  A.    YES.

20  Q.    DO SOME OF THOSE AGREEMENTS LIMIT WHICH PERSONNEL

21  CAN ACCESS THE TRADE SECRETS?

22  A.    THEY DO.

23  Q.    AND IN THIS INVESTIGATION WHEN THOSE AGREEMENTS

24  LIMITED THE PERSONNEL, WAS DR. YOU INCLUDED ON THAT

25  LIST?

1  A.    SHE WAS INCLUDED AND SOMETIMES THE ONLY POINT OF

2  CONTACT; AND WE RECENTLY OBTAINED E-MAILS THAT SUGGESTED

3  THAT DR. YOU WAS VERY COGNIZANT OF THAT, THAT SHE WAS THE

4  ONLY POINT OF CONTACT THAT WAS TO REVIEW THIS TRADE SECRET

5  INFORMATION THAT WAS SHARED BY THE VICTIM COMPANIES AND

6  PROHIBITED SHARING THAT INFORMATION WITH HER PEERS AT THE

7  COCA-COLA COMPANY.

8  Q.    IS IT FAIR TO SAY BASED UPON YOUR INVESTIGATION THAT

9  ONE OF THE DEFENDANT'S PRIMARY JOBS WHILE AT COKE WAS THE

10  REVIEW OF BPA-FREE TECHNOLOGY SHARED WITH COCA-COLA BY

11  THOSE COMPANIES THAT YOU MENTIONED?

12  A.    YES.

13  Q.    EARLIER YOU SAID THAT DR. YOU WAS ULTIMATELY LAID

14  OFF FROM COCA-COLA; IS THAT CORRECT?

15  A.    THAT IS CORRECT.

16  Q.    AND WHEN APPROXIMATELY WAS SHE NOTIFIED THAT SHE WAS

17  GOING TO BE LAID OFF?

18  A.    I BELIEVE IT WAS LATE JUNE 2017.

19  Q.    AND WHEN WAS THE ACTUAL EFFECTIVE DATE OF THAT

20  TERMINATION, THE LAYOFF?

21  A.    THE LAST DAY OF AUGUST.

22  Q.    SO APPROXIMATELY SIX WEEKS, TWO MONTHS LATER?

23  A.    YES.

24  Q.    AND WHEN DID SHE BEGIN WORK AT EASTMAN CHEMICAL?

25  A.    APPROXIMATELY SEPTEMBER 1ST.

1  Q.    LATE AUGUST, EARLY SEPTEMBER?

2  A.    THAT IS CORRECT.

3  Q.    DO YOU KNOW WHY IT WAS THAT EASTMAN CHEMICAL DECIDED

4  TO HIRE THE DEFENDANT?

5  A.    SPECIFICALLY FOR HER KNOWLEDGE AND INDUSTRY KNOW-HOW

6  RELATED TO BPA-NI PRODUCTS.

7  Q.    DID AGENTS INTERVIEW A NUMBER OF EMPLOYEES FROM

8  EASTMAN CHEMICAL?

9  A.    YES.

10 Q.    AND WHAT WAS -- DID THEY INTERVIEW HER

11 SUPERVISORS?

12 A.    YES.

13 Q.    WHAT WAS THOSE SUPERVISORS' UNDERSTANDING OF THE

14 TYPE OF EMPLOYEE THAT DR. YOU WAS?

15 A.    DR. YOU WAS NOT GIVEN A RESOUNDING RECOMMENDATION

16 FROM HER, HER MANAGEMENT.  ONE MANAGER DESCRIBED HER AS A

17 NIGHTMARE, OTHERS DESCRIBED HER AS UNWILLING TO WORK ON

18 THE PRODUCT THAT THEY WANTED; THAT SHE CONTINUALLY WORKED

19 ON PRODUCTS THAT EASTMAN WASN'T ATTEMPTING TO DEVELOP;

20 THAT SHE WAS RELUCTANT TO GO TO THE LAB SPACE AND THAT SHE

21 WAS COUNSELED ON MULTIPLE OCCASIONS.

22 Q.    DID EASTMAN CHEMICAL ULTIMATELY FIRE THE DEFENDANT

23 FOR CAUSE?

24 A.    THAT IS CORRECT.

25 Q.    AND WHEN DID THAT HAPPEN?

1   A.    ON JUNE 22, 2018.

2   Q.    EXPLAIN WHAT YOU LEARNED AS PART OF YOUR

3   INVESTIGATION AS TO WHY THAT HAPPENED.

4   A.    IT'S LIKE I SAID, DR. YOU HAD BEEN COUNSELED ON

5   MULTIPLE OCCASIONS FOR THE WAY THAT SHE HAD TREATED FELLOW

6   EMPLOYEES, THE WAY SHE INTERACTED WITH CUSTOMERS AND

7   VENDORS AT EASTMAN; BUT THE FINAL STRAW CAME WHEN EASTMAN

8   SENT DR. YOU TO CHINA TO WORK WITH THEIR SHANGHAI BRANCH.

9   EASTMAN WOULD LATER LEARN THAT THAT WAS BECAUSE DR. YOU

10   HAD ENCOURAGED SHANGHAI TO REACH OUT AND REQUEST HER

11   PRESENCE TO ASSIST THEM IN DEVELOPING THEIR IMAGE BECAUSE,

12   AS SHE PUT IT, SHE WAS FAMOUS IN THE INDUSTRY AND THAT SHE

13   NEEDED TO GO TO CHINA FOR THIS TRIP IN MAY OF 2018.

14   DR. YOU MANAGED TO LEAVE HER WORK AT EASTMAN, UNAPPROVED

15   LEAVE, AND GO TO CHINA EARLY, AND THEN WHEN ASKED TO COME

16   HOME WAS RELUCTANT TO DO SO AND STAYED LONGER THAN EASTMAN

17   HAD, HAD APPROVED HER TO GO AND TRAVEL TO SHANGHAI.

18   Q.    LET ME DIRECT YOUR ATTENTION TO EXHIBIT 1 HERE,

19   LETTER D AS IN DAVID.  FROM APRIL 27TH THROUGH MAY 24,

20   2018, DID YOUR INVESTIGATION SHOW THAT THE DEFENDANT WAS

21   IN CHINA TO MEET WITH A COMPANY CALLED WEIHAI JINHONG

22   GROUP?

23   A.    IT DID.

24   Q.    AND WHAT IS WEIHAI JINHONG GROUP?

25   A.    WEIHAI IS A CITY IN THE SHANDONG PROVINCE.  JINHONG

1  GROUP IS A COMPANY THAT WORKS IN WEIHAI.

2  Q.    AND AT THE END IT SAYS, AND TO MEET WITH WEIHAI

3  JINHONG GROUP AND XIANGCHEN.  XIANGCHEN IS THE OTHER NAMED

4  DEFENDANT IN THIS CASE; IS THAT RIGHT?

5  A.    THAT IS CORRECT.

6  Q.    WHAT'S HIS RELATIONSHIP TO WEIHAI JINHONG GROUP?

7  A.    HE'S A CHIEF ENGINEER.  HE MAKES THE TECHNOLOGY

8  HAPPEN THERE AT WEIHAI JINHONG GROUP.

9  Q.    FROM APRIL 27TH UNTIL MAY 24TH WAS THE DEFENDANT

10 STILL EMPLOYED AT EASTMAN CHEMICAL?

11 A.    SHE WAS.  EASTMAN THOUGHT THEY WERE SENDING HER ON

12 AN EIGHT DAY TRIP TO CHINA TO WORK WITH THEIR SHANGHAI

13 GROUP.

14 Q.    SO EASTMAN -- DID EASTMAN UNDERSTAND THAT THE

15 DEFENDANT WAS GOING TO MEET WITH THE WEIHAI JINHONG GROUP

16 AND XIANGCHEN?

17 A.    NO.

18 Q.    BEFORE THIS INVESTIGATION BEGAN, HAD EASTMAN EVER

19 HEARD ABOUT WEIHAI JINHONG GROUP OR XIANGCHEN?

20 A.    NO.

21 Q.    SO THAT WAS -- THAT ENDS MAY 24TH.  YOU SAID THE

22 DEFENDANT WAS TERMINATED ON JUNE 22, 2018, ABOUT A MONTH

23 LATER; IS THAT CORRECT?

24 A.    THAT'S CORRECT.

25 Q.    WHAT HAPPENED, IF YOU CAN LOOK AT THOSE LETTER G ON

1   JUNE 21ST AT 12:26 TO 12:40 P.M.?

2   A.      SO ON JUNE 21ST THE DECISION WAS MADE TO FORMALLY

3   COUNSEL MS. YOU, AND SHE WAS NOTIFIED THAT SHE NEEDED TO

4   COME MEET WITH HR AND HER MANAGEMENT; AND BETWEEN 12:26

5   AND 12:40 DR. YOU, UTILIZING A GOOGLE DRIVE ACCOUNT,

6   DOWNLOADED SEVERAL EASTMAN DOCUMENTS ONTO HER PERSONAL

7   GOOGLE DRIVE ACCOUNT JUST MINUTES -- THE MEETING THAT SHE

8   WAS SUPPOSED TO ATTEND WAS AT 1:00.

9   Q.      AND TO BE FAIR, AS PART OF THE INVESTIGATION DID YOU

10  LATER OBTAIN EVIDENCE THAT THERE WERE IN FACT EASTMAN

11  FILES ON DR. YOU'S GOOGLE DRIVE ACCOUNT?

12  A.      YES.

13  Q.      AND DID THE FORENSIC EVIDENCE SHOW THAT THOSE FILES

14  WERE UPLOADED BETWEEN 12:26 AND 12:40 ON JUNE 21ST?

15  A.      THAT IS CORRECT.

16  Q.      BUT TECHNICALLY YOU DON'T KNOW THAT THE DEFENDANT

17  UPLOADED THOSE FILES, IS THAT FAIR, OR DO YOU KNOW?

18  A.      I ASKED MS. YOU IN MICHIGAN, AND SHE ACKNOWLEDGED

19  THAT SHE MOVED THE FILES, BUT STATED THAT SHE DID IT

20  BECAUSE SHE BELIEVED SHE WAS GOING TO BE FIRED AND SHE

21  WANTED TO TAKE HER PERSONAL DOCUMENTS WITH HER.

22  Q.      AND THAT WAS 20 MINUTES BEFORE 1:00 P.M. ON THAT

23  DATE; IS THAT RIGHT?

24  A.      THAT IS CORRECT.

25  Q.      AND WHAT HAPPENED AT 1:00 P.M. ON JUNE 21ST?

A.     AT 1:00 P.M. SHE WAS, THE OFFICIAL COUNSELING BEGAN,

AND INCLUDED WERE MEMBERS FROM EASTMAN'S HR AND HER SECOND

LEVEL SUPERVISOR, AND THEY GOT THROUGH -- IT WAS A MUL-

TIPLE PAGE DOCUMENT, THEY GOT THROUGH PAGE 2, AND HER

SECOND LEVEL SUPERVISOR DEEPAK KATARIA (PH) ACKNOWLEDGED

THAT DR. YOU TOOK THE PAPERS AND THREW THEM AT THE

INDIVIDUALS AND BECAME VERY ANGRY; AND SO EASTMAN ELECTED

TO STOP THE MEETING FOR THE DAY, LET COOLER HEADS PREVAIL,

AND ASKED DR. YOU TO GO HOME AND WORK FROM HOME FOR THE

REST OF THE DAY UNTIL THEY COULD COME BACK TOMORROW AND

RECONVENE.

Q.     DURING THAT MEETING DID DR. YOU MENTION THAT SHE

HAD, OR SOMEBODY HAD, SHE HAD UPLOADED EASTMAN FILES TO

HER PERSONAL GOOGLE DRIVE ACCOUNT?

A.     NO.

Q.     AND WHAT HAPPENED ON JUNE 22, THE NEXT DAY?

A.     WELL, IN BETWEEN THAT TIME PERIOD, IT WAS -- DR. YOU

DIDN'T GO HOME AND WORK, INSTEAD, SHE TOURED THE EASTMAN

FACILITIES LOOKING FOR EXECUTIVE MANAGEMENT TO COMPLAIN

AND TALK TO; AND SO EVENTUALLY SHE DOES GO HOME, AND

EASTMAN FORENSIC SECURITY OFFICERS IDENTIFIED DOCUMENTS

THAT WERE BEING MOVED FROM HER EASTMAN LAPTOP TO A

PERSONAL HARD DRIVE, AT WHICH POINT EASTMAN ELECTED TO

TERMINATE DR. YOU'S EMPLOYMENT.

Q.     WAS THAT ON THE EVENING OF JUNE 21ST?

1    A.    YES.

2    Q.    SO SOMEBODY AT EASTMAN USING THEIR TECHNICAL

3    CAPABILITIES, IF I UNDERSTAND YOUR TESTIMONY CORRECTLY,

4    WAS ABLE TO DETERMINE THAT DR. YOU HAD TRANSFERRED FILES

5    FROM HER WORK COMPUTER; IS THAT RIGHT?

6    A.    THAT IS CORRECT.

7    Q.    SO MOVING NOW TO JUNE 22ND, WHAT HAPPENS ON JUNE

8    22ND?

9    A.    SO THE CONTINUATION OF THE INTERNAL INVESTIGATION AT

10   EASTMAN HAPPENED, AND THEY WERE ABLE TO CLEARLY IDENTIFY

11   DOCUMENTS WITHIN THE HARD DRIVE, AND THEY COULD SEE,

12   BASICALLY, A MAP OF THE HARD DRIVE THAT HAD TOUCHED THE

13   EASTMAN LAPTOP, AND SO THEY ELECTED TO TERMINATE MS. YOU.

14   THAT MEETING WAS PUSHED TO 3:00 P.M., AT WHICH TIME THEY

15   BROUGHT HER IN.  I GOT THE IMPRESSION IT WAS A RELATIVELY

16   QUICK MEETING, THAT SHE WAS GOING TO BE TERMINATED AND

17   THAT THEY WERE GOING TO NEED HER DEVICES BACK, TO INCLUDE

18   HER LAPTOP, AN ISSUED APPLE IPHONE, AND THEY QUESTIONED

19   DR. YOU ABOUT HER MOVEMENT OF EASTMAN PROPRIETARY TRADE

20   SECRET INFORMATION ONTO A PERSONAL DEVICE.

21   Q.    AND WHAT DID SHE SAY IN RESPONSE TO THAT QUESTION

22   ABOUT MOVING FILES?

23   A.    ORIGINALLY SHE DENIED IT, BUT EVENTUALLY SHE

24   ADMITTED THAT SHE MOVED ONE DOCUMENT AND THAT IT MIGHT

25   HAVE JUST SLIPPED IN, IT WAS SOMETHING TO DO WITH NEXT

1    GEN; AND THE HR DEPARTMENT REALLY HUNG ONTO THAT CONCEPT

2    OF NEXT GENERATION TECHNOLOGY.

3    Q.    THE WORD "NEXT GEN" OR PHRASE "NEXT GEN" MEANT

4    SOMETHING TO THEM?

5    A.    THAT IS CORRECT.

6    Q.    WE'LL COME BACK TO THAT IN A SECOND, BUT THIS

7    QUESTION ABOUT MOVING FILES, THAT PERTAINED TO EASTMAN'S

8    DISCOVERY THAT FILES HAD BEEN MOVED TO ANOTHER DRIVE; IS

9    THAT CORRECT?

10   A.    YES.

11   Q.    ANOTHER PHYSICAL DRIVE, NOT THE OTHER SEPARATE ISSUE

12   OF MOVING FILES UP TO THE GOOGLE DRIVE ACCOUNT; IS THAT

13   RIGHT?

14   A.    EASTMAN WAS UNAWARE OF THE GOOGLE DRIVE MOVEMENT AT

15   THAT TIME.

16   Q.    SO ON JUNE 22ND DURING THAT SECOND MEETING, DID THE

17   DEFENDANT MENTION ANYTHING ABOUT THOSE EASTMAN FILES SHE

18   HAD MOVED TO HER GOOGLE DRIVE ACCOUNT?

19   A.    NO.

20   Q.    I'M GOING TO SHOW YOU NOW WHAT'S BEEN MARKED AS

21   EXHIBIT 3.  DO YOU RECOGNIZE THIS?

22   A.    I DO.

23   Q.    WHAT IS THIS HARD DRIVE AND HOW DID THE FBI COME TO

24   POSSESS IT, IF YOU COULD EXPLAIN THAT TO THE COURT?

25   A.    SO HR EMPLOYEES AND SECURITY OFFICIALS AT EASTMAN,

1   FIRST THEY TOOK DR. YOU'S APPLE IPHONE AND LAPTOP, AND
2   THEY STARTED REVIEWING THE IPHONE AND FOUND PICTURES OF A
3   LABORATORY AT EASTMAN THAT CONTAINS SENSITIVE MACHINERY;
4   SO THEY PUT THE PHONE IN AIRPLANE MODE AND SEIZED IT AND
5   THEN BEGAN TO ASK DR. YOU OR INFORM DR. YOU THAT THEY WERE
6   GOING TO SEIZE THE HARD DRIVE WHERE THEY HAD SEEN THEIR
7   DOCUMENTS MOVED TO.
8   Q.    AND WHERE WAS THAT HARD DRIVE AT THE TIME THAT
9   EASTMAN TOLD THE DEFENDANT THAT THEY INTENDED TO SEIZE
10  IT?
11  A.    IT WAS LOCATED AT DR. YOU'S HOME.
12  Q.    SO WHAT HAPPENED NEXT?
13  A.    SO THREE EMPLOYEES FROM EASTMAN FOLLOWED DR. YOU TO
14  HER HOME.  DR. YOU AT FIRST ASKED THEM TO STAY OUTSIDE AT
15  THE GATE.  THEY DEMANDED THAT THEY COME WITHIN THE GATE.
16  DR. YOU WENT INSIDE TO HER HOUSE, RETRIEVED THE HARD DRIVE
17  AND BROUGHT IT OUT.  CACY FINK IS IN IT SECURITY AT
18  EASTMAN, HE KNEW THE EXACT PATH BASED ON THE ANALYSIS THAT
19  WAS PROVIDED EARLIER OF HOW TO REVIEW THE MATERIALS ON THE
20  HARD DRIVE.  HE PLUGGED IT INTO A LAPTOP.
21  Q.    AND JUST TO BE CLEAR, EVERYBODY'S STILL RIGHT
22  OUTSIDE OF DR. YOU'S HOME; IS THAT CORRECT?
23  A.    YES, THIS IS HAPPENING ON TOP OF CACY FINK'S JEEP.
24  Q.    ON TOP OF HIS JEEP?
25  A.    YES.

1    Q.    AND HE'S GOT A LAPTOP WITH HIM?

2    A.    YES.

3    Q.    SO DID HE TAKE THE HARD DRIVE THAT'S PICTURED IN

4    THIS EXHIBIT 3 AND CONNECT IT TO THAT LAPTOP?

5    A.    CORRECT.

6    Q.    AND WHAT DID HE DO, OR WHAT DID HE FIND?

7    A.    HE WAS ABLE TO NAVIGATE RATHER QUICKLY TO WHERE THE

8    EASTMAN TRADE SECRETS WERE IDENTIFIED.

9    Q.    DID THE DEFENDANT SAY ANYTHING AT THAT TIME?

10   A.    YES.

11   Q.    WHAT DID SHE SAY?

12   A.    MS. YOU WAS BEHIND MR. FINK AND INSTRUCTED HIM TO

13   DELETE THE FILES, SAYING SOMETHING ALONG THE LINES OF

14   THOSE ARE THE FILES THAT THEY WANT DELETED, JUST DELETE

15   THEM.

16   Q.    AND WHAT DID CASEY FINK DO?

17   A.    HE DID NOT.  HE SEIZED THIS HARD DRIVE HERE AND

18   BROUGHT IT BACK TO EASTMAN IN ORDER TO CONDUCT FORENSIC

19   ANALYSIS AND THEIR OWN INTERNAL INVESTIGATION.

20   Q.    AT THIS POINT IN THE INVESTIGATION WAS THE FBI

21   INVOLVED?

22   A.    NO.

23   Q.    WAS ANY GOVERNMENT AGENT AT ALL INVOLVED IN THIS

24   INVESTIGATION OR AWARE OF IT?

25   A.    NO.

1  Q.    NOT AT DR. YOU'S HOME?

2  A.    NO.

3  Q.    AT SOME POINT DID EASTMAN COME TO REALIZE THAT THIS

4  HARD DRIVE MIGHT CONTAIN INFORMATION IN ADDITION TO

5  EASTMAN CHEMICAL'S PROPRIETARY INFORMATION?

6  A.    THAT'S CORRECT.

7  Q.    WHEN THEY REALIZED THAT, WHAT DID THEY DO?

8  A.    SO EASTMAN WAS ATTEMPTING TO -- THEY BOUGHT DR. YOU

9  ANOTHER HARD DRIVE, AND THEY WERE GOING TO MOVE HER

10  PERSONAL MATERIAL FROM THIS HARD DRIVE TO THE NEW HARD

11  DRIVE SO NO FEELINGS WERE HURT ABOUT HER LOSING A HARD

12  DRIVE; AND AS THEY WERE DOING THAT, THEY WERE REVIEWING

13  THE MATERIAL WITHIN, AND THEY FOUND AND LOCATED FILE

14  FOLDERS THAT CLEARLY INDICATED OTHER COMPANIES'

15  INFORMATION WAS CONTAINED WITHIN.

16  Q.    DID THOSE COMPANIES INCLUDE THE ONES YOU MENTIONED,

17  AKZONOBEL, BASF, DOW CHEMICAL AND SO FORTH?

18  A.    THAT'S CORRECT.

19  Q.    AT THAT POINT DID EASTMAN CONTACT THE FBI?

20  A.    YES.

21  Q.    AND WAS THIS HARD DRIVE THEN SUBJECT TO A SEARCH

22  WARRANT THAT THE FBI OBTAINED?

23  A.    IT WAS.

24  Q.    AND THEN THE FBI TOOK OVER THE INVESTIGATION; IS

25  THAT FAIR?

1    A.    YES.

2    Q.    SO WHAT DID THE FBI DO AFTER IT GOT, JUST BRIEFLY,

3    GOT THIS HARD DRIVE?

4    A.    WE MADE CONTACT WITH COCA-COLA COMPANY AND CONFIRMED

5    DR. YOU'S EMPLOYMENT THERE AND THAT SHE WOULD HAVE HAD

6    ACCESS TO THIS TYPE OF INFORMATION WHILE EMPLOYED AT

7    COCA-COLA, AND THEN WE BEGAN THE PROCESS OF SEGREGATING

8    THE INFORMATION INTO SPECIFIC COMPANIES, AND THEN WE MADE

9    OUTREACH WITH THE VICTIM COMPANIES AND SUBMITTED THEIR

10   INFORMATION TO THEM FOR REVIEW.

11   Q.    DID YOU COPY IT TO A DISK OR A THUMB DRIVE OR

12   SOMETHING LIKE THAT?

13   A.    THAT'S CORRECT.

14   Q.    SO IS IT FAIR TO SAY THAT YOU SENT INFORMATION THAT

15   APPEARED TO BELONG TO AKZONOBEL TO AKZONOBEL?

16   A.    YES.

17   Q.    AND THEN SAME WITH THE OTHER COMPANIES?

18   A.    YES.

19   Q.    DID YOU THEN RECEIVE RESPONSES FROM THOSE

20   COMPANIES?

21   A.    THOSE COMPANIES WERE ASKED TO IDENTIFY SUBJECT

22   MATTER EXPERTS WHO UNDERSTOOD THE TECHNOLOGY AND GIVE US

23   AN OPINION OF WHETHER THIS WAS INFORMATION THAT DR. YOU

24   SHOULD HAVE AND IF IT HAD -- IF THEY WOULD HAVE ANY

25   CONCERN TO WHETHER OR NOT SHE STILL RETAINED THIS

1    INFORMATION (UNINTELLIGIBLE).

2    Q.    DID SOME OF THOSE SUBJECT MATTER EXPERTS PROVIDE

3    DECLARATIONS OR AFFIDAVITS?

4    A.    YES.

5    Q.    DID SOME OF THEM ALSO PERFORM, OR PROVIDE INTERVIEWS

6    TO THE FBI?

7    A.    YES.

8    Q.    LET ME SHOW YOU NOW WHAT'S BEEN MARKED AS EXHIBIT

9    NUMBER 4, DO YOU RECOGNIZE THIS DOCUMENT?

10   A.    I DO.

11   Q.    AND IF YOU CAN READ THE HIGHLIGHTED SECTIONS,

12   PLEASE.  WE WON'T READ THE WHOLE THING.

13   A.    "I, ROB LAGENDIJK, DECLARE AS FOLLOWS:  I AM THE

14   TECHNICAL DIRECTOR OF INDUSTRIAL COATINGS AT AKZONOBEL

15   COATINGS INDUSTRIAL, AKZONOBEL, AND HAVE PERSONAL

16   KNOWLEDGE OF THE MATTERS STATED HEREIN.

17           "I RECEIVED A B.S. IN CHEMICAL ENGINEERING FROM

18   THE HAGUE UNIVERSITY OF APPLIED SCIENCES" --

19           MR. JESSEE:  YOUR HONOR, I'M GOING TO OBJECT.

20   A.    -- "IN 1997."

21           THE COURT:  HOLD ON JUST A SECOND.

22           WHAT'S YOUR OBJECTION?

23           MR. JESSEE:  WE HAVE NO WAY OF KNOWING -- FOR

24   ME TO STAND HERE AND SAY THEY'RE NOT TRADE SECRETS HAS AS

25   MUCH MEANING AS FOR HIM TO STAND THERE AND SAY THEY ARE.

1   WE DON'T HAVE ANY IDEA WHAT THEY ARE, SO I JUST WANT TO

2   CONTINUE AN OBJECTION.

3           THE COURT:  OKAY.

4           MR. JESSEE:  HOW DOES THIS APPLY TO WHETHER

5   IT'S A FLIGHT RISK OR NOT OR HOW SHE IS A DANGER TO

6   SOCIETY?  THEY DID ALL THIS INVESTIGATION BEFORE THE FBI

7   GETS IN, WE DON'T KNOW WHO HAS HAD ACCESS, TO START OUT

8   WITH, TO THIS STUFF, SO IT'S ALL TAINTED WHEN EASTMAN GETS

9   IT.  RESPECTFULLY, IT'S IRRELEVANT TO THIS PURPOSE OF THIS

10  HEARING.

11          THE COURT:  OKAY.  AS FAR AS THE RELEVANCY

12  OBJECTION, I THINK THE INFORMATION ABOUT THIS INFORMATION,

13  I THINK, IS RELEVANT TO NATURE AND CIRCUMSTANCES OF THE

14  OFFENSE; AND I THINK YOU'RE LAYING THE GROUNDWORK FOR HER,

15  HER PATTERN OF BEHAVIOR, IT LOOKS LIKE TO ME, IN AN EFFORT

16  TO PERHAPS STEAL THE TRADE SECRET INFORMATION OR WHAT SHE

17  BELIEVED TO BE TRADE SECRET INFORMATION, AND I GUESS

18  THAT'S WHAT YOU'RE DOING.

19          MR. HARKER:  AND, YOUR HONOR, I WOULD ADD THAT

20  THERE ARE -- WE'RE NOT GOING TO GO THROUGH ALL OF THEM.

21          THE COURT:  RIGHT.

22          MR. HARKER:  THERE ARE SEVEN APPROXIMATELY

23  UNAFFILIATED MAJOR NATIONAL AND INTERNATIONAL

24  CORPORATIONS, ALL OF WHICH HAVE, OR MOST OF WHICH HAVE

25  SIGNED SWORN AFFIDAVITS LIKE THE ONE WE'RE LOOKING AT

1  HERE, SAYING THESE ARE TRADE SECRETS; SO THIS IS NOT A

2  TRIAL.  THIS GOES TO THE STRENGTH OF THE CASE, THE NATURE

3  AND CIRCUMSTANCES OF THE CASE, WHICH GOES TO THE FLIGHT

4  RISK; AND NOT ONLY THAT, YOUR HONOR, I'LL POINT OUT THAT

5  WHAT WE'LL SEE ON THE NEXT FEW PAGES IS THE VALUE OF THESE

6  TRADE SECRETS IN JUST THE COST TO PRODUCE IS

7  EXTRAORDINARY.

8          MR. JESSEE:  THAT'S NOT THE TEST FOR A TRADE

9  SECRET.  TO START OUT WITH, WE DON'T KNOW WHAT THEY ARE;

10 AND IN THE INDICTMENT THEY TALK ABOUT PATENTS, ALL THE

11 PATENTS.  PATENTS ARE PUBLIC RECORD, THEY'RE NOT TRADE

12 SECRETS.

13         THE COURT:  OKAY.

14         MR. HARKER:  LET ME JUST CORRECT, YOUR HONOR --

15         MR. JESSEE:  THIS IS TRIAL BY TRICK.

16         MR. HARKER:  YOUR HONOR, THE INDICTMENT DOES

17 NOT MENTION THE WORD "PATENT".  THIS IS A GREAT ARGUMENT

18 THE DEFENDANTS CAN MAKE IN A MOTION TO DISMISS OR A TRIAL.

19 I DON'T THINK IT'S A GOOD ARGUMENT, FRANKLY, BUT IT'S AN

20 ARGUMENT THAT'S PROPER --

21         THE COURT:  AS FAR AS I'M CONCERNED, I THINK

22 THIS STUFF IS RELEVANT, AND I'M GOING TO OVERRULE THE

23 OBJECTION; AND I WILL ALLOW YOU TO HAVE A CONTINUING

24 OBJECTION TO IT SO YOU WON'T FEEL LIKE YOU'RE GOING TO

25 HAVE TO CONTINUE TO OBJECT.

1          MR. JESSEE:  THANK YOU, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  GO AHEAD.

3     BY MR. HARKER:

4     Q.    GO AHEAD, AGENT LECKRONE, I THINK YOU WERE IN THE

5     MIDDLE OF PARAGRAPH 2.

6     A.    "I RECEIVED A B.S. IN CHEMICAL ENGINEERING FROM THE

7     HAGUE UNIVERSITY OF APPLIED SCIENCES IN 1997, A M.S. IN

8     CHEMICAL TECHNOLOGY FROM DELFT UNIVERSITY OF TECHNOLOGY IN

9     1999, AND AN MBA FROM NYENRODE UNIVERSITY IN 2010.  I'VE

10    WORKED IN THE AREA OF COATING TECHNOLOGY AT AKZONOBEL FOR

11    OVER 18 YEARS AND I AM BASED IN THE NETHERLANDS.

12          "I HAVE RECEIVED THE CONTENTS OF THE DISK

13    FORWARDED TO AKZONOBEL BY THE FBI.  I UNDERSTAND THE

14    CONTENTS OF THE DISK WERE IN POSSESSION OF MS. XIAORONG

15    'SHANNON' YOU, A FORMER EMPLOYEE OF COCA-COLA COMPANY."

16    Q.    AGENT LECKRONE, HERE IN THE MIDDLE OF THIS EXHIBIT

17    IS A BIG BLACK SQUARE.  THE DOCUMENT WAS NOT PROVIDED TO

18    US IN THAT FORM; IS THAT CORRECT?

19    A.    THAT'S CORRECT.

20    Q.    THAT'S JUST A REDACTION OF THE FILE NAMES THAT

21    MR. LAGENDIJK SAID HE REVIEWED?

22    A.    YES.

23    Q.    SO TURNING NOW TO THE NEXT PAGE, IF YOU CAN READ THE

24    HIGHLIGHTED SECTIONS ON THIS PAGE AS WELL.

25    A.    "THE FORMULATIONS TO WHICH DOCUMENTS 1 THROUGH 8

1  PERTAIN RELATES TO BPA-NI FORMULATIONS AKZONOBEL HAS BEEN

2  WORKING ON FOR AT LEAST 10 YEARS WITH SIGNIFICANT TIME,

3  PERSONNEL AND FINANCIAL EXPENDITURE."

4       "BASED ON A REVIEW OF THE DOCUMENTS, IT IS

5  EVIDENT THAT MS. YOU CAME INTO POSSESSION OF THESE

6  DOCUMENTS AS A RESULT OF AKZONOBEL HAVING PROVIDED THESE

7  DOCUMENTS TO COCA-COLA."

8       "DOCUMENTS 1, 3, 4 AND 8 CONTAIN DETAILED

9  INFORMATION ON OUR COATING FORMULATIONS."  "WHICH REFLECT

10 AKZONOBEL'S TRADE SECRET FORMULATIONS, IDENTIFY ALL THE

11 INDIVIDUAL COMPONENTS OF OUR FORMULATION AND THEIR

12 RESPECTIVE AMOUNTS."

13      "THE INFORMATION CONTAINED IN DOCUMENTS 1

14 THROUGH 8 ARE HIGHLY SENSITIVE AND CONFIDENTIAL

15 INFORMATION."

16 Q.   NOW, THE NEXT PAGE, IF YOU COULD READ THAT

17 HIGHLIGHTED TEXT AS WELL.

18 A.   "AKZONOBEL WOULD SUFFER A LOSS OF MARKET SHARE AND

19 SIGNIFICANT PROFIT LOSSES IF THESE FORMULATIONS ARE

20 PROVIDED TO A COMPETITOR."  "AKZONOBEL SALES ARE ESTIMATED

21 AT 150 MILLION EURO FOR THIS TYPE OF APPLICATION.  IF A

22 COMPETITOR IS ABLE TO MIMIC OUR TECHNOLOGY, OUR SALES AND

23 PROFITS WILL LIKELY DECLINE.  NEXT TO THIS, OUR MARKET

24 POSITION COULD BE COMPROMISED AND OUR OVERALL LEVERAGE

25 DURING COMMERCIAL TENDERS AND SALES OF ANCILLARY PRODUCTS

1   WILL BE AFFECTED.  THE ESTIMATED LOSS TO AKZONOBEL COULD

2   EASILY BE UP TO 60 MILLION EURO OVER A PERIOD OF THREE

3   YEARS."

4          "THE OVERALL COST OF R&D SPENT IN DEVELOPING

5   THESE COATING FORMULATIONS IS ESTIMATED AT MORE THAN 6.5

6   MILLION EUROS OVER THE LAST NINE YEARS."

7   Q.    NOW, DOWN THERE AT THE BOTTOM THERE'S A DIFFERENT

8   COLOR HIGHLIGHTING.  AS PART OF THE INVESTIGATION DID THE

9   FBI UNCOVER A POWER POINT SLIDE ON ANY OF DR. YOU'S

10  DEVICES?

11  A.    YES.

12  Q.    AND WHAT WAS THE NATURE OF THAT POWER POINT SLIDE?

13  A.    THIS POWER POINT SLIDE WAS UTILIZED BY DR. YOU IN

14  HER ATTEMPT TO GAIN ACCESS TO A TALENT PROGRAM KNOWN IN

15  CHINA AS THE THOUSAND TALENT PROGRAM.

16  Q.    WHAT IS THE THOUSAND TALENT, AGENT LECKRONE?

17  A.    CHINA SPONSORS TALENT PROGRAMS TO MEET SPECIFIC

18  TECHNOLOGICAL AND ECONOMIC GOALS, CHIEFLY IS THE THOUSAND

19  TALENTS PROGRAM WHICH IS DESIGNED TO ENTICE WESTERN

20  EDUCATED, EXPERIENCED AND TRAINED INDIVIDUALS TO RETURN TO

21  CHINA AND HELP ACCOMPLISH THOSE GOALS.  IT IS A VERY

22  STRINGENT AND COMPETITIVE APPLICATION PROCESS, WHICH

23  INCLUDES A PRESENTATION FROM THE APPLICANT TO A BOARD.

24  Q.    IN CHINA?

25  A.    YES.

1  Q.    IS THERE A FINANCIAL REWARD THAT GOES WITH THESE

2  PROGRAMS?

3  A.    THERE ARE NUMEROUS AWARDS THAT GO WITH THIS PROGRAM,

4  TO INCLUDE FINANCIAL ENHANCEMENTS.

5  Q.    IS IT FAIR TO SAY THAT THE AWARDS ARE LUCRATIVE?

6  A.    THEY'RE LUCRATIVE.  I MEAN, A LOT OF TIME IT

7  INCLUDES FUNDING FOR RESEARCH, LAB SPACE, INSURANCE,

8  HOUSING, EASY ACCESS INTO AND OUT OF CHINA, ET CETERA.

9  Q.    IS IT A PRESTIGEOUS AWARD?

10 A.    VERY.

11 Q.    NOW, UP HERE, IN THIS LETTER A, 6/18/2017 AND JULY

12 24, 2017, IT SAYS, XIANGCHEN TELLS THE DEFENDANT HE IS

13 PREPARING A THOUSAND TALENTS PROGRAM APPLICATION FOR HER.

14 AS PART OF THE INVESTIGATION DID AGENTS UNCOVER TEXT OR

15 VOICE MESSAGES THAT SHOW XIANGCHEN COMMUNICATING THIS

16 INFORMATION TO THE DEFENDANT?

17 A.    WE DID.

18 Q.    IN THE NEXT LINE ON JULY 24TH, IT SAYS, YISHI-YIYI

19 PROGRAM, IS THAT SIMILAR TO THE THOUSAND TALENTS

20 PROGRAM?

21 A.    SIMILAR, EXCEPT FOR THE FACT THAT THE THOUSAND

22 TALENT PROGRAM IS AT THE STATE OF CHINA LEVEL.  THE

23 YISHI-YIYI PROGRAM IS AT THE SHANDONG PROVINCE LEVEL WHERE

24 WEIHAI JINHONG AND XIANGCHEN LIU ACTUALLY WORKED.  THEY

25 SPONSORED DR. YOU'S APPLICATION TO BOTH AWARDS.  THE

1    SHANDONG PROVINCE YISHI-YIYI AWARD WAS SPECIFIC TO WHERE

2    THE SPONSOR AND THE AWARDEE WOULD FORM A NEW COMPANY, AND

3    THAT COMPANY BASED ON DR. YOU'S EXPERTISE WOULD THEN BRING

4    ECONOMIC GROWTH AND DEVELOPMENT TO THE SHANDONG PROVINCE.

5    Q.    SO THESE AWARD PROGRAMS, THOUSAND TALENT AND

6    YISHI-YIYI, ARE SPONSORED BY THE CHINESE GOVERNMENT; IS

7    THAT CORRECT?

8    A.    THAT'S CORRECT.

9    Q.    BOTH THE PRC ON THE ONE HAND AND A PROVINCIAL LEVEL

10   GOVERNMENT ON THE OTHER?

11   A.    YES.

12   Q.    IS IT FAIR TO SAY THAT THESE PROGRAMS ARE DESIGNED

13   TO ENCOURAGE PEOPLE TO BRING TECHNOLOGY AND EXPERTISE BACK

14   TO CHINA?

15   A.    YES.

16   Q.    AND THEY'RE STATE FUNDED PROGRAMS?

17   A.    THAT'S CORRECT.

18   Q.    IS THE FBI AWARE OF THESE PROGRAMS IN OTHER CASES?

19   A.    YES.

20   Q.    NOW, MOVING BACK TO AKZONOBEL'S DECLARATION, YOU

21   TESTIFIED EARLIER THAT THE INVESTIGATORS UNCOVERED A POWER

22   POINT SLIDE ON ONE OF DR. YOU'S DEVICES, WHAT DID THAT

23   POWER POINT SLIDE APPEAR TO BE?

24   A.    THIS IS CLEARLY LABELED ON THE FRONT, XIAORONG YOU,

25   THOUSAND TALENTS PROGRAM, AND THIS WAS HER PRESENTATION.

1  Q.    AND WHAT WERE SOME OF THE SLIDES THAT WERE IN THAT

2  PRESENTATION?

3  A.    CONTAINED WITHIN WERE BASICALLY A RESUME OF WHO

4  DR. YOU WAS, WHERE SHE HAD WORKED, WHERE SHE WAS EDUCATED;

5  AND THEN AS IT PROGRESSED, IT WAS -- IT CONTAINED

6  BASICALLY SHORT AND LONG-TERM GOALS FOR WEIHAI JINHONG

7  GROUP AND DR. YOU'S COLLABORATION MOVING FORWARD UNDER THE

8  THOUSAND TALENT FUNDING.

9  Q.    DID YOU SEND A COPY OF THOSE SLIDES TO SOME OF THESE

10  COMPANIES THAT YOU SENT THE CONFIDENTIAL FILES AND ALLEGED

11  TRADE SECRETS TO?

12  A.    WE EXTRACTED ONLY THE GOALS PORTION AND SUBMITTED

13  THE GOALS TO THE COMPANIES FOR REVIEW.

14  Q.    AND WHAT DID MR. LAGENDIJK SAY ABOUT THE SLIDES THAT

15  HE REVIEWED, IF COULD YOU READ THAT HIGHLIGHTED BLUE

16  TEXT?

17  A.    "THE FBI HAS FORWARDED SEVERAL SLIDES WHICH PERTAIN

18  TO FUTURE GOALS BY MS. YOU.  I HAVE REVIEWED THESE SLIDES.

19  THESE GOALS RELATE TO THE DESIRE AND NEED FOR BPA-NI

20  COATING FORMULATIONS IN CHINA WHICH ADDRESSES MATERIALS OF

21  CONCERN, BISPHENOL-A AND OTHER TOXICS, AND HAVE COMPARABLE

22  COATING CHARACTERISTICS AS EPOXY AND OTHER TRADITIONAL

23  COATING COMPOSITIONS."

24  Q.    BEFORE WE PROCEED, THE PHRASE "BPA-NI", DOES THAT

25  STAND FOR BISPHENOL-A NON-INTENDED?

1  A.    YES.

2  Q.    DOES THE INDUSTRY USE THAT ACRONYM BPA-NI TO MEAN

3  THE SAME THING AS BPA-FREE?

4  A.    YES.

5  Q.    AND WHAT DID -- AT THE END OF THIS DOCUMENT, WHAT

6  DID MR. LAGENDIJK SAY ABOUT THE GOALS STATED IN DR. YOU'S

7  POWER POINT PRESENTATION?

8  A.    "THE AKZONOBEL DOCUMENTS CAN BE UTILIZED TO ADVANCE

9  THESE GOALS, AS THESE DOCUMENTS PERTAIN TO BOTH OUR

10 CURRENT (AT THE TIME) BPA-NI FORMULATIONS AND FUTURE, NEXT

11 GENERATION BPA-NI TECHNOLOGY THAT WAS, AND STILL IS UNDER

12 CONTINUOUS RESEARCH AND DEVELOPMENT."

13 Q.    AND MR. LAGENDIJK DECLARED THAT THESE STATEMENTS

14 WERE TRUE --

15 A.    YES, HE DID.

16 Q.    -- ON OR ABOUT NOVEMBER 14TH OF LAST YEAR; IS THAT

17 RIGHT?

18 A.    YES.

19 Q.    I'LL SHOW YOU NOW WHAT'S BEEN MARKED AS EXHIBIT

20 NUMBER 5, AND WE'LL START SPEEDING THIS UP.  IF YOU COULD

21 JUST READ THE HIGHLIGHTED PORTIONS OF THIS DECLARATION AS

22 WELL.

23 A.    "I, JONATHAN F. MASON," "OBTAINED A BACHELOR OF

24 SCIENCE WITH HONORS IN CHEMICAL ENGINEERING FROM QUEEN'S

25 UNIVERSITY, KINGSTON, ONTARIO, CANADA IN 1989.

1          "I HAVE OVER 29 YEARS OF EXPERIENCE IN CHEMICAL

2    INDUSTRY, APPROXIMATELY 16 YEARS OF EXPERIENCE IN CHEMICAL

3    FIELDS FOR COATINGS, AND 8 YEARS OF EXPERIENCE IN THE CAN

4    COATING FIELD."

5          "I'M CURRENTLY AN ASSOCIATE RESEARCH AND

6    DEVELOPMENT DIRECTOR WITH THE DOW CHEMICAL COMPANY, DOW,

7    WORKING IN THE DOW COATING MATERIALS BUSINESS, AND I HAVE

8    HELD THIS POSITION FOR, FOR 8 YEARS."

9          "I AM INFORMED THE DOCUMENTS IN THE ATTACHED

10   SCHEDULE A WERE RECEIVED BY COUNSEL FOR THE DOW CHEMICAL

11   COMPANY BY MAIL FROM AGENTS FOR THE FEDERAL BUREAU OF

12   INVESTIGATION ON OR ABOUT SEPTEMBER 11, 2018."

13         "I HAVE PERSONALLY REVIEWED EACH OF THE 36

14   DOCUMENTS LISTED IN THE ATTACHED SCHEDULE A."

15         "TURNING FROM THE CONFIDENTIALITY OBLIGATIONS

16   TO MY EVALUATION OF THE DOCUMENTS IN SCHEDULE A," "THE

17   LISTED DOCUMENTS APPEAR TO INCLUDE THE MOST SENSITIVE

18   INFORMATION."

19         "IN MY OPINION, THE DOW CONFIDENTIAL DOCUMENTS

20   LISTED IN SCHEDULE A FALL INTO TWO VALUE CATEGORIES, HIGH

21   AND MEDIUM, AS EXPLAINED BELOW.

22         "'HIGH VALUE' DOCUMENTS CONTAIN TRADE SECRET

23   INFORMATION REGARDING THE COMPOSITION OF DOW'S POLYOLEFIN

24   DISPERSIONS OR PODS PRODUCTS FOR BEVERAGE CAN COATING

25   APPLICATIONS.  AS A CONSERVATIVE ESTIMATE, THIS INFORMA-

TION COST DOW OVER 25 MILLION (PRIMARILY IN DIRECT R&D

EXPENSES) AND TOOK OVER 8 YEARS TO DEVELOP.  AT ITS PEAK,

OVER 20 RESEARCHERS AND OTHER DOW PERSONNEL WORKED ON THE

PROGRAM.  DOW INCURRED THESE EXPENSES TO DEVELOP VARIOUS

EXPERIMENTAL AND COMMERCIAL PODS PRODUCTS WITH THE

EXPECTATION OF SELLING THEM PROFITABLY IN THE MARKET.

DOW'S COMMERCIALIZATION EFFORTS ARE WELL ADVANCED, AS

THESE PRODUCTS HAVE BEEN SOLD PROFITABLY TO DATE, AND DOW

EXPECTS THE MARKET FOR POD PRODUCTS TO GROW VERY

SUBSTANTIALLY IN THE NEXT 3 TO 5 YEARS.  COMPETITION TO

DEVELOP PRODUCTS FOR THIS MARKET IS BOTH BROAD AND

INTENSE, AND ANY DISCLOSURE TO COMPETITORS OR POTENTIAL

CUSTOMERS (OUTSIDE OF A CONFIDENTIALITY AGREEMENT) WOULD

HELP THEM AVOID SIMILAR SIGNIFICANT R&D EXPENDITURES AND

DELAYS, ENABLE THEM TO MORE SUCCESSFULLY POSITION THEIR

COMPETING PRODUCTS AGAINST DOW'S POD PRODUCTS, OR POTEN-

TIALLY BLOCK DOW'S ABILITY TO SECURE PATENT PROTECTION,

ANY OF WHICH WOULD HARM DOW BY PLACING IT AT A COMPETITIVE

DISADVANTAGE."

Q.    THAT WAS SIGNED BY MR. MASON ON SEPTEMBER 26TH?

A.    YES.

Q.    AND THOSE ARE THE REDACTED FILES THAT HE REVIEWED ON

THE BACK; IS THAT CORRECT?

A.    CORRECT.

Q.    SHOW YOU EXHIBIT NUMBER 6, IF YOU CAN READ THE

1   HIGHLIGHTED PORTIONS OF THIS ONE.

2   A.     "I, DAVID S. BEM, PH.D., AT THE REQUEST OF THE

3   DEPARTMENT OF JUSTICE, HEREBY ATTEST UNDER PENALTY OF

4   PERJURY THE FOLLOWING:

5          "I HOLD A PH.D. IN INORGANIC CHEMISTRY FROM THE

6   MASSACHUSETTS INSTITUTE OF TECHNOLOGY.

7          "I CURRENTLY SERVE AS VICE PRESIDENT OF SCIENCE

8   AND TECHNOLOGY AND CHIEF TECHNOLOGY OFFICER AT PPG

9   INDUSTRIES, INC. (PPG)."

10         "THE FEDERAL BUREAU OF INVESTIGATION, (FBI),

11  PROVIDED TO PPG COPIES OF PPG DOCUMENTS THAT IT OBTAINED

12  IN THE COURSE OF ITS INVESTIGATION INTO THE THEFT OF PPG

13  TRADE SECRETS.

14         "I'VE REVIEWED ALL THE DOCUMENTS PROVIDED TO

15  PPG.

16         "BASED ON MY PERSONAL KNOWLEDGE AS THE CHIEF

17  TECHNOLOGY OFFICER AND VICE-PRESIDENT OF SCIENCE AND

18  TECHNOLOGY AT PPG INDUSTRIES, INC., I ATTEST THE DOCUMENTS

19  THE FBI PROVIDED CONTAIN PROPRIETARY AND CONFIDENTIAL

20  INFORMATION AS WELL AS PPG TRADE SECRETS ABOUT THE

21  PRODUCTS LISTED IN APPENDICES A AND B."

22  Q.     THERE'S ONE SENTENCE ON THE NEXT PAGE, PARAGRAPH 12.

23  A.     "BASED ON CONSULTATION WITH PPG'S DEVELOPMENT TEAMS

24  AS WELL AS THE PPG FINANCE DEPARTMENT, AT THIS TIME I

25  DETERMINE THAT PPG HAS INVESTED AT LEAST $39,046,410.69 IN

1  RESEARCH AND DEVELOPMENT COSTS FOR PRODUCTS LISTED IN

2  APPENDIX B."

3  Q.    AND THEN DR. BEM SIGNED THIS ON DECEMBER 11, 2018;

4  IS THAT RIGHT?

5  A.    YES.

6  Q.    AND THOSE ARE SOME OF THE FILES THAT DR. BEM

7  REVIEWED; IS THAT CORRECT --

8  A.    THAT IS CORRECT.

9  Q.    -- REDACTED ON THE BACK THERE?

10          AND ONE MORE OF THESE.  THIS IS EXHIBIT NUMBER

11  7, IF YOU COULD READ THE HIGHLIGHTED SECTION HERE.

12  A.    "MY NAME IS THOMAS MALLEN.  I AM OVER THE AGE OF

13  EIGHTEEN, HAVE PERSONAL KNOWLEDGE OF ALL MATTERS SET FORTH

14  HEREIN AND AM OTHERWISE COMPETENT TO TESTIFY.

15          "I AM CURRENTLY EMPLOYED BY THE

16  SHERWIN-WILLIAMS COMPANY (SW), AS IT'S GLOBAL DIRECTOR

17  PACKAGING REGULATORY AFFAIRS AND STRATEGIC PROBLEM

18  SOLVING."

19          "BASED ON ANNUAL SALES SHERWIN-WILLIAMS IS A

20  LEADING GLOBAL SUPPLIER OF PACKAGING COATINGS TO THE LIGHT

21  METAL PACKAGING INDUSTRY, INCLUDING THE METAL FOOD AND

22  BEVERAGE CAN INDUSTRY.  MANY OF THESE SALES, AND

23  ESPECIALLY IN THE AREA OF FDA COMPLIANT FOOD-CONTACT

24  PACKAGING COATINGS, ARE DIRECTLY ATTRIBUTABLE TO

25  SHERWIN-WILLIAMS' PROPRIETARY TECHNOLOGIES AND ITS

1  SIGNIFICANT, AND CONTINUAL, INVESTMENT IN RESEARCH AND

2  DEVELOPMENT.  SOME OF SHERWIN-WILLIAMS MOST SUCCESSFUL

3  PACKAGING COATING PRODUCTS, INCLUDING THOSE COVERED BY

4  PATENTS, INCORPORATE TRADE SECRETS THAT HAVE REMAINED

5  VALUABLE TRADE SECRETS."

6            "SHERWIN-WILLIAMS HAS BEEN PROVIDED COPIES BY

7  THE FEDERAL BUREAU OF INVESTIGATION, FBI, OF CERTAIN

8  SHERWIN-WILLIAMS DOCUMENTS THAT WERE INDICATED TO HAVE

9  BEEN IN MS. YOU'S POSSESSION LONG AFTER HER EMPLOYMENT AT

10 THE COCA-COLA COMPANY."  "SHERWIN-WILLIAMS CAN CONFIRM

11 THAT THE DOCUMENTS INCLUDE VARIOUS DIFFERENT

12 SHERWIN-WILLIAMS TRADE SECRETS, INCLUDING TRADE SECRETS

13 RELATING TO MULTIPLE OF SHERWIN-WILLIAMS' VALPURE NON-BPA

14 BEVERAGE CAN COATING PRODUCTS".

15            "SHERWIN-WILLIAMS HAD INVESTED OVER $30 MILLION

16 IN THE DEVELOPMENT OF JUST ITS VALPURE V70 SERIES OF

17 PRODUCTS."  "ANNUAL SALES OF $50 TO 60 MILLION IN THE U.S.

18 ARE PROJECTED FOR 2019, WITH ADDITIONAL SALES GROWTH

19 EXPECTED IN SUBSEQUENT YEARS."

20 Q.    DID THE FBI ALSO PROVIDE SHERWIN-WILLIAMS WITH A

21 COPY OF SOME OF THOSE POWER POINT SLIDES THAT YOU

22 DISCUSSED EARLIER?

23 A.    YES.

24 Q.    WHAT DID THEY SAY?

25 A.    "THE FBI HAS ALSO PROVIDED SHERWIN-WILLIAMS WITH A

1  COPY OF A TRANSLATED PRESENTATION DOCUMENT."

2  Q.    NOW, ON THE NEXT PAGE WHAT WAS THEIR CONCLUSION

3  ABOUT THOSE POWER POINT SLIDES, THE GOALS SECTION?

4  A.    "THUS, THERE'S CLEAR DANGER THAT MS. YOU WOULD RELY

5  ON THE BPA-NI CAN COATING FORMULATION INFORMATION

6  CONTAINED IN THE SEIZED SHERWIN-WILLIAM DOCUMENT TO

7  ACHIEVE HER STATED GOALS, AS WELL AS THE TEST METHODS,

8  COATING EVALUATION STRATEGIES, AND PRODUCT PERFORMANCE

9  PROFILES ALSO CONTAINED THEREIN."

10  Q.    NOW, THAT'S THE LAST OF THE DOCUMENTS FOR PURPOSES

11  OF DECLARATIONS AND AFFIDAVITS THAT WE'LL GO THROUGH, BUT

12  IS IT FAIR TO SAY THAT TOYOCHEM AND BASF AND EASTMAN ALSO

13  PROVIDED SIMILAR STATEMENTS?

14  A.    YES.

15  Q.    DID MANY OF THOSE AFFIANTS HAVE PERSONAL WORKING

16  EXPERIENCE WITH DR. YOU WHILE SHE WAS AT COCA-COLA?

17  A.    MANY OF THEM DID, YES.

18  Q.    AND DID THEY KNOW WHETHER SHE WAS SUBJECT TO ANY

19  CONFIDENTIALITY AGREEMENTS?

20  A.    THEY DID.

21  Q.    OKAY.  LET ME SHOW YOU NOW EXHIBIT NUMBER 8.  WHAT

22  IS THIS A PICTURE OF?

23  A.    THIS IS AN EXHIBIT, THIS IS A PICTURE OF THE FILE

24  FOLDER STRUCTURE ON MS. YOU'S REMOVABLE HARD DRIVE SEIZED

25  ORIGINALLY BY EASTMAN.

1    Q.    AND THE HIGHLIGHTING WAS ADDED FOR THE PURPOSES OF

2    TODAY'S TESTIMONY; IS THAT CORRECT?

3    A.    THAT IS CORRECT.

4    Q.    SO THE FILES AKZO, BASF, DOW, PPG, TOYOCHEM AND

5    VALSPAR, THOSE WERE NAMED THAT WAY ON THE HARD DRIVE

6    SEIZED FROM THE DEFENDANT; IS THAT RIGHT?

7    A.    YES.

8    Q.    AND INSIDE THOSE FOLDERS, WHAT WAS IN THEM?

9    A.    DOCUMENTS RELATED TO COATING TECHNOLOGY ASSOCIATED

10   WITH EACH INDIVIDUAL COMPANY.

11   Q.    THOSE WERE THE FILES THAT YOU SENT TO THE VARIOUS

12   COMPANIES THAT WE JUST DISCUSSED?

13   A.    THAT'S CORRECT.

14   Q.    INSIDE OF THESE FOLDERS?

15   A.    YES.

16   Q.    WAS A FORENSIC ANALYSIS CONDUCTED ON THIS HARD

17   DRIVE?

18   A.    IT WAS.

19   Q.    WHEN WERE THESE FOLDERS CREATED?

20   A.    THE MATERIAL WITHIN THE FOLDERS CAME AT A LATER

21   DATE, BUT THE FOLDERS THEMSELVES WERE CREATED ON AUGUST

22   16, 2017.

23   Q.    WHAT HAPPENED THE NEXT DAY?

24   A.    THE NEXT DAY MS. YOU LEAVES FOR CHINA TO DEFEND AND

25   TRY AND EARN THE YISHI-YIYI AWARD.

1    Q.    SO WAS SHE IN CHINA FROM AUGUST 17TH TO AUGUST

2    23RD?

3    A.    THAT'S CORRECT.

4    Q.    WAS SHE STILL LINED UP WITH COCA-COLA?  EXCUSE ME,

5    WAS SHE STILL EMPLOYED AT COCA-COLA?

6    A.    YES, SHE WAS.

7    Q.    AND SHE HAD A JOB LINED UP WITH EASTMAN CHEMICAL OR

8    WAS ABOUT TO START A JOB WITH EASTMAN CHEMICAL?

9    A.    IT WOULD SEEM THAT WAY.  I'M NOT SURE WHEN SHE BEGAN

10   CONVERSATIONS WITH EASTMAN CHEMICAL.

11   Q.    DID EITHER COCA-COLA OR EASTMAN CHEMICAL HAVE

12   KNOWLEDGE THAT THE DEFENDANT WENT TO CHINA IN AUGUST OF

13   2017?

14   A.    NO.

15   Q.    WHAT HAPPENED EIGHT AND SIX DAYS BEFORE AUGUST 16TH?

16   A.    ON AUGUST 8TH, 2017, AN INDIVIDUAL NAMED DANA BREED

17   AT THE COCA-COLA COMPANY CAME TO DR. YOU AND EXPLAINED

18   THAT DR. YOU WOULD HAVE TO HAND OVER ALL OF THE INFORMA-

19   TION THAT SHE OBTAINED WHILE EMPLOYED AT THE COCA-COLA

20   COMPANY RELATED TO BPA-NI PRODUCTS, SPECIFICALLY THE

21   INFORMATION CONTAINED AND RELATED TO WHAT THEY REFER TO AS

22   VENDORS, OR THE VICTIMS IN THIS CASE, THAT SHE WAS SUP-

23   POSED TO TURN THAT MATERIAL OVER, AND MS. YOU WAS PROVIDED

24   WITH A SECURE HARD DRIVE TO PUT THAT MATERIAL ON.

25   Q.    BY COCA-COLA?

1    A.    YES; THAT WAS APPROXIMATELY 4:00 P.M.

2    Q.    DID, GO AHEAD, DID THE DEFENDANT EVER PROVIDE THAT

3    HARD DRIVE WITH THE TRADE SECRET AND CONFIDENTIAL

4    INFORMATION ON IT?

5    A.    THAT HARD DRIVE WAS NOT PROVIDED.  IN FACT, IT WAS

6    RETURNED TO COCA-COLA EMPTY.

7    Q.    WHAT HAPPENED ON AUGUST 10, 2017?

8    A.    WELL, PRIOR TO THAT, IF YOU DON'T MIND.

9    Q.    YEAH, GO AHEAD.

10   A.    COCA-COLA IN THEIR LEAN CENTER INITIATIVES HAD

11   DEPLOYED SOFTWARE WHICH PROHIBITED INDIVIDUALS WORKING AT

12   COKE FROM DOWNLOADING COKE MATERIAL ONTO PERSONAL HARD

13   DRIVES; SO APPROXIMATELY TWO HOURS AFTER MS. BREED

14   ATTEMPTS TO, OR INFORMS DR. YOU THAT SHE'S NOT ALLOWED TO

15   TAKE THAT MATERIAL WITH HER, LOGS ON COCA-COLA'S SECURITY

16   APPARATUS, CONFIRMS THAT DR. YOU MADE UNSUCCESSFUL

17   ATTEMPTS TO DOWNLOAD NUMEROUS DOCUMENTS ONTO A REMOVABLE

18   DEVICE FROM THE COCA-COLA NETWORK.

19   Q.    SO AUGUST 8TH DANA BREED TELLS THE DEFENDANT, HERE'S

20   A HARD DRIVE, PUT ALL THE CONFIDENTIAL AND TRADE SECRET

21   INFORMATION ON THIS ENCRYPTED HARD DRIVE AND RETURN IT TO

22   COCA-COLA?

23   A.    YES.

24   Q.    AND SHORTLY LATER THAT DAY COCA-COLA'S NETWORK LOGS,

25   YOU TESTIFIED, SHOW THAT SHE ATTEMPTED TO COPY FILES TO

1   SOME DEVICE?

2   A.    A DIFFERENT DEVICE, NOT THE DEVICE PROVIDED BY

3   COCA-COLA.

4   Q.    AND THOSE ATTEMPTS WERE SUCCESSFUL OR

5   UNSUCCESSFUL?

6   A.    THEY WERE UNSUCCESSFUL.

7   Q.    ON AUGUST 8TH?

8   A.    THEY WERE UNSUCCESSFUL BY DR. YOU, BUT SUCCESSFUL BY

9   THE COCA-COLA COMPANY'S STANDARD BECAUSE THE SOFTWARE

10  BLOCKED THE TRANSFER.

11  Q.    SO AT THAT POINT IT APPEARS THAT NO TRADE SECRET

12  FILES HAD BEEN TRANSFERRED ON AUGUST 8TH?

13  A.    THAT'S CORRECT.

14  Q.    LET ME SHOW YOU NOW WHAT'S BEEN MARKED AS EXHIBIT 9.

15  DID YOU OBTAIN THIS DOCUMENT AS PART OF THE INVESTIGATION?

16  A.    YES.

17  Q.    IF COULD YOU READ THE HIGHLIGHTED PORTIONS OF

18  THIS?

19  A.    "I, XIAORONG YOU, CERTIFY THAT:

20          "I HAVE RETURNED TO THE COCA-COLA COMPANY ALL

21  MEMORANDA, NOTES, RECORDS, MANUALS, AND OTHER DOCUMENTS,

22  INCLUDING ALL COPIES OF SUCH MATERIALS AND ALL DOCUMENTA-

23  TION PREPARED OR PRODUCED IN CONNECTION THEREWITH,

24  CONTAINING TRADE SECRETS OR CONFIDENTIAL INFORMATION."

25  Q.    AND THIS DOCUMENT IS ENTITLED "RETURN OF DOCUMENTS

1   CERTIFICATION"?

2   A.    YES.

3   Q.    PART OF HER SEVERANCE?

4   A.    THAT'S CORRECT.

5   Q.    ON THE NEXT PAGE, IF YOU COULD JUST READ THOSE

6   HIGHLIGHTED SECTIONS.

7   A.    "I'VE NOT RETAINED ANY COPIES OF DOCUMENTS IN ANY

8   FORM WHATSOEVER."

9           "I DO NOT CURRENTLY HAVE ACCESS TO ANY OF THE

10  DOCUMENTS IN ANY FORM WHATSOEVER."

11          "I CERTIFY UNDER OATH AND SUBJECT TO PENALTY OF

12  PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED

13  THE 10TH DAY OF AUGUST 2017," SIGNED XIAORONG YOU.

14  Q.    WAS DR. YOU COMPENSATED IN PART FOR SIGNING AND

15  AGREEING TO THE TERMS OF THIS AGREEMENT?

16  A.    YES.  COKE OFFERED HER MORE THAN $30,000 AS A

17  SEVERANCE PACKAGE.

18  Q.    SO THIS DOCUMENT WAS SIGNED AUGUST 10TH; IS THAT

19  RIGHT?

20  A.    YES.

21  Q.    AND SIX DAYS LATER, ON AUGUST 16TH, THOSE FILES,

22  THOSE FOLDERS, EXCUSE ME, ARE CREATED ON DR. YOU'S HARD

23  DRIVE; IS THAT RIGHT?

24  A.    THAT'S CORRECT.

25  Q.    I'M GOING TO SHOW YOU -- WHAT HAPPENED ON AUGUST

1   29TH, JUST A FEW WEEKS LATER, AFTER THE DEFENDANT HAD

2   RETURNED FROM CHINA AT 11:00 P.M.?

3   A.    WELL, ON AUGUST 29TH AT 11:00 P.M., DR. YOU WOULD

4   LEARN THAT -- IN TALKING TO THE COKE PERSONNEL IT BECAME

5   WIDELY KNOWN THAT YOU CAN MOVE INFORMATION, YOU CAN

6   CIRCUMVENT THE SOFTWARE WHICH PROHIBITED ONE FROM

7   DOWNLOADING DIRECTLY TO A DEVICE BY UTILIZING THE

8   INTERNET.  SO AT 8/29, ON AUGUST 29, 2017 AFTER 11:00

9   P.M., COKE'S LOGS REVEAL THAT THERE WAS AN INCIDENT WHERE

10  DR. YOU MOVED TECHNOLOGY OR MATERIALS FROM THE COKE

11  NETWORK VIA A GOOGLE DRIVE ACCOUNT.

12  Q.    SO, IN OTHER WORDS, IS IT FAIR TO SAY THAT AROUND

13  11:00 P.M. ON AUGUST 29TH FILES WERE UPLOADED TO WHAT

14  APPEARED TO BE A GOOGLE DRIVE ACCOUNT?

15  A.    THAT'S CORRECT.

16  Q.    AND COCA-COLA'S INTERNAL NETWORK LOGS SHOWED THE

17  TRANSFER OF THOSE FILES?

18  A.    THEY SHOW A TRANSFER.  THEY DO NOT SHOW

19  SPECIFICALLY.  BASED ON THE TIME LAPSE THEY DON'T SAVE ALL

20  THE DOCUMENTS, UNFORTUNATELY, THEY JUST SHOW THAT THERE

21  WAS A MOVEMENT OF DOCUMENTS AT THAT TIME.

22  Q.    COCA-COLA SOFTWARE WAS UNABLE TO BLOCK THE TRANSFER

23  OF THOSE FILES?

24  A.    THAT'S CORRECT.

25  Q.    AND THIS WAS RIGHT AROUND THE LAST FEW DAYS THAT THE

1    DEFENDANT WORKED FOR COCA-COLA; IS THAT CORRECT?

2    A.    THAT IS CORRECT.

3    Q.    TURNING NOW TO EXHIBIT 10.  WHAT IS THIS?

4    A.    THIS HIGHLIGHTS DOCUMENTS THAT WERE FOUND WITHIN THE

5    SPECIFIC FILE FOLDERS CREATED ON AUGUST 16TH.

6    Q.    SO UP HERE ON DR. YOU'S HARD DRIVE?

7    A.    THAT'S CORRECT.

8    Q.    SO THESE ARE THE FOLDERS, AKZONOBEL, BASF, DOW, PPG,

9    ET CETERA, THAT FORENSIC ANALYSIS SHOWED WERE CREATED ON

10   AUGUST 16TH?

11   A.    THAT IS CORRECT.

12   Q.    AND DOWN HERE IN THE REDACTED PORTION THERE'S SOME

13   FILES, ARE THESE ALL OF THE FILES THAT WERE FOUND IN THOSE

14   FOLDERS?

15   A.    NO.

16   Q.    JUST SOME OF THEM?

17   A.    YES.

18   Q.    BUT THIS INFORMATION, DID THE FORENSIC ANALYSIS SHOW

19   WHEN THE FILES THEMSELVES OR MOST OF THEM WERE CREATED ON

20   THAT HARD DRIVE FOUND IN THE DEFENDANT'S POSSESSION?

21   A.    MAJORITY OF THOSE FILES WERE CREATED ON THAT HARD

22   DRIVE AUGUST 29, 2017 SHORTLY AFTER 11:00 P.M.

23   Q.    SO SHORTLY AFTER THE DEFENDANT HAD UPLOADED

24   CONFIDENTIAL FILES FROM COCA-COLA'S NETWORK TO HER GOOGLE

25   DRIVE ACCOUNT, FILES THAT ARE CONFIDENTIAL AND WERE ON

1    COCA-COLA'S NETWORK ARE NOW ON THE DEFENDANT'S HARD

2    DRIVE?

3    A.    YES.

4    Q.    THIS IS ONLY A FEW WEEKS AFTER SHE SIGNED THAT

5    AGREEMENT INDICATING SHE HAD NOT RETAINED ANY TRADE

6    SECRETS SET FORTH IN DOCUMENT 9; IS THAT RIGHT?

7    A.    THAT IS CORRECT.

8    Q.    WAS THE DEFENDANT TRAINED ON WHETHER OR NOT SHE WAS

9    PERMITTED TO UPLOAD FILES TO ONLINE OR CLOUD STORAGE

10   ACCOUNTS?

11   A.    YES.  ALL EMPLOYEES AT COCA-COLA ARE TRAINED VIA

12   WHAT'S CALLED THE COCA-COLA UNIVERSITY, AND IT WAS, IS

13   WELL UNDERSTOOD THAT THIS WAS NOT A -- THIS IS OUTSIDE THE

14   POLICIES AT COCA-COLA.

15   Q.    UPLOADING THESE FILES, THAT'S NOT THE ONLY EXAMPLE

16   OF THE DEFENDANT BYPASSING COCA-COLA'S SECURITY MEASURES

17   THAT YOU ENCOUNTERED DURING THE INVESTIGATION; IS THAT

18   CORRECT?

19   A.    THAT IS CORRECT.

20   Q.    WHAT IS THIS DOCUMENT, EXHIBIT NUMBER 11, IF YOU CAN

21   SEE THAT?

22   A.    SO TWO DAYS AFTER DR. YOU RETURNS FROM CHINA IN

23   DEFENSE OF THE YISHI-YILI AWARD, THERE ARE NUMEROUS

24   DOCUMENTS THAT ARE STAMPED CREATION DATE AUGUST 25, 2017,

25   AND THESE --

1   Q.    ON THE HARD DRIVE?

2   A.    ON THE HARD DRIVE, WITHIN THE SPECIFIC FILE FOLDERS

3   RELATING BACK TO TECHNOLOGY BELONGING TO THOSE COMPANIES.

4   THESE DOCUMENTS APPEAR TO BE TAKEN VIA A PHONE AND THEN

5   MANIPULATED VIA SOFTWARE TO CREATE PDFS.

6   Q.    SO IS IT YOUR UNDERSTANDING BASED UPON YOUR REVIEW

7   OF THESE FILES THAT -- OR DOES IT APPEAR THAT SOMEBODY

8   TOOK A CAMERA TO TAKE A PHOTOGRAPH OF A COMPUTER SCREEN?

9   A.    THAT IS CORRECT.

10  Q.    WOULD THAT SUCCESSFULLY BYPASS COCA-COLA'S SECURITY

11  MEASURES?

12  A.    YES, IT WOULD.

13  Q.    SO DOWN THERE AT THE BOTTOM YOU CAN SEE WHAT APPEAR

14  TO BE WINDOWS OPERATING SYSTEM ICONS; IS THAT RIGHT?

15  A.    YES.

16  Q.    AND DID YOU FIND A NUMBER OF PHOTOGRAPHS LIKE THIS

17  ONE?

18  A.    NUMEROUS.

19  Q.    WHAT OTHER INDICIA TO YOU INDICATED THAT, OR WHAT

20  OTHER INDICATORS WERE THERE THAT THESE THINGS WERE TAKEN

21  WITH A CAMERA?

22  A.    IT'S HARD TO TELL IN THIS IMAGE, BUT THERE ARE -- IT

23  LOOKS LIKE THERE MIGHT HAVE BEEN, HAD A CRACKED SCREEN,

24  MAYBE A PIECE OF TAPE OVER THE SCREEN.  IT SEEMED

25  CONSISTENT ON EVERY SINGLE PICTURE.

1   Q.    DID YOU SEE ANYTHING THAT APPEARED TO BE THE

2   REFLECTION OF A CAMERA FLASH?

3   A.    THAT WAS IN THERE AS WELL, YES.

4   Q.    SO THESE DOCUMENTS WERE NOT REDACTED ON THE HARD

5   DRIVE THAT WAS IN THE DEFENDANT'S POSSESSION; IS THAT

6   CORRECT?

7   A.    NO, THEY CONTAINED TECHNICAL INFORMATION.

8   Q.    IN THIS CASE, THIS PARTICULAR PHOTOGRAPH, WHOSE

9   TECHNICAL INFORMATION DID IT CONTAIN?

10  A.    PPG'S.

11  Q.    AND ALL THIS INFORMATION THAT WAS REDACTED IN HERE

12  WAS TECHNICAL AND NUMERICAL DATA; IS THAT RIGHT?

13  A.    YES.

14  Q.    ON THE NEXT PAGE, JUST ANOTHER EXAMPLE, IS THAT

15  ANOTHER ONE OF THESE FILES?

16  A.    IT IS ANOTHER ONE OF THESE FILES.  AT THE TOP YOU

17  CAN CLEARLY SEE THAT IT'S THE COCA-COLA COMPANY AND AT THE

18  BOTTOM CLEARLY MARKED DOW RESTRICTED.

19  Q.    RIGHT HERE, IS THAT WHERE YOU'RE REFERRING TO?

20  A.    YES.

21  Q.    AND HERE ARE THOSE WINDOWS ICONS AS WELL; IS THAT

22  CORRECT?

23  A.    THAT'S CORRECT.

24  Q.    THESE WERE NOT THE ONLY TWO PHOTOS; IS THAT RIGHT?

25  A.    NO, THERE WERE NUMEROUS PHOTOS TAKEN.

1  Q.    I'M GOING TO DIRECT YOUR ATTENTION TO THE ENTRIES

2  FOR LETTER C HERE.  WHAT HAPPENS ON JANUARY 23, 2018 AND

3  THROUGH APRIL 8TH?

4  A.    THESE RELATE TO TEXT MESSAGES OR AUDIO VOICE

5  MESSAGES THAT WE FOUND WITHIN THE WECHAT APPLICATION

6  LOCATED ON DR. YOU'S PHONES.  ON JANUARY 23, 2018

7  CODEFENDANT XIANGCHEN LIU TELLS DR. YOU THAT SHE WON THE

8  YISHI-YILI AWARD WITH FUNDING OF 12 MILLION YUAN.

9         ON FEBRUARY 24, 2018, XIANGCHEN TELLS DR. YOU

10  TO MEET IN WEIHAI, WHICH IS WHERE WEIHAI JINHONG IS, ON

11  MAY 4TH, MAY 5TH TO TALK ABOUT NEXT STEPS AFTER WINNING

12  THE THOUSAND TALENTS PLAN.

13         ON MARCH 7, 2018, DR. YOU TELLS HER AUNT THAT

14  YOU'S SHARE SHOULD BE WORTH THE RISK SINCE SHE'LL HAVE TO

15  PAY LAWYERS IF SHE GETS IN TROUBLE.  THE AUNT SAYS, ALL IS

16  WORKABLE AS LONG AS THERE ARE NO INCIDENTS CONCERNING THE

17  TECHNICAL TRANSFER.  THE BUSINESS RISK IS ON JINHONG'S

18  SHOULDERS.

19         ON APRIL 8, 2018, DR. YOU TELLS XIANGCHEN LIU,

20  I WON'T WORK -- I WON'T TALK UNTIL WEIHAI JINHONG GROUP

21  CONFIRMS MY BENEFITS, SALARY, HOUSE, ET CETERA.  I WON'T

22  DO A THING BEFORE SEEING MONEY.  SHE'S TAKING THE RISK IN

23  THE U.S. AND WON'T GIVE AWAY TECHNOLOGY WITHOUT MONEY.

24  Q.    SO THESE FILES THAT WE WERE TALKING ABOUT IN

25  EXHIBITS 11 EARLIER, WERE THEY TRANSFERRED ANYWHERE AROUND

1   FEBRUARY 11, 2018?

2   A.    THE PHOTOGRAPHS THAT WERE LATER TURNED INTO PDFS

3   SHOW A CREATION DATE WITHIN THAT FILE FOLDER STRUCTURE ON

4   THE HARD DRIVE OF HITTING THE, THOSE SPECIFIC FOLDERS ON

5   FEBRUARY 11, 2018.

6   Q.    AND BASED UPON THOSE MESSAGES, IS IT FAIR TO SAY

7   THAT THE DEFENDANT KNEW SHE HAD TO DELIVER THE TECHNOLOGY

8   AROUND THAT SAME TIME?

9   A.    IT'S FAIR TO SAY.

10  Q.    DOCTOR, OR AGENT LECKRONE, THE DEVICE THAT WAS USED

11  TO TAKE THOSE PHOTOGRAPHS, DID THE FBI EVER RECOVER IT?

12  A.    NO.

13  Q.    IS THAT THE ONLY DEVICE THAT THE FBI IS AWARE OF

14  THAT IT DID NOT RECOVER?

15  A.    NO.

16  Q.    WHAT WAS THE OTHER DEVICE OR DEVICES THAT THE FBI

17  DID NOT RECOVER?

18  A.    DR. YOU RETURNED TO THE UNITED STATES, SPECIFICALLY

19  ATLANTA, ON SEPTEMBER 5, 2018, AFTER MEETING WITH MEMBERS

20  OF WEIHAI JINHONG GROUP AND THE ITALIAN CORPORATION

21  METLAC.  AT THE BORDER SHE WAS MET BY CUSTOM AND BORDER

22  PROTECTION AGENTS WHO ASKED HER A SERIES OF QUESTIONS.

23  LONG STORY SHORT, THEY GAVE HER REASON TO BELIEVE THAT SHE

24  WAS TARGETED AND IT WASN'T A RANDOM SCREENING; SO FAST

25  FORWARD TO SHE'S ARRESTED ON FEBRUARY 14, 2019, WITHIN HER

1   APARTMENT FBI LOCATED A SECOND HARD DRIVE.  ON THAT HARD

2   DRIVE WITHIN THE RECYCLE BIN WAS A DUPLICATION OF

3   DR. YOU'S OTHER HARD DRIVE WITH THE TRADE SECRET

4   INFORMATION.

5   Q.    THE HARD DRIVE THAT EASTMAN HAD SEIZED?

6   A.    THAT'S CORRECT; BUT THERE WERE CHANGES, SO SOMEONE

7   HAD GONE IN AND MANIPULATED THE FILE FOLDER NAME, FILE

8   FOLDER NAMES.  INSTEAD OF BEING AKZONOBEL OR BASF OR DOW,

9   THEY WERE NOW A1, B1, D1; AND THEN WITHIN THAT, THOSE FILE

10  FOLDERS' DOCUMENTS HAD BEEN MANIPULATED AS WELL.

11  Q.    SO THAT HARD DRIVE, THAT SECOND HARD DRIVE WAS

12  RECOVERED AT THE TIME OF THE DEFENDANT'S ARREST?

13  A.    THAT'S CORRECT.

14  Q.    BUT THE COMPUTER THAT WAS USED TO MOVE THINGS TO THE

15  RECYCLING BIN, WAS THAT RECOVERED?

16  A.    SO --

17  Q.    OR WHATEVER DEVICE --

18  A.    -- CUSTOM AND BORDER PROTECTION AGENTS SEIZED

19  DR. YOU'S LAPTOP UPON ENTERING THE UNITED STATES ON

20  SEPTEMBER 5TH.  THOSE DOCUMENTS HIT A RECYCLE BIN ON THE

21  HARD DRIVE ON SEPTEMBER 6TH, 2018, ONE DAY LATER.  THE

22  DEVICE UTILIZED TO MOVE THOSE DOCUMENTS TO THE RECYCLING

23  BIN HAS NOT BEEN RECOVERED.

24  Q.    EARLIER YOU SAID THAT THE DEFENDANT UPLOADED FILES

25  TO THE DEFENDANT'S GOOGLE DRIVE; IS THAT CORRECT?

1    A.    THAT IS CORRECT.

2    Q.    DID YOU OBTAIN A SEARCH WARRANT TO SEIZE THE

3    CONTENTS OF THAT GOOGLE DRIVE?

4    A.    YES.

5    Q.    WAS A SEARCH WARRANT EXECUTED IN DECEMBER OF 2018?

6    A.    2018.

7    Q.    2018.

8    A.    YES.

9    Q.    DECEMBER.

10   A.    YES.

11   Q.    ABOUT SIX MONTHS AFTER THAT JUNE 21ST DAY WHEN THE

12   DEFENDANT ADMITTED SHE UPLOADED ALL OF THOSE FILES -- OR,

13   I'M SORRY ABOUT EIGHT MONTHS AFTER -- AM I CONFUSED IN MY

14   FACTS?  EXCUSE ME, EIGHT MONTHS AFTER THE DEFENDANT SAID

15   SHE UPLOADED THOSE FILES TO THE GOOGLE DRIVE; IS THAT

16   RIGHT?

17   A.    SHE UPLOADED THE FILES ON JUNE 21, 2018.  WE

18   EXECUTED THE SEARCH WARRANT IN DECEMBER.  THAT SOUNDS

19   RIGHT, 2018, SIX MONTHS.

20   Q.    DID GOOGLE PROVIDE A RESPONSE TO THAT SEARCH

21   WARRANT?

22   A.    YES.

23   Q.    DID YOU REVIEW THAT RESPONSE?

24   A.    YES.

25   Q.    WHAT DID IT CONTAIN?

A.    WITHIN THE GOOGLE DRIVE ACCOUNT THERE WERE NUMEROUS

SUBFOLDERS, ONE BEING A MY EASTMAN FOLDER, ANOTHER BEING A

WEIHAI REPORT.  WITHIN THE WEIHAI REPORT FOLDER, WHICH YOU

SEE HERE, THIS IS A SCREEN SHOT OF IT, THERE WAS A

SUBFOLDER CALLED NEXT CAN COATING G2 REVIEW.  WITHIN THAT

WE IDENTIFIED NUMEROUS EASTMAN DOCUMENTS.

Q.    SO THIS IS EXHIBIT NUMBER 12, ON THE RIGHT-HAND SIDE

THERE ARE SOME REDACTED FILE NAMES.  THAT'S NOT ALL THE

FILES THAT WERE IN THIS GOOGLE DRIVE, IT'S JUST A PORTION

FOR ILLUSTRATIVE PURPOSES TODAY; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    DID YOU SEND THOSE FILES TO EASTMAN?

A.    WE DID.

Q.    AND WHAT DID EASTMAN SAY ABOUT THOSE FILES?

A.    EASTMAN IDENTIFIED TRADE SECRET INFORMATION WITHIN

THIS SUBFOLDER.

Q.    LET ME SHOW YOU NOW WHAT'S BEEN MARKED AS EXHIBIT

13, IF YOU COULD JUST READ THE HIGHLIGHTED PORTIONS OF

THIS.

A.    "I, DEEPANJAN BHATTACHARYA, DECLARE AS FOLLOWS:

        "I HAVE BEEN EMPLOYED AT, I'VE BEEN EMPLOYED AT

FOR EASTMAN CHEMICAL COMPANY SINCE 2003 AND CURRENTLY

SERVE AS THE DIRECTOR OF AFP COATINGS FOR EASTMAN.  I HAVE

PERSONAL KNOWLEDGE OF THE MATTERS STATED HEREIN.

        "I RECEIVED A BACHELOR OF SCIENCE DEGREE IN

1  CHEMISTRY FROM BOMBAY UNIVERSITY IN 1995, A BACHELOR OF
2  SCIENCE DEGREE IN CHEMICAL ENGINEERING FROM THE UNIVERSITY
3  OF CALCUTTA IN 1998, AND A DOCTOR OF PHILOSOPHY DEGREE IN
4  POLYMER CHEMISTRY FROM SUNY-ESF, SYRACUSE IN 2003.
5          "I HAVE REVIEWED COPIES OF CERTAIN OF THE
6  ELECTRONIC FILES THAT I UNDERSTAND WERE PROVIDED TO
7  EASTMAN BY THE FEDERAL BUREAU OF INVESTIGATION ON DECEMBER
8  19, 2018.  THESE DOCUMENTS ARE IDENTIFIED BELOW BY THEIR
9  FILE NAME."
10 Q.    AND THOSE ARE REDACTED ON THIS; IS THAT RIGHT?
11 A.    THAT'S CORRECT.
12 Q.    ON THE SECOND TO LAST PAGE HERE, YOU CAN READ WHAT
13 MR. BHATTACHARYA SAID ABOUT THOSE FILES.
14 A.    "DOCUMENTS 1 THROUGH 9 ALL APPEAR TO HAVE BEEN
15 CREATED BY PERSONNEL WITHIN EASTMAN AND THEY CONTAIN
16 INFORMATION THAT I RECOGNIZE AS HAVING BEEN DEVELOPED
17 WITHIN OR FOR THE AFP COATING TECHNOLOGY GROUP AT EASTMAN,
18 WHICH I CURRENTLY MANAGE.  THE DOCUMENTS CONTAIN
19 DESCRIPTIONS OF RESINS DEVELOPED BY EASTMAN CHEMICAL
20 COMPANY FOR USE IN BISPHENOL-A NON-INTENT COATINGS FOR THE
21 INTERIOR OF RIGID METAL PACKAGING.  THESE DOCUMENTS
22 INCLUDE INFORMATION DESCRIBING THE COMPOSITION OF THE
23 RESINS, HOW TO MANUFACTURE SUCH RESINS, INCLUDING HOW TO
24 MANUFACTURE THEM ON A COMMERCIAL SCALE, AND PROPERTIES OF
25 THE RESINS.

1    "DOCUMENTS 1 THROUGH 9 CONTAIN HIGHLY CONFIDEN-

2    TIAL INFORMATION.  ACCESS TO THIS INFORMATION IS

3    RESTRICTED TO A LIMITED GROUP OF INDIVIDUALS WITHIN

4    EASTMAN.  PERSONNEL WHO RECEIVE THE INFORMATION ARE

5    PROVIDED TRAINING REGARDING HANDLING OF CONFIDENTIAL

6    INFORMATION AND ARE BOUND BY WRITTEN AGREEMENT PROHIBITING

7    UNAUTHORIZED DISCLOSURE OF EASTMAN CONFIDENTIAL

8    INFORMATION.  THERE IS SIGNIFICANT VALUE TO EASTMAN IN

9    MAINTAINING THE SECRECY OF THIS INFORMATION."

10    "THE AFP COATINGS TECHNOLOGY ORGANIZATION'S

11    EXPENDITURES FOR THESE ACTIVITIES ARE ESTIMATED TO BE MORE

12    THAN 13 MILLION U.S. DOLLARS OVER THE YEARS OF 2015 TO

13    2018."

14    Q.    AND THIS WAS SIGNED BY DR. BHATTACHARYA IN JANUARY

15    OF THIS YEAR; IS THAT RIGHT?

16    A.    THAT IS CORRECT.

17    Q.    DR. BHATTACHARYA SAID THAT TRAINING IS PROVIDED BY

18    EASTMAN TO EMPLOYEES ABOUT PROPER HANDLING OF THIS TYPE OF

19    SENSITIVE INFORMATION; IS THAT TRUE?

20    A.    THAT IS TRUE.

21    Q.    DID YOU UNCOVER ANY EVIDENCE ABOUT THE TYPE OF

22    TRAINING THAT THE DEFENDANT WENT THROUGH?

23    A.    WE DID.

24    Q.    WHAT IS THIS IN EXHIBIT NUMBER 14?

25    A.    IN RESPONSE TO A SUBPOENA, EASTMAN PROVIDED TRAINING

1    THAT DR. YOU WAS GIVEN AS AN EMPLOYEE OF EASTMAN, AND

2    INCLUDED IS THIS SLIDE WHERE DR. YOU HAD TO SUCCESSFULLY

3    ANSWER THE QUESTION ACKNOWLEDGING HER UNDERSTANDING OF THE

4    RULES AND POLICIES OF WORKING AT EASTMAN.  THIS ONE

5    SPECIFICALLY STATES THAT, "WITH RESPECT TO RESTRICTED AND

6    CONFIDENTIAL INFORMATION, HANDLING REQUIREMENTS STIPULATE

7    TO NOT SHARE WITH EMPLOYEES WHO DO NOT HAVE A NEED TO KNOW

8    AND TO NOT PLACE IN FILE SHARES SUCH AS DROPBOX, GOOGLE

9    DRIVE, AND BOX.NET."

10   Q.    WHEN EASTMAN FIRED THE DEFENDANT, DID THEY SEIZE HER

11   COMPANY IPHONE FROM HER?

12   A.    THEY DID.

13   Q.    WHAT IS THIS IN EXHIBIT NUMBER 15?

14   A.    THESE ARE PHOTOS TAKEN OF DR. YOU'S IPHONE WHICH

15   CONTAINED PHOTOS OF AN EASTMAN LABORATORY.  THESE ARE

16   CLEARLY DATED AT THE TOP JUNE 11TH, AND THEY WERE TAKEN

17   BETWEEN 5:26 AND 5:30 P.M.

18   Q.    WHAT'S IN THE REDACTED PORTIONS HERE?

19   A.    THESE ARE MACHINERY UTILIZED IN THE PRODUCTION OF

20   TRADE SECRET INFORMATION AT EASTMAN CHEMICAL COMPANY.

21   Q.    SO WHY ARE THE PICTURES OF THE EQUIPMENT ITSELF

22   BLACKED OUT?

23   A.    EASTMAN HAS GIVEN US THE UNDERSTANDING THAT THE

24   SEQUENCE OF UTILIZING THESE MACHINES IS SPECIFIC TO THE

25   PRODUCTION OF THEIR TRADE SECRET MATERIAL.

1  Q.    SO EVEN KNOWING WHICH EQUIPMENT IS USED IS ITSELF

2  CRITICAL TO EASTMAN'S PROCESS?

3  A.    IT IS.

4  Q.    AND YOU SAID THAT THESE FILES WERE DATED JUNE 11TH

5  OF 2018; IS THAT RIGHT?

6  A.    THAT'S CORRECT.

7  Q.    LOOKING NOW AT ENTRIES NUMBER F, WHAT HAPPENED ON

8  MAY 17TH AND MAY 24TH, JUST A FEW WEEKS BEFORE THESE

9  PHOTOGRAPHS OF EASTMAN'S LABORATORY EQUIPMENT WAS TAKEN?

10  A.    DR. YOU SENDS A MESSAGE SAYING THAT SHE WILL

11  IDENTIFY LABORATORY EQUIPMENT SOON.  IN RESPONSE ON MAY

12  24, 2018, XIANGCHEN LIU TELLS DR. YOU, THE NEXT STEPS ARE:

13  USE THE ITALIAN COMPANY, USE ITALIAN COATING TO BUILD A

14  CLIENT BASE, GET A JOINT VENTURE WITH THE ITALIAN COMPANY

15  WHILE DOING RESEARCH AND DEVELOPMENT ON SECOND GENERATION

16  BPA-NI, BUILD COATING TO ACHIEVE THE ULTIMATE GOAL.

17  Q.    SO FAR WE'VE TALKED ABOUT WHAT, OR HOW THESE TRADE

18  SECRETS, ALLEGED TRADE SECRETS WERE OBTAINED, DID YOUR

19  INVESTIGATION SHOW WHAT THE DEFENDANT INTENDED TO DO WITH

20  THOSE TRADE SECRETS AND WEIHAI JINHONG GROUP?

21  A.    WE IDENTIFIED A CONTRACT AGREEMENT BETWEEN MS. YOU

22  AND WEIHAI JINHONG GROUP WHICH CLEARLY STIPULATED THAT SHE

23  WAS GOING TO LEAD AN R&D TEAM TO DEVELOP A BPA-NI PRODUCT

24  INDIGENOUS TO CHINA.

25  Q.    WITH WEIHAI JINHONG GROUP?

1    A.    CORRECT.

2    Q.    AND THAT CONTRACT THAT YOU IDENTIFIED, WAS THAT

3    FOUND ON ONE OF DR. YOU'S DEVICES?

4    A.    YES.

5    Q.    WERE THERE MESSAGES, TEXT MESSAGES AND VOICE

6    MESSAGES, BACK AND FORTH ABOUT THE CONTENT OF THAT

7    AGREEMENT OR TRANSFERRING THAT AGREEMENT?

8    A.    THERE WERE NUMEROUS REFERENCES TO THE DOCUMENT,

9    YES.

10   Q.    WITH XIANGCHEN AND OTHERS WHO HAVE NOT BEEN

11   INDICTED?

12   A.    YES.

13   Q.    NOW, AT ANY TIME DID EASTMAN CHEMICAL KNOW PRIOR TO

14   THIS INVESTIGATION BEGINNING THAT DR. YOU HAD ENTERED INTO

15   THIS ARRANGEMENT WITH WEIHAI JINHONG GROUP?

16   A.    NO.

17   Q.    DID THEY KNOW THAT SHE HAD UPLOADED THEIR

18   CONFIDENTIAL INFORMATION WHICH THEY SAY INCLUDE TRADE

19   SECRETS TO HER GOOGLE DRIVE ACCOUNT?

20   A.    NO.

21   Q.    DID THEY KNOW THAT SHE HAD TAKEN PICTURES OF THEIR

22   CONFIDENTIAL AND SECRET LABORATORY EQUIPMENT?

23   A.    NO.

24   Q.    DID THEY KNOW THAT SHE WAS HAVING COMMUNICATIONS

25   WITH THIS MAN XIANGCHEN AND OTHERS PRESUMABLY AFFILIATED

```
 1   WITH WEIHAI JINHONG GROUP ABOUT THIS NEXT VENTURE?

 2   A.    NO.

 3   Q.    DID YOU FIND A PHOTOGRAPH OF DR. YOU SIGNING AN

 4   AGREEMENT, THAT DOCUMENT YOU REFERRED TO EARLIER?

 5   A.    YES.

 6   Q.    WHERE DID YOU FIND THAT PHOTOGRAPH?

 7   A.    THAT PHOTOGRAPH WAS LOCATED ON DR. YOU'S IPHONE,

 8   DATED MAY 7, 2018, WHEN SHE WOULD HAVE BEEN IN WEIHAI; AND

 9   IT DEPICTS HER AND THE CEO OF WEIHAI JINHONG GROUP, AN

10   INDIVIDUAL NAMED SU DONGGUO, BOTH SIGNING THE AGREEMENT;

11   AND WHEN I ASKED DR. YOU IN MICHIGAN, SHE CONFIRMED THAT

12   THAT WAS THE TWO OF THEM SIGNING THE AGREEMENT.

13   Q.    DID EASTMAN KNOW THAT DR. YOU HAD APPLIED FOR THE

14   THOUSAND TALENT PROGRAM?

15   A.    NO.

16   Q.    DID THEY KNOW THAT SHE HAD APPLIED FOR THE

17   YISHI-YILI AWARD?

18   A.    NO.

19   Q.    DID THEY KNOW WHETHER OR NOT SHE WON THOSE AWARDS?

20   A.    NO.

21   Q.    DO YOU KNOW BASED ON YOUR INVESTIGATION WHETHER OR

22   NOT SHE IN FACT WON THOSE AWARDS?

23   A.    SHE DID.

24   Q.    BOTH OF THEM?

25   A.    YES.
```

1    Q.    AND WERE THERE DISCUSSIONS ABOUT HOW TO USE THE

2    MONEY THAT SHE WOULD RECEIVE AS PART OF THAT FUNDING?

3    A.    THERE WERE NUMEROUS DISCUSSIONS ABOUT THE FUNDING

4    OVER AND OVER AGAIN.  EVEN BEFORE THAT THERE WERE

5    DISCUSSIONS ABOUT BEING CAUTIOUS AND CAREFUL WITH EVEN

6    ANNOUNCING THE -- HER, HER RECEIVING AND, THIS AWARD.

7    DR. YOU DECIDED THAT SHE DIDN'T WANT TO STAND FOR A VIDEO.

8    I GUESS IT'S NORMAL PROCEDURE TO TAKE A VIDEO IF YOU'RE AN

9    AWARD WINNER AND DECLARE THAT YOU ARE, SHE DID NOT WANT TO

10   DO THAT.  HER AUNT RECEIVED THE DOCUMENTATION AND WAS

11   UNWILLING TO SHARE IT WITH HER VIA E-MAIL OR TEXT, THE

12   PICTURES.  SHE SAID SHE COULDN'T EVEN TAKE A PICTURE OF

13   IT; AND THEN ONCE IT WAS CONFIRMED THAT THE MONEY WAS

14   COMING IN, THERE WERE A LOT OF DISCUSSIONS BACK AND FORTH

15   ON WHAT TO DO WITH THE MONEY SURROUNDING THE FUNDING.

16   Q.    SO I'M GOING TO PUT MY FINGER RIGHT HERE ON THE

17   SEPTEMBER 1ST, EXCUSE ME, WAS THAT APPROXIMATELY THE TIME,

18   SEPTEMBER 1ST, THE DEFENDANT STARTED WORKING AT EASTMAN

19   CHEMICAL?

20   A.    YES.

21   Q.    AND JUNE 22, 2018, THAT WAS WHEN SHE WAS FIRED; IS

22   THAT CORRECT?

23   A.    THAT'S CORRECT.

24   Q.    THE EVENTS THAT TOOK PLACE IN HERE AT EASTMAN -- OR

25   DID EASTMAN CHEMICAL KNOW ABOUT THOSE EVENTS?

1   A.    THE MAJORITY OF THEM, NO.

2   Q.    LIKE SO, FOR EXAMPLE, YOU SAID THE MAJORITY UNDER D,

3   THEY KNEW THAT SHE WAS GOING TO CHINA, BUT THEY DIDN'T

4   KNOW THE TRUE PURPOSE; IS THAT RIGHT?

5   A.    CORRECT.

6   Q.    ON OCTOBER 24, 2018, DID AGENTS INTERVIEW MR., OR

7   DR. DEEPANJAN BHATTACHARYA FROM EASTMAN CHEMICAL?

8   A.    THAT'S CORRECT.

9   Q.    WHAT DID -- DR. BHATTACHARYA, WAS HE THE SUPERVISOR

10  FOR DR. YOU?

11  A.    YES.

12  Q.    HAD HE SPOKEN TO HER JUST AS PART OF HIS SUPERVISORY

13  ROLES THROUGHOUT HER EMPLOYMENT WITH EASTMAN?

14  A.    THAT'S CORRECT.

15  Q.    WHAT DID SHE SAY TO HIM ABOUT HER FINANCIAL STATUS

16  AND HER EMPLOYMENT AT EASTMAN, IF YOU RECALL?

17  A.    HE SAID HE RECALLED HER SAYING THINGS ALONG THE

18  LINES OF THAT SHE DIDN'T NEED MONEY, MONEY WASN'T

19  IMPORTANT TO HER; THAT SHE WAS DOING EASTMAN A FAVOR BY

20  WORKING THERE, AND TOUTED THE FACT THAT SHE HAD HOMES IN

21  SHANGHAI, BOSTON, IN ATLANTA AND THAT SHE INTENDED TO

22  RETIRE IN CHINA.

23  Q.    DID SHE STATE -- YOU SAID SHE HAD HOMES IN, COULD

24  YOU REPEAT THOSE LOCATIONS, PLEASE?

25  A.    SHANGHAI, BOSTON AND ATLANTA.

1  Q.    AND THAT SHE PLANNED TO DO WHAT WITH THOSE HOMES, OR

2  WHAT DID SHE SAY SHE PLANNED TO DO AFTER SHE WAS DONE

3  WORKING?

4  A.    SHE INTENDED TO RETIRE IN CHINA.

5  Q.    IN CHINA?

6  A.    CORRECT.

7  Q.    SHE SAID THOSE THINGS TO DEEPANJAN BHATTACHARYA?

8  A.    YES.

9  Q.    DID THE AGREEMENT WITH WEIHAI JINHONG, THAT AGREE-

10 MENT YOU SAID YOU FOUND, DID IT CONTEMPLATE OR DID IT

11 SPECIFY WHETHER OR NOT DR. YOU WOULD END UP MOVING TO

12 CHINA?

13 A.    IT DID.

14 Q.    WHAT DID IT SAY?

15 A.    IF STATED THAT DR. YOU WOULD BE AN EMPLOYEE, FULL-

16 TIME EMPLOYEE OF WEIHAI JINHONG GROUP LIVING AND WORKING

17 IN WEIHAI DOWN THE ROAD.

18 Q.    AT SOME POINT?

19 A.    THE AGREEMENT STIPULATED THAT SHE WAS ALREADY A

20 FULL-TIME EMPLOYEE THERE WHEN SHE WASN'T.

21 Q.    SO THE WRITTEN AGREEMENT THAT DR. YOU SIGNED SAID

22 SHE WAS A FULL-TIME EMPLOYEE OF WEIHAI JINHONG GROUP?

23 A.    CORRECT.

24 Q.    BUT SHE WAS A FULL-TIME EMPLOYEE OF EASTMAN

25 CHEMICAL?

1    A.    THAT'S CORRECT.

2    Q.    DID THE MESSAGES THAT YOU REVIEWED AS PART OF THE

3    INVESTIGATION SENT AND RECEIVED BY THE DEFENDANT SHOW

4    WHETHER OR NOT SHE WENT TO LOOK AT RESIDENTIAL REAL ESTATE

5    IN CHINA?

6    A.    THEY DID.

7    Q.    WHAT DID IT SHOW IN PARTICULAR?

8    A.    THAT DR. YOU WAS SIGNIFICANTLY INTERESTED IN

9    OBTAINING BEACH FRONT PROPERTY IN WEIHAI, AND EARLY ON IT

10   WAS SUGGESTED THAT SHE TOUR RESIDENTIAL NEIGHBORHOODS WITH

11   THE CEO SU DONGGUO.

12   Q.    THE SAME MAN THAT SHE TOOK THE PHOTOGRAPH WITH?

13   A.    CORRECT, DURING HER MAY TRIP; AND THEN LATER ON DOWN

14   THE ROAD AFTER SHE RETURNS, THERE ARE TEXT MESSAGES AND

15   PHOTOGRAPHS DISCUSSING MS. YOU OBTAINING A RESIDENCE IN

16   WEIHAI.  THIS SPECIFICALLY WAS SENT AND TAKEN FROM SU

17   DONGGUO'S BALCONY OVERLOOKING THE OCEAN.

18   Q.    THIS BEING EXHIBIT NUMBER 16?

19   A.    THAT'S CORRECT.

20   Q.    SO THIS IS A NIGHTTIME PHOTO, BUT THIS IS THE OCEAN

21   IN THE BACKGROUND?

22   A.    THAT IS CORRECT.

23   Q.    AND ON THE -- WHO SENT THIS PHOTOGRAPH TO THE

24   DEFENDANT?

25   A.    THE CEO OF WEIHAI STIPULATING THAT THIS APARTMENT

1    BUILDING AND THESE APARTMENTS WERE SPECIFIC TO HIGH UP
2    IMPORTANT PEOPLE IN WEIHAI, AND THAT THEY COULD GAIN
3    ACCESS TO THIS; AND SU DONGGUO SENT THAT PICTURE, AND I
4    GUESS WAS, MS. YOU WAS LOOKING AT -- HERE IT IS, THIS IS A
5    LIST OF APARTMENT PRICES IN THAT BUILDING, AND THE
6    APARTMENT THAT SHE WAS GOING TO PURCHASE WAS DIRECTLY
7    UNDERNEATH SU DONGGUO'S.
8    Q.    WERE THERE MESSAGES INDICATING HOW IT WAS THAT SHE
9    WAS GOING TO PAY FOR THIS REAL ESTATE?
10   A.    THERE WERE.  DR. YOU WANTED TO UTILIZE THE TALENT
11   FUNDING FROM THE YISHI-YILI AWARD AND THE THOUSAND TALENTS
12   PLAN TO PURCHASE THIS APARTMENT.  IT WAS, I DON'T REMEMBER
13   OFF THE TOP OF MY HEAD, I THINK IT WAS 1.8 MILLION YUAN
14   PURCHASE PRICE, 1.2 MILLION DOWN PLUS SOME TAXES AND FEES.
15   IT WAS TO BE FURNISHED, MOVE-IN READY FOR DR. YOU.
16   Q.    THAT'S THE MONEY THAT SHE WON FROM ONE OF THOSE
17   AWARD PROGRAMS THAT THE VARIOUS REPRESENTATIVES OF THOSE
18   COMPANIES SAID THEIR TECHNOLOGY COULD BE USED TO WIN THOSE
19   AWARDS AS EVIDENCED IN THAT POWER POINT SLIDE?
20   A.    THAT'S CORRECT.
21   Q.    MOVING BACK NOW TO, STARTING RIGHT UP HERE, IN
22   LETTER B, ALL THE WAY DOWN TO HERE, EARLIER YOU SAID THE
23   RED BOXES INDICATE THE DEFENDANT'S TRIPS TO CHINA; IS THAT
24   RIGHT?
25   A.    THAT'S CORRECT.

1    Q.    SO FROM AUGUST OF 2017 UNTIL OCTOBER, EXCUSE ME,

2    NOVEMBER OF 2018, HOW MANY TIMES DID THE DEFENDANT TRAVEL

3    TO CHINA THAT YOU KNOW OF?

4    A.    IT'S ACTUALLY FOUR.  THE LAST RED BOX SHE GOES, SHE

5    GOES TO ITALY AND MEETS WITH WEIHAI JINHONG PERSONNEL,

6    INCLUDING SU DONGGUO AND PROVINCIAL ELITES, TO TRY AND

7    SOLIDIFY A JOINT VENTURE GROUP, JOINT VENTURE COMMITMENT

8    FROM METLAC WITH THE JINHONG GROUP.

9    Q.    OTHER THAN THAT MAY 20 -- APRIL AND MAY OF 2018

10   TRIP, DID COCA-COLA OR EASTMAN TO YOUR KNOWLEDGE KNOW

11   ABOUT ANY OF THESE TRIPS TO CHINA?

12   A.    NO.

13   Q.    AND DID EASTMAN KNOW ABOUT THE REAL PURPOSE OF THE

14   TRIP IN APRIL AND MAY OF 2018?

15   A.    THEY DID NOT.

16   Q.    WHEN SHE TRAVELED TO ITALY IN, JUST A FEW MONTHS AGO

17   IN NOVEMBER OF 2018, DID SHE -- YOU SAID SHE TRAVELED WITH

18   SOME PROVINCIAL PERSONNEL, WHO ARE YOU REFERRING TO

19   SPECIFICALLY IN TERMS OF WHICH GOVERNMENT?

20   A.    THIS IS THE CHINESE GOVERNMENT, SHANDONG PROVINCE.

21   THEY MET HER THERE TO MEET WITH OFFICIALS FROM METLAC.

22   Q.    AS PART OF THIS PLAN TO USE WEIHAI JINHONG GROUP TO

23   DEVELOP SECOND GENERATION BPA-NI TECHNOLOGY?

24   A.    IT GOES RIGHT IN LINE WITH THE STATED GOALS, YES.

25   Q.    OKAY.  I WANT TO TALK A LITTLE BIT ABOUT THE

1  DEFENDANT'S FAMILY.  HAS YOUR INVESTIGATION SHOWED WHERE

2  THE DEFENDANT HAS LIVED FOR, SAY, THE LAST 10 YEARS?

3  A.    YES.

4  Q.    WHERE HAS SHE LIVED?

5  A.    SHE'S LIVED PRIMARILY IN ATLANTA AND IN JOHNSON

6  CITY.

7  Q.    HAS HER HUSBAND BEEN LIVING WITH HER?

8  A.    NO.

9  Q.    HOW WOULD YOU CHARACTERIZE, BASED ON YOUR

10 INVESTIGATION, THE RELATIONSHIP OF THE DEFENDANT'S HUSBAND

11 WITH THE DEFENDANT?

12 A.    THEY DON'T LIVE TOGETHER.  IT LOOKS LIKE AND

13 INDICATED THAT THEY MAY TRAVEL TOGETHER TO CHINA, BUT IT'S

14 MAYBE OF CONVENIENCE, I DON'T KNOW.

15 Q.    WHERE DOES THE HUSBAND LIVE?

16 A.    HE LIVES IN THE BOSTON AREA.

17 Q.    WAS HE INTERVIEWED ON THE DAY OF ARREST?

18 A.    YES.

19 Q.    AND HE LIVED IN THE BOSTON AREA?

20 A.    THAT'S CORRECT.

21 Q.    BY HIMSELF?

22 A.    YES.

23 Q.    WERE THERE ANY MESSAGES SENT BY THE DEFENDANTS ABOUT

24 THE RELATIONSHIP BETWEEN HER AND HER DAUGHTER?

25 A.    YES.

1   Q.    AND WHAT WAS THE NATURE OF THOSE MESSAGES?

2   A.    FRUSTRATION.  IT SEEMED THAT MS. YOU WAS FRUSTRATED,

3   THE FACT THAT SHE DIDN'T HAVE A BETTER RELATIONSHIP WITH

4   HER DAUGHTER, SOMETHING ALONG THE LINES OF, YOU KNOW, I

5   ONLY -- VERY RARELY TALK TO HER AND ONLY SEE HER WHEN

6   WE'RE IN THE SAME PLACE FOR THE OCCASIONAL DINNER.

7   Q.    TO YOUR KNOWLEDGE DOES THE DEFENDANT HAVE ANY OTHER

8   FAMILY MEMBERS IN THE UNITED STATES?

9   A.    NO.

10  Q.    DOES THE DEFENDANT HAVE FAMILY MEMBERS IN CHINA?

11  A.    YES.

12  Q.    WHO ARE THOSE FAMILY MEMBERS?

13  A.    THE INVESTIGATION HAS REVEALED THAT MS. YOU HAS

14  MUL -- HAS A SISTER THERE.  THE SISTER IS, DOES A

15  SIGNIFICANT AMOUNT OF BANKING FOR MS. YOU AND MANAGES

16  MONEY, WEALTH MONEY PRODUCTS FOR MS. YOU IN JOINT

17  ACCOUNTS.  SHE HAS HER AUNT, MAYBE TWO AUNTS, AND HER

18  MOTHER LIVE THERE.  HER AUNT ALSO DOES, HAS SHARED ACCESS

19  TO BANK ACCOUNTS IN CHINA.

20  Q.    WERE THERE TEXT MESSAGES AND VOICE MESSAGES BETWEEN

21  THE DEFENDANT AND THOSE PEOPLE WHO LIVE IN CHINA?

22  A.    NUMEROUS.

23  Q.    AND ONE OF THOSE PEOPLE WAS A WOMAN NAMED HONG MAI

24  PHAN (PH); IS THAT CORRECT?

25  A.    YES, THAT IS MS. YOU'S AUNT.

1    Q.    AND THAT WOMAN IS THE COCONSPIRATOR IDENTIFIED BY

2    PSEUDONYM IN THE INDICTMENT; IS THAT RIGHT?

3    A.    YES.

4    Q.    EARLIER YOU MENTIONED THAT SHE HAD, THE DEFENDANT

5    HAD SOME CONTACT WITH CHINESE GOVERNMENT OFFICIALS.  I'M

6    SHOWING YOU NOW WHAT'S BEEN MARKED AS EXHIBIT 17.  WHAT

7    ARE THESE ITEMS, AND I'LL SHOW YOU THE FRONTS AND THE

8    BACK?  GO AHEAD.

9    A.    THESE ARE BUSINESS CARDS.  WE LOCATED THESE IN

10   MULTIPLE PLACES.  THESE WERE SPECIFICALLY FOUND IN

11   MS. YOU'S HOME IN ATLANTA, AND THEY'RE BUSINESS CARDS OF

12   WEIHAI AND WEIHAI GOVERNMENT OFFICIALS THAT DR. YOU HAD

13   CONTACT WITH.  IT ALSO HAD SOME TEXT MESSAGES ABOUT

14   DR. YOU MEETING WITH AND HAVING LUNCH WITH THE VICE MAYOR,

15   WHICH I CAN ONLY ASSUME IS THIS ZHANG WEI INDIVIDUAL HERE,

16   WHILE IN CHINA.

17   Q.    AND THOSE PEOPLE, DID THE INVESTIGATION SHOW WHETHER

18   THEY WERE INVOLVED WITH THIS WEIHAI JINHONG PLANT TO

19   DEVELOP SECOND GENERATION BPA-NI TECHNOLOGY IN CHINA?

20   A.    TO SHOW THAT SOME OF THESE INDIVIDUALS WERE

21   INTIMATELY INVOLVED IN THE DEVELOPMENT OF THE JOINT

22   VENTURE PROCESS AND TRAVELED AND MET WITH MS. YOU IN AN

23   ATTEMPT TO BRING METLAC INTO THIS JOINT VENTURE PROCESS.

24   Q.    DOES THE DEFENDANT HAVE THE ABILITY TO OBTAIN

25   EMPLOYMENT IN CHINA?

1  A.   SHE'S EMPLOYED.  SHE HAS A CONTRACT STIPULATING THAT

2  SHE'S EMPLOYED BY WEIHAI JINHONG GROUP, AND, IN FACT,

3  WE'VE SEEN REFERENCES WHERE SHE IS DRAWING A MONTHLY

4  SALARY FROM WEIHAI JINHONG GROUP.

5  Q.   AS PART OF THE INVESTIGATION DID YOU UNCOVER ANY

6  EVIDENCE SHOWING THE DEFENDANT MOVING MONEY AROUND?

7  A.   THERE IS SIGNIFICANT AMOUNTS OF MONEY BEING MOVED

8  AROUND, YES.

9  Q.   AND IF YOU RECALL, WHICH BANKS WERE, WAS THAT MONEY

10  MOVED THROUGH, IF YOU COULD NAME ANY OF THEM?  AND IF YOU

11  DON'T RECALL IT BY NAME, WHY DON'T YOU TELL US WHERE

12  THEY'RE LOCATED.

13  A.   I THINK WE IDENTIFIED SIX BANK ACCOUNTS IN CHINA AT

14  DIFFERENT INSTITUTIONS, INCLUDING MOST NOTABLY THE

15  CONSTRUCTION BANK OF CHINA, I THINK THE AGRICULTURAL BANK

16  OF CHINA AND SOME OTHER ONES.

17  Q.   VARIOUS BANKS LOCATED IN CHINA?

18  A.   YES.

19  Q.   DO YOU KNOW IF SHE HAS, HOW MUCH MONEY SHE HAS AT A

20  FOUR LEVEL, AT ANY OF THESE CHINESE FINANCIAL

21  INSTITUTIONS?

22  A.   PRIOR TO DR. YOU'S ARREST WE IDENTIFIED

23  APPROXIMATELY $70,000 IN LIQUID ASSETS IN CHINA.

24  Q.   THAT'S WHAT YOU IDENTIFIED AS PART OF YOUR

25  INVESTIGATION?

1    A.    YES.

2    Q.    BUT NOT THROUGH THOSE FINANCIAL INSTITUTIONS, FROM

3    OTHER MEANS?

4    A.    THE TEXT MESSAGING BACK AND FORTH.

5    Q.    LET ME SHOW YOU NOW WHAT'S BEEN MARKED AS EXHIBIT

6    NUMBER 18.  WHAT IS THIS, WHAT DOES THIS DEPICT?

7    A.    SO FOLLOWING DR. YOU'S ARREST ON HER NEW TELEPHONE

8    THAT WE SEIZED, WE WERE ABLE TO IDENTIFY VOICE AND TEXT

9    MESSAGING BETWEEN DR. YOU AND HER AUNT, AND THIS PICTURE

10   COINCIDES WITH THOSE TEXT MESSAGES AND AUDIO RECORDINGS,

11   WHERE HER AUNT KEEPS AN OLD SCHOOL RECORD BOOK OF FINANCES

12   IN AND OUT OF A JOINT CONSTRUCTION BANK ACCOUNT.

13   Q.    WHEN YOU INTERVIEWED THE DEFENDANT, DID SHE SAY

14   WHETHER OR NOT SHE WAS BEING PAID BY THE WEIHAI JINHONG

15   GROUP?

16   A.    SHE WAS ADAMANT THAT SHE WASN'T BEING PAID, THAT SHE

17   WAS NEVER GOING TO BE PAID AND THAT THERE WAS NEVER GOING

18   TO BE ANY MONEY CHANGING HANDS.

19   Q.    THIS IS JUST A FEW MONTHS AGO?

20   A.    THIS WAS FEBRUARY 2019.

21   Q.    DID YOUR INVESTIGATION SHOW WHETHER OR NOT SHE WAS

22   ACTUALLY BEING PAID BY WEIHAI JINHONG GROUP?

23   A.    IF YOU'RE ABLE TO SEE IT HERE, THE ORANGE HIGH-

24   LIGHTED ASPECTS WERE HIGHLIGHTED BY THE DEFENDANT'S AUNT,

25   AND THEY REPRESENT INCOME IN, BELONGING TO MS. YOU, TO THE

1  TUNE OF, I BELIEVE SHE GETS PAID 50,000 YUAN A MONTH FROM

2  WEIHAI JINHONG GROUP.  THAT SALARY STARTED IN JUNE 2018,

3  AND WE WERE ABLE TO IDENTIFY IT THROUGH, IT LOOKS LIKE,

4  NOVEMBER.

5  Q.    ON SEPTEMBER 5TH, EARLIER YOU TESTIFIED THAT THE

6  DEFENDANT RETURNED TO THE UNITED STATES; IS THAT

7  CORRECT?

8  A.    THAT'S CORRECT.

9  Q.    WHEN SHE RETURNED, WAS SHE INTERCEPTED BY ANY

10  GOVERNMENT AUTHORITY?

11  A.    CUSTOMS AND BORDER PROTECTION AGENTS MET DR. YOU AT

12  THE BORDER.

13  Q.    DID THEY QUESTION HER?

14  A.    YES.

15  Q.    WERE THOSE QUESTIONS ABOUT THE SUBJECT MATTER OF

16  TODAY'S TESTIMONY MORE OR LESS, OR HOW WOULD YOU

17  CHARACTERIZE THEM?

18  A.    I THINK THEY WERE FAIRLY GENERAL IN NATURE, BUT THEY

19  DID STIPULATE, DID YOU RETAIN DOCUMENTS THAT YOU SHOULDN'T

20  HAVE, DO YOU STILL HAVE THOSE DOCUMENTS, WHO ARE YOU

21  EMPLOYED BY, ET CETERA.

22  Q.    IS IT FAIR TO SAY THAT SHE UNDERSTOOD ON SEPTEMBER

23  5TH THAT SOMEBODY MIGHT BE INTERESTED IN HER?

24  A.    YES.

25  Q.    AND THEN LATER WHEN YOU ARRESTED HER, DID YOU

1   CONDUCT A SEARCH, YOU OR OTHER AGENTS CONDUCT A SEARCH OF

2   HER APARTMENT?

3   A.    YES.

4   Q.    THAT WAS IN FEBRUARY OF 2019?

5   A.    CORRECT.

6   Q.    YOU FOUND THE SECOND HARD DRIVE, AS YOU TESTIFIED

7   EARLIER?

8   A.    YES.

9   Q.    AND ON THAT HARD DRIVE WHAT WAS LOCATED?

10  A.    WITHIN THE RECYCLING BINS, RECYCLING BIN WAS A

11  DUPLICATION OF THE BPA-NI TRADE SECRET DOCUMENT FOLDERS

12  THAT WERE LOCATED ON THE HARD DRIVE THAT EASTMAN HAD

13  SEIZED EARLIER.  SOMEONE HAD TAKEN THAT MATERIAL AND MOVED

14  IT, DELETED IT ON SEPTEMBER 6TH.

15  Q.    THE DAY AFTER THE DEFENDANT WAS INTERCEPTED BY

16  CUSTOMS AND BORDER PATROL?

17  A.    THAT'S CORRECT.

18  Q.    MR. XIANGCHEN WAS A DEFENDANT IN THIS CASE AS WELL,

19  AS YOU KNOW.  HAS MR. XIANGCHEN CONTACTED THE FBI OR THE

20  DEPARTMENT OF STATE TO YOUR KNOWLEDGE TO TURN HIMSELF IN?

21  A.    NO.

22  Q.    THE INDICTMENT IS PUBLIC; RIGHT?

23  A.    YES.

24  Q.    ON THE DAY THE DEFENDANT WAS ARRESTED, WHERE WAS

25  SHE, WHAT CITY?

```
1    A.    SHE WAS IN LANSING, MICHIGAN.

2    Q.    DID SHE LIVE IN A HOUSE?

3    A.    SHE RENTED AN APARTMENT.

4    Q.    WAS SHE LIVING THERE WITH HER HUSBAND?

5    A.    NO.

6    Q.    WHO WAS SHE LIVING THERE WITH?

7    A.    SHE LIVED THERE BY HERSELF.

8    Q.    WOULD YOU DESCRIBE HOW THE APARTMENT WAS

9    FURNISHED?

10   A.    BARELY.  SO THERE WAS A FOLD-UP CHAIR IN THE MAIN

11   LIVING SPACE WITH A FOLD-UP TABLE AND THEN DR. YOU HAD

12   UTILIZED EMPTY CARDBOARD BOXES FOR STORAGE AND HAD A

13   MATTRESS ON THE FLOOR.

14   Q.    NO BED FRAME?

15   A.    NO.

16   Q.    WHEN YOU -- WHEN AGENTS SEARCHED THAT APARTMENT, DID

17   THEY FIND A SUITCASE?

18   A.    THEY FOUND A BRIEFCASE.

19   Q.    THIS IS EXHIBIT NUMBER 19.  IS THIS A PICTURE OF

20   THAT BRIEFCASE THAT THEY FOUND?

21   A.    YES.

22   Q.    WAS IT OPEN OR CLOSED WHEN THEY FOUND IT?

23   A.    IT WAS CLOSED AND LOCKED.

24   Q.    IT WAS LOCKED?

25   A.    YES.
```

1    Q.    DID THEY BREAK IT OPEN OR DID THEY ATTEMPT TO -- DID

2    YOU ATTEMPT TO GET THE DEFENDANT TO PROVIDE YOU WITH THE

3    KEY?

4    A.    THE SEARCHING AGENTS CONTACTED ME, I WAS INVOLVED IN

5    THE TRANSPORT OF DR. YOU TO HER INITIAL APPEARANCE, AND

6    STATED THAT THEY HAD FOUND A BRIEFCASE LOCKED AND

7    REQUESTED THAT WE GET THE CODE FROM MS. YOU.

8    Q.    DID YOU ASK THE DEFENDANT FOR THE CODE?

9    A.    I DID.

10   Q.    WHAT DID SHE SAY?

11   A.    FIRST SHE SAID SHE DIDN'T REMEMBER, THEN SHE DIDN'T

12   RECALL, AND SHE WAS -- I EXPLAINED THAT IF WE HAD TO

13   SEARCH IT, WE WERE GOING TO BREAK IT, AND SHE NEVER GAVE

14   US THE CODE.

15   Q.    WHAT DID AGENTS DO IN RESPONSE?

16   A.    THEY FIDDLED WITH THE NUMBERS, AND IT OPENED RIGHT

17   UP.

18   Q.    THEY MOVED ONE DIGIT; IS THAT RIGHT?

19   A.    IT WASN'T VERY MUCH.

20   Q.    OKAY.  IS THIS A PICTURE OF THAT BRIEFCASE RIGHT

21   AFTER THEY OPENED IT?

22   A.    YES.

23   Q.    AND HERE ON THE SECOND PAGE OF EXHIBIT 19, THE

24   CONTENTS OF THAT BRIEFCASE ARE SPREAD OUT OVER THE FLOOR;

25   IS THAT RIGHT?

1    A.    THAT IS CORRECT.

2    Q.    IS THIS IN THE DEFENDANT'S APARTMENT IN LANSING?

3    A.    YES.

4    Q.    THE UNFURNISHED APARTMENT?

5    A.    YES.

6    Q.    WHAT WERE THE CONTENTS OF THIS BRIEFCASE?

7    A.    THE CONTENTS, YOU SEE THEM HERE, HERE THEY

8    INCLUDED --

9    Q.    DOWN HERE IN THE BOTTOM LEFT, WHAT'S THIS?

10   A.    OKAY, SO THAT'S CURRENCY.  WE FOUND THOUSANDS OF

11   DOLLARS IN CURRENCY IN MULTIPLE, WE HAD POUNDS, EUROS,

12   AUSTRALIAN DOLLAR, U.S. DOLLARS, CHINESE, RMB AND YUAN.

13   Q.    AND WHAT'S UP HERE?

14   A.    THOSE ARE PASSPORTS BELONGING TO -- DR. YOU'S

15   CURRENT PASSPORT AND THEN SOME OLD PASSPORTS BELONG TO

16   HER, OLD PASSPORTS BELONG TO HER HUSBAND AND HER

17   DAUGHTER.

18   Q.    WHAT WAS THE -- DOES THE FBI HAVE A TERM THEY USE

19   FOR THIS TYPE OF BRIEFCASE WITH THESE TYPES OF DOCUMENTS

20   IN THEM?

21   A.    SOME INDIVIDUALS REFER TO THAT AS A GO BAG, WHAT

22   DOCUMENTS THAT ONE WOULD NEED ARE READY TO GO AT A

23   MOMENT'S NOTICE.

24   Q.    WHAT ARE THESE OTHER DOCUMENTS STREWN OUT ALONG THE

25   FLOOR HERE?

A.     SO WITHIN THE BRIEFCASE ALSO CONTAINED DR. YOU AND

HER HUSBAND'S TRANSCRIPTS, DIPLOMAS, NATURALIZATION

PAPERS, INSURANCE INFORMATION, ALL THE PERTINENT DOCUMENTS

ONE WOULD ACQUIRE THROUGHOUT LIFE.  ALSO INCLUDED ARE

JOINT BANK ACCOUNT AT PNC BANK AND A BANK STATEMENT FROM

THE CHINESE BANK, CONSTRUCTION BANK.

Q.     SO THE DEFENDANT HAS A LARGE AMOUNT OF CASH IN

VARIOUS CURRENCIES YOUR INVESTIGATION REVEALED, BUT ALSO

HAS MONEY IN CHINESE BANKS?

A.     YES.

Q.     SO SHE'S WILLING TO USE BANKS, IT WOULD SEEM?

A.     YES.

Q.     NOW, THE FBI STILL HAS POSSESSION OF THESE ITEMS; IS

THAT RIGHT?

A.     YES.

Q.     AS A THOUSAND TALENT PROGRAM AWARD WINNER, ARE YOU

ABLE TO BREEZE THROUGH CUSTOMS OR IS IT DIFFICULT FOR YOU

TO GET THROUGH CUSTOMS WHEN YOU SHOW UP IN CHINA?

A.     YOU'RE PROVIDED WITH A CARD THAT BASICALLY, IT'S

SIMILAR TO A FAST PASS WHERE YOU GO TO A LINE, AND BEING A

THOUSAND TALENT MEMBER, YOU GET TO GO THROUGH WITH

RELATIVE EASE.

            MR. HARKER:  YOUR HONOR, I HAVE A FEW REMAINING

EXHIBITS THAT ARE REALLY JUST COURT DOCUMENTS PULLED OFF

OF PACER THAT I CAN RESERVE FOR ARGUMENT IF THE DEFENSE

1  DOESN'T OBJECT.  I THINK THEY'VE HAD A CHANCE TO LOOK AT

2  THESE, THEY'RE ALL PUBLICLY FILED DOCUMENTS, BUT I THINK

3  THEY'LL BE RELEVANT TO MY ARGUMENT AND I DON'T NEED TO

4  INTRODUCE THESE THROUGH THE WITNESS.

5            THE COURT:  OKAY.

6            MR. HARKER:  SO I JUST MOVE TO INTRODUCE ALL

7  THESE EXHIBITS.

8            THE COURT:  ALL RIGHT.  LET THEM BE ADMITTED IN

9  THE ORDER THAT THEY WERE, AND I HAVE EXHIBITS 1 THROUGH,

10 IT LOOKS LIKE, 23?

11           MR. HARKER:  20 THROUGH 23 ARE THE ONES THAT

12 I'LL RESERVE FOR ARGUMENT.  1 THROUGH 19 ARE THE EXHIBITS

13 THAT I JUST PROCEEDED THROUGH WITH THIS WITNESS.

14           THE COURT:  OKAY.  ALL RIGHT, SO 1 THROUGH 19

15 WILL BE -- DO YOU WANT TO ADMIT 20 THROUGH 23?

16           MR. HARKER:  YES, YOUR HONOR.

17           THE COURT:  ALL RIGHT.  THEY'LL BE ADMITTED AS

18 WELL.

19           ALL RIGHT.  ARE YOU FINISHED?

20           MR. HARKER:  I'M FINISHED, YOUR HONOR.

21           THE COURT:  ALL RIGHT, MR. JESSE, DO YOU WANT

22 TO TAKE A FEW MINUTE BREAK?

23           MR. JESSEE:  YES, IF WE COULD, YOUR HONOR.

24           THE COURT:  YEAH, THAT WILL BE FINE.  WE'VE

25 BEEN GOING AT IT FOR ABOUT TWO HOURS, SO WE'LL BE IN

1  RECESS FOR ABOUT TEN MINUTES.

2      (RECESS FROM 10:56 A.M. UNTIL 11:15 A.M.)

3          THE COURT:  ALL RIGHT.  MR. JESSEE, YOU'RE FREE

4  TO CROSS EXAMINE.

5          MR. JESSEE:  THANK YOU, YOUR HONOR.

6  CROSS EXAMINATION

7  BY MR. JESSEE:

8  Q.    HAVE YOU SEEN THE MOTION AND THE ATTACHMENTS THAT

9  WERE FILED ON BEHALF OF THE DEFENDANT --

10  A.    NOT THAT I RECOLLECT.

11  Q.    -- FOR RELEASE?

12  A.    I THINK I'VE LOOKED AT THEM ONCE.

13  Q.    WELL, THEN YOU SAW SHE HAS A SISTER LIVING IN THE

14  UNITED STATES; CORRECT?

15  A.    IF IT'S IN THERE, THEN, YES, I SAW THAT.

16  Q.    OKAY.  WELL, THEN WHY DID YOU TELL THE COURT SHE

17  DOESN'T HAVE ANYBODY BUT HER HUSBAND AND DAUGHTER?

18  A.    I DON'T RECOLLECT IN THE COURSE OF THE INVESTIGATION

19  IDENTIFYING ANY OF THE FAMILY MEMBERS THAT LIVED IN THE

20  UNITED STATES.

21  Q.    SHE VOLUNTARILY INTERVIEWED WITH YOU; DIDN'T SHE?

22  A.    YES.

23  Q.    SHE TOLD YOU SHE HAD A SISTER AND DAUGHTER IN SAN

24  JOSE, CALIFORNIA, AND THAT HER DAUGHTER -- HER SISTER HAS

25  CHILDREN THAT SHE SEES REGULARLY; DIDN'T SHE?

1    A.    I DON'T RECOLLECT THAT, NO.

2    Q.    OKAY, BUT YOU DON'T DISPUTE THAT SHE HAS A SISTER IN

3    SAN JOSE, GIVEN THAT THE DECLARANT, HER SISTER, SIGNED IT

4    AND FILED IT HERE WITH THE COURT, DID YOU CHECK IT OUT?

5    A.    NO.

6    Q.    YOU DIDN'T INTENTIONALLY WANT TO MISLEAD THE COURT;

7    DID YOU?

8    A.    NO.

9    Q.    DID YOU GO TO ITALY OR CONTACT ANYBODY IN ITALY AT

10   THE CAN COATING COMPANY THERE?

11   A.    YES.

12   Q.    OKAY.  AND THEY WERE DOING THE NEGOTIATIONS TO DO

13   THE JOINT VENTURE IN CHINA; WERE THEY NOT?

14   A.    AT THAT INITIAL CONTACT WITH THE COMPANY IN ITALY,

15   METLAC, WE HAVEN'T HAD A FORMAL SITDOWN YET, NO.

16   Q.    SO YOU DIDN'T BOTHER TO FIGURE OUT THAT THIS STORY

17   YOU TOLD ABOUT THIS JOINT VENTURE DOCUMENTS NEVER OCCURRED

18   BECAUSE METLAC DIDN'T SIGN THE AGREEMENT.  YOU KNOW THAT;

19   DON'T YOU?

20   A.    THE INVESTIGATION INDICATED THAT THE JOINT VENTURE

21   WAS NOT FINALIZED, YES.

22   Q.    SO THERE IS NO DEAL IN CHINA 'CAUSE METLAC DIDN'T

23   SIGN THE AGREEMENT?

24   A.    THE AGREEMENT THAT WAS REFERRED TO WAS MS. YOU'S

25   AGREEMENT WITH WEIHAI JINHONG COMPANY TO ASSIST IN

1    OBTAINING A JOINT VENTURE WITH METLAC.

2    Q.    AND IT DIDN'T HAPPEN?

3    A.    I CANNOT CONFIRM THAT, BUT IT DOESN'T SEEM THAT WAY,

4    NO.

5    Q.    OKAY.  AND YOU DO KNOW THAT METLAC IS A CAN LINING

6    PRODUCER, LARGEST ONE IN EUROPE; CORRECT?

7    A.    IT SEEMS THAT WAY, YES.

8    Q.    OKAY, SO WHY IN THE WORLD DO YOU THINK ANYBODY NEEDS

9    DOW CHEMICAL'S OLD DATA THAT WAS DONE BEFORE BPA-FREE, WHO

10   CARES ANYMORE NOW THAT SHE'S GOT METLAC THAT'S GOING TO DO

11   THIS ALLEGED DEAL THAT YOU KEEP DESCRIBING?

12   A.    IT SEEMS LIKE DOW CARES.

13   Q.    OKAY.  IT SEEMS LIKE DOW CARES.  WHEN YOU SENT THEM

14   THE INFORMATION, DID YOU OR ANYONE ELSE READ IN DETAIL FOR

15   THEM THE STATUTE AS TO THE DEFINITION OF WHAT YOU EASILY

16   THROW AROUND THE WORDS "TRADE SECRET"?

17   A.    NO.  THE INFORMATION WAS PROVIDED TO THESE COMPANIES

18   TO REVIEW AND TO RETURN BACK THEIR ASSESSMENT OF THE DATA.

19   Q.    OKAY.  SO YOU DIDN'T ASK THEM WHAT WAS CONFIDENTIAL

20   INFORMATION NOT COVERED BY THE STATUTE, I'M NOT SAYING

21   THEY DON'T WANT TO GET IT OUT, NOT COVERED BY THE STATUTE,

22   AND WHAT IS COVERED BY THE STATUTE, YOU DIDN'T ASK THAT;

23   DID YOU?

24   A.    I ASKED THEM TO IDENTIFY INFORMATION THAT WAS

25   IMPORTANT TO THEIR INDIVIDUAL COMPANIES, YES.

Q.    BUT YOU DIDN'T ASK THEM TO BREAK IT DOWN BETWEEN
WHAT WAS, QUOTE, A TRADE SECRET AND WHAT WAS CONFIDENTIAL
INFORMATION?
A.    I CAN'T RECOLLECT THE CONVERSATIONS THAT I HAD; BUT
I AM SURE THAT IF THERE WERE TRADE SECRETS, THAT I ASKED
THEM TO IDENTIFY TRADE SECRETS, YES.
Q.    WELL, LET ME ASK YOU, THERE'S REFERENCE IN THE DOW
ONE ABOUT PATENTS.  YOU KNOW PATENTS ARE PUBLIC KNOWLEDGE;
DON'T YOU?
A.    YES.
Q.    THAT'S NOT THE DEFINITION OF A TRADE SECRET; IS
IT?
A.    NO.
Q.    OKAY.  AND YOU KNOW THAT ALL THESE CAN LINING
FORMULAS AND PROCESSES HAVE TO BE PREAPPROVED BY THE FOOD
AND DRUG ADMINISTRATION; CORRECT?
A.    YES.
Q.    PUBLIC KNOWLEDGE, AGAIN; CORRECT?
A.    THAT SOUNDS REASONABLE, YES.
Q.    OKAY, SO YOU'VE NOT BEEN ABLE TO EVEN GIVE THE COURT
A FOUNDATION AS TO THESE SIX THINGS ARE DEFINITELY DEFINED
AS TRADE SECRETS UNDER THIS STATUTE; HAVE YOU?
        MR. HARKER:  YOUR HONOR, IF I COULD OBJECT, THE
GRAND JURY HAS ALREADY FOUND THAT THESE WERE TRADE
SECRETS.

1     THE COURT:  OKAY.

2     MR. JESSEE:  I WON'T COMMENT ON WHAT I THINK OF

3  THE GRAND JURY.

4     THE COURT:  ALL RIGHT.  OVERRULED.

5  Q.   WELL, DID YOU GO IN AND TELL THE GRAND JURY WHICH

6  ONES ARE TRADE SECRETS?

7  A.   I TOLD THE GRAND JURY WHAT THE COMPANIES TOLD ME,

8  THAT THEY IDENTIFIED MATERIAL WITHIN, THAT I SUBMITTED

9  THAT WAS TRADE SECRET TO THEIR COMPANY.  I'M NOT AN EXPERT

10  IN THIS TECHNOLOGY.

11  Q.   AND NOT ONE OF THOSE DECLARATIONS THAT YOU'VE

12  OFFERED TODAY BREAKS DOWN WHAT ONES ARE SPECIFICALLY TRADE

13  SECRETS; DOES IT?

14  A.   NO.  THEY IDENTIFY SPECIFIC DOCUMENTS THAT CONTAIN

15  TRADE SECRETS, YES.

16  Q.   NO, THEY DEFINE DOCUMENTS.  THEY DIDN'T TELL YOU

17  WHICH ONES HAD THE TRADE SECRETS AND WHICH ONES HAD JUST

18  CONFIDENTIAL INFORMATION.

19  A.   I BELIEVE SEVERAL OF THE COMPANIES IDENTIFIED

20  DOCUMENTS THAT FELL INTO BOTH CATEGORIES.

21  Q.   OKAY.  DID YOU ASK THEM HOW MUCH OF THAT INFORMATION

22  IS PUBLIC KNOWLEDGE BASED ON THE PATENTS THAT THEY HAD?

23  A.   NO, I DID NOT.

24  Q.   WE TALKED ABOUT DR. YOU'S SISTER AND HER FAMILY,

25  WHICH YOU HAVE FORGOTTEN.  YOU SEEMED SURPRISED THAT HER

1  APARTMENT HADN'T GOTTEN FURNISHED YET TO ANY GREAT EXTENT.

2  DO YOU KNOW WHEN SHE MOVED THERE?

3  A.    SHE WAS IN THE PROCESS OF MOVING THERE IN SEPTEMBER

4  OF 2018 WHEN SHE CAME BACK FROM ITALY.

5  Q.    NO, I'M ASKING, DO YOU KNOW WHEN SHE SIGNED THE

6  LEASE TO MOVE INTO HER APARTMENT?

7  A.    NO (UNINTELLIGIBLE).

8  Q.    WHAT DATE DID YOU ARREST HER?

9  A.    FEBRUARY 14TH.

10 Q.    FEBRUARY 14TH.  DID YOU REALIZE THAT SHE DIDN'T EVEN

11 SIGN THE LEASE TILL DECEMBER 8, 2018; AND YOU KNOW SHE

12 TRAVELED AT CHRISTMAS; DON'T YOU?  SHE TOLD YOU THAT.

13 LESS THAN 35 DAYS TO GET HER APARTMENT FURNISHED, IS IT

14 FAIR TO THINK SHE MIGHT NOT HAVE HAD TIME OVER THE

15 HOLIDAYS TO GO GET HER FURNITURE?

16 A.    I'M NOT SURE WHAT SHE DID OVER THE HOLIDAYS.  I KNOW

17 THAT SHE WAS GIVEN A MOVING ALLOWANCE FROM THE COMPANY

18 THAT SHE WAS WORKING FOR IN LANSING, MICHIGAN.

19 Q.    WELL, THAT'S ANOTHER PIECE OF EVIDENCE THAT I FIND

20 THAT I DON'T UNDERSTAND WHY YOU LEFT OUT.  MR. HARKER

21 ASKED YOU THE LAST JOB SHE HAD WAS AT EASTMAN.  WHEN YOU

22 ARRESTED HER, SHE WAS WORKING; WASN'T SHE?

23 A.    THAT'S CORRECT.

24 Q.    OKAY.  AND SHE WAS WORKING WITH A COMPANY IN

25 MICHIGAN DOING THE SCIENCE THAT SHE DOES; CORRECT?

1   A.    YES.

2   Q.    DID YOU GO INTERVIEW THEM?

3   A.    SUBSEQUENT TO HER ARREST.

4   Q.    OKAY.  YOU KNOW SHE GOT FIRED, OBVIOUSLY, WHEN SHE

5   GOT ARRESTED AND COULDN'T COME BACK?

6   A.    INDIVIDUALS INTERVIEWED STATED THAT THEY WERE GOING

7   TO FIRE HER THE FOLLOWING DAY.

8   Q.    OKAY, SO YOU DIDN'T INTENTIONALLY LEAVE OUT THAT SHE

9   WAS EMPLOYED AT THE TIME THAT YOU ARRESTED HER?

10  A.    NO.

11  Q.    OKAY.  YOU'RE SEEN THE PUBLIC SERVICE ADS ABOUT BE

12  PREPARED FOR STORMS, FOR DISASTERS, FOR FIRES THAT ARE

13  FOREVER RUNNING ON TV ANYMORE?

14  A.    OKAY, PROBABLY.

15  Q.    YOU'VE SEEN THEM.  I ASSUME YOU KEEP SOME STUFF IN

16  THE HOUSE IF THE POWER GOES OUT FOUR OR FIVE DAYS?

17  A.    YES.

18  Q.    SO LET ME ASK YOU, WHAT'S SO UNUSUAL TO KEEP ONE'S

19  PERSONAL DOCUMENTS, INSURANCE, HEALTH CARDS AND ALL THAT,

20  IN A SAFE PLACE IF THERE IS A NATURAL DISASTER?

21  A.    NOTHING.

22  Q.    OKAY.  AND THE STUFF IN THAT -- START OFF WITH YOU

23  DIDN'T FIND ANY GUNS, KNIVES, ANY DANGEROUS WEAPONS IN ALL

24  THIS; DID YOU?

25  A.    NO.

Q.    OKAY.  AND IN THAT BAG YOU SEEM TO IMPLY OR SAY TO

THE COURT THAT YOU THINK SHE'S RUNNING TO CHINA, OR

POTENTIALLY IS GOING TO RUN TO CHINA.  WOULD YOU AGREE

WITH ME THAT THE ONE LARGEST QUANTITY OF CASH IN THERE WAS

MONEY FROM EUROPE, EUROS, AND MONEY FROM GREAT BRITAIN IN

POUNDS, THAT SHE ONLY HAD 400 YUAN IN THE BAG, WHICH I

THINK IS 60, $70?

A.    IT SOUNDS ACCURATE.

Q.    OKAY, SO YOU FIGURE SHE'S GOING TO START HER LIFE IN

CHINA WITH 60 BUCKS, SHE'S GOING TO GET FROM HERE TO

CHINA?  LET ME ASK YOU, IN THOSE PASSPORTS, YOU COMMENTED

THAT YOU FOUND THE ORIGINAL, HER ORIGINAL PASSPORT?

A.    FOUND OLDER OUT-OF-DATE PASSPORTS, YES.

Q.    OKAY.  IS THERE SOMETHING WRONG WITH OLD,

OUT-OF-DATE PASSPORTS?

A.    NO.

Q.    YOU'RE ALLOWED TO KEEP THEM; AREN'T YOU?

A.    YES.

Q.    A LOT OF PEOPLE KEEP THEM BECAUSE THE STAMPS WHERE

ALL THEY'VE BEEN, THEY SORT OF USE THEM AS A COLLECTOR'S

SITUATION; DON'T YOU?  YOU'VE SEEN THAT, HEARD THAT?

A.    YES.

Q.    OKAY.  WELL, AND HER ACTIVE PASSPORT, IT WAS AN

AMERICAN PASSPORT; WASN'T IT?

A.    THAT'S CORRECT.

1  Q.    SHE DOESN'T HAVE A CHINESE PASSPORT; DOES SHE?

2  A.    NOT THAT WE UNCOVERED, NO.

3  Q.    OKAY.  NOT THAT YOU UNCOVERED.  WELL, IF YOU HAD

4  LOOKED INSIDE THE PASSPORT, YOU WOULD HAVE FOUND THAT SHE

5  HAS A VISA THAT ALLOWS HER TO TRAVEL TO CHINA BECAUSE SHE

6  DOESN'T HAVE A PASSPORT, DID YOU SEE HER VISA?

7  A.    YES.

8  Q.    OKAY.  YOU TOOK HER PASSPORT; CORRECT?

9  A.    YES.

10  Q.    YOU TOOK HER VISA?

11  A.    YES.

12  Q.    OKAY, SO I PRESUME, AT LEAST FROM MY EXPERIENCE, SHE

13  SURE AS HECK CAN'T GET ON AN INTERNATIONAL FLIGHT AND GET

14  OUT OF THIS COUNTRY WITHOUT HER PASSPORT AND WITHOUT THAT

15  VISA?

16  A.    THAT IS CORRECT.

17  Q.    OKAY, AND DO YOU AGREE WITH ME THAT SHE ALSO CAN'T

18  GET INTO CHINA WITHOUT THE VISA?

19  A.    I'M NOT FAMILIAR WITH CHINA'S LAWS.  I WOULD ASSUME

20  THAT THAT IS A REQUIREMENT, YES.

21  Q.    WELL, THEN WHY WOULD YOUR OFFICE OR THE U.S.

22  ATTORNEY'S OFFICE SAY THAT SHE HAS DUAL CITIZENSHIP

23  BECAUSE YOU KNOW THAT SHE'S NOT A DUAL CITIZEN.  SHE

24  RELINQUISHED HER CITIZENSHIP IN CHINA WHEN SHE BECAME AN

25  AMERICAN CITIZEN, AS DID HER HUSBAND, YOU KNEW THAT.

1   A.    I KNOW SHE'S A U.S. CITIZEN, YES.

2   Q.    AND YOU KNEW SHE DOES NOT HAVE DUAL CITIZENSHIP?

3   A.    RECOGNIZED BY THE UNITED STATES, YES.

4   Q.    OKAY.  AND THE ONLY EMPLOYMENT SHE HAD TO YOUR

5   ACTUAL KNOWLEDGE, ACTUALLY WORKING, WHEN YOU ARRESTED HER,

6   WAS IN MICHIGAN; CORRECT?

7   A.    AT THE TIME SHE WAS ARRESTED TO MY KNOWLEDGE?

8   Q.    MM-HMM.

9   A.    WAS THAT SHE HAD FULL-TIME EMPLOYMENT IN MICHIGAN,

10  YES.

11  Q.    OKAY, SO IF SHE'S A FLIGHT RISK, YOU HAVE HER COMING

12  BACK THROUGH THE AIRPORT IN SEPTEMBER; IS THAT CORRECT?

13  A.    YES.

14  Q.    OKAY.  AND YOU SAID, I THINK, THAT SHOULD HAVE PUT

15  HER ON SOME CAUTION ABOUT SOMEBODY WAS LOOKING AT HER,

16  FAIR STATEMENT?

17  A.    YES.

18  Q.    OKAY.  SHE WENT BACK OUT OF THE COUNTRY AFTER THAT

19  AND CAME BACK; CORRECT?

20  A.    YES.

21  Q.    SHE WENT BACK OUT AGAIN AND CAME BACK, I THINK SHE

22  WENT TWICE.  YOU DON'T KNOW?  YOU STOPPED, YOU STOPPED

23  YOUR CHART IN NOVEMBER, DO YOU KNOW WHETHER SHE WENT

24  ANYWHERE AFTER NOVEMBER?

25  A.    I DON'T KNOW.

1   Q.    OKAY.  AND NOT ONLY DID SHE COME BACK, SHE TOLD YOU

2   SHE DIDN'T WANT TO BE ARRESTED BECAUSE SHE WANTED TO GO

3   BACK TO WORK THE NEXT MORNING, FAIR STATEMENT?

4   A.    I DON'T REMEMBER THAT, NO.

5   Q.    OKAY.  DID YOU INTERVIEW HER DAUGHTER?

6   A.    NO.

7   Q.    SO YOU DON'T KNOW WHAT REALLY HER DAUGHTER'S

8   RELATIONSHIP IS WITH HER MOTHER; DO YOU?

9   A.    NO.

10  Q.    GOING DOWN THE DETENTION STATUTE, YOU AGREE WITH ME

11  THAT SHE'S NOT CHARGED WITH ANY VIOLENT CRIME, SEX

12  OFFENDER, NONE OF THE CATEGORIES THAT MAKES RETAINING HER

13  MANDATORY?

14  A.    I AGREE.

15  Q.    OKAY.  SHE HAS, YOU AGREE, NO CRIMINAL HISTORY OF

16  ANY KIND?

17  A.    NO.

18  Q.    OKAY.  YOU FOUND NO WEAPONS OR SAW ANYTHING THAT

19  CAUSED YOU TO BELIEVE SHE'S VIOLENT OR WOULD HURT SOMEBODY

20  IN THE COMMUNITY?

21  A.    NO.

22  Q.    SHE WAS GAINFULLY EMPLOYED AND HAS BEEN CONSTANTLY

23  GAINFULLY EMPLOYED SINCE GETTING HER PH.D.; IS THAT

24  CORRECT?

25  A.    YES.

1    Q.    OKAY.  IN FACT, ALTHOUGH YOU SAY EASTMAN DESCRIBED

2    HER AS NOT THE MOST COOPERATIVE EMPLOYEE, SHE'S BEEN ABLE

3    TO GET JOBS RELATIVELY EASILY WHEN SHE MOVES ON TO ANOTHER

4    COMPANY?  YOU'VE REVIEWED HER RESUME.

5    A.    HER RESUME IS CONSISTENT EMPLOYMENT, YES.

6    Q.    AND YOU SAY THAT SHE'S NOT CLOSE TO HER HUSBAND.

7    NOW, THEY WORKED TOGETHER IN MASSACHUSETTS AT ONE TIME,

8    SHE HAD A JOB IN MASSACHUSETTS, HE DID TOO, YOU KNEW THAT?

9    YES?

10   A.    YES.

11   Q.    OKAY.  AND YOU KNEW THAT THE HOUSE IN ATLANTA WAS

12   BOUGHT WHEN SHE WENT TO WORK FOR COCA-COLA, AND IT'S PAID

13   FOR, AND IT'S IN HER AND HER HUSBAND'S NAME, YOU KNOW

14   THAT?

15   A.    I KNEW IT WAS IN THEIR -- JOINTLY, YES.

16   Q.    AND YOU KNEW THAT THE HUSBAND CONTINUED TO WORK IN

17   BOSTON UNTIL YOU ARRESTED HIS WIFE, AND THEN HE GOT FIRED,

18   YOU KNEW THAT?

19   A.    YES.

20   Q.    AND YOU KNOW HE NOW LIVES IN ATLANTA IN THEIR

21   HOUSE?

22   A.    I DID NOT KNOW THAT.

23   Q.    YOU DIDN'T KNOW THAT?

24   A.    NO.

25   Q.    OKAY.  DID YOU ASK HIM?

1    A.    NO.

2    Q.    OKAY.  YOU KNOW THEY HAVE A HOUSE RIGHT UP, LESS

3    THAN 25 MILES FROM HERE, A HOUSE IN WASHINGTON COUNTY,

4    TENNESSEE, THAT SHE LIVED IN?

5    A.    YES.

6    Q.    OKAY.  DO YOU KNOW WHAT THEY DID FOR THE HOLIDAYS,

7    THIS PAST HOLIDAY, THE FAMILY?

8    A.    I DO NOT.

9    Q.    OKAY.  BASED ON THE FINANCIAL AFFIDAVIT, THEY'VE GOT

10   OVER A MILLION FIVE HUNDRED THOUSAND DOLLARS WORTH OF

11   VALUE IN MONEY, CARS AND HOUSES PAID FOR IN THE UNITED

12   STATES; DON'T THEY?

13   A.    THEY HAVE SUBSTANTIAL ASSETS IN THE UNITED STATES,

14   YES.

15   Q.    OKAY.  DR. YOU HAS NO OTHER CASES PENDING, YOU

16   AGREE?

17   A.    YES.

18   Q.    OKAY.  YOU FOUND NO HISTORY OF ANY DRUG OR ALCOHOL

19   PROBLEMS; DID YOU?

20   A.    NO.

21   Q.    DID YOU DO ANYTHING TO CHECK ABOUT HER HEALTH OTHER

22   THAN TO REALIZE THAT SHE'S IN GOOD HEALTH OR REASONABLE

23   HEALTH?

24   A.    SHE IDENTIFIED SOME MEDICATION THAT SHE TAKES UPON

25   OUR REQUEST.

1  Q.   GOING BACK TO THE BAG, WHAT IN THE BAG SPECIFICALLY,

2  SPECIFICALLY CONCERNED YOU ABOUT THAT THAT SHE WOULD BE A

3  FLIGHT RISK WITH WHAT WAS IN THAT BAG?

4  A.   THE BAG CONTAINS ALL OF DR. YOU'S ORIGINAL DOCUMENTS

5  THAT WOULD BE IMPORTANT FOR HER TO GAIN EMPLOYMENT OR

6  ANY -- REALLY DO ANYTHING (UNINTELLIGIBLE), HER SOCIAL

7  SECURITY CARD, HER DIPLOMAS, HER TRANSCRIPTS.

8  Q.   OTHER THAN WHAT WOULD YOU HAVE PROPOSED HER TO KEEP

9  THOSE DOCUMENTS IN, THERE'S NOTHING ILLEGAL ABOUT KEEPING

10 THEM IN A LOCKED SUITCASE, BRIEFCASE; IS THERE?

11 A.   NO.   THEY'D BE IMPORTANT IF YOU WANTED TO TAKE THEM

12 WITH YOU, THAT'S THE CONCERN.

13 Q.   OKAY, BUT SHE CAME BACK FROM CHINA AND HAD MONTHS TO

14 LEAVE IF SHE WAS LEAVING, DID SHE NOT?

15 A.   SHE DID.

16 Q.   BUT WHAT DID SHE DO, SHE SOUGHT EMPLOYMENT AFTER

17 BEING FIRED AT EASTMAN; DIDN'T SHE?

18 A.   YES.

19 Q.   YOU KNOW, YOU KNOW ANYTHING ABOUT HER FAMILY IN

20 CHINA EXCEPT WHO THEY ARE?

21 A.   NO.

22 Q.   OKAY.   DID YOU KNOW HER MOTHER IS JUST BARELY ALIVE,

23 MAY DIE LITERALLY WHILE WE'RE IN THIS COURTROOM?

24 A.   NO.

25 Q.   OKAY.   YOU KNOW THE JOINT VENTURE DIDN'T GO THROUGH.

1    SO AS I UNDERSTAND YOUR TESTIMONY, THAT TALENT MONEY ONLY

2    GETS PAID WHEN THAT JOINT VENTURE IS IN PLACE AND

3    OPERATING.  YOU ARE AWARE OF THAT; AREN'T YOU?

4    A.    NO, THAT WAS NOT MY TESTIMONY.  MY TESTIMONY WAS

5    THAT MS. YOU RECEIVED TALENT MONEY TO FORM A SECOND

6    COMPANY.  THAT SECOND COMPANY WAS GOING TO SIGN A JOINT

7    VENTURE WITH METLAC.

8    Q.    AND YOU REALIZE WITHOUT METLAC'S SIGNATURE WITH ALL

9    THOSE PEOPLE THAT YOU SHOWED THE BUSINESS CARDS, YOU

10   REALIZE THE REASON THEY ALL MET IN ITALY WAS TO SIGN THE

11   JOINT VENTURE SO THEY COULD GET THE MONEY, AND METLAC

12   DIDN'T SIGN THE JOINT VENTURE?

13   A.    OUR INVESTIGATION CONCLUDED -- THE LAST TIME WE HAD

14   A SEARCH WARRANT, IT WAS ABOUT THE SAME TIME.  I'M NOT

15   SURE WHAT THEY'RE DOING IN CHINA FOLLOWING THE FALL-OUT OF

16   THAT MEETING.

17   Q.    OKAY.  WHEN YOU SAID 12 MILLION IN YOUR CHART THAT

18   YOU PREPARED, YOU DIDN'T MEAN $12 MILLION; DID YOU?

19   A.    THAT'S 12 MILLION YUAN.

20   Q.    WHICH IS ABOUT A MILLION BUCKS; RIGHT?

21   A.    IT'S STIPULATED THAT MS. YOU WOULD RECEIVE A MILLION

22   YUAN A YEAR FOR FOUR YEARS; THAT WAS JUST THE YISHI-YILI

23   AWARD.  THE THOUSAND TALENT MONEY WAS TO COME IN ON TOP OF

24   THAT.

25   Q.    WHAT I'M SAYING TO CONVERT IT TO THE COURT FOR

1    DOLLARS, A MILLION YUAN TO BUY AN APARTMENT THAT SHE NEVER

2    BOUGHT IS ABOUT $250,000; ISN'T IT?

3    A.    APPROXIMATELY.

4    Q.    YEAH.  SO SHE'S GOT PLENTY OF MONEY IF SHE WANTED TO

5    HAVE BOUGHT SOMETHING.  YOU KNOW THAT SHE OWNS NOTHING IN

6    CHINA, BOUGHT NO REAL ESTATE?

7    A.    I DON'T KNOW THAT.

8    Q.    WELL, DID YOU SEE ANY DEEDS?  DID YOU SEE ANY

9    DOCUMENTS ESTABLISHING THAT SHE DID OWN SOMETHING BECAUSE

10   THIS REPORT SAYS EITHER MR. HARKER OR YOU TOLD THE

11   PROBATION OFFICE SHE OWNED A PIECE OF PROPERTY IN CHINA.

12   A.    WHAT WE KNOW IS THAT HER CO-EMPLOYEES SAID SHE OWNED

13   LAND IN SHANGHAI.  THERE'S NO EVIDENCE TO SAY ONE WAY OR

14   THE OTHER WHETHER OR NOT THAT'S TRUE.

15   Q.    DID YOU ASK HER?

16   A.    I DON'T KNOW.

17   Q.    DID YOU ASK HER HUSBAND?

18   A.    I'VE NEVER SPOKEN TO HER HUSBAND.

19   Q.    DID YOU ASK HER DAUGHTER?

20   A.    I'VE NEVER SPOKEN TO HER DAUGHTER.

21            MR. JESSEE:  OKAY.  IF I COULD HAVE JUST A

22   MINUTE, YOUR HONOR.

23            THE COURT:  OKAY.

24            MR. JESSEE:  THAT'S ALL I HAVE.

25            THE COURT:  ANY OTHER QUESTIONS BY THE UNITED

1    STATES?

2              MR. HARKER:  I'M SORRY, YOUR HONOR?

3              THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS?

4              MR. HARKER:  NO, YOUR HONOR.

5              THE COURT:  ALL RIGHT.

6    EXAMINATION

7    BY THE COURT:

8    Q.    THE INFORMATION THAT YOU HAVE ABOUT HER OWNING

9    PROPERTY IN CHINA, THIS WAS BASED ON THE EASTMAN, THAT

10   CONVERSATION THAT SHE HAD WITH AN EASTMAN BOSS, I'VE

11   FORGOTTEN HIS NAME, AND THAT WAS RELAYED TO YOU THAT

12   MS. YOU SAID THAT --

13   A.    THAT IS CORRECT.

14   Q.    -- SHE HAD PROPERTY?

15   A.    THAT IS CORRECT.

16   Q.    AND AS FAR AS OTHER PROPERTY LIKE BANK ACCOUNTS, YOU

17   DISCOVERED A BANK STATEMENT OF CONSTRUCTION BANK IN CHINA

18   IN HER BELONGINGS?

19   A.    WITHIN THAT BRIEFCASE, YES.

20   Q.    IN THAT BRIEFCASE.  AND IS IT YOUR UNDERSTANDING --

21   YOU MENTIONED THAT THERE WAS A LOT OF MONEY BEING

22   TRANSFERRED AMONG IN CHINA, WAS IT, WAS IT THE DEFENDANT'S

23   MONEY?  I MEAN, WHAT'S YOUR UNDERSTANDING OF THAT?

24   A.    THE TEXT MESSAGE STIPULATE THAT IT WAS THE

25   DEFENDANT'S MONEY COMMINGLED WITH HER SISTER THAT WE KNOW

1  ABOUT IN CHINA, AND THAT THAT MONEY WAS MOVED BETWEEN

2  DIFFERENT WEALTH MANAGEMENT PORTFOLIOS; AND THEN SOMETIME

3  IN SHORTLY 2017 THERE WERE WECHAT MESSAGES THAT STIPULATE

4  THAT IT'S GETTING HARDER FOR HER TO MOVE HER MONEY OUT OF

5  CHINA, AND WE SEE WHERE HERSELF AND HER HUSBAND BEGIN TO

6  BRING MONEY IN $10,000 INCREMENTS INTO THE UNITED STATES.

7  Q.    OKAY.  ALL RIGHT, AND DO YOU KNOW, AS FAR AS HOW

8  MUCH MONEY WE'RE TALKING ABOUT, DO YOU KNOW HOW MUCH WE'RE

9  TALKING ABOUT?  I THINK YOU MENTIONED $70,000 OR

10  SOMETHING?

11  A.    FORENSIC ACCOUNTANTS AT THE FBI WERE ABLE TO LOOK AT

12  THE TRAFFIC MESSAGES AND IDENTIFY APPROXIMATELY $70,000

13  U.S. DOLLARS IN MONEY IN FOREIGN BANK ACCOUNTS THAT

14  MS. YOU HAD ACCESS TO VIA EITHER HER SISTER OR HER AUNT.

15  I THINK IN ONE CASE THERE'S A BANK ACCOUNT THAT'S IN HER

16  SISTER'S SON'S NAME.

17            THE COURT:  OKAY.  ALL RIGHT.

18            YES, MR. JESSEE.

19            MR. JESSEE:  IF I MAY, YOUR HONOR.

20            THE COURT:  YOU CAN FOLLOW UP ON THAT.

21  CROSS EXAMINATION

22  BY MR. JESSEE:

23  Q.    YOU TALKED ABOUT 2017, LET'S TALK ABOUT TODAY, YOU

24  DON'T KNOW WHAT BANK ACCOUNTS SHE DOES OR DOESN'T HAVE IN

25  CHINA; DO YOU?

```
 1   A.    I CANNOT SUBPOENA THE CHINESE BANKS, NO.

 2   Q.    I DIDN'T ASK YOU THAT.  DID YOU ASK HER TO GIVE YOU

 3   THE STATEMENTS BECAUSE YOU TALKED TO HER AND SHE TOLD YOU

 4   SHE HAD ONE BANK ACCOUNT AT CONSTRUCTION BANK, WHICH YOU

 5   HAVE THE STATEMENT FOR.

 6            MR. HARKER:  YOUR HONOR, OBJECTION, ARGUMENTA-

 7   TIVE; AND IF STATEMENTS ARE AVAILABLE, MR. JESSEE CAN

 8   PRODUCE THEM.

 9   Q.    YOU'VE GOT THE STATEMENT TO CONSTRUCTION BANK;

10   CORRECT?

11   A.    YES.

12   Q.    OKAY.  HOW MUCH MONEY IS IN THE CONSTRUCTION BANK

13   ACCOUNT?

14   A.    ON THAT STATEMENT IS $1.

15   Q.    RIGHT.  AND SHE TOLD THAT AT ONE TIME THERE WAS 400

16   AND SOME YUAN IN THERE WHICH TOTALED ABOUT 50 AMERICAN

17   DOLLARS, AND THAT'S THE ONLY MONEY SHE HAS IN CHINA?

18   A.    THE WECHATS AND PHOTOGRAPHS IN ONE OF THESE EXHIBITS

19   EXTRACTED FROM HER PHONE POST ARREST AND THEY SHOW WHERE

20   MS. YOU HAS BEEN DRAWING A SALARY REGULARLY FROM WEIHAI

21   JINHONG.

22   Q.    OKAY.  I DIDN'T SEE ANY OF THAT SHOWN TO THE JUDGE.

23   I JUST WONDERED.

24   A.    IT WAS IN THE EXHIBIT.

25   Q.    IT WAS IN THE EXHIBIT?
```

1    A.    YES, SIR.

2    Q.    THAT HAND CHICKEN SCRATCH THAT'S IN HER AUNTS'S

3    NAME?

4    A.    YES.

5    Q.    OKAY, SO LET ME ASK YOU, WHAT BANKS IS THAT MONEY IN

6    IF IT EVEN EXISTS?

7    A.    THE TRANSLATION STATES THAT IT'S IN A CONSTRUCTION,

8    CHINA CONSTRUCTION BANK ACCOUNT.

9    Q.    OKAY, BUT IS THAT THE AUNT'S ACCOUNT?

10   A.    THE TRANSLATIONS ALSO STIPULATE THAT THE AUNT, WHO

11   WAS INSTRUMENTAL IN THIS ENTIRE CONSPIRACY, IS WORKING

12   THE, OR MANAGING THE ACCOUNT --

13   Q.    OKAY.

14   A.    -- FOR MS. YOU.

15   Q.    BUT IS IT MONEY THAT BELONGS TO THE AUNT, TO HER

16   MOTHER WHO IS DYING ESTATE ACCOUNT, HER SISTER?  THAT BOOK

17   DOESN'T TELL YOU WHAT QUANTITY BELONGS TO HER; DOES IT?

18   A.    IT DOES.  IT STIPULATES THAT THE HIGHLIGHTED IN

19   ORANGE PORTIONS ARE CONSISTENT WITH DR. YOU'S FINANCIALS.

20   Q.    ALL RIGHT, AND WHEN WAS THAT HIGHLIGHTED?

21   A.    I DON'T KNOW WHEN IT WAS HIGHLIGHTED.

22   Q.    WELL, I MEAN, DO WE KNOW TODAY THAT THAT BOOK IS

23   INDICATIVE OF WHAT IS THERE TODAY, OR WHAT WAS IN 2017,

24   BECAUSE YOU SAID THERE'S AN E-MAIL THAT SAYS THAT YOU

25   CAN'T MOVE MONEY, SO THEY BROUGHT IT BACK TO THE UNITED

1    STATES?

2    A.    THIS -- THESE HIGHLIGHTED PICTURES DATE, I BELIEVE,

3    THE LAST ONE IS NOVEMBER 2018.

4    Q.    OKAY, BUT WHEN WAS THE MONEY IN THE ACCOUNT?  AS YOU

5    SAID, IN 2017 IS WHEN YOU SAY THEY BROUGHT MONEY OUT FROM

6    CHINA.

7    A.    THE MONEY WAS DEPOSITED ON A MONTHLY BASIS BEGINNING

8    IN JUNE 2018 --

9    Q.    OKAY.

10   A.    -- UNTIL NOVEMBER 2018.

11   Q.    ALL RIGHT, AND THEN STOPPED?

12   A.    BASED ON THAT PICTURE, YES.

13   Q.    AND HOW MUCH IN AMERICAN DOLLARS WAS DEPOSITED?

14   A.    IT TRANSLATES TO ROUGHLY $7,000.

15   Q.    OKAY.  IN A JOINT ACCOUNT WITH HER AUNT?

16   A.    YES.

17   Q.    WELL, IF THE AUNT IS IN THIS DEAL, WHAT SHARE OF

18   THAT IS HERS?

19   A.    I DON'T KNOW.

20            MR. JESSEE:  OKAY.  THAT'S ALL I HAVE.

21            THE COURT:  ALL RIGHT.  ANYTHING ELSE?

22            MR. HARKER:  AS ONE LEARNED MAGISTRATE ONCE

23   ADVISED ME, TIMING IS EVERYTHING, YOUR HONOR, I HAVE

24   NOTHING FURTHER.

25            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

1    YOU MAY STEP DOWN.

2              ALL RIGHT.  DO YOU HAVE ANY OTHER WITNESSES YOU

3    WANT TO CALL?

4              MR. HARKER:  NONE FROM THE GOVERNMENT, YOUR

5    HONOR.

6              THE COURT:  ALL RIGHT.

7              MR. JESSEE:  MAY WE HAVE JUST A SECOND, YOUR

8    HONOR?

9              THE COURT:  YES.

10             MR. JESSEE:  WE'D CALL LINDA XU, YOUR HONOR.

11             THE COURT:  ALL RIGHT.

12             LINDA XU, DEFENDANT'S WITNESS, SWORN

13   DIRECT EXAMINATION

14   BY MR. JESSEE:

15   Q.   MS. XU, YOU'RE GOING TO NEED TO SPEAK UP SO

16   EVERYBODY BACK HERE CAN HEAR YOU.  STATE YOUR FULL NAME

17   AND ADDRESS FOR THE RECORD, PLEASE.

18   A.   LINDA XU.

19   Q.   AND WHERE DO YOU LIVE?

20   A.   I LIVE IN SUNNYVALE, CALIFORNIA.

21   Q.   OKAY.  WHERE DO YOU WORK?

22   A.   AT GOOGLE AS A SOFTWARE ENGINEER.

23   Q.   OKAY.  WHAT DO YOU DO THERE AS A SOFTWARE

24   ENGINEER?

25   A.   I WORK ON HOTEL REVIEWS.

1    Q.    YOU WORK ON HOTEL REVIEWS?

2    A.    YES.

3    Q.    OKAY, SO YOU WORK ON PUBLIC INFORMATION?

4    A.    CORRECT.

5    Q.    OKAY, AND HOW ARE YOU RELATED TO THE DEFENDANT?

6    A.    SHE IS MY MOTHER.

7    Q.    HOW OLD ARE YOU?

8    A.    TWENTY-FOUR.

9    Q.    OKAY.  HOW LONG HAVE YOU BEEN OUT IN CALIFORNIA

10   WORKING?

11   A.    ALMOST THREE YEARS.

12   Q.    OKAY.  PRIOR TO THAT WHERE DID YOU GO TO SCHOOL?

13   A.    JOHNS HOPKINS UNIVERSITY.

14   Q.    IN BALTIMORE?

15   A.    YES.

16   Q.    OKAY.  WHERE DID YOU GO TO HIGH SCHOOL?

17   A.    THE MASSACHUSETTS ACADEMY OF MATH AND SCIENCE.

18   Q.    OKAY, AND WHO LIVED IN THE HOME AS YOU WERE GROWING

19   UP FROM THE WHOLE TIME THROUGH HIGH SCHOOL?

20   A.    BOTH OF MY PARENTS.

21   Q.    OKAY.  AND YOUR DAD, I BELIEVE, IS A CIVIL ENGINEER

22   OR SOME TYPE OF ENGINEER?

23   A.    YES, A MECHANICAL ENGINEER.

24   Q.    OKAY.  AND WHEN YOU WENT OFF TO COLLEGE, DID YOU

25   JUST PICK ONE AND GO OFF OR HOW DID YOU GO ABOUT FIGURING

1   OUT YOUR COLLEGE CAREER?

2   A.    MY MOM TOOK TIME TO TAKE ME TO THREE OF THE SCHOOLS

3   THAT I WAS MOST INTERESTED IN; AND EVEN THOUGH WE WEREN'T

4   SURE IT WOULD, YOU KNOW, HELP THAT MUCH, SHE STILL

5   THOUGHT, YOU KNOW, AS LONG AS THERE IS A CHANCE IT COULD

6   BE USEFUL, IT'S, IT'S AN INVESTMENT FOR MY FUTURE, AND SHE

7   WOULD TAKE THE TIME TO DO IT.

8   Q.    OKAY.  NOW, THERE HAVE BEEN TIMES DEPENDING ON YOUR

9   PARENTS' WORK, HAS THERE NOT, THAT THEY LIVED IN DIFFERENT

10  CITIES?

11  A.    YES.

12  Q.    OKAY.  DID THEY COMMUNICATE REGULARLY TO YOUR

13  KNOWLEDGE?

14  A.    OH, OF COURSE, ALL THE TIME.

15  Q.    OKAY.  WOULD YOUR PARENTS GET OUT TO SEE YOU DEPEND-

16  ING ON THEIR WORK SCHEDULES AND COME TO CALIFORNIA?

17  A.    YES.

18  Q.    OKAY.  YOU SAW YOUR MOTHER YESTERDAY AT THE JAIL;

19  CORRECT?

20  A.    YES.

21  Q.    AND LET ME ASK YOU, HOW OFTEN, SAY, IN THE LAST YEAR

22  HAVE YOU ALL PHYSICALLY BEEN IN EACH OTHER'S PRESENCE?

23  A.    MAYBE ONCE OR TWICE.

24  Q.    OKAY.  SHE WAS CHANGING JOBS AND YOU WERE GETTING

25  SETTLED IN YOUR JOB?

1    A.    CORRECT.

2    Q.    DESCRIBE YOUR RELATIONSHIP AS FAR AS YOU AND YOUR

3    MOM.

4    A.    I THINK THAT EVEN THOUGH WE DON'T REGULARLY SPEAK

5    THAT MUCH, WE'RE STILL, YOU KNOW, A FAMILY.  LIKE WHEN WE

6    VISITED HER IN JAIL YESTERDAY, THE FIRST THING SHE ASKED

7    WAS HOW I WAS DOING, WHETHER MY JOB WAS GOING WELL, HOW I

8    WAS SETTLING INTO MY NEW HOUSE, AND SHE WAS THE ONE IN

9    PRISON.  WE WERE ALL WORRYING ABOUT HER, AND THEN SHE'S

10   ASKING ABOUT ME FOR SOME REASON.

11   Q.    OKAY.  OKAY.  DO YOU HAVE OTHER RELATIVES THAT LIVE

12   IN THE UNITED STATES?

13   A.    YES, MY AUNT.  I THINK HER ENGLISH NAME IS LILLY.

14   Q.    AND SHE LIVES?

15   A.    IN SAN JOSE.

16   Q.    IN SAN JOSE.  AND SHE HAS A FAMILY?

17   A.    YES, TWO SONS.

18   Q.    OKAY.  AND DOES YOUR MOTHER HAVE ANOTHER SISTER

19   BESIDES HER?

20   A.    YES.

21   Q.    OKAY, AND WHERE DOES THAT SISTER LIVE?

22   A.    CHINA.

23   Q.    OKAY.  AND I BELIEVE HER MOTHER IS VERY, VERY ILL?

24   A.    YES.

25   Q.    OKAY.  HER FATHER IS DECEASED?

1    A.    YES.

2    Q.    OKAY.  IF THE COURT ASKS FOR YOU TO, THE BEST YOU

3    COULD TO HELP OUT IF THEY CHOSE TO RELEASE HER TO MONITOR

4    OR BE CLOSE OR CHECK ON HER, DOES THAT CAUSE YOU ANY

5    PROBLEMS OTHER THAN IT CAN INTERFERE WITH YOUR JOB, I

6    UNDERSTAND?

7    A.    I WOULD DO WHATEVER I COULD.

8    Q.    OKAY.  I THINK THAT'S ALL I -- OH, LET ME ASK YOU,

9    TO YOUR KNOWLEDGE DO YOUR PARENTS OWN REAL ESTATE IN

10    CHINA?

11    A.    I DON'T KNOW.

12    Q.    OKAY.  YOU DON'T KNOW.

13           THAT'S ALL I HAVE.

14           THE COURT:  MR. HARKER, DO YOU HAVE ANY

15    QUESTIONS?

16    CROSS EXAMINATION

17    BY MR. HARKER:

18    Q.    DO YOU HAVE ANY YOUNGER SIBLINGS, BROTHERS OR

19    SISTERS?

20    A.    NO.

21    Q.    NO MINOR CHILDREN OF YOUR MOTHER OTHER THAN YOU?

22    A.    CORRECT.

23    Q.    AND YOU'RE 24 YEARS OLD?

24    A.    YES.

25    Q.    YOU SAID YOU MOVED OUT OF YOUR PARENTS' HOUSE WHEN

1   YOU WENT TO JOHNS HOPKINS?

2   A.    YES.

3   Q.    IN BALTIMORE?

4   A.    YES.

5   Q.    WERE YOU 18 YEARS OLD WHEN YOU WENT TO COLLEGE?

6   A.    SEVENTEEN.

7   Q.    SEVENTEEN.  SOUNDS LIKE YOU'RE A GOOD STUDENT.

8   A.    THANK YOU.

9   Q.    WHEN YOU MOVED OUT AT 17, WAS THAT THE LAST TIME YOU

10  LIVED WITH BOTH YOUR PARENTS?

11  A.    NO.  I WOULD LIVE WITH THEM OVER THE SUMMER.

12  Q.    OVER THE SUMMERS FOR -- WERE YOU AT JOHNS HOPKINS

13  FOR FOUR YEARS?

14  A.    YES.

15  Q.    AND DID YOU COME HOME EVERY SUMMER?

16  A.    I DON'T RECALL.  I HAD INTERNSHIPS.

17  Q.    IT SAYS HERE ON EXHIBIT 2, IT SAYS YOUR MOTHER WAS

18  EMPLOYED AT COCA-COLA IN ATLANTA BEGINNING IN DECEMBER OF

19  2012.

20  A.    OKAY.

21  Q.    WAS THAT, WAS DECEMBER -- THE SUMMER OF 2012, WAS

22  THAT THE LAST SUMMER THAT YOU SPENT WITH YOUR PARENTS IN

23  MASSACHUSETTS TOGETHER?

24  A.    I DON'T RECALL, BUT WE DID -- SO WE LIVED IN BOTH

25  THERE, MASSACHUSETTS OR ATLANTA, AT DIFFERENT SUMMERS.

1  Q.     AT DIFFERENT SUMMERS?

2  A.     YES.

3  Q.     SO DID YOU LIVE WITH BOTH YOUR PARENTS IN ATLANTA

4  OVER THOSE SUMMERS?

5  A.     THEY WOULD LIKE COME BETWEEN THE TWO HOUSES.

6  Q.     BETWEEN THE TWO HOUSES IN MASSACHUSETTS?

7  A.     YES.

8  Q.     YOUR FATHER WORKED AT A COMPANY IN MASSACHUSETTS?

9  A.     YES.

10  Q.     AT PROCTER & GAMBLE?

11  A.     DON'T KNOW, THINK SO.

12         MR. HARKER:  OKAY.  YOUR HONOR, I HAVE NO

13  FURTHER QUESTIONS.

14         MR. JESSEE:  THAT'S ALL I HAVE, YOUR HONOR.

15         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH FOR

16  BEING HERE TODAY.

17  A.     THANKS.

18         THE COURT:  ALL RIGHT.  DO YOU HAVE ANY OTHER

19  WITNESSES YOU'D LIKE TO CALL?

20         MR. JESSEE:  I HAVE NO OTHER WITNESSES, YOUR

21  HONOR.

22         THE COURT:  ALL RIGHT.  DOES THE UNITED STATES

23  WANT TO OFFER ANY REBUTTAL OR ANYTHING LIKE THAT?

24         MR. HARKER:  JUST AN ARGUMENT, YOUR HONOR.

25         THE COURT:  JUST ARGUMENT, OKAY.

1          MR. HARKER:  WOULD YOU LIKE ME TO DO THAT NOW?

2          THE COURT:  YEAH, I GUESS SO.  I GUESS WE'LL

3   PROCEED TO ARGUMENT.

4          MR. HARKER:  I'M GOING TO -- I'LL SOMEHOW

5   SHORTEN THIS.  I HAD A LENGTHIER ARGUMENT, BUT I'LL

6   SHORTEN IT.  I WANT TO -- SINCE WE DIDN'T FILE ANY

7   RESPONSIVE BRIEF, I APOLOGIZE, THAT WAS MY FAULT.  MY

8   COLLEAGUE, MR. WALCZEWSKI, HAD PREPARED ONE, AND I DIDN'T

9   HAVE TIME TO FINALIZE IT AND FILE IT, BUT I WOULD LIKE TO

10  ADDRESS SEVERAL CASES THAT THE DEFENDANTS RAISED IN THEIR

11  BRIEF.

12         ONE OF THEM IS UNITED STATES VERSUS ZHENG.

13  THAT'S A NORTHERN DISTRICT OF NEW YORK CASE.  NOW, THE

14  COMPLAINT IN THAT, YOUR HONOR, WAS FILED ON JULY 5, 2018.

15  THE REASON THE DEFENDANT CITED THAT CASE AND THE OTHER TWO

16  CASES I'LL MENTION IS BECAUSE IN THOSE CIRCUMSTANCES THE

17  DEFENDANT WAS RELEASED.  THERE I POINT OUT THAT ON -- THIS

18  IS EXHIBIT NUMBER 20, THE DOCKET SHEET FROM ZHENG.  EXCUSE

19  ME, THE COMPLAINT WAS FILED ON AUGUST 1, 2018, AND IT SAYS

20  THERE WAS A DETENTION HEARING ON AUGUST 2ND, BUT THEN

21  THERE ARE ALL THESE ORDERS TO CONTINUE; AND THE INDICTMENT

22  ACTUALLY -- THIS CHART ENDS, BUT THE INDICTMENT ACTUALLY

23  JUST CAME DOWN ON MONDAY.  SO, IN OTHER WORDS, IF THE

24  DEFENDANT HAD BEEN DETAINED IN THAT CASE, SHE OR HE WOULD

25  HAVE BEEN DETAINED ON A COMPLAINT FOR NINE MONTHS; BUT AS

1    IT TURNS OUT IN EXHIBIT 21, THE GOVERNMENT DIDN'T ACTUALLY

2    SEEK DETENTION IN THAT CASE.

3              THIS IS A TRANSCRIPT, WHICH I PROVIDED TO THE

4    DEFENDANTS, THAT I OBTAINED YESTERDAY FROM THAT DETENTION

5    HEARING ON AUGUST 2ND -- EXCUSE ME, FROM THAT BOND HEARING

6    ON AUGUST 2ND.  THIS RIGHT HERE IN THE HIGHLIGHTED SECTION

7    IS THE TESTIMONY -- NOT THE TESTIMONY, BUT THE STATEMENT

8    OF THE AUSA, MR. BELLISS, WHO SAYS, YOUR HONOR, THE

9    GOVERNMENT DOES VIEW THE DEFENDANT AS A FLIGHT RISK,

10   HOWEVER, WE BELIEVE THERE ARE CERTAIN CONDITIONS THAT

11   COULD SET, THAT YOU COULD SET THAT WOULD MITIGATE THAT

12   RISK, AND THEN HE RECOMMENDS A BOND.  IN OTHER WORDS, THE

13   GOVERNMENT DID NOT BELIEVE IN THAT CASE THAT THE DEFENDANT

14   WAS A SERIOUS FLIGHT RISK, AND THE REASONS ARE ACTUALLY

15   EXPLAINED BY THE DEFENDANT'S ATTORNEY IN THAT TRANSCRIPT;

16   SO THE DEFENDANT'S ATTORNEY, A MR. LUIBRAND, LUIBRAND, HE

17   SAYS, THE WEIGHT OF THE EVIDENCE AGAINST THE DEFENDANT,

18   THERE IS NO INDICTMENT, YOUR HONOR, ALL WE HAVE IS A

19   CRIMINAL COMPLAINT.  WHEN YOU LOOK AT THE CRIMINAL

20   COMPLAINT, YOUR HONOR, THERE'S NOT A FIRST-HAND FACTUAL

21   ASSERTION AGAINST THE DEFENDANT.  SO THE DEFENDANT

22   BELIEVES THE EVIDENCE WAS WEAK.  THAT IS NOT THE CASE

23   HERE.

24             HIS FAMILY TIES, HE'S BEEN MARRIED FOR 31 YEARS

25   TO THE SAME PERSON, HE HAS THREE MINOR CHILDREN -- THREE

1  CHILDREN, INCLUDING MINOR CHILDREN IN THE HOUSE.  HE HAS A
2  VERY SUPPORTIVE DAUGHTER WHO CAME UP FROM NEW YORK TO BE
3  HERE AND HAS A SUPPORTIVE WIFE WHO IS HERE.  HE'S LIVED IN
4  THIS COMMUNITY FOR 10 YEARS.  HE'S INVOLVED IN THE
5  COMMUNITY.  HE SUPPORTS THE FOOD BANK.  HE'S ACTIVE WITH
6  THE CHINESE COMMUNITY IN THE AREA.  HE'S A MENTOR TO
7  YOUNGER PEOPLE, AND HE'S CERTAINLY SOMEONE WHO SHOULD BE
8  HELD UP AS A GOOD PERSON IN THE COMMUNITY.  HE'S NOT A
9  DANGER TO ANYONE.  HE'S NOT A DANGER TO THE COMMUNITY.

10          NONE OF THAT IS PRESENT IN THIS CASE, YOUR
11  HONOR.  THERE ARE NO TIES TO A COMMUNITY, THERE'S HOPPING
12  AROUND FROM GEORGIA AND TENNESSEE AND MASSACHUSETTS AND
13  LANSING, LIVING IN UNFURNISHED APARTMENTS, MOVING BETWEEN
14  HOMES, LIVING APART FROM HER HUSBAND.  NO TESTIMONY OR ANY
15  EVIDENCE SHOWING THAT SHE HAS ANY CONNECTION TO ANY
16  COMMUNITY AT ALL, EXCEPT THE COMMUNITY OF PEOPLE THAT SHE
17  DEALS WITH IN CHINA.

18          ON TOP OF THAT, THE DEFENSE IN THAT CASE SAYS
19  THAT HE'S NOT A DANGER TO THE COMMUNITY, BUT THE
20  GOVERNMENT HERE HAS ESTABLISHED QUITE APPARENTLY THAT WE
21  HAVE NOT RECOVERED ALL OF THE DEVICES THAT CONTAIN THESE
22  TRADE SECRETS THAT COST A HUNDRED AND TWENTY MILLION
23  DOLLARS TO PRODUCE, THE MARKET VALUE OF WHICH COULD BE
24  SUBSTANTIALLY IN EXCESS OF THAT.  IN OTHER WORDS, WE KNOW
25  OF TWO DEVICES THAT WE DON'T HAVE.  WE DON'T KNOW ALL THE

1    THINGS THAT WE DON'T KNOW, THE UNKNOWN UNKNOWNS.

2              ON THE NEXT PAGE THE DEFENSE ATTORNEY SAYS, ONE

3    THING THAT DID NOT COME UP WAS THE SENTENCING GUIDELINES.

4    MY PRELIMINARY READING OF THE SENTENCING GUIDELINES IS HE

5    FACES 6 TO 12 MONTHS.  NOBODY IS GOING TO RUN FROM THAT.

6    IT'S POSSIBLE PROBATION.

7              YOUR HONOR, I THINK WE'VE ESTABLISHED HERE

8    TODAY THAT THIS DEFENDANT IS NOT LOOKING AT 6 TO 12

9    MONTHS.  WE'VE ALSO ESTABLISHED IN THIS TESTIMONY HERE

10   THROUGH AGENT LECKRONE THAT PUTTING ON THE PROOF IN THIS

11   CASE IS NOT GOING TO BE PARTICULARLY CHALLENGING.  IN

12   FACT, WE'VE ALREADY DONE A LOT OF IT IN THE FORM OF THE

13   TESTIMONY OF AGENT LECKRONE SPEAKING ON BEHALF OF OTHER

14   WITNESSES.  SHE EXCEEDS THE WIRE FRAUD 20 YEAR CAP.

15             NOW, LET ME DIGRESS FOR A MOMENT AND TALK ABOUT

16   SOMETHING MR. JESSEE SAID ABOUT TRADE SECRETS.  I DON'T

17   THINK THAT'S GOING TO BE A VIABLE DEFENSE HERE, BUT LET'S

18   ASSUME THAT IT IS, LET'S ASSUME BY SOME FEAT OF INCREDIBLE

19   LAWYERING THESE CAPABLE ATTORNEYS ARE ABLE TO CONVINCE A

20   COURT THAT THESE ARE NOT TRADE SECRETS, CONTRARY TO THE

21   INDEPENDENT AND UNAFFILIATED STATEMENTS OF SEVEN INTER-

22   NATIONAL CORPORATIONS, LET'S ASSUME THEY CAN DO THAT, DOES

23   THAT MAKE A DIFFERENCE?  THE WIRE FRAUD STATUTE DOESN'T

24   REQUIRE THAT THERE BE A TRADE SECRET, THE CONSPIRACY

25   STATUTE ONLY REQUIRES AN ATTEMPT, AND THE GUIDELINE RANGE

1   IS THE SAME.  SO THAT ARGUMENT, WHICH IS NOT A VALID ONE,

2   IS PARTICULARLY INVALID FOR THE PURPOSES OF ESTABLISHING

3   WHETHER OR NOT THE DEFENDANT IS A FLIGHT RISK.

4           THE COURT:  SO IT'S YOUR UNDERSTANDING THAT

5   BASED ON YOUR SENTENCING GUIDELINE CALCULATION SHE'S

6   LOOKING AT 210 TO 240 MONTHS?

7           MR. HARKER:  WELL, I WOULD ADD, YOUR HONOR,

8   THAT TECHNICALLY, IF I'VE DONE MY CALCULATIONS CORRECT,

9   THE OFFENSES COULD BE STACKED, SO I WOULD SAY THAT

10  ACTUALLY SHE'S LOOKING AT 210 TO 262.

11          THE COURT:  262, OKAY.

12          MR. HARKER:  SO IN THAT CASE THE GOVERNMENT

13  DIDN'T SEEK DETENTION.

14          NOW, I ALSO HAVE, THE XANTHE LAM CASE IS

15  ANOTHER ONE THAT THE DEFENDANTS CITED TO OUT OF THE

16  NORTHERN DISTRICT OF CALIFORNIA.  IN THIS CASE THERE WERE

17  FOUR DEFENDANTS WHO WERE INDICTED, XANTHE LAM, ON THE TOP

18  LEFT, AND SEVERAL OTHER PEOPLE; AND WHAT I HAVE HERE IN

19  EXHIBIT NUMBER 23, YOUR HONOR, ARE THE INITIAL APPEARANCE

20  MINUTES FOR ALL OF THESE FOUR DEFENDANTS, XANTHE LAM,

21  ALLEN LAM, JOHN CHAN AND JAMES QUACH.  THERE'S AN INITIAL

22  APPEARANCE THAT WAS HELD AND THERE WAS AN ARRAIGNMENT.

23  THERE WAS NO DETENTION HEARING.  AN APPEARANCE BOND WAS

24  ISSUED, AND THE AMOUNT OF THE SECURITY WAS $125,000, AND A

25  NOT GUILTY PLEA WAS ENTERED; AND THERE ARE OTHER INITIAL

1  APPEARANCE MINUTES THAT SHOW THE SAME THING, NO DETENTION

2  HEARING.  IN OTHER WORDS, THE GOVERNMENT DID NOT BELIEVE

3  THAT THE DEFENDANT IN THOSE CASES WAS A RISK; AND I WON'T

4  GO THROUGH THE OTHER TWO, BUT THEY ARE MORE OR LESS THE

5  SAME.  I THINK THE SECURITY MIGHT HAVE BEEN REDUCED TO A

6  HUNDRED THOUSAND FOR ONE OF THEM.

7            SO THE GOVERNMENT HAS EVIDENCE AT ITS DISPOSAL,

8  WE CAN PRESUME IN BOTH OF THOSE CASES, THAT ALLOWS IT TO

9  CONCLUDE THAT THE DEFENDANTS WERE NOT A FLIGHT RISK; BUT

10 IN THIS CASE, YOUR HONOR, IT IS VERY UNUSUAL FOR ME TO

11 WALK INTO YOUR HONOR'S COURT AND ASK THAT THIS COURT

12 IMPOSE DETENTION.  I HANDLE THE WHITE COLLAR CASES FOR

13 THIS DIVISION.  THAT ALMOST NEVER HAPPENS.

14           I BRING TO YOUR ATTENTION, YOUR HONOR, A CASE

15 WHERE THE GOVERNMENT ALLEGES THAT DEFENDANTS WITH

16 CONNECTIONS TO EGYPT WHERE THE GOVERNMENT ALLEGES POCKETED

17 IN EXCESS OF $100 MILLION DOLLARS, WE DID NOT EVEN REQUEST

18 A DETENTION HEARING BECAUSE WE MADE AN ASSESSMENT THAT THE

19 DEFENDANTS IN THOSE CASES ARE NOT A HIGH LIKELIHOOD OF

20 FLIGHT.

21           NOT ONLY IS THE DEFENDANT A FLIGHT RISK IN THIS

22 CASE, AS I MENTIONED, SHE'S ALSO A DANGER TO PROPERTY.

23 SHE'S LIED TO THE FBI ABOUT BEING PAID BY WEIHAI JINHONG

24 GROUP.  SHE CONCEALED INFORMATION FROM EASTMAN CHEMICAL

25 ABOUT HAVING UPLOADED DOCUMENTS TO THE GOOGLE DRIVE

1    ACCOUNT; AND AS I MENTIONED, THERE ARE DEVICES THAT WE

2    HAVE NOT RECOVERED.

3            NOW, IF WE DON'T KNOW WHERE THOSE DEVICES ARE,

4    AND NOT ONLY DO WE NOT KNOW WHERE THOSE TWO DEVICES ARE,

5    WE DON'T ACTUALLY KNOW WHERE ALL THE DEVICES ARE OR ALL

6    THE CLOUD STORAGE ACCOUNTS ARE, WE DON'T KNOW THOSE

7    THINGS, WE CAN SURMISE THAT IF SHE'S RELEASED, THE VALUE

8    OF THAT TRADE SECRET, THE POSSIBILITY THAT THOSE TRADE

9    SECRETS BE DISCLOSED, IF THEY HAVEN'T BEEN DISCLOSED

10   ALREADY, WILL INCREASE; AND, YOUR HONOR, I SUBMIT THAT A

11   BOND OF 100,000 OR 500,000 OR A MILLION OR 10 MILLION IS

12   NOT GOING TO DISSUADE THE DEFENDANT OR ALL THE PEOPLE IN

13   CHINA, INCLUDING THE CHINESE GOVERNMENT OFFICIALS THAT WE

14   KNOW SHE'S BEEN DEALING WITH IN THIS CASE, FROM WANTING TO

15   GAIN ACCESS TO THOSE TRADE SECRETS.

16           MR. JESSEE ASKED AGENT LECKRONE WHETHER OR NOT

17   THIS DEFENDANT WAS A PHYSICAL THREAT TO ANYBODY.  WE DON'T

18   DISPUTE THAT, SHE'S NOT A PHYSICAL THREAT TO ANYBODY AS

19   FAR AS WE KNOW; BUT THESE TRADE SECRETS ARE WORTH AT LEAST

20   $120 MILLION, AND THE MARKET VALUE COULD BE 5X, 10X

21   MULTIPLE OF THAT.  WE CAN BET, AND WE KNOW FROM THE

22   EVIDENCE THAT WE HEARD TODAY, THAT AT LEAST THE PROVINCIAL

23   AND STATE GOVERNMENT OF CHINA, THE NATIONAL GOVERNMENT OF

24   CHINA ARE INTERESTED IN THE TECHNOLOGY BECAUSE THEY

25   AWARDED HER SEVERAL MILLION YUAN.  THERE ARE TWO DIFFERENT

1    AWARD PROGRAMS FOR THIS VERY PURPOSE.  IF WE RELEASE HER,

2    DOES THEIR INTEREST DISSIPATE?  DOES HER INTEREST

3    DISSIPATE?  THE GOVERNMENT SUBMITS IT DOESN'T.

4              SHE HAS ABSOLUTELY NO REASON TO STAY IN THIS

5    COUNTRY, NONE.  THERE'S EVIDENCE THAT SHE OWNS PROPERTY BY

6    HER OWN ADMISSION IN CHINA.  SHE HAS CONNECTIONS TO PEOPLE

7    IN CHINA.  SHE HAS FULL EMPLOYMENT IN CHINA TO THE TUNE OF

8    7,000 U.S. DOLLARS A MONTH THAT WE KNOW ABOUT.  SHE'S

9    HIGHLY EMPLOYABLE WITH TECHNICAL SKILLS.  PEOPLE IN CHINA

10   WANT HER TO COME.  HER OWN CODEFENDANT WHO KNOWS HE'S BEEN

11   INDICTED, WE CAN PRESUME BECAUSE THIS IS ALL PUBLIC, HE

12   HASN'T COME TO THE UNITED STATES.  HE'S SIMILARLY SITUATED

13   TO HER EXCEPT FAR LESS SKILLED.  WHY ISN'T HE HERE?  WE

14   CAN PRESUME HE'S NOT HERE BECAUSE HE KNOWS HE'S FACING

15   SERIOUS PRISON TIME.

16             YOUR HONOR, THE DEFENDANT HAS THE MEANS TO RUN,

17   SHE HAS THE MOTIVE TO RUN, SHE HAS THE FAMILIAL CONNEC-

18   TIONS IN CHINA TO RUN; AND, INCIDENTALLY, I WOULD POINT

19   OUT THAT IF THE DEFENDANT IS IN CHINA, THERE'S NOTHING

20   THAT PREVENTS EITHER HER DAUGHTER OR HER HUSBAND FROM

21   VISITING HER THERE.  THE UNITED STATES GOVERNMENT, UNLIKE

22   THE CHINESE GOVERNMENT, DOESN'T HOLD PEOPLE HOSTAGE.  THIS

23   REFERENCING A RECENT NEWS STORY WHERE THE CHINESE

24   GOVERNMENT PREVENTED AN AMERICAN CITIZEN'S CHILDREN FROM

25   LEAVING FOR THE VERY PURPOSE OF INDUCING THAT PERSON TO

1  RETURN TO CHINA, THAT DOESN'T HAPPEN HERE; SO IF SHE WANTS

2  TO RETAIN HER FAMILIAL CONNECTIONS, ALL SHE HAS TO DO IS

3  GO TO CHINA WHERE SHE CAN VISIT WITH HER AUNT, VISIT WITH

4  HER SISTER AND VISIT WITH THESE OTHER PEOPLE WHO EMPLOY

5  HER, AND HER FAMILY CAN COME VISIT HER, WHICH THEY

6  APPARENTLY HAVE NO DIFFICULTY DOING.  WHY WOULD THEY?

7            HER INTENTION TO LEAVE WAS EVIDENCED BY THE

8  FACT THAT SHE HAD NO FURNISHINGS IN THAT APARTMENT.  SHE

9  GOT A MATTRESS, BUT NO BOX SPRING AND NO, NO BED.  SHE HAD

10  A GO BAG.  MR. JESSEE HAS SUGGESTED THAT THERE MIGHT BE

11  OTHER REASONS WHY A GO BAG WOULD BE APPROPRIATE, LIKE, FOR

12  EXAMPLE, YOU'RE PREPARING FOR AN EARTHQUAKE OR A HURRICANE

13  OR MAYBE IT'S CULTURAL.  I SUBMIT THAT ALL THOSE

14  EXPLANATIONS ARE PLAUSIBLE, BUT THEY'RE INCONSISTENT WITH

15  ONE VERY IMPORTANT FACT, THERE WASN'T JUST ONE CURRENCY IN

16  THAT BAG, THERE WERE FIVE.  YUAN, AUSTRALIAN DOLLARS, U.S.

17  DOLLARS, BRITISH POUNDS AND EUROS WORTH THOUSANDS OF

18  DOLLARS WHEN CONVERTED.  THERE'S NO REASON YOU WOULD NEED

19  FIVE DIFFERENT CURRENCIES IN YOUR GO BAG IN ORDER TO AVOID

20  AN EARTHQUAKE.  THERE'S NO REASON CULTURALLY THAT YOU

21  WOULD NEED FIVE DIFFERENT CURRENCIES OF THE COUNTRY THAT

22  YOU ARE NOT PRESENTLY IN UNLESS YOU INTENDED TO HAVE THOSE

23  CURRENCIES FOR THE PURPOSES OF USING THEM IN THE TERRITORY

24  WHERE THEY ARE ACCEPTED AS LEGAL TENDER.  THAT IS NOT THE

25  UNITED STATES IN FOUR OF THOSE FIVE CURRENCIES, YOUR

1    HONOR.

2            TEXT MESSAGES AND VOICE MESSAGES SHOW THAT SHE

3    WAS FEARFUL OF THE FBI'S INVOLVEMENT.  AS SHE KNEW, SHE

4    WAS FACING A RISK, AND SHE KNEW SHE'D HAVE TO PAY LAWYERS

5    IF SHE WAS ULTIMATELY EVER IN TROUBLE.

6            YOUR HONOR, IN CONCLUSION, THE DEFENDANT IS AN

7    EXTREME FLIGHT RISK.  AS I SAID, I DON'T ASK FOR DETENTION

8    VERY FREQUENTLY, I DON'T ASK FOR DETENTION EVEN ON VERY

9    LARGE CASES, BUT IN THIS CASE I CANNOT THINK OF A REASON

10   WHY THE DEFENDANT WOULD SUSTAIN HER PRESENCE IN THIS

11   COUNTRY OR THIS DISTRICT FOR TRIAL.

12           THE GOVERNMENT IS PREPARED, I WOULD ALSO ADD,

13   TO GO TO TRIAL EXPEDITIOUSLY, AS I THINK WAS EVIDENT FROM

14   TODAY'S PRESENTATION.  THERE'S NOT GOING TO BE DIFFI-

15   CULTIES WITH DISCOVERY BEYOND THE DIFFICULTIES WE CAN

16   EXPECT IN CONNECTION WITH HAVING TO GO THROUGH SOME

17   PROCESS TO PROTECT THESE TRADE SECRETS.  AFTER ALL, WHAT'S

18   THE PURPOSE OF NOT PROTECTING THEM, SINCE WE'VE ALLEGED

19   THAT THAT'S THE WHOLE PURPOSE THE CASE WAS BROUGHT IN THE

20   FIRST CASE.  SO WE'VE GOT TO GO THROUGH THAT LABORIOUS

21   PROCESS, BUT IT'S NOT SO CUMBERSOME THAT IT SHOULD SLOW

22   THINGS DOWN.  IN OTHER WORDS, THIS TRIAL IS GOING TO

23   HAPPEN WHEN THEY'RE READY FOR IT TO GO TO TRIAL.  WE'RE

24   READY.  YOUR HONOR SAID THE DEFENSE, THIS CASE WON'T GO TO

25   TRIAL IN JUNE, WE ACCEPT THAT, BUT WE'RE READY FOR A TRIAL

1    IN JUNE.

2            THE DEFENDANT IS NOT GOING TO BE DETAINED

3    INDEFINITELY LIKE IN SOME OF THESE OTHER CASES REFERRED TO

4    IN THEIR INDICTMENT WHERE THE GOVERNMENT ONLY HAS A

5    COMPLAINT.  THE INDICTMENT HAS BEEN HANDED DOWN.  THE

6    GOVERNMENT'S DUCKS ARE IN A ROW.  INITIAL DISCOVERY

7    CONTAINING THE NAME, CASE FILE HAS ALREADY BEEN TURNED

8    OVER.  THE REST OF IT WILL BE TURNED OVER SHORTLY, AND

9    THEN, OF COURSE, YOUR HONOR ON THE PROTECTIVE ORDER WILL

10   ADDRESS THE REMAINING ISSUES; BUT ALL OF THAT GOES TO THE

11   POINT THAT THE DEFENDANT HAS NO REASON TO STAY AND IS NOT

12   BEING PREJUDICED SUBSTANTIALLY BY BEING INCARCERATED FOR

13   THE FEW MONTHS THAT IT MIGHT TAKE TO TAKE THIS MATTER TO

14   TRIAL; AND ON TOP OF THAT, YOUR HONOR, I WOULD SAY THAT

15   THE LIKELIHOOD OF CONVICTION IS VERY HIGH IN THIS CASE,

16   AND AS A RESULT OF THAT THE LIKELIHOOD OF IMPRISONMENT IS

17   VERY HIGH.

18           I HAVE NOTHING FURTHER UNLESS THE COURT HAS ANY

19   QUESTIONS.

20           THE COURT:  YOU'RE PROCEEDING UNDER THE MOTION

21   THAT SHE -- A MOTION THE U.S. ATTORNEY, THAT THE DEFENDANT

22   IS A SERIOUS RISK THAT SHE WILL FLEE, THAT THERE'S A

23   SERIOUS RISK THAT SUCH PERSON WILL FLEE, IT'S UNDER

24   (F)(2)(A), ARE YOU -- IS THAT, THAT'S THE PRIMARY ARGUMENT

25   THAT YOU'RE MAKING; RIGHT?

1          MR. HARKER:  I THINK I'VE STATED MORE WORDS IN

2     SUPPORT OF THAT ARGUMENT, BUT I WOULD SUBMIT THE DANGER TO

3     THE PROPERTY AND THE COMMUNITY'S PROPERTY IS EQUALLY

4     IMPORTANT.

5          NOW, I BELIEVE THAT THE CASE LAW IS PRETTY

6     CLEAR THAT CONTINUING THREAT TO ECONOMIC PROPERTY, EVEN

7     THOUGH IT'S NOT EXPLICITLY REFERENCED IN THOSE TERMS IN

8     THE STATUTE, IS A FACTOR THAT THE COURT CAN CONSIDER.  IN

9     THIS CASE, YOUR HONOR, IF THE DEFENDANT IS RELEASED, THEN

10    ONE OF HER PRIMARY BARGAINING CHIPS IN TERMS OF

11    NEGOTIATING WITH ANY PARTIES THAT MIGHT WANT TO ASSIST HER

12    IN HER FLIGHT, INCLUDING PARTIES THAT HAVE ESSENTIALLY

13    UNLIMITED POCKETS, LIKE THE PROVINCIAL AND NATIONAL

14    GOVERNMENTS OF CHINA, IF THEY WANTED TO DO THAT, WE KNOW

15    SHE HAS CONNECTIONS WITH THEM, THEN, YOU KNOW, SHE WOULD

16    -- HER PRIMARY BARGAINING CHIP IS THIS PROPERTY; AND IF

17    IT'S TURNED OVER TO THOSE ENTITIES OR PEOPLE, IF IT HASN'T

18    BEEN ALREADY, THEN CLEARLY THE DESTRUCTION WOULD BE

19    MEASURED WITH NINE FIGURES AT LEAST.

20          THE COURT:  AND THAT'S, AS FAR AS THE

21    DESTRUCTION OF PROPERTY, YOU'RE TALKING ABOUT THE, ONE OF

22    THE FACTORS THAT THE COURT HAS TO CONSIDER, AND THAT IS

23    THE NATURE AND SERIOUSNESS OF THE DANGER TO ANY PERSON OR

24    THE COMMUNITY THAT WOULD BE POSED BY HER RELEASE?

25          MR. HARKER:  YES, YOUR HONOR; AND I BELIEVE, IF

1   I'M MISTAKEN ABOUT THIS, THEN I WILL CORRECT THE COURT

2   AFTERWARDS, BUT I BELIEVE THAT A THREAT TO PROPERTY FALLS

3   INTO THAT CATEGORY UNDER THE DETENTION STATUTES.  IN THIS

4   CASE THE THREAT, THE DESTRUCTION TO PROPERTY, A TRADE

5   SECRET IS IN EFFECT, YOUR HONOR, DESTROYED THE MOMENT IT

6   IS RELEASED, UNLESS IT HAPPENS TO BE SUBJECT TO A PATENT;

7   BUT THE TRADE SECRET, LIKE COCA-COLA'S SECRET SAUCE, FOR

8   EXAMPLE, IS MEANINGLESS THE MOMENT SOMEBODY ELSE CAN

9   DUPLICATE IT ESSENTIALLY, OR AT LEAST ITS VALUE IS

10  SUBSTANTIALLY DESTROYED.  IN THIS CASE THESE TRADE

11  SECRETS, IF THEY HAVEN'T BEEN DISCLOSED YET, IF THEY'RE

12  SIMPLY SITTING ON THESE HARD DRIVES OR PHONES OR IN CLOUD

13  STORAGE, THEN THE LONGER THEY SIT THERE, THE BETTER FOR

14  THE VICTIMS.

15          THE COURT:  BUT I HAVE NEVER CONSIDERED (G)(4)

16  WITH A DANGER TO THE COMMUNITY BASED ON JUST ECONOMIC

17  INTERESTS, IS THAT -- HAVE YOU SEEN CASES OUT THERE WHERE

18  THEY SAY THAT IF SOMEBODY HAS INTELLECTUAL PROPERTY THAT

19  THEY MIGHT REVEAL, THAT THAT COULD RESULT IN A DANGER TO

20  THE COMMUNITY?

21          MR. HARKER:  YOUR HONOR, I THINK IF YOUR HONOR

22  IS INTERESTED IN THAT, INSTEAD OF ME OPINING ON THIS ISSUE

23  FROM THE LECTERN, IT WOULD BE MORE APPROPRIATE FOR US TO

24  BRIEF THAT BECAUSE I CAN'T SPEAK INTELLIGENTLY ABOUT

25  SPECIFIC CASES OR SPECIFIC CIRCUITS, AND -- BUT MY

1  UNDERSTANDING IS GENERALLY THAT THAT THREAT EXISTS UNDER

2  THAT CATEGORY; AND IF I'M MISTAKEN, WE'LL CORRECT IT.

3         NEVERTHELESS, I WOULD ALSO ADD THAT FROM THE

4  GOVERNMENT'S PERSPECTIVE BOTH CATEGORIES ARE SUFFICIENT IN

5  AND OF THEMSELVES TO JUSTIFY DETENTION; AND, AGAIN, THE

6  LAST POINT I MADE IS THERE'S NO REASON UNLESS THE

7  DEFENDANT SO CHOOSES THAT THIS MATTER ISN'T PROCEEDING TO

8  TRIAL IN THE FALL OR DECEMBER.  IT SHOULD PROCEED TO TRIAL

9  QUICKLY; AND ALSO I WOULD POINT OUT I BELIEVE SHE'S BEING

10 HOUSED IN WASHINGTON COUNTY RIGHT NOW, AND THE GOVERNMENT

11 DOESN'T OBJECT TO HER CONTINUED MAINTENANCE AT THAT

12 LOCATION, IF THE COURT OR THE MARSHALS ARE ABLE TO ARRANGE

13 THAT.  I UNDERSTAND THEY HAVE A WOMAN'S FACILITY THERE.

14         THE COURT:  AND WHEN I SAID THE CASE WON'T GO

15 IN JUNE, I MEAN, I SAID THAT ONLY TO ADDRESS THEIR MOTION

16 TO CONTINUE, THAT IF THEY WANTED IT CONTINUED, WE'LL

17 CONTINUE IT.

18         MR. HARKER:  YES, YOUR HONOR.

19         THE COURT:  YOU KNOW, OBVIOUSLY, IF THEY DON'T,

20 THEN, YOU KNOW, THE CASE WILL GO FORWARD IN JUNE.

21 THAT'S -- SO I JUST WANTED TO MAKE THE RECORD'S CLEAR THAT

22 I'M NOT SAYING THAT IT'S NOT GOING, NOT GOING --

23         MR. HARKER:  YES, YOUR HONOR.

24         THE COURT:  -- UNTIL WE RULE ON THE MOTION.

25         OKAY.  ALL RIGHT.  MR. JESSEE.

1           MR. JESSEE:  YOUR HONOR, THERE'S A UNITED

2  STATES VERSUS HO CASE, H O, IN KNOXVILLE.  GENTLEMAN PLED

3  GUILTY TO STEALING NUCLEAR SECRETS, A LOT MORE THAN THE

4  LINING OF A CAN OF COKE, AND GOT TWO YEARS, JUST SENTENCED

5  IN THIS DISTRICT.

6           THE COURT:  WAS HE DETAINED?

7           MR. JESSEE:  HE WAS, QUICKLY PLED GUILTY, AND

8  IT WAS OVER WITH; BUT HE HAD NO CONTACTS AT ALL IN THE

9  COMMUNITY EXCEPT WHERE HE WORKED, PERIOD --

10           THE COURT:  RIGHT.

11           MR. JESSEE:  -- AND GOT JUST TWO YEARS.  EVERY

12  CASE ON TRADE SECRETS, AND I'VE NOT DONE A LOT, YOU GO

13  BACK AND LOOK AT THE COST OF R&D IN 2011, YOU THEN HAVE TO

14  DEPRECIATE IT DOWN BECAUSE IT'S LESS VALUABLE.  YOU JUST

15  DON'T ADD UP ALL THE NUMBERS AND PUT HIS PLUS 24 ON THE

16  SENTENCING.

17           THE COURT:  RIGHT.

18           MR. JESSEE:  THE GOVERNMENT HAD THE ABILITY TO

19  GIVE YOU THAT SORT OF INFORMATION, THEY CHOSE NOT TO

20  BECAUSE THEY KNOW THEY CAN'T, NUMBER ONE.  NUMBER TWO,

21  THEY HAVEN'T EVEN GIVEN US -- WE CAN'T GO TO TRIAL.  YOU

22  KNOW, I'M A BIG ONE TO SAY GIVE ME MY 71 DAYS, I'LL GO TO

23  TRIAL, I'VE DONE IT MORE THAN ONCE; BUT THE BOTTOM LINE IS

24  THEY DON'T EVEN -- THEY DIDN'T GIVE OUR FORMER COUNSEL,

25  WHICH IT'S BEEN TWO OR THREE MONTHS, THESE TRADE SECRET

INFORMATION.  WE DON'T KNOW WHETHER IT IS TRADE SECRETS.
WE DON'T KNOW WHAT THE TRADE SECRETS ARE.  ANYTHING, AS
MR. HARKER NOW ADMITS, THAT HAS ANYTHING TO DO WITH A
PATENT IS NOT A TRADE SECRET IN AND OF ITSELF IF THE
PATENT HAS BEEN -- ALSO THE FDA INFORMATION, SINCE THESE
ARE FOOD PRODUCTS; AND, MORE IMPORTANTLY, JUST LOGICALLY,
THEY DON'T NEED ANY OF IT.  THEY HAVE THE LARGEST PRODUCER
OF CAN LINING IN EUROPE SITTING THERE IN ITALY THAT SHE
WAS TALKING TO TRYING TO GET THEM TO COME TO CHINA, SO
THEY DON'T NEED THIS AMERICAN STUFF.

SO LET'S BACK UP AND LOOK AT THE STATUTE AND
GO, OKAY, WE KNOW SHE'S NOT A HARM TO THE COMMUNITY
PHYSICALLY.  SHE HAS NO VIOLENT CRIMES, NONE OF THAT.  WE
KNOW SHE'S NEVER BEEN IN ANY TROUBLE OF ANY KIND BEFORE.
SHE'S RAISED THAT WONDERFUL DAUGHTER.  SHE'S MARRIED SINCE
1989.  SHE GAVE UP HER CITIZENSHIP IN CHINA.  YOU CAN'T
HAVE THE DUAL CITIZENSHIP, SO SHE HAS ONLY AMERICAN
CITIZENSHIP.  THEY ADMIT THEY TOOK HER PASSPORT AND HER
VISA.  YOU CAN SPECULATE ALL YOU WANT TO, BUT YOU CAN'T
DRIVE TO CHINA.  YOU'RE GOING TO HAVE TO FLY SOMEHOW, SOME
WAY, UNLESS SHE WALKS ACROSS THE NORTH POLE; SO LOGICALLY
THEY CAN SAY SHE'S A FLIGHT RISK, BUT WHERE IS SHE GOING?
SHE HAS OVER A MILLION DOLLARS IN REAL ESTATE IN HER AND
HER HUSBAND'S NAME, ONE RIGHT UP THE ROAD HERE.  HER
HUSBAND LIVES IN ATLANTA NOW, WHICH IS VERY CONVENIENT TO

1  COME BACK AND FORTH TO THE COURT WITH US TO BE ABLE TO

2  WORK.  IF SHE'S OUT, I DON'T HAVE TO GO THROUGH AS MANY

3  HOOPS TO HAVE THE FBI -- I WILL GUARANTEE THAT AGENT IS

4  NOT GOING TO BE HAPPY ABOUT COMING OVER AND SITTING IN THE

5  WASHINGTON COUNTY JAIL, AND THEN HOW DO I TALK TO MY

6  CLIENT BECAUSE HE CAN'T LEAVE THE SIDE OF THE COMPUTER,

7  YOU KNOW, SO WE'VE GOT PROBLEMS.  AT LEAST IF I CAN TAKE

8  HER, WE CAN DO THAT WORK OUT AT THE OFFICE, THEN THEY KNOW

9  THEY CAN, QUOTE, WATCH ME THERE.

10         SHE'S GOT A CHILD.  SHE WENT BACK TO WORK.  IF

11  YOU LOOK AT THAT, LOOK AT THAT HISTORY OF HER TRAVEL,

12  SHE'S ONLY GONE TO CHINA A COUPLE OF TIMES A YEAR, AND

13  THAT'S WHEN SHE IS TRYING TO MEET WITH PEOPLE.  SHE KNEW

14  THE ITALIAN COMPANY.  SHE'S FAMOUS IN CAN LININGS.  QUITE

15  FRANKLY, SHE DOESN'T NEED ANY OF THAT STUFF.  THEY NEED

16  HER MORE THAN SHE NEEDS SOME PIECE OF PAPER OF A TEST THEY

17  DID IN 2011, AND THAT'S WHAT THE PROOF WILL SHOW.  NOT

18  ONLY WAS SHE THE ONE THAT THEY WANTED TO CONSULT WITH AND

19  DO THINGS WITH, IF SHE WAS SO GOOD AT IT AND GOING TO DO

20  IT IN CHINA, WHY WORK WITH THE ITALIAN COMPANY.  THEY

21  DIDN'T EVEN -- YOU KNOW, WE TALK ABOUT WHAT WE'RE GOING TO

22  HAVE TO DO, WE MAY HAVE TO GO TO ITALY, WE MAY HAVE TO GO

23  TO CHINA TO FIGURE OUT WHY MR. HARKER IS SO INTENT ON THAT

24  THERE'S SOME BUSINESS THAT THEY HAVEN'T BEEN ABLE TO

25  PRODUCE.

SO RESPECTFULLY WE KNOW SHE'S NOT A DANGER.
THE STATUTE DOES NOT SAY, IF SHE COULD DAMAGE PROPERTY.
WE DON'T KNOW WHAT THE TRADE SECRETS ARE. THEY'VE NOT --
IT'S VERY EASY, I THINK, I MIGHT BE WRONG, BUT I THINK
YOUR HONOR HAS ALLOWED A CHILD PORNOGRAPHER OUT, NOT
DETAINED HIM THE WHOLE TIME; AND WHAT DO YOU DO? HE CAN
HAVE NO ACCESS TO A COMPUTER. THAT'S STANDARD IN THOSE
CASES BECAUSE THAT'S HOW THE CRIME IS COMMITTED.

SHE DOESN'T HAVE A PHONE. THEY TOOK HER PHONE.
THEY TOOK HER DRIVER'S LICENSE. SHE CAN'T EVEN DRIVE
BECAUSE THEY TOOK HER DRIVER'S LICENSE. WE'RE NOT ASKING
FOR IT BACK. YOU KNOW, SO SHE CAN'T DRIVE, SHE CAN'T GET
ON AN AIRPLANE AND LEAVE THE UNITED STATES UNDER ANY
CIRCUMSTANCES. SHE CAN'T GET INTO CHINA WITHOUT THE VISA.
SHE'D HAVE TO, SHE WOULD HAVE TO EITHER WALK OR LITERALLY
HIDE ON A PLANE OR A SHIP TO GET THERE; AND THAT'S A 56
YEAR OLD WOMAN WHO HAS BEEN MORE THAN A CREDIT TO THIS
COUNTRY, HER EDUCATION, HER EXPERIENCE, HER WORK HISTORY,
WHAT SHE HAS DONE, AND SHE HAS INVESTMENTS IN THIS COUNTRY
FAR MORE IMPORTANT THAN GOING BACK TO CHINA.

SO RESPECTFULLY WHEN YOU APPLY THE ELEMENTS OF
THE STATUTE, I THINK THE CASE LAW IS PRETTY CLEAR THAT THE
LEAST WEIGHT IS GIVEN TO THE INFORMATION IN THE, OR THE
EVIDENCE, NOTICE THERE'S NOT A THING IN THAT INDICTMENT
THAT ANYBODY GOT ANY OF THIS ALLEGED STUFF. WHATEVER IT

1    IS, WE DON'T KNOW.  THEY HAVEN'T, THEY HAVEN'T SAID SHE

2    SENT IT TO JOHN OR PETE IN CHINA; THAT ANYBODY HAS

3    BENEFITTED FROM IT OR ANYTHING ELSE.  THEY JUST SAID, SHE

4    HAD THE MEANS TO DO IT IF SHE WANTED TO DO IT.

5              SHE HAS LONG RESIDENCE IN ATLANTA.  THEY'VE HAD

6    THEIR HOUSE SINCE 2012.  SHE'S A MEMBER OF THE AMERICAN

7    CHEMICAL SOCIETY.  SHE, SHE HAS OTHER AFFILIATIONS THAT

8    YOU SAW ON HER RESUME.  I BELIEVE THE PROOF WILL SHOW

9    ULTIMATELY SHE'S NOT GUILTY; AND WITH THAT, THAT CAREER OF

10   ALL THESE WRITINGS AND ALL THIS RESEARCH HAS BEEN DONE

11   HERE.  HER HOME, HER LIFE, HER REPUTATION IS HERE.

12             RESPECTFULLY, WE'D ASK THE COURT TO ALLOW HER A

13   REASONABLE RELEASE.  SHE CAN LIVE IN ATLANTA WITH HER

14   HUSBAND.  WE WOULD LET HER STAY UP HERE, BUT THERE'S A

15   TENANT IN THIS HOUSE UNTIL AUGUST.  ANKLE BRACELET, THOSE

16   ARE AVAILABLE DOWN THERE TO MONITOR, IF THE COURT DEEMS.

17   ALL THIS PROPERTY IS FREE AND CLEAR, SO THEY HAVE THE

18   ABILITY TO LIEN ALL THE PROPERTY.  WE, WE BELIEVE TO

19   PROPERLY PREPARE FOR THIS CASE AND HER LACK OF RISK TO THE

20   COMMUNITY AND TO FLIGHT THAT WE NEED HER RELEASED.

21             THE COURT:  OKAY.

22             MR. JESSEE:  THANK YOU, YOUR HONOR.

23             THE COURT:  THANK YOU.  THANK YOU VERY MUCH.

24             DOES THE UNITED STATES WANT TO RESPOND TO THAT

25   AT ALL?

1          MR. HARKER:  JUST A BRIEF REBUTTAL, YOUR HONOR.

2   THE HO MATTER INVOLVED A 24 MONTH SENTENCE.

3          THE COURT:  YEAH, I'M FAMILIAR WITH THAT CASE.

4   THAT'S THE ONE THAT OUR CHIEF MAGISTRATE JUDGE GUYTON

5   DETAINED A DEFENDANT IN THAT CASE AND THEN THEY QUICKLY

6   WORKED IT OUT AND RESOLVED IT.

7          LET ME ASK YOU ALL, AS FAR AS -- THIS IS NOT

8   YOUR STANDARD DETENTION HEARING.  IT'S NOT ONE WHERE

9   IT'S -- I MEAN, I CAN GIVE YOU AN ORAL RULING.  I'M GOING

10  TO HAVE TO GO BACK AND JUST KIND OF GET ORGANIZED A LITTLE

11  BIT ON IT, I THINK.  DO YOU ALL WANT TO -- AS FAR AS THE

12  MOTION TO CONTINUE, DO YOU ALL, DO YOU STILL WANT ME TO --

13  DOES IT AFFECT YOUR DESIRE TO HAVE A CONTINUANCE IF I GO

14  ONE WAY OR THE OTHER?  I KNOW WE HAD PUT THAT --

15         MR. JESSEE:  I THINK IF YOU DETAIN HER, YOUR

16  HONOR, I APOLOGIZE, IF YOU DETAIN HER, IT'S GOING TO BE

17  LONGER AND HARDER FOR US TO GET READY VERSUS IF SHE'S OUT

18  AND I CAN TAKE HER TO THE FBI BUILDING AND DO THOSE SORT

19  OF THINGS, THEN IT -- WE CAN GO FASTER.

20         NOW, I DO NEED A CONTINUANCE FROM JUNE.

21  THERE'S NO WAY I CAN BE READY OR MR. SHIPLEY CAN BE READY

22  IN JUNE.

23         THE COURT:  OKAY.

24         MR. JESSEE:  BUT, YOU KNOW, I CERTAINLY KNOW

25  IT'S GOT TO GO TO DECEMBER IF SHE'S DETAINED.

1          THE COURT:  OKAY.  ALL RIGHT.  AS FAR AS THE

2    PROBATION OFFICER IS CONCERNED, HAS YOUR OPINION CHANGED

3    AT ALL BASED ON WHAT YOU'VE HEARD HERE TODAY?

4          PROBATION OFFICER MCCULLOUGH-WALKER:  NO, YOUR

5    HONOR, WE'D STILL RECOMMEND DETENTION.

6          THE COURT:  STILL RECOMMEND DETENTION, OKAY.

7          ALL RIGHT.  WELL, I'M GOING TO TAKE JUST A FEW

8    MINUTE BREAK AND GET ORGANIZED HERE, AND THEN I'LL COME

9    BACK AND GIVE YOU A RULING TODAY, WHICH I WILL THEN REDUCE

10   TO WRITING, OKAY.

11         MR. JESSEE:  THANK YOU, YOUR HONOR.

12         MR. HARKER:  THANK YOU, YOUR HONOR.

13      (RECESS AT 12:17 P.M., UNTIL 12:48 P.M.)

14         THE COURT:  LET ME FIRST SAY THAT HAVE I BEEN

15   DOING THIS FOR ALMOST FOUR YEARS NOW, AND THIS HAS

16   PROBABLY BEEN ONE OF THE BEST DETENTION HEARINGS THAT I'VE

17   HAD TO SIT IN.  MY COMPLIMENTS TO BOTH THE U.S. ATTORNEY'S

18   OFFICE AND TO THE DEFENDANT'S ATTORNEYS, MR. JESSEE AND

19   MR. SHIPLEY, FOR HOW YOU PRESENTED YOUR CASE.  IT

20   CERTAINLY MAKES MY JOB A LOT HARDER WHEN I HAVE VERY

21   EXPERIENCED TRIAL ATTORNEYS WHO KNOW WHAT THEY'RE DOING

22   BEFORE ME, SO I JUST WANT TO SAY THAT INITIALLY.

23         THIS IS A CASE IN WHICH THE UNITED STATES IS

24   SEEKING HER, THE DEFENDANT'S DETENTION BASED ON THEIR

25   BELIEF THAT THERE IS A SERIOUS RISK THAT THE DEFENDANT

1    WILL FLEE, AND THEY ALSO INDICATE THAT THEY BELIEVE THAT

2    SHE POSES A SERIOUS RISK TO AND A DANGER TO ANY PERSON OR

3    THE COMMUNITY BASED ON ECONOMIC CONCERNS.  I, I'M GOING TO

4    FOCUS MY ATTENTION PRIMARILY ON THE EVIDENCE RELATING TO

5    HER RISK OF FLIGHT.

6           THE COURT STARTS WITH NO PRESUMPTION EXCEPT THE

7    PRESUMPTION OF INNOCENCE IN THIS CASE.  THE DEFENDANT IS

8    PRESUMED TO BE INNOCENT, AND SHE IS AFFORDED THAT

9    PRESUMPTION EVEN IN A DETENTION HEARING.  THIS IS NOT A

10   CASE, AS HAS BEEN ARGUED, THAT THERE IS A REBUTTABLE

11   PRESUMPTION OF DETENTION.  THERE'S NOT A PRESUMPTION AT

12   ALL THAT SHE SHOULD BE DETAINED.  IF ANYTHING, IT IS THAT

13   SHE SHOULD BE RELEASED UNLESS SHE POSES A RISK, A SERIOUS

14   RISK THAT SHE WILL FLEE; AND AS A CONSEQUENCE OF THAT, THE

15   COURT HAS TO EXAMINE WHAT EVIDENCE IS OUT THERE THAT WOULD

16   SUPPORT THE GOVERNMENT'S POSITION THAT SHE DOES POSE THAT

17   RISK AND THAT THE RISK IS SUCH THAT THE COURT CANNOT

18   MITIGATE IT TO PERMIT HER TO LIVE SOMEWHERE ELSE OR ON

19   CONDITIONS THAT WOULD PREVENT HER FROM ACTUALLY FLEEING.

20   IF THE COURT CAN IMPOSE CONDITIONS THAT WOULD BE THE LEAST

21   RESTRICTIVE MEANS TO PREVENT, OR TO ASSURE THAT SHE WOULD

22   APPEAR, THEN THE COURT IS OBLIGATED TO RELEASE HER ON

23   THOSE CONDITIONS.  SO THAT'S THE BIG QUESTION; AND IN

24   ANSWERING THAT QUESTION, THE COURT HAS TO CONSIDER THE

25   EVIDENCE THAT SUPPORTS THE GOVERNMENT'S THEORY ON THE

1  FLIGHT ISSUE.

2         THE FIRST IS, AND AS THE SIXTH CIRCUIT HAS

3  NOTED, AND AS CHIEF JUDGE, MAGISTRATE JUDGE GUYTON

4  INDICATED, HAVING FAMILY CONNECTIONS OUTSIDE THE UNITED

5  STATES, AND IN THIS CASE THE DEFENDANT DOES HAVE FAMILY

6  OUTSIDE THE UNITED STATES.  SHE HAS A SISTER IN CHINA, SHE

7  HAS AN AILING MOTHER IN CHINA, SHE HAS -- SO SHE HAS

8  FAMILY THERE.  SHE DOES HAVE FAMILY HERE IN THE UNITED

9  STATES, HAS PROPERTY HERE IN THE UNITED STATES, PROPERTY

10  HERE IN THE COMMUNITY; AND SO, I MEAN, SO SHE'S GOT -- SHE

11  DOES HAVE FAMILY.  IT'S NOT LIKE SHE HAS NO CONNECTION TO

12  CHINA.

13         SHE ALSO HAS SUBSTANTIAL CONNECTIONS TO CHINA

14  INSOFAR AS IT RELATES TO THE, HER, HER INVOLVEMENT WITH

15  OTHER, EITHER THE CODEFENDANT IN THIS CASE OR THE BUSINESS

16  OF, CEO OF THE COMPANY OUT THERE.  SHE DID APPEAR IN CHINA

17  AND SHE SIGNED A CONTRACT FOR A JOB IN CHINA THAT

18  INDICATED THAT SHE WAS INTENDING TO GO TO CHINA TO WORK IN

19  CHINA.  EVIDENCE PRESENTED WAS THAT SHE WAS GETTING PAID

20  BY HER EMPLOYER IN CHINA, TO THE TUNE OF ABOUT $7,000 A

21  MONTH THAT WAS BEING DEPOSITED IN AN ACCOUNT MANAGED BY

22  HER AUNT THAT THE UNITED STATES HAS INDICATED IS ACTUALLY

23  RELATING TO THE DEFENDANT AND A SALARY THAT SHE IS DRAWING

24  WHILE SHE'S HERE IN THE UNITED STATES.

25         THE PRETRIAL SERVICES REPORT INDICATES THAT SHE

1 HAS SUBSTANTIAL ASSETS, ABOUT $200,000, THEY INDICATE, IN

2 CHECKING AND SAVINGS ACCOUNT, AND WITH A NET WORTH OF OVER

3 $1.6 MILLION IN REAL ESTATE, CARS AND THE LIKE; BUT AS FAR

4 AS LIQUID ASSETS, SHE HAS SUBSTANTIAL ASSETS THAT THE

5 COURT CAN TELL IN HER ACCOUNT THAT'S IMMEDIATELY

6 ACCESSIBLE.  THERE'S SOME EVIDENCE THAT SHE HAS MONEY IN

7 CHINA BANK ACCOUNT, IN THE CONSTRUCTION ACCOUNT,

8 CONSTRUCTION BANK ACCOUNT, BUT IT'S NOT -- NO EVIDENCE

9 THAT SHE'S GOT SUBSTANTIAL ASSETS THERE.  I MEAN, IN FACT,

10 THE ONLY EVIDENCE THAT WE'VE GOT IS THAT SHE'S GOT VERY

11 MINIMAL ASSETS AS IT STANDS TODAY.

12          SHE INDICATED IN HER BRIEF THAT SHE OWNS NO

13 PROPERTY IN CHINA.  THE EVIDENCE THAT WAS PRESENTED TODAY

14 WAS THAT SHE TOLD HER BOSS AND EASTMAN THAT SHE DID OWN

15 PROPERTY IN CHINA, SO I DON'T KNOW.  I DON'T KNOW WHETHER

16 SHE OWNS IT, IF SHE'S LYING TO HER BOSS THAT SHE OWNS

17 PROPERTY THERE OR IF THE ATTORNEY IN LOS ANGELES IS

18 MISINFORMED, SO I CAN'T, I CAN'T PUT MUCH WEIGHT ON THAT

19 FACTOR AT ALL.

20          WHAT'S INTERESTING IS THAT IT APPEARS, NOTWITH-

21 STANDING THE ARGUMENTS TO THE CONTRARY, IT CERTAINLY

22 APPEARS THAT THE DEFENDANT IS GETTING READY TO GO TO

23 CHINA, AND I'LL TELL YOU A NUMBER OF FACTORS THAT POINT IN

24 THAT DIRECTION; AND THAT IS, NUMBER ONE, SHE SIGNS A

25 CONTRACT FOR EMPLOYMENT WITH A COMPANY IN CHINA THAT

1   INDICATES THAT SHE IS INTENDING TO WORK FOR THE COMPANY IN

2   CHINA.  SHE INQUIRES ABOUT ACQUIRING REAL ESTATE, OWNING

3   PROPERTY IN CHINA, SPECIFICALLY A BEACH FRONT PROPERTY.

4   THERE IS A PICTURE THAT WAS INTRODUCED FROM THE CEO'S

5   BALCONY OVERLOOKING THE WATERFRONT AND THAT, THAT SHE WAS

6   INTERESTED IN RENTING THAT PROPERTY ON THE FLOOR BENEATH

7   HIM; AND THERE WAS SOME, SOME PAPERWORK THAT SUGGESTED

8   THAT, THAT SHE WAS SERIOUSLY CONSIDERING THAT.  SO THAT

9   SUGGESTS TO ME THAT SHE WAS THINKING ABOUT -- I MEAN, IF

10  YOU'RE THINKING ABOUT MOVING SOMEWHERE, YOU DO EXACTLY

11  WHAT SHE'S DOING, YOU HAVE YOUR -- YOU HAVE A JOB LINED UP

12  AND THEN YOU GET YOUR HOUSING LINED UP.  IT SEEMS LIKE

13  THAT'S WHAT SHE WAS DOING, AND SHE WAS GOING TO HAVE A

14  FULLY FURNISHED APARTMENT THERE AND RIGHT NEAR THE, THE,

15  HER BOSS.

16          NOW, AS FAR AS THE CITIZENSHIP IS CONCERNED, I

17  DON'T KNOW WHAT TO MAKE OF THAT; BUT WHAT, WHAT IT APPEARS

18  IS THAT SHE DOESN'T BELIEVE THAT HER CITIZENSHIP IN THE

19  UNITED STATES IS GOING TO POSE HER ANY OBSTACLE TO MOVING

20  TO CHINA IF THAT'S IN FACT WHAT SHE SEEMS TO BE INTENDING

21  TO DO; SO I DON'T KNOW WHETHER SHE'S GOING TO WORK THAT

22  OUT AND HAVE HER CITIZENSHIP RESTORED OR WHETHER THAT'S

23  EVEN GOING TO BE AN ISSUE, BUT IT DOESN'T -- GETTING TO

24  CHINA THOUGH IS NOT AN ISSUE.  SHE CAN GET TO CHINA IF SHE

25  WANTS TO GET TO CHINA, AND SHE'S DONE THAT NUMEROUS TIMES;

1    AND SHE'S DONE IT SO MANY TIMES, IT SEEMED TO ME, THAT IT

2    WAS REMARKABLE THAT NOT THESE ATTORNEYS, BUT THE ATTORNEYS

3    IN CALIFORNIA HAD INDICATED THAT SHE ONLY TRAVELED TO

4    CHINA ONCE EVERY FEW YEARS, BECAUSE WHEN I READ THAT, I'M

5    LIKE, WELL, IF SHE'S NOT HAVING THAT MUCH CONNECTION HERE

6    AND SHE DOESN'T HAVE SIGNIFICANT FAMILY THERE, THEN

7    WHAT'S -- I DON'T UNDERSTAND THE PROBLEM, I DON'T

8    UNDERSTAND HOW, WHAT THE DEAL IS; BUT THEN WE COME INTO

9    THE HEARING TODAY, AND WE'VE GOT DOCUMENTED TRIPS TO CHINA

10   IN AUGUST 2017 FOR A WEEK, THE NEXT MONTH, SEPTEMBER 17

11   FOR FOUR DAYS IN CHINA, APRIL 2018 SHE GOES TO CHINA AND

12   IS THERE FOR A MONTH, AND THEN SHE'S BACK IN CHINA IN

13   AUGUST 2018 AND STAYS THERE FOR A COUPLE OF WEEKS; SO THAT

14   SEEMS TO UNDERCUT THE ARGUMENT, WHICH I THINK WAS AN

15   EFFECTIVE ARGUMENT IF IT WERE TRUE, THAT SHE ONLY TRAVELS

16   TO CHINA ONCE EVERY FEW YEARS, AND, THEREFORE, THE RISK OF

17   HER GOING TO CHINA IS VERY MINIMAL; BUT IT'S NOT MINIMAL,

18   I MEAN, AND IT'S NOT INFREQUENT.  I MEAN, SHE'S GONE TO

19   CHINA IN A PERIOD OF ONE YEAR FOUR TIMES AND HAS SPENT A

20   SUBSTANTIAL AMOUNT OF DAYS OVER THERE, ON ONE OCCASION A

21   WHOLE MONTH, SO THAT, THAT SUGGESTS THAT SHE HAS

22   CONNECTIONS TO CHINA AND CAN GET OVER THERE.

23            BUT THEN THE QUESTION IS, OKAY, WHAT DOES SHE

24   DO WHILE SHE'S IN CHINA?  IS SHE JUST WORKING FOR EASTMAN?

25   IS SHE WORKING FOR A COMPANY OR IS SHE DOING SOMETHING

1   THAT APPEARS AT LEAST TO SUGGEST THAT SHE'S LAYING THE

2   GROUNDWORK FOR A RETURN TO CHINA, AND THAT'S REALLY THE

3   CONCERN I HAVE.  I CAN'T SPEAK TO ALL THE TRADE SECRET

4   INFORMATION AND ALL THAT, BUT WHAT DOES IT LOOK LIKE.

5   WELL, YOU GET HER APPLYING FOR THE THOUSAND TALENT

6   PROGRAM, WHICH IS A GOVERNMENT FUNDED PROGRAM IN AN AREA

7   OF EXPERTISE THAT INVOLVES THE VERY TRADE SECRETS THAT SHE

8   IS ALLEGED TO HAVE STOLEN.  SHE APPLIES FOR AND WINS THESE

9   VERY COVETED TALENT SEARCH PROGRAMS THAT ALLOW HER A

10  FOUNDATION AND A SECURE FOUNDATION TO RETURN TO CHINA, TO

11  HAVE MONEY, TO HAVE FUNDING FOR -- IN AN AREA OF BUSINESS

12  THAT SHE HAS HAD PRIOR EXPOSURE TO, THAT SHE HAS TRADE

13  SECRET INFORMATION REGARDING, AND HAS THAT INFORMATION

14  THAT SHE HAS ESSENTIALLY MISREPRESENTED THAT SHE, SHE HAD.

15          I MEAN, SHE SIGNED A, SWORE TO HER PRIOR

16  EMPLOYERS THAT SHE HAD NONE OF THEIR TRADE SECRET

17  INFORMATION, BUT IN FACT THAT WAS NOT TRUE.  SHE HAD IN

18  FACT SAVED THAT INFORMATION THAT ACCORDING TO THE

19  AFFIDAVITS THAT WAS PRESENTED TODAY WERE THAT SHE

20  SHOULDN'T HAVE HAD, BUT SHE SAID SHE DIDN'T HAVE, OKAY.

21  SO WHAT YOU HAVE IS YOU HAVE HER REPRESENTING TO HER

22  EMPLOYER, I DON'T HAVE ANY OF YOUR INFORMATION, I HAVE

23  NONE OF THIS COATING TECHNOLOGY, I DON'T HAVE YOUR

24  INFORMATION, AND YET SHE HAD IT ALL.  SHE HAD IT ALL, AND

25  SHE WAS APPLYING IN CHINA FOR A PROJECT AND FOR FUNDING

1    THAT WOULD USE THAT VERY TECHNOLOGY IN CHINA.  SO THAT

2    TELLS ME THAT, THAT SHE -- THAT, AGAIN, THAT SUPPORTS THIS

3    NOTION THAT SHE DOES NOT HAVE INSUBSTANTIAL CONNECTIONS TO

4    CHINA.  SHE IN FACT HAS SUBSTANTIAL CONNECTIONS.  SHE HAS

5    A VERY STRONG ECONOMIC INTEREST TO GO TO CHINA BECAUSE SHE

6    HAS LAID THE GROUNDWORK TO DO SO.  AND THE, THE AGENT

7    TESTIFIED THAT SHE EVEN NOW HAD HAD SOME CONNECTION WITH

8    THE CHINESE GOVERNMENT OFFICIALS; AND I DON'T KNOW THE

9    EXTENT OF THAT, AND I DON'T THINK THAT WAS INTRODUCED, BUT

10   THE FACT THAT THE PROGRAM ITSELF WAS FUNDED BY THE

11   GOVERNMENT AND THEN YOU SEE HER WITH GOVERNMENT OFFICIALS

12   SUGGESTS THAT SHE, HER CONNECTIONS ARE NOT

13   INCONSEQUENTIAL.

14           NOW, THE OTHER THING YOU HAVE TO LOOK AT ON

15   THIS RISK OF FLIGHT IS, WELL, IS SHE ACTING IN ANY OTHER

16   WAY WITH HOW SHE'S LIVING HERE IF -- THAT WOULD SUGGEST

17   THAT SHE REALLY DOESN'T INTEND TO STAY HERE.  DOES SHE

18   INTEND TO STAY HERE?  THE ARGUMENT IS THAT SHE'S GOT

19   SUBSTANTIAL PROPERTY HERE, SHE'S GOT PLENTY OF FINANCES

20   HERE AND HOMES ALL OVER THE EAST COAST THAT I WON'T, YOU

21   KNOW, GO THROUGH RIGHT NOW; AND YET WHEN SHE'S ARRESTED,

22   SHE -- THE EVIDENCE WAS THAT SHE LEASED AN APARTMENT IN

23   DECEMBER 2018.  SHE IS ARRESTED FEBRUARY 14, 2019, AND

24   DURING THOSE 60, 75 DAYS, THERE'S NO EFFORT TO DO ANYTHING

25   WITH THE PLACE THAT SHE'S LIVING.

1          NOW, WHY IS THAT SIGNIFICANT?  WELL, THE

2    ARGUMENT IS THAT SHE WAS EMPLOYED AND SHE WAS WORKING IN

3    LANSING, MICHIGAN AND SHE WAS INTENDING TO CONTINUE TO

4    WORK THERE USING HER SKILL SET TO MAKE A LIVING; AND, YET,

5    THE ONLY THING THAT SHE HAS IN THE APARTMENT IS A

6    MATTRESS, A FOLDING CHAIR AND A FOLDING TABLE.  NOW, THAT

7    DOESN'T TO ME INDICATE THAT SOMEBODY IS REALLY INTERESTED

8    IN PUTTING THEIR ROOTS DOWN, BUT IS MORE INTERESTED IN

9    MAKING A QUICK GET AWAY.  I MEAN, WHY WASTE YOUR MONEY ON

10   FURNISHINGS WHEN YOU KNOW YOU'RE GOING TO BE HITTING THE

11   DOOR AT A MOMENT'S NOTICE.  SO THAT'S CERTAINLY

12   CONSISTENT.  IT DOESN'T PROVE IT.  IT DOESN'T PROVE THAT

13   SHE WAS INTENDING TO LEAVE BY LIVING A VERY SIMPLE

14   LIFESTYLE, BUT IT CERTAINLY IS CONSISTENT WITH SOMEBODY

15   WHO WAS READY TO LEAVE AT A MOMENT'S NOTICE.

16          AND THE SAME THING IS TRUE WITH WHAT IS, WHAT

17   HAS BEEN CALLED THE GO BAG.  I DON'T -- I HAD NEVER HEARD

18   THAT TERM BEFORE, BUT IT'S A BAG, IT'S A BAG, I'M JUST

19   GOING TO CALL IT A BAG, IN THE BAG HAD FOREIGN CURRENCY,

20   PASSPORTS, DIPLOMAS.  IT DOESN'T SHOW THAT SHE WAS

21   READY -- SHE WAS GOING TO LEAVE, IT SHOWS THAT IT'S

22   CONSISTENT WITH SOMEBODY WHO IS READY TO GO AT A MOMENT'S

23   NOTICE; AND THAT SHE WAS -- IF, IF SOMEONE WERE INTENDING

24   TO FLEE, THAT'S WHAT I WOULD DO.  I WOULD STAY IN AN

25   APARTMENT WITH NO FURNISHINGS, NOT WASTE MY MONEY.  I'D

1   HAVE A BAG WITH FOREIGN CURRENCY, PASSPORT, DIPLOMAS AND I

2   CAN PICK UP AND GO AT ANY MOMENT IN TIME WHEN I THOUGHT

3   THE MOMENT WAS RIGHT.  SO THAT SUGGESTS SHE'S A RISK OF

4   FLIGHT.

5          AND THEN, FINALLY, THE SENTENCE IF CONVICTED, I

6   DON'T KNOW WHAT HER SENTENCING RANGE IS, THE UNITED STATES

7   HAS REPRESENTED THAT IT IS SIGNIFICANT IF CONVICTED, THEY

8   ESTIMATE 210 TO 262 MONTHS.  THAT WOULD BE A SUBSTANTIAL

9   SENTENCE.  AGAIN, THERE'S BEEN NO CALCULATION OF HER

10   GUIDELINE RANGE, SO -- BUT THAT IS A FACTOR THE COURT HAS

11   TO CONSIDER IS IF THERE IS A SUBSTANTIAL EXPOSURE TO A

12   LENGTHY SENTENCE IF CONVICTED; THAT, THE SIXTH CIRCUIT HAS

13   SAID, IS A FACTOR THE COURT CAN WEIGH IN CONSIDERING

14   WHETHER SOMEBODY IS A FLIGHT RISK.

15          SO THE QUESTION IS -- SHE'S A FLIGHT RISK.  I

16   THINK THE EVIDENCE IS SHE'S A FLIGHT RISK.  SHE HAS ALL

17   THESE CONNECTIONS TO CHINA AND APPEARS THAT SHE WAS READY

18   TO GO AT A MOMENT'S NOTICE AND STILL COULD GO.

19          SO THE QUESTION IS, ALL RIGHT, IS THERE -- ARE

20   THERE CONDITIONS THAT I CAN IMPOSE THAT WOULD MITIGATE

21   THAT RISK OF HER LEAVING OR, OR NOT.  AND SO I'VE THOUGHT

22   ABOUT WHAT I CAN DO, COULD I PUT A FINANCIAL -- IS THERE A

23   FINANCIAL OBLIGATION I COULD PUT THAT WOULD GUARANTEE HER

24   APPEARANCE, IS THERE ELECTRONIC MONITORING THAT WOULD

25   GUARANTEE HER APPEARANCE, WOULD SHE FOLLOW MY CONDITIONS?

1  SHE HAS A HISTORY OF NOT BEING HONEST WITH HER EMPLOYER

2  BASED ON THE THINGS THAT SHE HAS SIGNED SAYING THAT SHE

3  DOESN'T HAVE THE TRADE SECRETS, SO I THINK HER CREDIBILITY

4  IS SUSPECT.  SO, I MEAN, TRUST IS OBVIOUSLY A BIG ISSUE IN

5  THESE CASES WHERE, YOU KNOW, YOU TRUST SOMEBODY WHO IS

6  GOING TO FOLLOW YOUR CONDITIONS; AND IF YOU HAVE THEM

7  ENGAGING IN SOPHISTICATED ACTS OF DISHONESTY, THAT THEIR

8  CREDIBILITY IS CERTAINLY QUESTIONABLE.

9          YOU KNOW, CONSIDERING HER PAST, HER CHARACTER,

10  HER PHYSICAL, MENTAL CONDITIONS, THEY'RE ALL POSITIVE.

11  SHE DOESN'T HAVE A DRUG PROBLEM, SHE DOESN'T HAVE A

12  CRIMINAL HISTORY, SHE DOESN'T HAVE ANY BAD RECORDS OF

13  APPEARING IN COURT.  SHE'S NOT A VIOLENT PERSON.  SHE

14  WASN'T ON PAROLE AT THE TIME OF THESE OFFENSES.  ALL THOSE

15  ARE VERY POSITIVE IN HER FAVOR, SO THEY WOULD, THEY WOULD

16  LEAN ON IMPOSING SOME CONDITIONS.

17          MY CONCERN IS GIVEN THE TOTALITY OF IT ALL,

18  GIVEN WHO SHE IS CONNECTED WITH IN CHINA, HER SOPHIS-

19  TICATED EFFORTS TO, IN THIS OFFENSE.  FROM WHAT I CAN

20  TELL, SHE'S A BRILLIANT, BRILLIANT, BRILLIANT PERSON, NO

21  QUESTION ABOUT THAT.  I DON'T THINK I CAN IMPOSE ANY

22  CONDITION THAT WOULD GUARANTEE THAT SHE WOULD APPEAR; AND

23  WHEN SHE'S GONE, SHE'S GONE.  HER CODEFENDANT IS GONE.

24  HER CODEFENDANT IS IN CHINA, AND I'M NOT WILLING TO TAKE

25  THAT CHANCE, AND I JUST DON'T THINK THERE'S ANY CONDITIONS

1    I CAN IMPOSE ON HER.

2              I'VE CONSIDERED THE BRIEF, I'VE CONSIDERED THE

3    ARGUMENTS, AND I'M GOING TO FIND THAT SHE HAS TO BE

4    DETAINED PENDING THE TRIAL, SO THAT'S MY RULING.

5              NOW, LET ME ASK YOU ALL, AND I'LL REDUCE ALL

6    THAT TO WRITING HERE THIS AFTERNOON, WHAT DO YOU WANT TO

7    DO ABOUT THE CONTINUANCE OF THE TRIAL?  I ASSUME YOU WANT

8    THE CASE CONTINUED.

9              MR. JESSEE:  YES, YOUR HONOR.

10             THE COURT:  OKAY.

11             MR. JESSEE:  WE'RE GOING TO HAVE TO HAVE IT

12   CONTINUED IF YOUR HONOR WOULD ALLOW.  I DON'T KNOW THAT

13   YOU CAN PUT IN YOUR ORDER, BUT TO GET READY FOR THIS UNDER

14   THE CIRCUMSTANCES, I KNOW THE MARSHALS HAVE THEIR OWN

15   PROBLEMS TRYING TO DEAL WITH PRISONERS.

16             THE COURT:  YEAH.

17             MR. JESSEE:  I REALLY WOULD ASK IF THERE'S SOME

18   WAY TO REQUEST OR ORDER, INSIST THAT THEY NOT MOVE HER

19   FROM WASHINGTON COUNTY BECAUSE THAT'S WHERE THE DATA THAT

20   WE'RE GOING TO HAVE TO WORK ON AND WORK WITH HER ON IS

21   GOING TO BE STORED.  IT'S NOT LIKE WE CAN TAKE IT TO HER.

22             THE COURT:  WELL, THAT'S A FAIR POINT.  I HAVE

23   NOT GOTTEN INTO TELLING THE -- AND I WANT TO TELL YOU

24   THIS, THE MARSHALS ARE VERY SENSITIVE TO THOSE KIND OF

25   ISSUES TOO.

1          MR. JESSEE:  THEY'RE GREAT TO WORK WITH.

2          THE COURT:  YES.

3          MR. JESSEE:  BUT I ALSO HAD THEM DISAPPEAR AT

4   MIDNIGHT, AND I'VE GOT ONE FOUR HOURS AWAY FROM HERE NOW

5   THAT I DON'T KNOW WHY HE GOT MOVED.

6          THE COURT:  I UNDERSTAND THAT.

7          MR. JESSEE:  SO I JUST WANTED TO PUT IT ON THE

8   RECORD.

9          THE COURT:  RIGHT, I APPRECIATE THAT; AND I

10  THINK IF YOU COMMUNICATE WITH THE MARSHALS, THEY'LL BE

11  SENSITIVE TO THAT TOO, MY GUESS IS THAT THEY WILL, UNLESS

12  THERE'S SOMETHING EXTRAORDINARY THAT HAPPENS THAT REQUIRES

13  HER TO BE MOVED.  I MEAN, I'M NOT GOING TO PUT AN ORDER

14  SAYING THAT THEY HAVE TO KEEP HER THERE, YOU KNOW, I

15  DON'T, I DON'T GET INTO MEDDLING WITH --

16         MR. JESSEE:  I UNDERSTAND.

17         THE COURT:  IT IS AN EXTRAORDINARY PROCESS

18  BECAUSE WE'VE GOT 300 AND SOME DEFENDANTS NOW THAT THEY'RE

19  MANAGING IN ALL THESE DIFFERENT LOCATIONS, AND SO I KIND

20  OF LEAVE IT TO THEM FROM A LOGISTICAL STANDPOINT TO KIND

21  OF MANAGE WHERE THEY NEED TO BE; AND SHE'S A FEMALE TOO,

22  AND THAT IS THE OTHER CHALLENGING PART OF HOUSING BECAUSE

23  SHE'S A FEDERAL INMATE AND THAT MIGHT CREATE PROBLEMS FOR

24  THEM AS WELL, BUT, BUT --

25         MR. JESSEE:  THEY'VE HEARD ME MENTION IT, WE'LL

1    STOP DOWNSTAIRS ON THE WAY DOWN --

2               THE COURT:  GOOD.

3               MR. JESSEE:  -- ASSUMING SHE'S HERE.

4               WELL, WE'D LIKE THE DECEMBER DATE, IF YOU HAVE

5    A DECEMBER DATE.

6               THE COURT:  WELL, YOU KNOW, I TOOK MY -- DO YOU

7    STILL HAVE THAT THING?

8               THE CLERK:  DECEMBER THE 3RD OR 5TH.

9               THE COURT:  DECEMBER THE 3RD OR THE 5TH.  NOW,

10   DO YOU THINK, JUST SO THE RECORD IS CLEAR, DO YOU THINK

11   THAT YOU NEED THAT MUCH TIME THAT I NEED TO EXCLUDE UNDER

12   THE SPEEDY TRIAL ACT SO YOU CAN GET READY FOR THIS CASE

13   BECAUSE OF THE VOLUME OF DISCOVERY AND THE COMPLEXITY OF

14   THE CASE?

15              MR. JESSEE:  YES, I REALLY DO; AND THERE MAY BE

16   TWO PIECES OF PAPER, AND I'LL BE A GOOD OFFICER OF THE

17   COURT'S TIME AND SAY, JUDGE, WE'RE SURPRISED, THE STUFF

18   THAT, THE FBI'S TWO PIECES OF PAPER, WE CAN DO IT IN

19   SEPTEMBER; BUT WHEN I CONSIDER HAVING TO FIRST FIND AN

20   EXPERT DEPENDING ON WHAT I SEE, GET THAT PERSON TO COME IN

21   HERE, MAKING THOSE ARRANGEMENTS, LITERALLY POSSIBLY GOING

22   TO CHINA OR, AND/OR ITALY, I DON'T THINK DECEMBER IS

23   UNREASONABLE.

24              THE COURT:  OKAY.  WELL, I JUST WANTED -- YOU

25   KNOW, AS FAR AS EXCLUDING UNDER THE SPEEDY TRIAL ACT, THE

1  TIME FROM TODAY UNTIL A DECEMBER TRIAL DATE, I'LL MAKE

2  THAT FINDING THAT NOTWITHSTANDING THE EXERCISE IN DUE

3  DILIGENCE, THERE'S NO WAY YOU COULD GET THE CASE READY

4  BEFORE THEN; AND IF YOU, IF YOU CAN, THEN YOU'LL FILE A

5  MOTION SAYING --

6            MR. JESSEE:  WE'LL FILE A MOTION AND SAY WE'RE

7  READY, YOU KNOW, WE'RE CLOSER TO GETTING READY.

8            THE COURT:  RIGHT.

9            MR. JESSEE:  AND THE DECEMBER 3RD IS FINE IF

10  YOU HAVE THAT DATE.

11            THE COURT:  HOW LONG IS THIS CASE GOING TO

12  LAST, DO YOU THINK?

13            MR. HARKER:  YOUR HONOR, I THINK THE GOVERNMENT

14  CAN PUT ITS CASE IN CHIEF ON IN FOUR OR FIVE DAYS.

15            MR. JESSEE:  I THINK IT'S --

16            THE COURT:  TEN DAY TRIAL?

17            MR. JESSEE:  TEN DAYS, TWO WEEKS, BECAUSE WE'VE

18  GOT SO MANY TECHNICAL DOCUMENTS TO GET IN, THEY'LL HAVE TO

19  PUT THEM IN, WE'RE NOT GOING TO STIPULATE TO ANYTHING.

20            THE COURT:  OKAY.

21            MR. HARKER:  YOUR HONOR, FOUR OR FIVE DAYS FOR

22  THE GOVERNMENT; SO IF THEY'RE SAYING TEN DAYS, THEN WE

23  INTERPRET THAT TO MEAN IT WILL TAKE THEM FIVE DAYS TO PUT

24  THEIR DEFENSE CASE ON.

25            THE COURT:  IS THAT WHAT YOU'RE THINKING?  I

1   MEAN, IT'S KIND OF HARD TO TELL NOW, BUT.  AND I GUESS

2   WE'RE JUST TRYING TO FIGURE OUT HOW MUCH TO BUDGET FOR

3   WITH JUDGE GREER.

4           MR. JESSEE:  UNTIL I SEE IT, I DON'T REALLY

5   KNOW, SO I WOULD SAY MARK OFF TWO WEEKS AND THEN WE'LL SEE

6   WHAT HAPPENS.

7           THE COURT:  OKAY.  ALL RIGHT.  IF THAT'S THE

8   CASE, IF WE HAVE A DECEMBER 3RD TRIAL DATE, I'M GOING TO

9   RECOMMEND THAT WE HAVE A PRETRIAL CONFERENCE A LITTLE BIT

10  FURTHER OUT THAN WE NORMALLY DO.  NORMALLY WE DO 30 DAYS

11  AND WE GET EVERYTHING DONE, I GET THE ORDERS OUT, THE

12  R&R'S OUT PRETTY QUICKLY AND THAT ALLOWS YOU ALL, YOU

13  KNOW, TWO WEEKS TO OBJECT AND THEN THE DISTRICT JUDGE CAN

14  THEN RULE ON THE OBJECTIONS; BUT THIS MIGHT VERY WELL

15  INVOLVE A LOT MORE COMPLICATED MOTIONS, I DON'T KNOW, IT

16  COULD, SO I'M GOING TO RECOMMEND THAT INSTEAD OF WE GO 30

17  DAYS OUT, GO 60 DAYS OUT AND HAVE THE PRETRIAL CONFERENCE

18  IN THE FIRST PART OF OCTOBER.  IF YOU ALL COULD CHECK YOUR

19  AVAILABILITY THAT OCTOBER 7TH WEEK.

20          MR. JESSEE:  YOUR HONOR, I'M ALREADY BOOKED TO

21  BE GONE THE WEEK OF THE 7TH, SO I IMAGINE MR. SHIPLEY IS

22  TOO BECAUSE THAT'S FALL BREAK.

23          THE COURT:  IS IT FALL BREAK?

24          MR. JESSEE:  FOR STUDENTS HERE.

25          1ST, 2ND OR 3RD OR 4TH IS FINE.

1          THE COURT:  OKAY.  YEAH, 1ST, 2ND, 3RD OR 4TH

2    ARE FINE BY ME, IT'S WIDE OPEN.  IT DEPENDS ON WHAT YOU

3    ALL WANT TO DO.

4          MR. HARKER:  2ND OR 3RD WOULD BE THE BEST FOR

5    THE GOVERNMENT, YOUR HONOR.

6          MR. JESSEE:  3RD IS CLEAR, SO WHY DON'T WE JUST

7    DO THE 3RD.

8          THE COURT:  3RD WORKS.  ALL RIGHT.  OCTOBER 3,

9    2019 AT 9:00 WE'LL DO THE PRETRIAL CONFERENCE, AND I'LL

10   GIVE YOU, AND I'LL GIVE YOU UNTIL SEPTEMBER THE 6TH TO

11   FILE ANY MOTIONS.  YOU THINK YOU CAN -- THAT SHOULD BE AN

12   ADEQUATE TIME.

13         MR. JESSEE:  YES, YOUR HONOR.

14         THE COURT:  OKAY.  THAT WILL BE YOUR MOTION

15   DEADLINE, AND I'LL GIVE THE UNITED STATES UNTIL SEPTEMBER

16   THE 27TH TO RESPOND, THAT'S YOUR DEADLINE, AND THAT WILL

17   GIVE ME ENOUGH TIME, I THINK, THE NEXT WEEK TO GET READY

18   FOR THEM.

19         AND THEN YOUR PLEA DEADLINE?

20         THE CLERK:  NOVEMBER 19TH.

21         THE COURT:  NOVEMBER 19TH, 2019.

22         OKAY.  ALL RIGHT, SO NOW WE'VE GOT THE TRIAL

23   DATE SET, AND I THINK THAT TAKES CARE OF EVERYTHING.  DOES

24   IT?

25         MR. HARKER:  EVERYTHING FROM THE GOVERNMENT,

1    YOUR HONOR.

2              MR. JESSEE:  YES, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  THANK YOU ALL VERY

4    MUCH.

5              MR. JESSEE:  THANK YOU.

6        (PROCEEDINGS ARE CONCLUDED AT 1:16 P.M.)

7    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

8    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10
     KAREN J. BRADLEY/S                    05/20/19
11   SIGNATURE OF COURT REPORTER           DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2   WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE
    WILLIAM LECKRONE
3       DIRECT EXAMINATION BY MR. HARKER               13
        CROSS EXAMINATION BY MR. JESSEE                88
4       DIRECT EXAMINATION BY THE COURT                104
        CROSS EXAMINATION BY MR. JESSEE                105
5
    WITNESSES ON BEHALF OF THE DEFENDANT
6   LINDA XU
        DIRECT EXAMINATION BY MR. JESSEE               109
7       CROSS EXAMINATION BY MR. HARKER                113

8   ARGUMENT:
    GOVERNMENT   116, 134
9   DEFENDANT    128

10  RULING      136

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2    GOVERNMENT'S:                                    MARKED ADMITTED
     1              SUMMARY OF VOICE AND TEXT   14        87
3                   MESSAGES
     2              RESUME OF XIORONG YOU       16        87
4    3              PHOTOGRAPH OF HARD DRIVE    28        87
     4              DECLARATION OF ROB          33        87
5                   LAGENDIJK
     5              DECLARATION OF JONATHAN F.  42        87
6                   MASON
     6              AFFIDAVIT OF DAVID S. BEM   45        87
7    7              DECLARATION OF THOMAS       46        87
                    MALLEN
8    8              PHOTOGRAPH OF FILE FOLDER   48        87
                    STRUCTURE
9    9              RETURN OF DOCUMENTS         52        87
                    CERTIFICATION
10   10             DOCUMENTS FOUND IN FILE     55        87
                    FOLDERS ON HARD DRIVE
11   11             DOCUMENTS OF FILE FOLDERS   56        87
                    OF PPG
12   12             DOCUMENTS OF FILE FOLDERS   63        87
     13             DECLARATION OF DEEPANJAN    63        87
13                  BHATTACHARYA
     14             SLIDE OF RULES AND          65        87
14                  QUESTIONS
     15             PHOTOGRAPHS ON IPHONE OF    66        87
15                  EQUIPMENT
     16             PHOTOGRAPH OF FROM          73        87
16                  RESIDENTIAL PROPERTY
     17             PHOTOGRAPH OF BUSINESS      78        87
17                  CARDS                                 87
     18             PHOTOGRAPH OF RECORD BOOK   80        87
18   19             PHOTOGRAPH OF BRIEFCASE     83        87
     20             US V. ZHENG DOCKET SHEET    87        87
19   21             ZHENG BOND HEARING          87        87
                    TRANSCRIPT
20   22             MINUTES FROM ZHANG,         87        87
                    NORTHERN DISTRICT OF                  87
21                  CALIFORNIA
     23             MINUTES FROM LAM, NORTHERN  87        87
22                  DISTRICT OF CALIFORNIA

23

24

25