1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF TENNESSEE
2                     GREENEVILLE

3

UNITED STATES OF AMERICA,   .  DOCKET NO. CR-2-19-14
4                              .
         GOVERNMENT,           .
5                              .
              VS.              .  GREENEVILLE, TN
6                              .  APRIL 8, 2020
XIAORONG YOU,                  .  1:45 P.M.
7                              .
         DEFENDANT.            .
8                              .
. . . . . . . . .              .
9

10              TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE J. RONNIE GREER
11              UNITED STATES DISTRICT JUDGE

12       (DEFENDANT PRESENT BY VIDEO CONFERENCE)

13

APPEARANCES:
14

FOR THE GOVERNMENT:      U.S. DEPARTMENT OF JUSTICE
15                       OFFICE OF U.S. ATTORNEY
                         TIMOTHY CURTIS HARKER, AUSA
16                       800 MARKET STREET, SUITE 211
                         KNOXVILLE, TN 37902
17
FOR THE GOVERNMENT       U.S. DEPARTMENT OF JUSTICE
18 VIA VIDEOCONFERENCE:   OFFICE OF U.S. ATTORNEY
                         J. DOUGLAS OVERBEY,
19                       UNITED STATES ATTORNEY
                         800 MARKET STREET, SUITE 211
20                       KNOXVILLE, TN 37902

21 FOR THE GOVERNMENT      U.S. DEPARTMENT OF JUSTICE -
   VIA TELEPHONE:         (CRIMINAL DIVISION)
22                       COMPUTER CRIME AND INTELLECTUAL
                         PROPERTY SECTION
23                       MATTHEW R WALCZEWSKI, AUSA
                         1301 NEW YORK AVENUE N.W.,
24                       SUITE 600
                         WASHINGTON, DC 20530
25

```
 1                              U.S. DEPARTMENT OF JUSTICE
                                (NATIONAL SECUIRTY)
 2                              NATIONAL SECUIRTY DIVISION,
                                COUNTERTERRORISM SECTION
 3                              NICHOLAS O. HUNTER, AUSA
                                950 PENNSYLVANIA AVENUE N.W.
 4                              WASHINGTON, DC 20530

 5   FOR THE DEFENDANT:         COLLINS SHIPLEY, PLLC
                                COREY B. SHIPLEY, ESQ.
 6                              128 SOUTH MAIN STREET, SUITE 102
                                GREENEVILLE, TN 37743
 7
     FOR THE DEFENDANT          JESSEE & JESSEE
 8   VIA VIDEOCONFERENCE:       THOMAS C. JESSEE, ESQ.
                                412 EAST UANAKA AVENUE
 9                              JOHNSON CITY, TN 37601

10                              COLLINS SHIPLEY, PLLC
                                MICHAEL CURTIS COLLINS, ESQ.
11                              128 SOUTH MAIN STREET, SUITE 102
                                GREENEVILLE, TN 37743
12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:           KAREN J. BRADLEY
                                RPR-RMR
23                              U.S. COURTHOUSE
                                220 WEST DEPOT STREET
24                              GREENEVILLE, TN 37743

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER.
```

1     (CALL TO ORDER OF THE COURT AT 1:45 P.M.)

2              THE COURT:  GOOD AFTERNOON.

3              ATTORNEYS:  GOOD AFTERNOON, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  MS. HOPSON, WOULD YOU

5     CALL THIS CASE, PLEASE.

6              THE CLERK:  USA VERSUS XIAORONG YOU, CASE

7     NUMBER CR-2-19-14.

8              THE COURT:  ALL RIGHT.  OF COURSE, MR. SHIPLEY

9     AND MR. HARKER ARE PRESENT HERE IN THE COURTROOM.

10             IS THAT THE U.S. ATTORNEY?  IT IS.

11             MR. OVERBEY:  YES, IT IS, YOUR HONOR.  GOOD

12    AFTERNOON.

13             THE COURT:  GOOD AFTERNOON.

14             THE UNITED STATES ATTORNEY, MR. OVERBEY, HAS

15    JOINED US BY VIDEO.  WE HAVE A COUPLE OF LAWYERS FOR THE

16    GOVERNMENT ON THE TELEPHONE.

17             ALL RIGHT.  COUNSEL, WE'LL TRY TO MOVE THROUGH

18    THIS AS QUICKLY AS WE CAN.  I HAVE TRIED NOT TO SCHEDULE

19    HEARINGS DURING THIS PERIOD OF TIME, BUT THIS ONE SEEMED

20    TO BE ONE WE COULDN'T AVOID A HEARING ON.  THERE ARE TWO

21    MATTERS, OF COURSE, PENDING BEFORE THE COURT.  THE FIRST

22    ONE IS A STATUS CONFERENCE, BASICALLY A SCHEDULING

23    CONFERENCE TO TALK ABOUT THE RESCHEDULING OF THIS CANCELED

24    TRIAL; AND, SECONDLY, TO REVISIT THE MOTION FOR BOND THAT

25    WAS PREVIOUSLY FILED BY, BY THE DEFENDANT.  I SHOULD ALSO

1    NOTE THAT THE DEFENDANT IS PRESENT BY VIDEO AS WELL.

2               MS. YOU, CAN YOU HEAR US OKAY?

3               THE DEFENDANT:  YES.  YES, YOUR HONOR.

4               THE COURT:  OKAY.  GOOD.  IF AT ANY TIME YOU

5    HAVE TROUBLE HEARING, LET ME KNOW, PLEASE.

6               THE DEFENDANT:  THANK YOU, YOUR HONOR.

7               THE COURT:  ALL RIGHT.  COUNSEL, UNLESS THERE'S

8    SOME REASON TO DO IT IN A DIFFERENT ORDER, I SUGGEST WE

9    TAKE UP THE BOND MOTION FIRST AND THEN DEAL WITH THE

10   SCHEDULING ISSUE, ALL RIGHT.

11              MR. SHIPLEY, I TAKE IT YOU'RE GOING TO ADDRESS

12   THAT ISSUE.  WHY DON'T YOU, SO THAT WE CAN MAINTAIN AS

13   MUCH SEPARATION AS POSSIBLE, JUST REMAIN SEATED AND SPEAK

14   INTO THAT MICROPHONE THERE, AND THEN MR. HARKER CAN DO THE

15   SAME.

16              MR. SHIPLEY:  VERY WELL, JUDGE.

17              THE COURT:  AND, MR. SHIPLEY, I'LL JUST JUMP

18   RIGHT IN BEFORE YOU START.  LET ME TELL YOU WHAT MY

19   CONCERN AT THIS POINT IS.  AS THE RECORD REFLECTS, THE

20   COURT ENTERED AN ORDER INITIALLY GRANTING THE DEFENDANT'S

21   MOTION FOR BOND IN THIS CASE, BUT BECAUSE OF SOME CONCERNS

22   THAT AROSE BASED ON INFORMATION RECEIVED FROM THE

23   PROBATION OFFICE I WAS MORE CONCERNED THAT THERE HAD BEEN

24   SOME MISINFORMATION, HOPEFULLY NOT MISREPRESENTATIONS,

25   PROVIDED TO THE COURT IN THOSE PLEADINGS, SPECIFICALLY

1   WITH RESPECT TO THE POSSIBILITY OF THE DEFENDANT'S HUSBAND

2   BEING A THIRD-PARTY CUSTODIAN AND THE REPRESENTATION TO

3   THE COURT THAT MS. YOU WOULD LIVE IN PROPERTY OWNED BY HER

4   IN JOHNSON CITY.

5          I HAVE SEEN YOUR SUPPLEMENTAL PLEADING, I'VE

6   READ ALL THE PLEADINGS, BUT I'LL BE HAPPY TO HEAR FROM

7   YOU, BUT MY CONCERN, FRANKLY, IS WITH, WITH THOSE ISSUES.

8          MR. SHIPLEY:  YOUR HONOR, FIRST AND FOREMOST

9   THAT'S WHY I DECIDED TO FILE THE SUPPLEMENTAL PLEADING

10  YESTERDAY BECAUSE, FIRST AND FOREMOST, JUDGE, THERE WAS

11  NEVER ANY, ANY INTENT.  I HAVE TALKED WITH THE UNITED

12  STATES PROBATION OFFICE ABOUT ANY POSSIBLE MISINFORMATION

13  OR MISREPRESENTATION, JUDGE, THAT WAS NEVER, NEVER MY

14  INTENT, NEVER MR. JESSEE'S INTENT TO DO SO.

15         JUDGE, AS YOU KNOW VERY WELL, WE'RE OPERATING

16  ON CHANGING CIRCUMSTANCES EVERYDAY.  WE WERE UNDER THE

17  UNDERSTANDING THAT AT THE TIME WE FILED OUR ORIGINAL

18  MOTION FOR RELEASE, PRETRIAL RELEASE, I SHOULD SAY,

19  THAT -- WELL, I SHOULD SAY THIS, THAT HER HUSBAND, MR. SU

20  {PH}, WE WEREN'T, WE WEREN'T SURE AT THAT TIME WHAT HIS

21  JOB SITUATION WAS GOING TO BE.  WE THINK NOW BASED ON WHAT

22  WE KNOW THAT HE IS GOING TO BE AN ESSENTIAL EMPLOYEE.

23  HE'S GOING TO GET TO KEEP HIS JOB.  THAT IS REFLECTED IN

24  THE SUPPLEMENT, JUDGE.  SOUTH CAROLINA FINALLY FOLLOWED

25  SUIT ON APRIL THE 6TH AND ISSUED THE STAY-AT-HOME ORDER.

1    THAT PROVIDES THE, THE ISSUE WHY, WHY WE, OR WHY I

2    DISCUSSED THAT WITH THE PROBATION OFFICE ABOUT A POSSIBLE

3    ALTERNATIVE.

4            JUDGE, IT WAS NEVER INTENDED FROM THE DEFENSE

5    SIDE, WHEN MR. JESSEE AND I SAT IN MY OFFICE AND TALKED TO

6    THE PROBATION OFFICE, THAT THIS WAS THE ONLY OPTION THAT

7    WAS THERE.  QUITE THE CONTRARY, JUDGE.  WE WERE OPERATING

8    UNDER THE ASSUMPTION THAT WE HAD THE HEARING SCHEDULED

9    WITH JUDGE WYRICK AND JUDGE WYRICK WAS GOING TO SET THOSE

10   CONDITIONS OF BOND, SET THOSE CONDITIONS OF RELEASE.  IT

11   WAS JUST A SUGGESTION THAT SHE COULD RESIDE IN ANDERSON,

12   SOUTH CAROLINA AND BE SUBJECTED TO THE SAME BOND

13   CONDITIONS.

14           JUDGE, AS I'VE NOTATED IN MY SUPPLEMENT THAT

15   WAS ONE OF THE OPTIONS THAT I SAY THAT, YOU KNOW, WITH THE

16   PROPER CONDITIONS I BELIEVE THAT SHE COULD BE -- THAT HER

17   HUSBAND COULD ACT AS A THIRD-PARTY CUSTODIAN WITH THE

18   PROPER HOME CONFINEMENT, ELECTRONIC MONITORING AS WE HAVE

19   SEEN IN THE PAPERWORK HERE THAT WAS JUST PROVIDED TO US,

20   EVEN THOUGH THERE IS A DISTANCE ISSUE, I UNDERSTAND THAT,

21   JUDGE.  WE'VE GOT 142 MILES FROM WHERE WE SIT RIGHT NOW TO

22   WHERE HER HOME IS, BUT THAT WOULD --

23           THE COURT:  LET ME GO AHEAD AND ADDRESS THAT AS

24   WELL, MR. SHIPLEY.  I'M NOT LIKELY TO APPROVE HER LIVING

25   IN ANDERSON, SOUTH CAROLINA.  AS YOU NOTED IN YOUR PLEA,

1  IT'S 142 MILES FROM GREENEVILLE.  IT -- ALTHOUGH I HAVE

2  FOUND THAT THE RISK OF FLIGHT HAS BEEN TEMPERED SOMEWHAT

3  HERE BY THE CIRCUMSTANCES, I THINK THERE IS STILL SOME

4  CONCERN ABOUT RISK OF FLIGHT; AND I, I GUESS I'D REPEAT

5  WHAT I SAID TO THE PROBATION OFFICER EARLIER, I'M NOT

6  INCLINED TO GIVE HER A THREE HOUR HEAD START.

7            MR. SHIPLEY:  VERY WELL, JUDGE, AND THAT WOULD

8  TAKE ME TO MY SECOND OPTION, JUDGE, THAT I WOULD PRESENT

9  TO THE COURT.

10           THERE WAS SOME INFORMATION, AND I'M, I'M

11  GETTING THIS INFORMATION, JUDGE, FROM MS., DR. -- FROM

12  DR. YOU'S HUSBAND THAT I'M GETTING INFORMATION TO FROM

13  WHAT THEIR CONVERSATIONS WERE, PROBATION, MEANING THEIR

14  CONVERSATIONS WITH DR. YOU'S HUSBAND, SO I'M GETTING, YOU

15  KNOW, TWO DIFFERENT VERSIONS -- OR I DON'T MEAN TWO

16  DIFFERENT VERSIONS, BUT TWO VERSIONS, I SHOULD SAY, OF

17  KIND OF WHAT'S GOING ON.

18           ALTERNATIVELY, JUDGE, IN MY SUPPLEMENT I

19  SUGGESTED THAT SHE LIVE IN WASHINGTON COUNTY.  I REREAD

20  OUR MOTION THIS MORNING, AND SAYING THAT, JUDGE, I BELIEVE

21  WE SAID IN OUR MOTION THAT SHE OWNS PROPERTY IN WASHINGTON

22  COUNTY AND SHE CAN LIVE THERE.  SHE DOES IN FACT HAVE A

23  TOWNHOUSE OR A CONDO IN WASHINGTON COUNTY.  THE TENANTS

24  ARE THERE, THEY HAVE A LEASE THROUGH I BELIEVE IT'S

25  NOVEMBER OF 2020.  MR. JESSEE CONFIRMED WITHIN THE LAST

COUPLE OF DAYS THROUGH HER, THROUGH DR. YOU'S HUSBAND THAT

IF THE COURT WERE TO REQUIRE THAT PLACE BE THE SPECIFIC

LOCATION WHERE SHE IS TO RESIDE, THAT THERE IS A POSSI-

BILITY THE TENANTS CAN MOVE OUT AND SEEK OTHER RESIDENCE.

THE COURT: WELL, I'M NOT SURE IT'S HELPFUL TO

TALK IN TERMS OF POSSIBILITIES AT THIS POINT.

MR. SHIPLEY: SECONDLY, JUDGE, IF THE COURT

DOESN'T -- THAT'S JUST AN OPTION, BUT, ALTERNATIVELY,

JUDGE, THERE IS A SET OF APARTMENTS THAT I'M SURE THE

COURT IS VERY FAMILIAR WITH THAT'S LITERALLY .5 MILES AWAY

FROM THE FEDERAL BUREAU OF INVESTIGATION, IT'S CALLED THE

HAVEN AT KNOB CREEK.

JUDGE, WE, WE CONFIRMED RECENTLY, AND THAT HAS

BEEN CONFIRMED VIA E-MAIL, THAT THIS APARTMENT COMPLEX

LOCATED AT 1185 WEST MOUNTAIN VIEW ROAD, JOHNSON CITY,

TENNESSEE, AND, LIKE I SAID, THAT IT'S WITHIN .5 MILES OF

DRIVING FROM THE FEDERAL BUREAU OF INVESTIGATION OFF KNOB

CREEK ROAD, THEY DO HAVE LODGING, AND THEY ARE WILLING TO

ACCEPT DR. YOU TO BE A PLACE OF POSSIBLE RESIDENCE.

JUDGE, I THINK THAT BEING, BEING THE LOCATION

IT IS, THAT WOULD ALLEVIATE THE COURT'S CONCERN ABOUT IT

BEING IN EAST TENNESSEE. IT ALSO PUTS HER IN A POSITION

THAT SHE IS IN, IF SHE IS CONFINED, WHICH I'M ASSUMING SHE

WILL BE IF THE COURT SO CHOOSES TO RELEASE HER TO BE AT

HOME, HOUSE ARREST, IF YOU WILL, THAT WOULD ALLOW HER EASY

1    ACCESS TO THE FEDERAL BUREAU OF INVESTIGATION IF WE HAVE

2    TO GO LOOK AT -- IF WE HAVE TO GO VIEW EVIDENCE THERE OR

3    JUST IN THE LOCALE BEING THAT CLOSE TO THE FEDERAL BUREAU

4    OF INVESTIGATION.  JUDGE, THAT IS MORE FOR SURE, AND I

5    CAN, AND I CAN PROVIDE THAT CONFIRMATION, JUDGE, THAT

6    THERE IS ACTUAL LODGING FOR HER TO HAVE THERE.  THAT TAKES

7    UP THE CONCERN OF SPECULATING WHETHER OR NOT THE TENANTS

8    THAT ARE THERE UNDER CONTRACT RIGHT NOW TO BE THERE UNTIL

9    NOVEMBER 2020 TO VACATE.

10           THIRD, JUDGE, MY --

11           THE COURT:  MR. SHIPLEY, THAT GOES RIGHT TO THE

12   HEART OF MY CONCERN ABOUT THE REPRESENTATIONS THAT WERE

13   MADE TO THE COURT.  WHETHER YOU KNEW AT THE TIME YOU FILED

14   THE PLEADING OR NOT THAT THAT PROPERTY WAS LEASED, YOU

15   CLEARLY WERE PUT ON NOTICE OF IT BY THE TIME THE GOVERN-

16   MENT'S RESPONSE WAS FILED.  MR. HARKER NOTED THE FACT THAT

17   THAT PROPERTY WAS UNDER LEASE IN A FOOTNOTE IN HIS

18   PLEADING, AND, YET, I HEARD NOTHING FURTHER AND ONLY

19   LEARNED FROM THE PROBATION OFFICE JUST BEFORE JUDGE

20   WYRICK'S HEARING THAT THAT IN FACT WAS PROPERTY THAT WAS

21   NOT AVAILABLE TO HER.  THAT -- I'M NOT SURE HOW THAT

22   MISUNDERSTANDING ARISES; BUT I TAKE IT AT THIS POINT THAT

23   YOU ACKNOWLEDGE THAT THE PROPERTY SHE OWNS IN WASHINGTON

24   COUNTY IS NOT CURRENTLY AVAILABLE FOR HER TO RESIDE THERE

25   BECAUSE IT IS LEASED TO THIRD PARTIES?

1          MR. SHIPLEY:  JUDGE, THE SHORT ANSWER TO THAT

2    QUESTION IS I ACKNOWLEDGE THAT IT IS LEASED, AND I NEVER

3    INTENDED TO, IN ANY PLEADING THAT WE FILED WITH THE COURT

4    TO COME ACROSS AND SAY THAT, TRYING TO HIDE THAT FROM THE

5    COURT, SAYING THAT IT NOT AVAILABLE.  MY UNDERSTANDING,

6    JUDGE, IS THAT AT ANY TIME, BASED ON WHAT I HAVE BEEN TOLD

7    BY DR. YOU'S HUSBAND, THAT IT CAN -- THAT THE PARTIES

8    THERE ARE -- THERE ARE OPTIONS, JUDGE, FOR THAT PARTY

9    THERE TO VACATE THE PREMISES AND SEEK OTHER, OTHER

10   RESIDENCES, JUDGE, LIKE AND, AND --

11          THE COURT:  IS THERE A PROVISION IN THE LEASE

12   THAT ALLOWS THE RIGHT FOR YOU TO SIMPLY CANCEL THAT LEASE?

13          MR. SHIPLEY:  JUDGE, AS FAR AS I'M CONCERNED, I

14   DON'T KNOW THAT THERE IS A UNILATERAL PROVISION IN THAT

15   LEASE THAT WOULD ALLOW HER TO CANCEL THAT LEASE, I'VE JUST

16   BEEN TOLD THAT THAT'S A POSSIBILITY, JUDGE; AND I UNDER-

17   STAND WHERE THE COURT IS COMING FROM, BUT IN OUR INITIAL

18   MOTION THE WAY IT WAS WRITTEN WHEN IT SAYS THAT SHE OWNS

19   PROPERTY IN WASHINGTON COUNTY AND CAN RESIDE THERE, IT'S,

20   IT WAS ALWAYS A POSSIBILITY, JUDGE, FOR HER TO RESIDE

21   THERE AT THAT PLACE, BUT ALSO TO RESIDE IN WASHINGTON

22   COUNTY.  WE THOUGHT THAT'S SOMETHING THAT THE COURT WOULD

23   REQUIRE HER TO DO.  WE CAN ABSOLUTELY FIND PROPER

24   ACCOMMODATIONS.

25          OTHERWISE, JUDGE, WE HAVE, WE HAVE ALSO IN-

1  QUIRED SINCE, SINCE THIS HAS BEEN GOING ON, WE'VE INQUIRED

2  THROUGH MULTIPLE -- WELL, NOT MULTIPLE, BUT A SINGLE

3  REALTOR IN THE WASHINGTON COUNTY AREA THAT BASICALLY

4  SHOWED US THAT THERE ARE OTHER ACCOMMODATIONS, AND

5  MR. JESSEE AND I HAVE FOLLOWED UP ON THAT AND CONFIRMED

6  THAT A PLACE WITHIN A HALF A MILE OF THE FBI IS IN FACT

7  AVAILABLE.  SO, JUDGE, IT WAS NEVER --

8             THE COURT:  WHICH ONE OF THOSE COMPLEXES ON

9  KNOB CREEK IS THE HAVEN?  THERE -- I CAN THINK OF RIGHT

10  NOW AT LEAST THREE OF THOSE COMPLEXES RIGHT THERE ON KNOB

11  CREEK ROAD.

12             MR. SHIPLEY:  JUDGE, IF I'M NOT MISTAKEN --

13             THE COURT:  IS THAT THE GATED COMMUNITY OR --

14             MR. SHIPLEY:  I THINK SO, JUDGE.

15             MR. JESSEE:  YES.

16             MR. SHIPLEY:  THE REASON I SAY THAT IS, I THINK

17  IT IS, AND MR. JESSEE, I KNOW HE'S TALKED TO ME ABOUT

18  THAT, HE CAN PROBABLY SPEAK TO THAT BECAUSE I THINK HE'S

19  VERY FAMILIAR WITH THE HAVEN; BUT I THINK, JUDGE, THAT IS

20  THE -- IF YOU'RE TRAVELING TO JOHNSON CITY AND YOU TAKE

21  THE BACK ROAD ON KNOB -- IF YOU TAKE KNOB CREEK ROAD

22  INSTEAD OF TAKING -- YOU WOULD TAKE A LEFT ONTO MOUNTAIN

23  VIEW IS THE APARTMENT, IT'S THE CORPORATE QUARTERS, AND I

24  THINK THAT'S WHAT THEY SPECIALIZE IN IS FOR PEOPLE THAT

25  ARE COMING THERE TO STAY.  THEY'RE FULLY FURNISHED

1    APARTMENTS, AND THAT'S WHERE WE HAVE CONFIRMED THAT THERE

2    IS ACTUALLY A PLACE FOR HER TO STAY.

3              THE COURT:  ALL RIGHT.  THAT DOESN'T --

4    MR. JESSEE, YOU MIGHT WANT TO JUMP IN.  THAT DOESN'T SOUND

5    LIKE THE GATED COMMUNITY, THAT SOUNDS MORE LIKE THE ONE

6    RIGHT THERE BEHIND THE OLD SHOPPING CENTER.

7              MR. JESSEE:  YOUR HONOR, IT IS THE HAVEN, IT IS

8    THE ONE YOU'RE TALKING ABOUT, IT IS THE GATED COMMUNITY.

9              THE COURT:  IT IS THE GATED COMMUNITY.

10             MR. JESSEE:  CORPORATE QUARTERS OF KNOXVILLE

11   LEASES PERMANENTLY 20 OF THOSE FACILITIES.  I HAPPEN TO

12   HAVE LIVED IN ONE FOR SIX MONTHS ABOUT SIX YEARS AGO.  I

13   CONFIRMED WITH THEM, THEY'RE HOLDING A ONE BEDROOM.  THEY

14   CONTROL THOSE UNITS, BUT IT IS IN THE HAVEN, WHICH IS

15   THOSE MULTI-COLORED SECTIONS WITH THE GATE RIGHT THERE, ON

16   MOUNTAIN VIEW ROAD YOU'D COME DOWN TO THE CORNER AND YOU

17   EITHER GO UNDER THE OVERPASS IF YOU GO STRAIGHT OR THE

18   RAILROAD OR YOU TURN LEFT AND GO DOWN TO THE FBI OFFICE.

19   THE, THE UNIT IS AVAILABLE NOW.  I TALKED TO THEM AGAIN

20   THIS MORNING.  IT'S FULLY FURNISHED.  SHE ONLY HAS TO SHOW

21   UP WITH HER CLOTHES AND TOILETRIES.

22             THE COURT:  ALL RIGHT.

23             MR. JESSEE:  AND I JUST AT RANDOM ASKED THEM

24   WOULD THEY BE AVAILABLE FOR AT LEAST FOUR TO SIX MONTHS

25   DEPENDING ON WHEN YOUR HONOR WAS GOING TO SET THE TRIAL,

1   AND THEY SAID IT WAS, AND WE JUST HAVE TO GIVE THEM NOTICE

2   TO CLEAN TO MOVE IN.

3            THE COURT:  ALL RIGHT.

4            ALL RIGHT.  MR. SHIPLEY, ANYTHING ELSE ON THAT

5   ISSUE THEN?

6            AND, BY THE WAY, I JUST PULLED UP YOUR MOTION.

7   HERE'S WHAT IT SAYS, IT SAYS, "DR. YOU HAS PROPERTY IN

8   WASHINGTON COUNTY, TENNESSEE WHERE SHE WOULD STAY IN THE

9   EVENT OF HER RELEASE."  THAT'S A LITTLE DIFFERENT THAN

10  SAYING THAT SHE CAN STAY THERE OR SHE MIGHT STAY THERE OR

11  SHE COULD STAY THERE, IT SAYS THAT IS WHERE SHE WOULD

12  STAY.  THAT WAS MY CONCERN.  AND THAT WAS NEVER CORRECTED

13  AFTER THE FILING OF THE GOVERNMENT'S PLEADING, NOR IN FACT

14  WAS IT CORRECTED UNTIL YESTERDAY IN THE RECORD.

15           MR. SHIPLEY:  JUDGE, I'M --

16           THE COURT:  AND THE VERY NEXT SENTENCE

17  INDICATES THAT DR. YOU'S HUSBAND IS CURRENTLY EMPLOYED IN

18  GREENEVILLE, SOUTH CAROLINA AND COULD STAY WITH HER IN THE

19  EVENT OF HER RELEASE.  THAT DOES NOT APPEAR TO HAVE NECES-

20  SARILY BEEN THE CASE EITHER, ALTHOUGH I'LL ACKNOWLEDGE

21  THAT THE STAY-AT-HOME ORDER WAS NOT ENTERED IN SOUTH

22  CAROLINA UNTIL JUST A FEW DAYS AGO.

23           MR. JESSEE:  YOUR HONOR, NOT TO INTERRUPT --

24           THE COURT:  THAT'S WHAT I SEE AS TROUBLING.

25           MR. JESSEE:  YOUR HONOR --

1          THE COURT:  GO AHEAD, MR. JESSEE.

2          MR. JESSEE:  -- NOT TO INTERRUPT, IT IS HER

3     HUSBAND'S INTENTION, HAVING TALKED TO HIM, THAT IF HE HAS

4     TO PHYSICALLY STAY WITH HER, HE HAD -- IT'S A TWO-HOUR

5     DRIVE TO HIS OFFICE IN SOUTH CAROLINA, HE WOULD JUST HAVE

6     TO MAKE THE DRIVE EVERYDAY AND RETURN, AND HE UNDERSTANDS

7     THAT.

8          THE COURT:  ALL RIGHT.

9          ALL RIGHT.  ANYTHING ELSE ON THE MOTION?

10         MR. SHIPLEY:  AND, JUDGE, JUST AGAIN ON THE

11    RECORD, THAT'S WHY THAT WE MADE SURE TO FILE THE

12    SUPPLEMENT YESTERDAY.  AGAIN, IT WAS NEVER ANY INTENT TO

13    MISLEAD THE COURT, MISLEAD THE PROBATION OFFICE.  IT WAS

14    FROM THE TIME, I THINK ON MARCH THE 27TH, JUDGE -- AND I

15    APOLOGIZE, I'M LOOKING AT THE COURT'S ORDER HERE, ORDER ON

16    RELEASE WAS MARCH THE 25TH, AND I SPOKE TO PROBATION, AND

17    MR. JESSEE AND I IN MY OFFICE SPOKE TO PROBATION ON MARCH

18    THE 27TH, AND THAT'S JUST WHERE WE WERE SUGGESTING THAT

19    THERE COULD BE ALTERNATIVES, AND IT WAS NEVER A -- I DON'T

20    KNOW HOW TO SAY IT, JUDGE, OTHER THAN IT WAS NEVER -- TO

21    US IT WAS SOMETHING THAT WE WERE TRYING TO PROVIDE OPTIONS

22    TO WHERE SHE COULD STAY, AND IT WAS NEVER INTENDED TO --

23    AND I THOUGHT THAT WAS SOMETHING, JUDGE, BASED ON

24    PROBATION'S REPRESENTATIONS TO THE COURT SUBSEQUENTLY, IF

25    THAT'S SOMETHING THAT DIDN'T WORK, WE COULD GO FROM THERE;

1  BUT, JUDGE, THERE WAS NEVER ANY INTENT IN HERE TO MISLEAD
2  THE COURT, AND THAT'S WHY I FELT IT NECESSARY YESTERDAY
3  BEFORE WE GOT IN HERE BASED ON THE COURT'S MOST RECENT
4  ORDER REGARDING THE MISREPRESENTATIONS OR THE POTENTIAL
5  MISREPRESENTATIONS.  IT WAS NEVER AN INTENTIONAL
6  MISREPRESENTATION.  NOW, WAS IT A MISTAKE?  WAS IT WORDED
7  IMPROPERLY?  YES, JUDGE, AND I'LL ACKNOWLEDGE THAT IT WAS
8  WORDED IMPROPERLY, BUT IT WAS NEVER ANY TYPE OF
9  INTENTIONAL, INTENTIONAL ACT TO MISLEAD THE COURT OR
10 PROBATION BECAUSE FINDING A SUITABLE RESIDENCE FOR HER,
11 FOR DR. YOU, PENDING HER POTENTIAL RELEASE, I'M ASSUMING
12 WOULD BE SOMETHING THAT PROBATION WOULD HAVE TO SAY THIS
13 IS ACCEPTABLE AND THIS WOULD BE ACCEPTABLE TO JUDGE WYRICK
14 AND ALSO ULTIMATELY ACCEPTABLE TO YOU, YOUR HONOR, SO.
15 JUST, JUST FOR THAT, JUDGE, THAT'S, JUST WANTED TO MAKE
16 SURE THAT'S WHY WE FILED WHAT WE WANTED TO FILE, AND WHEN
17 WE KNEW SOMETHING DEFINITIVELY TO FILE, INSTEAD OF MAKING
18 MULTIPLE FILINGS, THAT'S WHAT WE DECIDED TO DO YESTERDAY,
19 JUDGE.
20          THE COURT:  ALL RIGHT.  ONE OTHER QUESTION
21 BEFORE I HEAR FROM MR. HARKER.  MR. SHIPLEY, MR. JESSEE,
22 ARE THERE ANY OF THE CONDITIONS PROPOSED BY THE GOVERNMENT
23 THAT YOU WOULD RESIST?
24          MR. SHIPLEY:  JUDGE, I'LL GO AHEAD AND SPEAK TO
25 THAT, AND NOT TO JUMP IN FRONT OF MR. JESSEE, AND -- BUT

1   IT KIND OF GOES BACK TO MY, WITHIN MY SUPPLEMENT, JUDGE,

2   TO THE THIRD OPTION.  JUDGE, WE'RE NOT HERE IN A POSITION

3   TO REALLY ARGUE WITH ANY TYPE OF CONDITION THAT WOULD BE

4   SET BY THE COURT.  AS I SAID, JUDGE, AS THE THIRD OPTION

5   IN THE SUPPLEMENT, IF THE COURT REQUIRED HER TO STAY IN

6   GREENEVILLE, TENNESSEE WITHIN ROCK-THROWING DISTANCE OF

7   THE COURT, THAT'S SOMETHING THAT WE WOULD TRY TO MAKE

8   HAPPEN AND DO IT EXPEDITIOUSLY, JUDGE.

9           SO AS FAR AS I'M CONCERNED, AND I'LL DEFER TO

10  MR. JESSEE TO MAKE A SUPPLEMENT TO WHAT I'M SAYING, BUT I

11  DON'T THINK WE HAVE ANY OBJECTION TO WHATEVER CONDITIONS

12  THAT THE COURT WANTS TO PUT ON DR. YOU BECAUSE AS LONG AS

13  SHE IS COMMUNICATING TO THE UNITED STATES PROBATION

14  OFFICE, IF SHE HAS TO -- IF SHE IS TRAVELING TO MY OFFICE

15  OR IF SHE IS TRAVELING TO MR. JESSEE'S OFFICE IN JOHNSON

16  CITY, THAT'S THE ONLY PLACE THAT SHE'LL BE GOING.  SO,

17  JUDGE, AS FAR AS I'M CONCERNED WE DON'T HAVE ANY

18  OBJECTIONS TO ANY TYPE OF RESTRICTIVE OR TO THE UTMOST

19  RESTRICTIVE CONDITIONS THAT THE COURT WOULD SET.

20          THE COURT:  ALL RIGHT.

21          ALL RIGHT.  THEN, MR. HARKER, I'LL HEAR FROM

22  YOU ON THIS AS WELL.  KEEP IN MIND THAT I HAVE READ YOUR

23  PLEADINGS AND YOUR SUPPLEMENTAL PLEADINGS, AND I GUESS I'D

24  LIKE FOR YOU TO ADDRESS ONE QUESTION FOR ME AT THE BEGIN-

25  NING.  I'VE SEEN THE ATTORNEY GENERAL'S MEMO OF APRIL 6,

THE U.S. ATTORNEY'S, IN WHICH HE INDICATES THAT THE

CONCERN ABOUT COVID-19 IS, IN THE DEPARTMENT'S VIEW, NOW A

SIGNIFICANT FACTOR IN BOND DECISIONS.  I WOULD LIKE FOR

YOU TO TELL ME IN LIGHT OF THAT DIRECTIVE FROM THE

ATTORNEY GENERAL WHETHER YOUR POSITION HAS CHANGED ANY.

MR. HARKER:  THANK YOU, YOUR HONOR.

AND I HAVE READ THAT DIRECTIVE, AND THE

GOVERNMENT'S POSITION HAS NOT CHANGED IN THIS PARTICULAR

CASE.  AND IN THAT DIRECTIVE ONE OF THE FACTORS THAT THE

GOVERNMENT IS STILL TO CONSIDER IS FLIGHT RISK, AND THE

GOVERNMENT'S POSITION IS THAT TODAY VERSUS A YEAR AGO IT'S

NOT THE CASE THAT THE RISK OF FLIGHT HAS BEEN MITIGATED,

IT'S ACTUALLY THE CASE THAT THE RISK OF FLIGHT HAS

INCREASED; AND SO I'D LIKE TO ADDRESS A FEW -- I'D LIKE TO

PROVIDE THE COURT WITH A FEW EXPLANATIONS AS TO WHY, BUT

I'D ALSO LIKE TO DIGRESS BRIEFLY TO ADDRESS THE

CORONAVIRUS CONCERN.

THE COURT:  ALL RIGHT.

MR. HARKER:  AND IF I MAY, I NOTE -- I NOTE

THAT THE DEFENSE -- WHERE SHOULD THE COURT LOOK TO

DETERMINE WHAT TYPES OF CONCERNS IT HAS ABOUT THE

CORONAVIRUS, IN PARTICULAR AT THE WASHINGTON COUNTY

DETENTION CENTER; AND I'LL NOTE THAT THE DEFENSE MOTION IS

THE FIRST PLACE TO LOOK, AND THEY DON'T ACTUALLY MAKE AN

ARGUMENT THAT THE DEFENDANT IS SUSCEPTIBLE TO THIS ILLNESS

1  MORE THAN ANY ORDINARY PERSON, THAT SHE HAS ANY PARTICULAR

2  MEDICAL CONDITION THAT WOULD CAUSE HER TO BE AT A

3  HEIGHTENED RISK, SHE IS NOT ELDERLY.  AND AS OF EARLIER

4  THIS WEEK, I CONFIRMED WITH A REPRESENTATIVE OF THE

5  WASHINGTON COUNTY DETENTION CENTER, THE REGIONAL DIRECTOR

6  OF NURSING, THAT THERE ARE AS OF EARLIER THIS WEEK NO

7  CASES OF THE CORONAVIRUS AT THE WASHINGTON COUNTY

8  DETENTION CENTER.

9              ON TOP OF THAT I CONFIRMED WITH MS. HEATHER

10  TAYLOR, WHO IS THE REGIONAL DIRECTOR OF NURSING FOR

11  QUALITY CORRECTIONAL HEALTH CARE, THAT THERE IS IN FACT IN

12  PLACE THERE A WELL ARTICULATED PLAN AS TO EXACTLY WHAT THE

13  MEDICAL STAFF THERE WILL DO IN THE EVENT OF A CORONAVIRUS

14  INFECTION; AND I CAN PROVIDE FOR THE COURT MS. TAYLOR'S

15  E-MAIL TO ME WITH THE ATTACHMENTS IF THE COURT WOULD LIKE

16  TO SEE THAT.  THE POINT IS AT THIS MOMENT WASHINGTON

17  COUNTY IS EXTREMELY WELL PREPARED, PERHAPS BETTER PREPARED

18  THAN SOME OF THE LOCAL COMMUNITIES INTO WHICH THE DEFEN-

19  DANT WOULD BE RELEASED TO HANDLE A CORONAVIRUS.

20              THE COURT:  YOU'RE SUGGESTING THAT THE RISK OF

21  CONTRACTING THE VIRUS IS LESS IN THE JAIL THAN IT IS IN

22  THE COMMUNITY?

23              MR. HARKER:  NO, YOUR HONOR, I'M NOT QUALIFIED

24  TO MAKE THAT SORT OF STATEMENT.  WHAT I AM SAYING RIGHT

25  NOW IS THE DEFENSE HAS NOT ARGUED THAT THE DEFENDANT IS

1  LIKELY TO BE INFECTED.  THERE'S NO EVIDENCE THAT SHE'S

2  LIKELY TO BE INFECTED IN THE JAIL, AND --

3          THE COURT:  BUT DOESN'T COMMON SENSE TELL US

4  THAT CONFINING A PERSON UNDER THOSE CIRCUMSTANCES WITH

5  HUNDREDS OF OTHER PEOPLE WHO HAVE CERTAINLY THE POTENTIAL

6  OF SPREADING THE DISEASE IS GREATER THAN WOULD BE IN THE

7  COMMUNITY?

8          MR. HARKER:  WELL, YOUR HONOR, I COULD READ TO

9  YOU WHAT -- I RAISED THOSE EXACT CONCERNS WITH MS. TAYLOR,

10  AND I CAN READ TO THE COURT WHAT SHE SAID IN PART IN

11  RESPONSE; BUT TO SUMMARIZE THOSE POINTS, THEY SCREEN EVERY

12  VISITOR, THEY TAKE TEMPERATURES.  IF A PERSON WERE TO TEST

13  POSITIVE, THEY PLACE THAT PERSON IN ISOLATION FOR AS LONG

14  AS NECESSARY, IN EFFECT IN QUARANTINE.  I WOULD SUBMIT

15  THAT IN SOME CASES THE PRISON MIGHT ACTUALLY BE BETTER AT

16  QUARANTINING A PERSON THAN AT ANOTHER PLACE, BUT I'M NOT

17  SUGGESTING THAT THE RISK OF INFECTION IS GREATER OR LESS;

18  AND I UNDERSTAND THE ANECDOTAL SENSE THAT IT IS MORE

19  LIKELY THAT YOU MIGHT BE INFECTED, BUT THE QUESTION BEFORE

20  THE COURT IS IS THE DEFENDANT A RISK OF NONAPPEARANCE, NOT

21  WHETHER OR NOT SHE'S LIKELY TO BE INFECTED; AND I ADMIT

22  THAT IF THE FACTORS WERE TO CHANGE, IF THERE WERE AN

23  OUTBREAK OF THIS ILLNESS WITHIN WASHINGTON COUNTY, THEN

24  PERHAPS THE ISSUE WOULD HAVE TO BE REVISITED.

25          THE COURT:  BUT MAYBE YOU AND I ARE READING THE

20

1  ATTORNEY GENERAL'S MEMO DIFFERENTLY.  IT SEEMS TO ME THAT

2  WHAT HE IS DIRECTING THAT YOU CONSIDER IS THE RISK OF

3  CONTRACTING THE DISEASE, NOT THE RISK OF DYING FROM IT.

4          MR. HARKER:  YES, SIR.

5          THE COURT:  AND THE RISK DOESN'T NECESSARILY

6  CORRELATE TO THE MINUTE-BY-MINUTE CONDITIONS WITHIN THE

7  JAIL.  IN OTHER WORDS, THE RISK HAS NOTHING TO DO AT THIS

8  POINT WITH WHETHER THERE HAVE OR HAVE NOT BEEN CASES.  IF

9  THERE HAVE BEEN CASES, I WOULD ASSUME THERE IS A

10  HEIGHTENED RISK.  NEVERTHELESS, THE RISK OF AN INMATE

11  CONTRACTING THE VIRUS IS, IS PRESENT IN A JAIL, CERTAINLY,

12  WOULDN'T YOU AGREE WITH THAT?

13          MR. HARKER:  YES, YOUR HONOR, JUST LIKE IT'S

14  PRESENT IN THE POPULATION; AND IT MAY IN FACT BE HIGHER,

15  AND WE ARE CONSIDERING THAT.

16          THE COURT:  ALL RIGHT.  OKAY.

17          MR. HARKER:  AND I WOULD ADD, YOUR HONOR, THAT

18  ON THE OTHER SIDE OF THAT, LET'S ASSUME FOR THE SAKE OF

19  ARGUMENT THAT OTHER THAN THE CORONAVIRUS ALL OTHER THINGS

20  ARE EQUAL OR AT LEAST UNCHANGED FROM WHERE THEY WERE A

21  YEAR AGO, I THINK THE GOVERNMENT WOULD ADD TO THIS POINT,

22  THERE ARE SEVERAL FACTORS THAT ARE ALSO WEIGHING IN FAVOR

23  OF A HIGHER RISK OF FLIGHT.  ONE IS THAT THE REPRE-

24  SENTATIONS IN THE DEFENSE FILING, EVEN THOUGH THE DEFENSE

25  COUNSEL THEMSELVES UNDERSTOOD THAT THOSE REPRESENTATIONS

1   WERE TRUE AT THE TIME THEY MADE THEM, THE DEFENDANT AND

2   THE DEFENDANT'S HUSBAND KNEW THAT THEY WERE NOT TRUE.  THE

3   DEFENDANT KNEW THAT HER PROPERTY WAS LEASED THROUGH

4   NOVEMBER 2020; AND THE GOVERNMENT ALSO HAS A COPY OF THAT

5   LEASE AGREEMENT HERE IF THE COURT WOULD LIKE TO ACQUIRE A

6   COPY OF THAT.  IN ADDITION, HER HUSBAND KNEW THAT HE WAS

7   UNLIKELY TO BE ABLE TO TRAVEL FROM EAST TENNESSEE TO HIS

8   JOB IN SOUTH CAROLINA WHETHER OR NOT A STAY-AT-HOME ORDER

9   WAS IN PLACE.  HE AND SHE BOTH KNEW THAT THOSE THINGS WERE

10  FALSE AT THE TIME THAT THEIR REPRESENTATIVES, COUNSEL FOR

11  THE DEFENDANT, FILED THE MOTION.  IN OTHER WORDS, THE

12  DEFENDANT WAS WILLING TO CAUSE FALSE STATEMENTS TO BE MADE

13  TO THIS COURT TO INDUCE THIS COURT TO RELEASE THE

14  DEFENDANT.

15          AND THEN FURTHER I WOULD POINT OUT, I'VE OF

16  COURSE READ THE COURT'S ORDER THAT TALKS ABOUT THE RISK OF

17  FLIGHT TO CHINA, AND LET'S CONCEDE, LET THE GOVERNMENT

18  CONCEDE FOR THE SAKE OF ARGUMENT THAT THE RISK OF FLIGHT

19  TO CHINA TODAY IS LOWER THAN IT WAS SAY FOUR MONTHS AGO,

20  IT WOULD BE HARDER TO GET DIRECTLY TO CHINA, BUT THE

21  QUESTION UNDER 3162 IS WHETHER OR NOT THERE'S A RISK OF

22  NONAPPEARANCE.  THE DEFENDANT DOESN'T NEED TO BE IN CHINA

23  IN ORDER TO BE A FUGITIVE, SHE COULD HIDE IN THE WOODS OF

24  NORTH CAROLINA, THAT WOULD BE SUFFICIENT, AT LEAST FOR THE

25  TIME BEING.

1          ALSO IN PREPARATION FOR THIS HEARING, YOUR

2    HONOR, I USED PUBLIC WEBSITES TO DETERMINE WHETHER OR NOT

3    A FLIGHT COULD BE OBTAINED FROM QUEBEC AND MEXICO CITY, IN

4    FACT, AN FBI AGENT DID THIS ON MY BEHALF, AND FLIGHTS ARE

5    AVAILABLE IN THE NEAR FUTURE FROM MEXICO CITY AND QUEBEC

6    TO CHINA.  NOW, I DON'T KNOW WHAT HAPPENS WHEN THE PEOPLE

7    LAND ON A TARMAC IN BEIJING, I DON'T KNOW WHETHER OR NOT

8    THE CHINESE AUTHORITIES WOULD LET ANY PARTICULAR PASSENGER

9    IN, BUT I SUSPECT THEY WOULD LET THIS PARTICULAR PASSENGER

10   IN.  SO THE GOVERNMENT'S POSITION IS THE DEFENDANT IS AN

11   EXTRAORDINARY FLIGHT RISK, EVEN IF THAT RISK IS SOMEWHAT

12   MITIGATED BY THE INCREASED DIFFICULTY OF FINDING A PLANE

13   TICKET TO CHINA, IT DOESN'T MEAN THAT SHE'S STILL NOT A

14   HIGH FLIGHT RISK, AND WE THINK THAT THAT RISK OFFSETS THE

15   RISK, THE INCREASED RISK OF INFECTION FROM A DETENTION

16   FACILITY.

17          THE COURT:  SO YOU'RE SUGGESTING THAT SHE WOULD

18   TRAVEL ILLEGALLY TO MEXICO OR TO CANADA AND OBTAIN A PLANE

19   TICKET HOW WITHOUT A PASSPORT?

20          MR. HARKER:  WELL, YOUR HONOR, I WOULD POINT

21   OUT AGAIN THAT SHE NEED NOT GO TO CANADA OR MEXICO, SHE

22   COULD ONLY GO TO NORTH CAROLINA AND HIDE IN THE WOODS.

23          THE COURT:  WELL, BUT YOU CAN SPECULATE THAT

24   ABOUT ANY DEFENDANT.

25          MR. HARKER:  RIGHT.  WE'VE ESTABLISHED ALREADY,

1   YOUR HONOR, THE MOTIVES WHY THE DEFENDANT WOULD FLEE, AND

2   THOSE MOTIVES ARE STILL APPLICABLE.  IF ANYTHING, THE

3   DEFENDANT IS NOW AWARE OF THE STRENGTH OF THE GOVERNMENT'S

4   EVIDENCE AGAINST HER.  IT'S BEEN A FULL YEAR, SHE HAS HAD

5   AMPLE TIME TO REVIEW THE DISCOVERY, AND SHE UNDERSTANDS

6   THAT CONVICTION IS -- THERE'S A HIGH LIKELIHOOD OF

7   CONVICTION, THE EVIDENCE IS VERY STRONG; SO WHETHER HER

8   DIFFICULTY OF TRAVELING TO CANADA OR MEXICO ARE POINTS THE

9   GOVERNMENT CONCEDES DUE TO SOME SMALL DEGREE MITIGATE THE

10  RISK, BUT THIS IS NOT JUST ANY DEFENDANT, THIS IS A

11  DEFENDANT WITH SUBSTANTIAL TIES TO CHINA AND A SUBSTANTIAL

12  MOTIVE TO FLEE; AND I WON'T REPEAT ALL THOSE RECORDS, I

13  KNOW YOUR HONOR HAS READ THOSE RECORDS EARLIER.

14          THE COURT:  LET ME ASK YOU THIS, CAN'T THE RISK

15  OF FLIGHT, WHATEVER IT IS, BE MITIGATED HERE BY THE COURT

16  REQUIRING HOME CONFINEMENT WITH ELECTRONIC MONITORING AND

17  OTHER KINDS OF SAFEGUARDS THAT REQUIRE MULTIPLE DAILY

18  CONTACTS WITH THE PROBATION OFFICE?

19          MR. HARKER:  YOUR HONOR, I THINK IT CAN BE

20  MITIGATED, BUT NOT TO THE POINT WHERE WE -- NOT ANY

21  REASONABLE SET OF CONDITIONS THAT WOULD ASSURE HER

22  APPEARANCE AT TRIAL; AND I WOULD ADD THAT PRECISELY AS A

23  RESULT OF THE CORONAVIRUS THE ABILITY OF LAW ENFORCEMENT

24  TO EFFECTUATE THE TERMS OF THE COURT ORDER ABOUT CONDI-

25  TIONS OF RELEASE IS ITSELF UNDERMINED.  MY UNDERSTANDING

1  IS THAT MONITORING GPS BY THE PROBATION OFFICE WERE, IF WE

2  WERE EVEN TO ATTEMPT TO ASSIGN AN FBI AGENT OR SERIES OF

3  AGENTS TO DO THIS, IT IS SEVERELY UNDERMINED.  IN FACT,

4  YOUR HONOR, I HAD EXTREME DIFFICULTY DELIVERING A TARGET

5  LETTER JUST LAST WEEK, AND WE HAD TO END UP USING

6  CERTIFIED MAIL TO DELIVER A TARGET LETTER TO A DEFENDANT

7  IN A MAJOR CASE.

8          SO, AGAIN, YOUR HONOR, THE GOVERNMENT'S

9  POSITION IS THAT, YES, THERE IS AN INCREASED RISK OF

10  INFECTION IN THE JAIL.  I DON'T KNOW IF THAT INCREASED

11  RISK IS, WHETHER IT'S SIZEABLE OR WHETHER IT'S NEGLIGIBLE,

12  BUT I THINK IT'S FAIR TO CONCEDE THE COURT'S POINT THAT IT

13  IS A HIGHER RISK THAN LIVING ON A FARM BY YOURSELF; BUT,

14  ON THE OTHER HAND, THE DEFENDANT'S RISK OF FLIGHT IS AT

15  LEAST AS GREAT AS IT WAS LAST YEAR WHEN THE GOVERNMENT WON

16  THIS ARGUMENT WITH THE MAGISTRATE AND ON APPEAL AT THE

17  DISTRICT COURT LEVEL; AND FROM THE GOVERNMENT'S VIEW IT'S

18  ACTUALLY STRONGER NOW IN LIGHT OF THE PENDING TRIAL AND

19  THE STRENGTH OF THE GOVERNMENT'S EVIDENCE, AS WELL AS THE

20  DIFFICULTY THE EXECUTIVE BRANCH WOULD HAVE AND THE

21  PROBATION OFFICE WOULD HAVE IN ENFORCING THE COURT'S

22  CONDITIONS OF RELEASE.  AND I HAVE REVIEWED THE CONDI-

23  TIONS, AND I SEE THAT THEY LARGELY TRACK THE GOVERNMENT'S

24  REQUEST, BUT I DON'T THINK THAT THEY SUFFICIENTLY MITIGATE

25  THE RISK TO ASSURE THE DEFENDANT'S APPEARANCE AT TRIAL.

1          THE COURT:  ALL RIGHT, MR. HARKER.

2          ANYTHING ELSE, MR. SHIPLEY?

3          MR. SHIPLEY:  YOUR HONOR, IF, IF IT EVEN NEEDS

4  TO BE ADDRESSED, JUDGE, I WOULD TAKE EXCEPTION WITH THE

5  GOVERNMENT'S POSITION ON HOW THE -- NOW THE DEFENDANT IN

6  THIS CASE, DR. YOU, AND BOTH HER AND HER HUSBAND HAVE MADE

7  FALSE STATEMENTS TO INDUCE ANYTHING, JUDGE.  AGAIN, AGAIN,

8  JUDGE, THERE WAS NEVER ANY INTENTIONAL MISREPRESENTATION

9  TO ANYONE BY ANYONE.  I THINK THE CHARACTERIZATION THERE

10 IS A LITTLE SHORTSIGHTED.  JUST ASSUMING, ASSUMING THAT

11 THAT WOULD BE THE CASE, JUDGE, BUT THAT'S NOT THE CASE.

12 THAT'S NOT THE CASE THAT THEY HAVE, HER HUSBAND AND

13 DR. YOU HAVE CONSPIRED TO MAKE SOME WRONG STATEMENTS THAT

14 WOULD NOW CAUSE HER FLIGHT RISK TO INCREASE BECAUSE OF

15 THAT, JUDGE.  THERE IS NO --

16          THE COURT:  WELL, AT LEAST TO THIS EXTENT,

17 MR. SHIPLEY, I DISAGREE WITH YOU A BIT BECAUSE IF HER

18 CREDIBILITY IS SUSPECT, FURTHER SUSPECT AT THIS POINT,

19 THEN IT DOES INCREASE THE RISK OF FLIGHT IN MY VIEW.  AND

20 I DON'T -- YOU KNOW, I READ THE LANGUAGE FROM YOUR PLEAD-

21 ING, THAT LANGUAGE, THAT WAS NOT CORRECT.  THE JOHNSON

22 CITY PROPERTY, THE WASHINGTON COUNTY PROPERTY WAS NOT

23 AVAILABLE FOR HER TO LIVE IN BECAUSE THERE IS A LEASE, AND

24 IT'S OBVIOUSLY A WRITTEN LEASE.  THE GOVERNMENT HAS A COPY

25 OF THAT, YOU KNOW, WRITTEN LEASE, THE GOVERNMENT HAS A

 1   COPY OF THAT LEASE, AND THERE WAS NEVER ANY EFFORT BY

 2   ANYBODY TO CORRECT THAT, AND SO THAT'S THE REAL ISSUE.

 3             I MEAN, I THINK ALL OF YOU KNOW HOW IMPORTANT

 4   CANDOR WITH THE COURT IS, TO ME, AT LEAST, AND THERE'S

 5   ONLY ONE POSSIBLE WAY IN MY OPINION TO READ THOSE

 6   SENTENCES THAT I READ FROM YOUR PLEADING; BUT, NEVERTHE-

 7   LESS, THE BIGGER ISSUE IS DOES THAT CAUSE HER CREDIBILITY

 8   OR THE TRUSTWORTHINESS OF HER PROMISES TO THE COURT TO BE

 9   MORE SUSPECT THAN THEY WERE BEFORE, AND THAT'S, THAT'S

10   WHAT TROUBLES ME.  I MEAN, I'M NOT SURE WHY IT WAS EVEN

11   PROPOSED THAT SHE LIVE IN THE WASHINGTON COUNTY PROPERTY

12   IN THE FIRST PLACE SINCE IT WAS NOT AVAILABLE.

13             MR. JESSEE:  YOUR HONOR, MAY I SPEAK JUST A

14   MINUTE?  I CAN'T SEE YOU, SO I CAN'T -- THIS IS TOM

15   JESSEE.  I TALKED TO THE REALTORS THIS TIME AND THE TIME

16   BEFORE.  THERE IS A POSSIBILITY, WHICH WE WOULD HAVE

17   SOLIDIFIED ONE WAY OR THE OTHER, AS TO WHETHER THE TENANTS

18   WERE WILLING TO VACATE UNDER THE CIRCUMSTANCES.  YOU'RE

19   CORRECT, WE COULD NOT JUST GO KICK THEM OUT, BUT THERE WAS

20   AND IS, DEPENDING ON WHAT WE DEVELOPED AS THE PLAN.  SO

21   I'LL TAKE THE BLAME FOR THE WAY THE WORDING WAS PUT IN

22   THERE, BUT THERE IS A POSSIBILITY BECAUSE I KNEW THAT

23   THERE WAS APARTMENTS AVAILABLE WE WERE GOING TO ASK THOSE

24   PEOPLE TO MOVE TO UNDER THE CIRCUMSTANCES, BUT WE WERE

25   TRYING TO FIGURE OUT, THIS WHOLE THING MR. HARKER SAID

1    ABOUT DR. YOU'S HUSBAND NOT BEING WILLING TO COMMUTE,

2    WE'VE BEEN TRYING TO FIGURE OUT SINCE DAY ONE WHEN THIS

3    LOCKDOWN STARTED WHETHER HE'D GET LOCKED DOWN OR NOT.  WE

4    TALKED ABOUT WITH THE PROBATION OFFICER EVERYTHING DR. YOU

5    OWNS AS FAR AS CLOTHING AND STUFF IS IN THE ATLANTA AREA,

6    AND SHE WOULD HAVE TO GO THERE TO GET HER BELONGINGS.

7    IT'S MY FAULT IT WASN'T CONCRETE, AND I'LL TAKE THE BLAME

8    FOR IT, BUT IT CERTAINLY WASN'T DONE OTHER THAN AS AN

9    ALTERNATIVE.  I ASSURE YOU THAT ON MONDAY WHEN I WALKED

10   INTO JUDGE WYRICK'S COURT, I WOULD HAVE GIVEN HER THE PLAN

11   AND DIDN'T EVEN ANTICIPATE GETTING TALKED TO BY THE, BY

12   THE PROBATION OFFICE BEFORE THEN.  SO I WANT TO APOLOGIZE

13   TO THE COURT, BUT WHEREVER YOUR HONOR -- SHOULD YOU DECIDE

14   TO LET HER OUT, SHE'LL LIVE WHEREVER YOU TELL HER SHE HAS

15   TO LIVE.

16          THE COURT:  MR. JESSEE, MR. SHIPLEY, WHAT KIND

17   OF LIQUID ASSETS DOES DR. YOU HAVE ACCESS TO?

18          MR. JESSEE:  YOUR HONOR, I DIDN'T -- THE SOUND

19   BLURB, I COULDN'T HEAR YOUR QUESTION.

20          THE COURT:  WHAT KIND OF LIQUID ASSETS DOES

21   DR. YOU HAVE ACCESS TO?

22          MR. JESSEE:  THEY HAVE, THEY HAVE THEIR BANK

23   ACCOUNTS, WHICH HAVE BEEN SUBSTANTIALLY REDUCED THROUGH

24   THE COST OF THIS.  DR. YOU'S HUSBAND IS WORKING EVERYDAY,

25   SO THEY HAVE THAT JOINT BANK ACCOUNT.  I WOULD HAVE TO GET

1    AN UPDATED LIST TO THE COURT AS TO WHAT'S AVAILABLE AS OF

2    TO THAT.

3              THE COURT:  WOULD YOU SAY THEY ARE SUBSTANTIAL?

4              MR. JESSEE:  I WOULD SAY THAT -- WELL, I DON'T

5    HAVE ANY WAY OF CONFERRING WITH DR. YOU.  I'M JUST SENDING

6    A TEXT RIGHT NOW TO HER HUSBAND AS TO HOW MUCH MONEY HE

7    HAS IN THE BANK; AND I KNOW THAT BECAUSE OF THE COST OF

8    THIS PREPARATION THEY HAVE SPENT THE MAJORITY OF WHAT THEY

9    HAD, OR WHAT I WOULD CALL LIQUID ASSETS, BUT LET ME SEE IF

10   HE ANSWERS IN A SECOND.  IF -- HE USUALLY ANSWERS

11   RELATIVELY QUICKLY, SO LET ME -- YOUR HONOR, IF I COULD,

12   IF I COULD MUTE MY VIDEO HERE, I CAN CALL HIM AND THEN

13   TURN IT BACK ON IF YOU WOULD PREFER.

14             THE COURT:  ALL RIGHT.  WHY DON'T YOU DO THAT.

15             MR. JESSEE:  ALL RIGHT.

16        (MR. JESSEE MUTES HIS END OF THE CONFERENCE)

17             THE COURT:  WHILE MR. JESSEE IS DOING THAT,

18   LET'S GO AHEAD AND ADDRESS THE ISSUE OF RESCHEDULING THIS

19   CASE FOR TRIAL.

20             MR. SHIPLEY, JUDGE WYRICK PUT DOWN A RATHER

21   DETAILED ORDER ABOUT THE REQUEST FOR VIDEO CONFERENCING

22   AND, IN FACT, AGREED TO PERMIT VIDEO DEPOSITIONS TO BE

23   TAKEN.  WHERE ARE YOU WITH ARRANGEMENTS TO DO THAT?

24             MR. SHIPLEY:  JUDGE, I WAS JUST PROVIDED AN

25   UPDATE THIS MORNING ON THAT, JUDGE.  WE HAVE, WE HAVE

TALKED TO TWO COMPANIES THAT HAVE THE CAPABILITY TO SET UP

THESE DEPOSITIONS IN CHINA.  THE LAWYER IN PARTICULAR

WE'VE BEEN TALKING TO THROUGH DR. YOU'S HUSBAND HAS AN

INTERNATIONAL DEPARTMENT IN HIS LAW FIRM WHICH IS CAPABLE

OF ASSISTING THESE DEPOSITIONS IN ENGLISH WHO THEY HAVE

ALSO REACHED OUT NOT ONLY TO THEIR FIRM BUT ALSO A LARGER

FIRM.  THE TWO WITNESSES IN WEIHAI ARE NOW ALLOWED TO

TRAVEL TO BEIJING BUT MUST QUARANTINE FOR 14 DAYS WHEN

THEY GET THERE AND WHEN THEY RETURN.

RIGHT NOW, JUDGE, WE ARE CHECKING, WE ARE

LOOKING INTO A CITY OUTSIDE OF BEIJING CLOSER TO WUHAN

WHERE THE TRAVEL, WHERE THE TRAVEL MIGHT NOT BE AS

RESTRICTED.  WE'VE ALSO REACHED OUT, JUDGE --

THE COURT:  AS I UNDERSTAND IT FROM THE NEWS,

THE CHINESE GOVERNMENT LIFTED SOME TRAVEL RESTRICTIONS

FROM WUHAN TO OTHER AREAS OF THE COUNTRY YESTERDAY.

MR. SHIPLEY:  SO THAT'S WHAT WE'RE TRYING TO

LOOK AT, JUDGE, AS FAR AS SOME PLACES THAT ARE CLOSER.

WE'VE ALSO REACHED OUT TO A HONG KONG LAW FIRM WITH

OFFICES IN BEIJING.

WE'RE HOPING, JUDGE, TO BE ABLE TO PROVIDE, IF

REQUIRED, JUDGE, AND I HAVE HERE IN MY NOTES THAT,

OBVIOUSLY WHAT THE COURT JUST SAID, THEY HAVE JUST AS OF

YESTERDAY, BASED ON MY NOTES HERE LIKE YOU SAID, JUDGE,

THEY HAVE LIFTED SOME OF THE RESTRICTIONS, WHAT WE'RE

1   HOPING TO, WE'RE HOPING, JUDGE, WE'RE HOPING TO HAVE SOME

2   MORE INFORMATION BY THE END OF THE WEEK SINCE EVERYTHING

3   IS CHANGING.  I --

4           THE COURT:  GIVE ME AN IDEA OF HOW LONG YOU

5   REALISTICALLY THINK IT WILL TAKE YOU TO GET THESE

6   DEPOSITIONS DONE.

7           MR. SHIPLEY:  IF EVERYTHING GOES WELL THIS

8   WEEK, JUDGE, FROM WHAT I UNDERSTAND, AND THE TRAVEL

9   RESTRICTIONS BEING LIFTED LIKE THEY ARE NOW, OR NOT LIFTED

10  BUT BEING MODIFIED, I GUESS I SHOULD SAY, I DON'T ENVISION

11  IT TAKING MONTHS, JUDGE, BUT I DON'T ENVISION US BEING

12  ABLE TO DO IT NEXT WEEK EITHER; AND I KNOW THAT THAT'S,

13  THAT'S NOT A DEFINITIVE ANSWER AND WHAT THE COURT WANTED

14  TO HEAR, BUT I THINK THAT JUST WITH EVERYTHING CHANGING,

15  AND WE'RE HOPE -- LIKE I SAID, WE'RE TRYING TO -- WE

16  LOOKED AT THE BEIJING POSSIBILITY, BUT NOW WE'RE LOOKING

17  BECAUSE OF THE WUHAN TRAVEL RESTRICTIONS BEING MODIFIED,

18  WE'RE TRYING TO GET SOMEWHERE DIFFERENT.  WE'VE CONTACTED

19  MULTIPLE ATTORNEYS, JUDGE, IN CHINA AND IN JAPAN, JUDGE,

20  TO TRY TO SEE IF THERE'S SOMEWHERE ELSE WE CAN DO THIS

21  THAT'S MORE MUTUALLY CONVENIENT, THAT WAY WE CAN EXPEDITE

22  THIS.

23          THE COURT:  HAVE YOU BEEN ABLE TO RESOLVE THE

24  ISSUE AT THIS POINT OF WHETHER THE CHINESE GOVERNMENT WILL

25  EVEN ALLOW THESE WITNESSES TO TESTIFY BY DEPOSITION, OR IF

1    SO UNDER WHAT CIRCUMSTANCES?

2              MR. SHIPLEY:  JUDGE, I WOULD PROBABLY, IF THE

3    COURT WOULD, I DON'T MEAN TO PUT MR. JESSEE ON THE SPOT

4    THERE, BUT AS FAR AS THE LOGISTICAL NATURE OF THE CHINESE

5    GOVERNMENT, I WOULD LIKE TO ASK MR. JESSEE IF HE WOULDN'T

6    MIND SPEAKING TO THAT, JUDGE, WITH THE RESTRICTION WITH

7    THE CHINESE GOVERNMENT ISSUE.

8              THE COURT:  ALL RIGHT.  MR. JESSEE, ARE YOU

9    BACK ON?

10             MR. JESSEE:  I'M BACK ON, YOUR HONOR.

11             DR. YOU'S HUSBAND SAYS THEY HAVE $90,000 IN

12   BANK ACCOUNTS.  THERE IS SOMEWHERE, HE DOESN'T KNOW BASED

13   ON THE DROPS OF THE STOCK MARKET, SOMEWHERE COMBINED

14   BETWEEN THE TWO OF THEM 400,000 PLUS OR MINUS IN

15   RETIREMENT ACCOUNTS THROUGH THE COMPANIES THEY'VE WORKED

16   FOR, BUT ACTUAL ACCESS TO CASH HE HAS $90,000.  THE HOUSE

17   THAT THEY OWN IN THE ATLANTA AREA, WHICH I THINK IS

18   SMYRNA, IS PAID FOR, HOWEVER.

19             AND AS FAR AS YOUR QUESTION ABOUT I -- YOU WORK

20   THROUGH AN INTERPRETER WHEN I'VE BEEN TALKING TO CHINA, WE

21   HAVEN'T GOT FINAL CONFIRMATION OF ANYTHING, BUT THE

22   INTERNATIONAL LAW FIRM THERE IS, IS PROCESSING GETTING

23   PERMISSION FROM THE GOVERNMENT TO ALLOW US TO TAKE THE

24   DEPOSITIONS IN BEIJING IN A LAW OFFICE THAT'S SUITABLE TO

25   YOUR HONOR'S, THE EARLIER ORDER OF THE COURT; AND I SPOKE

1    WITH THEM THE END OF LAST WEEK, AND WHERE THEY WERE, THE

2    TWO WITNESSES -- THERE'S ONE WITNESS IN BEIJING, TWO IN

3    WEIHAI, THEY ARE NOW ALLOWED TO TRAVEL FROM WEIHAI TO

4    BEIJING, WHICH JUST OCCURRED RECENTLY.  THEY HAVE A 14 DAY

5    QUARANTINE GETTING THERE AND 14 DAYS WHEN THEY LEAVE, AND

6    I KNOW WE'RE NOT WORRIED ABOUT WHEN THEY LEAVE.  THEY

7    SUGGESTED THAT THERE IS A SMALLER CITY WHICH DOESN'T HAVE

8    QUITE THE LIMITATIONS ON TRAVEL THAT BEIJING HAS THAT THEY

9    WERE CHECKING ON.  I'VE TALKED TO TWO INTERNATIONAL

10   COMPANIES THAT DO VIDEO CONFERENCING AND DEPOSITION WORK,

11   AND THEY'RE WANTING A LITTLE MORE INFORMATION AS TO WHEN

12   WE WOULD TAKE THESE.  SO THE BOTTOM LINE IS I SHOULD KNOW

13   BY THE END OF THIS WEEK THAT THERE EITHER IS ANOTHER

14   ACCEPTABLE TOWN FOR THE WITNESSES TO TRAVEL TO THAT HAS AN

15   AMERICAN-STYLE LAW OFFICE THAT WE CAN TAKE THEM IN;

16   OTHERWISE, AS I SAID, WHEN THE WITNESSES GET TO BEIJING,

17   THEY'RE QUARANTINED FOR 14 DAYS, AND THE LAW FIRM HAS MADE

18   THE REQUEST, BUT EVERY WITNESS AND THE ATTORNEYS THAT

19   WE'RE TALKING TO HAVE PRETTY MUCH SAID THEY'RE NOT

20   CONCERNED ABOUT THE CHINESE GOVERNMENT NOT APPROVING THESE

21   DEPOSITIONS.  I HAVE NO -- NOTHING TO GIVE ME ANY COMFORT

22   ONE WAY OR THE OTHER BECAUSE I CAN'T TALK TO ANYBODY

23   EXCEPT THROUGH THE INTERPRETER; BUT I, I WOULD SUGGEST

24   THAT WE GET THROUGH TO NEXT WEEK SINCE THEY'VE ALLOWED

25   TRAVEL NOW, AND I'LL FILE A REPORT WITH THE COURT WITH THE

1   EXACT PLAN ASSUMING NOW THAT THERE'S TRAVEL WE HAVE A
2   PLAN.
3           THE COURT:  ALL RIGHT.  YOU KNOW, ALL OF THAT
4   SOUNDS VERY MUCH LIKE THE REPORT THAT YOU GAVE TO JUDGE
5   WYRICK EARLIER.  THERE ARE POSSIBILITIES, YOU'VE TALKED TO
6   PEOPLE.  WE NEED TO START PINNING THIS DOWN IN TERMS OF
7   ALL THESE DETAILS SO THAT WE DETERMINE WHETHER THESE
8   DEPOSITIONS CAN OR CANNOT GO FORWARD, AND WE NEED TO DO
9   THAT RELATIVELY QUICKLY.  BEYOND THAT, I'LL LEAVE IT IN
10  YOUR HANDS TO, TO DO THAT.  I WILL -- I DO WANT YOU TO
11  FILE A STATUS REPORT THOUGH WITH THE COURT WITHIN A WEEK
12  TO GIVE ME SPECIFICS ON WHERE YOU ARE WITH THESE
13  POSSIBILITIES.
14          I MEAN, NUMBER ONE, YOU NEED TO DETERMINE THAT
15  THERE'S NO IMPEDIMENT THAT THE CHINESE GOVERNMENT WILL
16  RAISE TO THE TAKING OF DEPOSITIONS; NUMBER TWO, THAT THE
17  WITNESSES CAN TRAVEL AND WHEN YOU ANTICIPATE DOING THE
18  DEPOSITION; AND, THIRD, I GUESS, HOW LONG YOU EXPECT THIS
19  PROCESS TO TAKE BEFORE WE CAN HAVE THIS TESTIMONY
20  CAPTURED, SO A WEEK FROM TODAY --
21          MR. JESSEE:  YOUR HONOR --
22          THE COURT:  I'M SORRY, GO AHEAD.
23          MR. JESSEE:  FOR YOUR PLANNING RIGHT NOW, EACH
24  ONE OF THE WITNESSES WHEN I TALKED TO THEM ON FRIDAY, THE
25  WITNESSES ARE NOT THE IMPEDIMENT, THEY ARE, THEY ARE

1    PREPARED TO APPEAR; AND OTHER THAN ONCE THEY OPENED UP THE

2    TRAVEL, WHICH THEY DID LAST WEEK, NONE OF THEM HAVE GIVEN

3    ME ANY REAL CONCERN.  IT'S NAILING DOWN THE GOVERNMENT'S

4    PERMISSION AND THE LAW FIRM'S SET-UP, SO I'LL HAVE A

5    REPORT BY A WEEK FROM TODAY.

6              THE COURT:  ALL RIGHT.

7              MR. HARKER:  YOUR HONOR, MAY I COMMENT ON THIS?

8              THE COURT:  YOU MAY, SURE.

9              MR. HARKER:  I'M NOT AN EXPERT ON INTERNATIONAL

10   LAW, BUT MY UNDERSTANDING IS THAT IN ORDER FOR THE DEFENSE

11   TO CONDUCT THESE DEPOSITIONS ON CHINESE SOIL THEY ARE

12   REQUIRED TO COMPLY WITH THE STATE DEPARTMENT'S LETTERS OF

13   ROGATORY PROCESS, WHICH AS FAR AS I AM ABLE TO DISCERN

14   INVOLVES FOUR STEPS.  FIRST, THE DEFENSE MUST DRAFT

15   LETTERS OF ROGATORY AND SUBMIT THEM TO THE COURT; SECOND,

16   THE COURT MUST REVIEW THOSE LETTERS OF ROGATORY, DETERMINE

17   WHETHER THEY SATISFY THE STATE DEPARTMENT'S REQUIREMENTS

18   AND THEN SUBMIT THOSE LETTERS OF ROGATORY TO THE STATE

19   DEPARTMENT FOR TRANSMISSION TO THE CHINESE AUTHORITIES

20   THROUGH THE APPROPRIATE DIPLOMATIC CHANNELS ALONG WITH A

21   LETTER OF TRANSLATION; AND STEP THREE, THE CHINESE

22   GOVERNMENT WOULD HAVE TO REVIEW AND THEN NOTIFY THE STATE

23   DEPARTMENT AS TO WHETHER OR NOT THEY'RE GOING TO APPROVE

24   OF THE PROCESS; AND THEN AT STEP FOUR, IF APPROVED BY THE

25   CHINESE GOVERNMENT, THE STATE DEPARTMENT WOULD NOTIFY THE

1    COURT THAT THE DEPOSITIONS COULD PROCEED ACCORDINGLY, AT

2    WHICH POINT ALL OF JUDGE WYRICK'S OTHER CONDITIONS WOULD

3    STILL APPLY.  SO I DON'T HAVE ANY SENSE AS TO HOW LONG

4    THAT PROCESS WOULD TAKE.

5            I DO HAVE ONE OTHER CONCERN, WHICH MY

6    RECOLLECTION OF JUDGE WYRICK'S ORDER, IT WAS A LITTLE

7    AMBIGUOUS, BUT IT MAY HAVE CONTEMPLATED THAT THE ATTORNEYS

8    FOR THE GOVERNMENT AND THE DEFENSE WOULD BE PHYSICALLY

9    PRESENT IN CHINA.  IF THAT'S --

10           THE COURT:  IT WAS A LITTLE UNCLEAR, BUT I

11   THINK THAT'S IMPRACTICAL.

12           MR. HARKER:  I WOULD SAY THAT IT IS, AND IT'S

13   PARTICULARLY CONFUSING IN LIGHT OF THE RISK OF FLIGHT OF

14   THE DEFENDANT AND THE ARGUMENT THAT SHE CAN'T GET TO

15   CHINA.

16           THE COURT:  MR. JESSEE, HAVE YOU CONTACTED THE

17   STATE DEPARTMENT?

18           MR. JESSEE:  I HAVE NOT CONTACTED OUR STATE

19   DEPARTMENT, YOUR HONOR; BUT OUR LAWYER IN CHINA, I SENT

20   MR. HARKER'S SUBMISSION THAT HE JUST WENT THROUGH OVER

21   THERE TO ASK THEM WHAT THEIR UNDERSTANDING WAS AS TO WHAT

22   WE WERE GOING TO HAVE TO DO TO GET THE INFORMATION

23   NECESSARY, IF WE HAD TO GO THROUGH WHAT MR. HARKER JUST

24   DESCRIBED.  THEY ASSURED ME THEY ARE WORKING ON IT FROM

25   THEIR END, AND THEY BELIEVE THEY WILL HAVE PERMISSION TO

1  BE ABLE TO DO THE DEPOSITIONS IN BEIJING; AND THAT'S ALL I

2  KNOW.

3          THE COURT:  ALL RIGHT.

4          MR. JESSEE:  ALL I TOLD THEM WAS I KNOW FROM

5  OUR COCOUNSEL THAT WE WERE WORKING WITH AT THE BEGINNING

6  THE PROBLEM WITH TAKING A DEPOSITION IN CHINA IS US

7  SHOWING UP IN CHINA WITHOUT CLEARANCE AND THEY WILL ARREST

8  US.  IF THE CHINESE GOVERNMENT CLEARS THE WITNESS THERE TO

9  APPEAR AND WE TAKE IT BY VIDEO CONFERENCE, THERE IS NOT

10  APPARENTLY THE HEIGHT OF CONCERN.  ALL I'M DOING IS

11  RELYING ON WHAT THE INTERNATIONAL LAW FIRM THAT WAS

12  RECOMMENDED TO ME BY THE LAW FIRM IN LOS ANGELES TO TALK

13  TO AND DEAL WITH.

14          ORIGINALLY, WE HAD TALKED ABOUT THE POSSIBILITY

15  OF BRINGING THE WITNESSES OUT TO HONG KONG JUST BECAUSE

16  THERE'S A TREATY THAT FACILITATES IT VERY EASILY, AND AT

17  THIS POINT THEY CAN'T TRAVEL TO HONG KONG.  SO I WILL

18  REPORT IN A WEEK TO TELL HOPEFULLY HOW LONG AND WHAT IT

19  WILL TAKE TO GET IT DONE.

20          THE COURT:  ALL RIGHT.  LET ME THROW OUT THREE

21  POTENTIAL TRIAL DATES, AND YOU CAN REACT TO THESE; AND

22  THESE MAY BE THE EARLIEST TRIAL DATES WE CAN FIND, BUT

23  THEY ALSO MAY BE THE LATEST WE CAN FIND AND STILL

24  ACCOMMODATE THE COURT'S SCHEDULE AND TO SOME EXTENT

25  MR. HARKER'S SCHEDULE.  WE HAVE A MULTI-WEEK TRIAL

1    SCHEDULED FOR -- WHEN IS THAT, MID SEPTEMBER?

2              MR. HARKER:  YES, YOUR HONOR; AND I WOULD URGE

3    THE COURT TO SCHEDULE THIS MATTER WITHOUT REGARD TO THAT

4    MATTER.

5              THE COURT:  ALL RIGHT.

6              MR. HARKER:  TO CHOP THE WOOD THAT'S IN FRONT

7    OF US.

8              THE COURT:  ALL RIGHT.  I WON'T TRY TO READ

9    BETWEEN THE LINES ON THAT.

10             THE MOST LIKELY DATES ARE -- AND, OBVIOUSLY,

11   THERE'S SOME UNCERTAINTY HERE, I DO NOT KNOW HOW LONG ALL

12   THESE CONCERNS WILL LAST; BUT JULY 14, 21 OR 28.

13             MR. HARKER:  YOUR HONOR, FOR THE GOVERNMENT,

14   JULY 14TH OR JULY 21ST WOULD WORK.  JULY 28TH WOULD -- THE

15   END OF THAT, IF THE TRIAL LASTS A LITTLE UNDER TWO WEEKS,

16   THE END OF THAT WOULD CONFLICT WITH ONE OF MY COCOUNSEL'S

17   SCHEDULES, SO WE WOULD PREFER JULY 14TH OR JULY 21ST.

18             THE COURT:  ALL RIGHT.  MR. SHIPLEY,

19   MR. JESSEE?

20             MR. JESSEE:  SUBJECT TO REPORTING TO THE COURT

21   WHAT THIS POSSIBILITY OF THE VIDEO DEPOSITION, JULY 14TH

22   ON MY SCHEDULE IS BETTER.

23             THE COURT:  MR. SHIPLEY, WHAT DOES YOUR

24   CALENDAR LOOK LIKE?

25             MR. SHIPLEY:  JUDGE, I CAN MAKE EITHER ONE OF

1  THOSE WORK.  I MEAN, I HAVE A, I HAVE A FAMILY OBLIGATION

2  THAT I HAD SET THERE FOR THE WEEK OF THE 14TH, BUT,

3  OBVIOUSLY, IF THAT'S NOT CONVENIENT WITH THE COURT, SO I

4  WILL DO THE 21ST, I COULD DO THE 21ST; BUT, JUDGE, THIS

5  TAKES PRECEDENCE.

6          MR. JESSEE:  21ST IS FINE, OR THE 14TH JUDGE, I

7  CAN DO EITHER ONE.

8          THE COURT:  ALL RIGHT.  ARE YOU PLANNING A

9  VACATION ON THE 14TH?

10         MR. SHIPLEY:  JUDGE, I WAS; BUT, JUDGE, WITH

11 ALL THE UNCERTAINTY, I DON'T KNOW THAT I'LL BE GOING

12 ANYWHERE; BUT ALSO, JUDGE, I WANT TO SAY THIS TRIAL WOULD

13 TAKE PRECEDENCE OVER ANY TYPE OF VACATION THING THAT I

14 WOULD HAVE.  I MEAN, THE CHANCES OF ME GOING ON VACATION

15 ON, IF THIS TRIAL WERE SET ON THE 21ST, OF COURSE, FOR

16 THAT TIME IT'S HIGHLY UNLIKELY ANYWAY, SO.

17         THE COURT:  YOU'RE LIVING DANGEROUSLY BY SAYING

18 THAT WITHOUT CONSULTING WITH YOUR WIFE AND CHILDREN.

19         MR. SHIPLEY:  FAIR POINT, JUDGE.

20         THE COURT:  WELL, HOW ABOUT THE 21ST?

21         MR. SHIPLEY:  FINE, YOUR HONOR.  THANK YOU.

22         THE COURT:  AND IF TWO WEEKS IS THE LENGTH,

23 THEN IT SOUNDS LIKE WE CAN PROBABLY BE DONE IN ORDER TO

24 ACCOMMODATE THE CONFLICTS WITH GOVERNMENT'S COUNSEL AS

25 WELL.

1          ALL RIGHT.  WE'LL RESET THE TRIAL FOR JANUARY

2    21ST THEN.

3               THE CLERK:  JULY.

4               THE COURT:  NOT JANUARY.  I'VE GOTTEN RUSTY.

5               DR. YOU, I DIDN'T KNOW THIS HAD BEEN PREPARED,

6    BUT THERE WAS SOMETHING I SHOULD HAVE DONE WITH YOU RIGHT

7    AT THE BEGINNING OF THE HEARING.  THE CLERK HAS JUST

8    HANDED ME A CONSENT TO APPEAR BY VIDEO CONFERENCE THAT HAS

9    BEEN SIGNED APPARENTLY BY YOUR ATTORNEY WITH YOUR CONSENT

10   AGREEING TO WAIVE YOUR RIGHT TO BE PERSONALLY PRESENT HERE

11   TODAY AND APPEAR BY VIDEO CONFERENCE.  DID YOU AUTHORIZE

12   THE PLACEMENT OF YOUR SIGNATURE ON THIS DOCUMENT?

13              THE DEFENDANT:  YES, YOUR HONOR.

14              THE COURT:  AND YOU UNDERSTAND THAT THIS WAIVES

15   YOUR RIGHT TO APPEAR HERE IN COURT PERSONALLY FOR THIS

16   PROCEEDING?

17              THE DEFENDANT:  YES, YOUR HONOR.

18              THE COURT:  ALL RIGHT.  AND HAVE ANY THREATS OR

19   PROMISES BEEN MADE TO YOU BY ANYONE TO CONVINCE YOU TO

20   SIGN THIS DOCUMENT?

21              THE DEFENDANT:  NO, YOUR HONOR.

22              THE COURT:  ALL RIGHT.  AND DID YOU REVIEW THE

23   DOCUMENT WITH YOUR ATTORNEYS BEFORE YOU AUTHORIZED THE

24   PLACEMENT OF YOUR SIGNATURE ON IT?

25              THE DEFENDANT:  YES, YOUR HONOR.

1    THE COURT:  ALL RIGHT.  THEN I'LL MAKE A

2  FINDING TO THE EXTENT NECESSARY THAT THE CONSENT TO APPEAR

3  AND THE WAIVERS CONTAINED THEREIN IS KNOWINGLY AND

4  VOLUNTARILY MADE, AND I WILL APPROVE IT.

5    THE DEFENDANT:  YES, YOUR HONOR.

6    THE COURT:  ALL RIGHT.  COUNSEL, ANYTHING ELSE

7  WE NEED TO ADDRESS TODAY?

8    MR. SHIPLEY:  NOTHING FURTHER FROM ME, YOUR

9  HONOR.

10    MR. HARKER:  YOUR HONOR, I JUST HAD A FEW EXTRA

11  POINTS THAT I THINK WE COULD ADDRESS EXPEDITIOUSLY.

12    THE COURT:  ALL RIGHT.

13    MR. HARKER:  ONE IS THERE WAS A HEARING ABOUT A

14  MONTH AGO WHERE THERE WAS SOME CONFUSION, I THINK, AT

15  LEAST ON THE GOVERNMENT'S PART, ABOUT THE GOVERNMENT

16  WANTED TO PUT ON THE RECORD THAT THE DEFENSE HAD MADE A

17  STRATEGIC DECISION NOT TO REQUEST THE GOVERNMENT'S EXPERT

18  DISCLOSURES.

19    THE COURT:  EXPERTS, YES.

20    MR. HARKER:  AND THAT'S THEIR RIGHT, THEY'RE

21  ABSOLUTELY ABLE TO DO THAT, IT WOULD TRIGGER THE

22  RECIPROCAL OBLIGATION ON THEIR BEHALF WERE THEY TO REQUEST

23  THE GOVERNMENT'S EXPERT DISCLOSURES; BUT WE HAVE NOT

24  PROVIDED THAT INFORMATION TO THEM BECAUSE THEY HAVE NOT

25  REQUESTED IT, THAT'S ONE ISSUE.

1          AT SOME POINT I THINK WE NEED TO HAVE A

2 LAFLER/FRYE HEARING, AND THEN ALSO THERE IS A 120 PAGE

3 TRANSCRIPT OF AN INTERVIEW.  WE HAVE PROVIDED THAT

4 TRANSCRIPT TO THE DEFENSE.  I THINK WE'VE ASKED THEM TO --

5          THE COURT:  JUST A MINUTE.  THAT BACKGROUND

6 NOISE, THAT NOISE IS GETTING WORSE, IS THAT THE PROBLEM

7 YOU WERE TALKING TO ME EARLIER ABOUT?

8          MR. DEMBO {IT DEPARTMENT}:  YES, IT'S FROM

9 MR. JESSEE'S LINE.

10          MR. JESSEE:  I CAN BARELY HEAR, JUDGE.

11          THE COURT:  WELL, I THINK ALL THE BACKGROUND

12 NOISE THAT WE'RE HEARING HERE IS COMING FROM YOUR PHONE.

13 IF YOU WILL MUTE IT, I THINK THAT MIGHT CORRECT -- I GUESS

14 HE LEFT US.

15          MR. JESSEE:  NO, I'M ON MUTE.

16          THE COURT:  OKAY.  ALL RIGHT.

17          MR. JESSEE:  I'LL MUTE.

18          THE COURT:  IF YOU MUTE IT, THAT SOUNDS LIKE

19 THAT SOLVES THE PROBLEM, AT LEAST PARTIALLY.

20          ALL RIGHT.  GO AHEAD, MR. HARKER, I'M SORRY.

21          MR. HARKER:  SO, YOUR HONOR, I DON'T KNOW IF WE

22 NEED TO DISCUSS THESE ISSUES TODAY, BUT THERE IS THE

23 REQUEST FOR THE GOVERNMENT'S EXPERT DISCLOSURES; SECOND,

24 THERE'S -- IN ORDER TO AVOID IDEALLY A ROBINSON HEARING ON

25 A LENGTHY TWO PLUS HOUR INTERVIEW, TRANSCRIBED INTERVIEW,

1   THE GOVERNMENT HAS PROVIDED A TRANSCRIPT TO THE DEFENSE.

2   WE HAVE PROPOSED SOME CORRECTIONS TO IT, WE HAVE ASKED

3   THEM TO GET BACK TO US, WE HOPE THEY CAN DO THAT PROMPTLY;

4   BUT IN THE EVENT THAT THERE ARE SOME AREA OF DISAGREEMENT,

5   OUR UNDERSTANDING OF THE COURT'S ORDER ON DISCOVERY AND

6   SCHEDULING IS THAT THE PARTIES MUST IDENTIFY FOR THE COURT

7   WHERE THE AREAS OF DISAGREEMENT ARE.  THE GOVERNMENT HAS

8   PROVIDED THAT INFORMATION TO THE DEFENSE, SO THE BALL IS

9   IN THEIR COURT; AND THEN, THIRD, AT SOME POINT, MAYBE NOT

10  TODAY, WE WOULD ASK THAT WE PUT ON THE RECORD THAT THE

11  DEFENDANT HAS FORMALLY REJECTED THE GOVERNMENT'S PLEA

12  OFFER.

13          THE COURT:  ALL RIGHT.  I DON'T USUALLY DO A

14  LAFLER/FRYE HEARING THIS EARLY IN THE PROCEEDINGS SIMPLY

15  BECAUSE THINGS CHANGE AS WE APPROACH TRIAL, AND I WILL DO

16  THAT MUCH CLOSER TO TRIAL.

17          MR. SHIPLEY, WHAT IS GOING ON WITH THE EXPERT

18  DISCLOSURES, DO YOU INTEND TO SEEK RECIPROCAL DISCLOSURE

19  AT SOME POINT IN THIS CASE?

20          MR. SHIPLEY:  YES, YOUR HONOR.  AND AS THE

21  COURT CAN PROBABLY TELL, THAT WAS AN ISSUE THAT WAS A

22  POINT OF CONTENTION DURING OUR LAST HEARING.  ANY

23  INSINUATION THAT IT WAS -- AND MR. HARKER IS RIGHT, IT IS,

24  IT CAN BE A STRATEGIC DECISION; HOWEVER, JUDGE, THAT IS

25  NOT THE CASE HERE.  AS A MATTER OF FACT, JUDGE, MR. JESSEE

1   AND I SPOKE, SPOKE ABOUT THIS, WE, WE RECEIVED AN E-MAIL

2   FROM MR. HARKER AT 11:27 THIS MORNING, AND I ASSUMED THAT

3   THIS WOULD BE BROUGHT UP TO THE COURT.

4          MR. JESSEE HAS INFORMED ME THAT HIS, HIS

5   ASSOCIATE THAT HE HAS, HE'S REQUESTED THAT SHE COMPLETE

6   THE REQUEST FOR THE EXPERT DISCLOSURE, AND SHE'S NOT BEEN

7   TO WORK IN THE PAST FEW DAYS BECAUSE SHE HAS PINK EYE AND

8   MR. JESSEE DOESN'T WANT HER ANYWHERE AROUND THE OFFICE.  I

9   OVERHEARD THE CONVERSATION WITH HE AND HER THIS MORNING,

10  THAT'S SOMETHING HE HAS REQUESTED.

11         JUDGE, FROM OUR STANDPOINT WE ARE STILL WAITING

12  ON OUR REPORT, AND THAT'S SOMETHING THAT IT'S NOT, IT'S

13  NOT ANYTHING, JUDGE, THAT IT HAS BEEN A STRATEGIC ISSUE,

14  IT'S A MATTER OF WE'VE MADE THAT DECISION, WE'VE DISCUSSED

15  THAT, AND IT'S PENDING AS SOON AS -- WE SHOULD HAVE THAT

16  TO THE GOVERNMENT WITHIN A WEEK, OUR REQUEST FOR ANY TYPE

17  OF EXPERT DISCLOSURES, AND WE WILL OBVIOUSLY PROVIDE

18  ANYTHING THAT WE HAVE WHEN WE OBTAIN IT.

19         THE COURT:  WHEN DO YOU ANTICIPATE GETTING AN

20  EXPERT REPORT?

21         MR. SHIPLEY:  THE LAST TIME, JUDGE, THAT

22  MR. JESSEE AND I SPOKE ABOUT THIS, AND TALKING WITH OUR

23  EXPERT, WE, WE -- WE'RE EXPECTING THAT REPORT, JUDGE, ANY

24  DAY FROM HIM; AND THAT'S SOMETHING, LIKE I SAID, JUDGE,

25  ONCE WE, ONCE WE REQUEST THAT FROM THE GOVERNMENT, JUDGE,

1   WHICH SHOULD BE FORTHCOMING WITHIN THE NEXT -- HONESTLY,

2   JUDGE, IF WE CAN GET IT TO THEM TOMORROW, WE WILL; BUT

3   THAT'S SOMETHING IF I HAVE TO DRAFT IT, JUDGE, IT'S

4   SOMETHING I'LL DO; BUT THAT WAS SOMETHING WE HAD GIVEN HER

5   TO DO, AND IT WILL BE FORTHCOMING, JUDGE; BUT I DON'T SEE

6   ANY TYPE OF UNDUE DELAY FROM OUR EXPERT REPORT.  I THINK

7   HE HAS GONE THROUGH MOST OF EVERYTHING THAT HE HAS HAD

8   ACCESS TO DO, JUDGE.

9           THAT'S ANOTHER THING THAT WE'RE HOPING TO

10  PROVIDE TO THE COURT, ANOTHER THING THAT -- I DON'T KNOW

11  THAT THE COURT NEEDS TO ADDRESS THAT NOW BECAUSE WE'RE

12  HOPING WE CAN COME TO AN AGREEMENT WITH THE GOVERNMENT ON

13  ANOTHER SUBSEQUENT MODIFICATION OF THIS PROTECTIVE ORDER

14  IN THIS CASE, JUDGE.  THE -- MR. HARKER'S COCOUNSEL, WE

15  HAVE BEEN IN CONTACT WITH HIM ABOUT MODIFYING THIS

16  PROTECTIVE ORDER TO HAVE EASIER ACCESS TO THE DISCOVERY

17  MATERIAL.  WE HAVE SENT A LENGTHY E-MAIL TO MR. WALCZEWSKI

18  ABOUT SAFEKEEPING OF THE MATERIAL.  WE HAVE DESCRIBED THE

19  SAFES THAT MR. JESSEE AND I BOTH HAVE THAT WE CAN STORE

20  THE MATERIAL, THE QUOTE, UNQUOTE, TRADE SECRET MATERIAL.

21  THAT'S SOMETHING ELSE, JUDGE, THAT WE DON'T WANT TO

22  PRESENT TO THE COURT AT THIS POINT BECAUSE WE THINK WE'RE

23  WORKING TOWARD A RESOLUTION ON PROVIDING THE COURT WITH

24  SOMETHING OF AN AGREEMENT TO MODIFY THE PROTECTIVE ORDER

25  TO ALLOW EASIER ACCESS TO THE DISCOVERY; AND I THINK,

1  JUDGE, THAT I CAN SAY THIS WITH A HIGH DEGREE OF
2  CERTAINTY, IF -- THE REASON IT'S TAKING A LONG TIME TO --
3  AND THIS IS NO, THIS IS NO CASTING STONES AGAINST THE
4  GOVERNMENT BECAUSE WE UNDERSTAND THEIR POSITION, BUT IT'S
5  THE ACCESS OUR EXPERT HAS HAD TO THE MATERIAL.  IT WAS
6  HERE, AND THEN THEY WERE VERY ACCOMMODATING TO TAKE IT OUT
7  TO THE FBI OFFICE IN LOS ANGELES, BUT IT'S A MATTER OF
8  WHAT YOU CAN TAKE IN AND WHAT YOU CAN TAKE OUT; AND I
9  THINK, JUDGE, THAT'S SOMETHING THAT WE ARE WORKING TOWARD
10  GETTING THE COURT SOMETHING PENDING THE COURT'S APPROVAL
11  OF MODIFYING THAT PROTECTIVE ORDER.
12          THE COURT:  ALL RIGHT.  IT SOUNDS LIKE YOU
13  WON'T HAVE ANY TROUBLE THEN MAKING YOUR REQUEST FOR EXPERT
14  DISCLOSURES WITHIN 14 DAYS?
15          MR. SHIPLEY:  NO, JUDGE, THAT WILL NOT BE A
16  PROBLEM.
17          THE COURT:  ALL RIGHT, THEN THE DEFENDANT WILL
18  MAKE THAT REQUEST WITHIN 14 DAYS OF TODAY.
19          AND DID -- I DON'T HAVE THE SCHEDULING ORDER IN
20  FRONT OF ME, WAS THERE A DATE SET IN THAT SCHEDULING ORDER
21  THEN FOR THE DISCLOSURE BY THE DEFENDANT?
22          MR. HARKER:  THERE WAS NOT, YOUR HONOR.
23          THE COURT:  WHAT DO YOU SUGGEST IS A REASONABLE
24  TIME, MR. HARKER?
25          MR. HARKER:  YOUR HONOR, I -- AS LONG AS WE

1    HAVE IT TWO MONTHS IN ADVANCE OF TRIAL, A MONTH IN ADVANCE

2    OF TRIAL, THAT'S SUFFICIENT.  I THINK THE ISSUE IS JUST

3    PROTECTING THE RECORD HERE PRIMARILY.

4              THE COURT:  ALL RIGHT.  THEN THE PLAINTIFFS --

5    I MEAN THE DEFENDANT WILL FILE THE REQUEST WITHIN 14 DAYS,

6    THAT WILL TRIGGER THEN THE REQUIREMENT THAT THE DEFENDANT

7    MAKE EXPERT DISCLOSURES WITHIN 30 DAYS OF THAT.

8              MR. HARKER:  THANK YOU, YOUR HONOR.

9              THE COURT:  I ADDRESSED LAFLER/FRYE.

10             WHAT'S YOUR PERSPECTIVE ON THIS TRANSCRIPT

11   ISSUE AND THE NEED FOR A ROBINSON HEARING, MR. SHIPLEY?

12             MR. SHIPLEY:  JUDGE, I HAVE LOOKED THROUGH THE

13   TRANSCRIPT AT LENGTH, I DON'T THINK IT'S GOING TO BE

14   NECESSARY TO HAVE A ROBINSON HEARING.  I THINK THAT'S

15   SOMETHING THAT I BELIEVE MR. HARKER AND I HAVE EVEN

16   DISCUSSED THAT ABOUT THE CERTAIN STIPULATIONS THAT WE CAN

17   POSSIBLY DO GOING INTO TRIAL.  THERE IS SOME INCON-

18   SISTENCIES WITHIN THAT, JUDGE, SOME SPELLING AND SOME

19   WORDS THAT I THINK ARE OUT OF CONTEXT, BUT THAT'S

20   SOMETHING I THINK I CAN TAKE UP WITH MR. HARKER, AND I

21   THINK WE CAN REACH AN AGREEMENT ON THAT ABOUT CERTAIN

22   THINGS WITHOUT RESORTING TO HAVING A ROBINSON HEARING.

23             THE COURT:  ALL RIGHT.  OBVIOUSLY, A ROBINSON

24   HEARING INVOLVING A TRANSCRIPT THIS LONG COULD TAKE A FAIR

25   AMOUNT OF TIME.  I GUESS MY CONCERN HERE IS THAT WE NEED

1    TO GET THAT DONE AS FAR IN ADVANCE OF THE TRIAL DATE AS

2    POSSIBLE.  CAN YOU COMPLETE YOUR REVIEW OF THAT TRANSCRIPT

3    AND GIVE THE COURT A NOTICE WITHIN 30 DAYS OF WHETHER

4    THERE WILL BE A ROBINSON HEARING REQUIRED?

5              MR. SHIPLEY:  JUDGE, I'LL DO SO.

6              THE COURT:  ALL RIGHT.  IS THAT SATISFACTORY,

7    MR. HARKER?

8              MR. HARKER:  YES, IT IS, YOUR HONOR.  THANK

9    YOU.

10             THE COURT:  ALL RIGHT.  AND AS FAR AS THE

11   PROTECTIVE ORDER MODIFICATION IS CONCERNED, MR. SHIPLEY, I

12   DON'T HAVE ANYTHING BEFORE ME AT THIS POINT.  HOPEFULLY

13   YOU ALL CAN REACH A, AN AGREEMENT ON THAT.  I -- I TAKE IT

14   IF DR. YOU IS RELEASED ON BOND, THAT SOME OF THE CONCERNS

15   ABOUT THAT BECOME MOOT?  I MEAN, SHE IS -- I MEAN, YOU'RE

16   TELLING ME SHE'S LIVING WITHIN A HALF MILE OF THE FBI'S

17   OFFICE, IT SEEMS TO ME THAT HER REVIEW OF THOSE DOCUMENTS

18   AT THE FBI'S OFFICE WOULD BE FAR, FAR PREFERABLE TO WHAT

19   YOU HAVE NOW.

20             MR. SHIPLEY:  IT WOULD BE, JUDGE, AND THAT'S

21   SOMETHING THAT WE'VE TALKED A LOT ABOUT IN THE PROTECTIVE

22   ORDER THAT WAS PRIOR TO -- WE'VE BEEN DISCUSSING THAT FOR

23   QUITE SOME TIME, JUDGE, WITH THE GOVERNMENT AS A MODIFICA-

24   TION; BUT, YES, JUDGE, I MEAN, THAT, THE ELEPHANT -- THE

25   PROVERBIAL ELEPHANT IN THE ROOM HERE IF SHE WERE TO BE

1   RELEASED ON SOME TYPE OF BOND, THEN THAT WOULD ALLOW
2   EASIER ACCESS TO LOOK AT THE MATERIAL, JUDGE, YOU'RE
3   ABSOLUTELY CORRECT ON THAT.
4           I THINK MR. JESSEE AND I AND OUR EXPERT IN LOS
5   ANGELES WERE TALKING TO THE GOVERNMENT WITH THE
6   UNDERSTANDING THAT US HAVING THE MATERIAL, BEING ABLE TO
7   GO OVER THAT MATERIAL, DO THE PROPER TRIAL PREP WITHOUT
8   HAVING TO GO TO THE FBI TO LOOK AT IT; BUT, JUDGE, IF SHE
9   IS RELEASED, THAT'S EASIER ACCESS TO EVERYTHING.
10          SO THAT'S SOMETHING THAT PENDING THE COURT'S
11  ORDER ON, ONE OF THE REASONS WE'RE HERE TODAY ON RELEASE,
12  I THINK THAT WILL MORE THAN LIKELY CAUSE THE NEXT
13  CONVERSATION WITH MR. HARKER AND MR. WALCZEWSKI ABOUT WHAT
14  WE'RE GOING TO DO TO THE UNDERLYING PROTECTIVE ORDER.
15          THE COURT:  ALL RIGHT.  YOU JUST SAID YOUR
16  EXPERT IS IN LOS ANGELES?
17          MR. SHIPLEY:  THAT'S CORRECT, JUDGE.
18          THE COURT:  ONE OF THE THINGS YOU NEED TO DO,
19  OBVIOUSLY, I WOULD EXPECT YOU TO DO ANYWAY, IS COMMUNICATE
20  TO YOUR EXPERT WHAT THE REQUIREMENTS FOR DISCLOSURE ARE
21  GOING TO BE, AND, OBVIOUSLY YOUR EXPERT NEEDS TO GET THOSE
22  REPORTS, REPORT OR REPORTS TO YOU IN SUFFICIENT TIME THAT
23  YOU DON'T HAVE TO ASK FOR AN EXTENSION OF THAT DEADLINE.
24          MR. SHIPLEY:  JUDGE, I'LL CONTACT HIM THIS
25  AFTERNOON.

1          THE COURT:  ALL RIGHT.

2          ALL RIGHT.  THEN IS THAT ALL WE CAN DO EXCEPT

3     FOR THE BOND ISSUE?

4          MR. HARKER:  THAT'S EVERYTHING FROM THE

5     GOVERNMENT, YOUR HONOR.

6          MR. SHIPLEY:  EVERYTHING I HAVE, JUDGE.

7          THE COURT:  ALL RIGHT.  WELL, AS FAR AS THE

8     MOTION FOR RELEASE ON BOND, I CONTINUE TO BE BOTHERED BY

9     THE FACT THAT THIS HEARING WAS EVEN NECESSARY BECAUSE

10    THERE WERE INDEED STATEMENTS MADE IN BOTH THE DEFENDANT'S

11    MOTION AND THE ACCOMPANYING MEMORANDUM THAT HAVE PROVEN TO

12    BE INACCURATE.  I DO NOT MAKE ANY FINDING THAT THE LAWYERS

13    WERE INTENTIONALLY MISREPRESENTING ANY FACT TO THE COURT;

14    HOWEVER, I AGREE WITH MR. HARKER, ESPECIALLY IN LIGHT OF

15    THE FACT THAT THERE IS A WRITTEN LEASE COVERING THAT

16    JOHNSON CITY PROPERTY, THAT DR. YOU AND/OR HER HUSBAND

17    WERE FULLY AWARE THAT THAT JOHNSON CITY PROPERTY WAS NOT

18    AVAILABLE AT THAT TIME FOR HER TO RESIDE THERE; AND TO THE

19    EXTENT THAT RAISES A CREDIBILITY PROBLEM WITH DR. YOU,

20    THEN THAT CREDIBILITY PROBLEM EXTENDS BEYOND THE ISSUES

21    RAISED IN THE MOTION FOR BOND AND, FRANKLY, CALLS INTO

22    QUESTION THE CREDIBILITY OF CERTAIN PROMISES SHE WOULD BE

23    REQUIRED TO MAKE TO THIS COURT IF SHE WERE RELEASED ON

24    BOND.

25          I WILL GIVE YOU WHAT I WILL TERM AS A

1    PRELIMINARY RULING ON THE MOTION.  THERE WILL NOT BE A

2    FINAL RULING ON THE MOTION, HOWEVER, UNTIL YOU RECEIVE THE

3    COURT'S MEMORANDUM OPINION.

4          DESPITE MY CONCERN ABOUT THAT, IT APPEARS TO ME

5    THAT THE FINDINGS MADE IN THE COURT'S PRIOR ORDER, THE NOW

6    VACATED ORDER, WERE IN FACT JUSTIFIED, AND I SEE NO REASON

7    TO CHANGE THEM.  I AM INCLINED TO GRANT THE MOTION FOR

8    BOND SUBJECT TO CONDITIONS.

9          DO YOU HAVE THAT, BY THE WAY?

10          AND IT WOULD BE OUR GOAL, OF COURSE, TO GET YOU

11    A FINAL ORDER ON THIS BY WEEK'S END.

12          DESPITE THE GOVERNMENT'S ARGUMENT THAT THE RISK

13    OF FLIGHT HAS IN FACT BECOME GREATER GIVEN THE CIRCUM-

14    STANCES, I SIMPLY DO NOT AGREE.  IN ADDITION, I THINK THE

15    POSSIBILITY OF RISK OF HARM TO THE DEFENDANT AND/OR OTHER

16    INMATES AT THE JAIL WHERE SHE IS CURRENTLY HOUSED AS A

17    RESULT OF THE COVID-19 VIRUS ARE INDEED REAL DESPITE THE

18    FACT THAT THERE DO NOT APPEAR TO BE ANY CONFIRMED CASES OF

19    THE VIRUS AT THAT PARTICULAR FACILITY.

20          SEVERAL THINGS LEAD ME TO THE CONCLUSION THAT

21    THAT RISK IS VERY REAL AND THAT IT IS A SIGNIFICANT FACTOR

22    IN DETERMINING WHETHER OR NOT TO RELEASE DR. YOU ON BOND

23    PENDING THE JANUARY -- EXCUSE ME, I SAID JANUARY AGAIN --

24    JULY 21 TRIAL DATE.

25          FIRST OF ALL, THERE HAVE BEEN SOME SERIOUS OUT-

1  BREAKS IN CORRECTIONAL FACILITIES ACROSS THE COUNTRY, AT

2  LEAST ONE IN A BUREAU OF PRISONS FACILITY, BUT ALSO A

3  NUMBER IN LOCAL JAILS.  THAT RISK IS VERY REAL BECAUSE

4  THERE ARE A LARGE NUMBER OF PEOPLE CONFINED IN A RELA-

5  TIVELY SMALL SPACE WITH BOTH VISITORS AND NEW INMATES

6  COMING INTO THOSE FACILITIES ON A REGULAR BASIS.

7          NOW, CERTAINLY THE PRECAUTIONS THAT MR. HARKER

8  HAS DESCRIBED ARE IMPORTANT, BUT ONE OF THE THINGS THAT'S

9  OCCURRED DURING THIS BREAK FROM COURT ACTIVITY IS THAT THE

10  COURT HAS HAD A LOT OF TIME TO DO READING AND HAVE READ

11  SOME ARTICLES JUST IN THE LAST FEW DAYS THAT INDICATE THAT

12  PEOPLE WHO ARE COMPLETELY ASYMPTOMATIC NEVERTHELESS CAN

13  SPREAD THE VIRUS.

14          I ALSO NOTE THAT IN THE LAST COUPLE OF WEEKS

15  THE ATTORNEY GENERAL HAS TAKEN SOME ACTIONS THAT ARE

16  SIGNIFICANT IN THAT RESPECT.  NUMBER ONE, AT THE ATTORNEY

17  GENERAL'S DIRECTION THE BUREAU OF PRISONS IS CONDUCTING A

18  REVIEW IN AN ATTEMPT TO IDENTIFY INMATES WHO BECAUSE OF

19  AGE OR UNDERLYING MEDICAL CONDITIONS OR OTHER THINGS ARE

20  MORE SUSCEPTIBLE TO THE VIRUS AND PROVIDING FOR THEIR

21  RELEASE EARLIER THAN MIGHT OTHERWISE HAVE BEEN THE CASE TO

22  A HALFWAY HOUSE OR TO HOME INCARCERATION.

23          IN ADDITION, JUST TWO DAYS AGO THE ATTORNEY

24  GENERAL ISSUED A MEMO TO UNITED STATES ATTORNEYS, AMONG

25  OTHERS, THAT -- AND THIS IS MY PARAPHRASE -- DIRECTS THAT

1  CONSIDERATION BE GIVEN TO THE RISK, NOT ONLY ACTUAL RISK,

2  BUT POTENTIAL RISK TO A DEFENDANT BASED UPON INCARCERATION

3  WITHOUT BOND.  I WON'T READ TOO MUCH INTO THE ATTORNEY

4  GENERAL'S MEMO, BUT CERTAINLY THE ATTORNEY GENERAL

5  INDICATES THAT THE RISK FROM COVID-19 SHOULD BE A FACTOR

6  IN THE UNITED STATES ATTORNEY'S OFFICE ANALYSIS OF WHETHER

7  TO RECOMMEND BOND OR IN RESPONDING TO AND LITIGATING

8  MOTIONS FILED BY PREVIOUSLY DETAINED DEFENDANTS FOR BOND.

9         I HAVE TO ADMIT THAT THE ISSUE OF RELEASE FOR

10 THIS DEFENDANT IS A CLOSE CALL HERE, BUT I WOULD ALSO NOTE

11 THE BURDEN OF PROOF THAT'S ON THE GOVERNMENT IN THIS

12 RESPECT.  SO I AM INCLINED, ALTHOUGH I WANT TO THINK ABOUT

13 IT JUST A LITTLE BIT AND DISCUSS IT WITH MY LAW CLERK, TO

14 GRANT THE MOTION FOR RELEASE.  THAT RELEASE, HOWEVER,

15 WOULD BE SUBJECT TO SOME SIGNIFICANT CONDITIONS.

16        FIRST OF ALL, THE DEFENDANT WILL BE REQUIRED TO

17 POST AN APPEARANCE BOND IN THE AMOUNT OF $500,000, AT

18 LEAST PARTIALLY SECURED BY A $100,000 CASH DEPOSIT WITH

19 THE COURT AND A DEED OF TRUST SECURING AT LEAST ONE OF THE

20 PROPERTIES OWNED BY THE DEFENDANT AND HER HUSBAND EITHER

21 IN WASHINGTON COUNTY, TENNESSEE OR IN ATLANTA, GEORGIA.

22 I -- THE PRETRIAL REPORT INDICATED A VALUE OF THE

23 WASHINGTON COUNTY PROPERTY OF APPROXIMATELY $250,000 AND

24 OF THE ATLANTA PROPERTY OF APPROXIMATELY $500,000.  I

25 WOULD NOTE THAT IN ORDER FOR THAT CONDITION TO BE MET,

1   DR. YOU'S HUSBAND WILL HAVE TO SIGN THE NECESSARY DOCU-

2   MENTS; AND ALTHOUGH COUNSEL WILL HAVE TO CONFIRM THIS WITH

3   THE CLERK'S OFFICE, I BELIEVE THAT WHAT ACTUALLY HAS TO BE

4   DONE IS A DEED OF TRUST PREPARED AND SIGNED BY BOTH

5   PARTIES IN FAVOR OF THE CLERK, I THINK THAT'S THE WAY

6   THAT'S DONE.

7               THE CLERK:  I BELIEVE IT IS, YOUR HONOR.

8               THE COURT:  SO THAT WOULD BE THE FIRST

9   CONDITION.

10              SECONDLY, THE DEFENDANT WILL BE REQUIRED TO

11  RESIDE IN THE NORTHEASTERN DIVISION OF THE UNITED STATES

12  DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE,

13  PRESUMABLY IN WASHINGTON COUNTY OR GREENE COUNTY, DURING

14  THE PERIOD OF THE BOND.  SHE WILL BE SUBJECT TO HOME

15  DETENTION DURING THAT PERIOD OF TIME WITH ELECTRONIC

16  MONITORING.  INITIALLY THE DEFENDANT WILL BE REQUIRED TO

17  COMPLY WITH ALL CDC REQUIREMENTS, INCLUDING THE TWO WEEK

18  QUARANTINE, AND I BELIEVE IT'S TWO WEEKS, QUARANTINE

19  DURING WHICH TIME SHE WOULD BE SUBJECT TO 24 HOUR A DAY, 7

20  DAY A WEEK DETENTION AT HOME.  IN OTHER WORDS, SHE

21  COULDN'T LEAVE HOME FOR THAT -- I BELIEVE IT'S A 14 DAY

22  PERIOD.  SOMEBODY NEEDS TO CONFIRM.

23              DID YOU CONFIRM IT WAS 14 DAYS?

24              PROBATION OFFICER:  NO, YOUR HONOR, BUT I

25  WILL.

1        THE COURT:  SOMEBODY NEEDS TO CONFIRM THAT IT'S
2   14 DAYS.  WHATEVER THAT REQUIREMENT IS, SHE NEEDS TO BE
3   UNDER QUARANTINE.  AFTER THAT, SHE WILL BE PERMITTED TO
4   LEAVE HER RESIDENCE FOR ONLY ONE OF THE FOLLOWING REASONS:
5   NUMBER ONE, TO SEE A DOCTOR IF SHE NEEDS TO DO THAT;
6   SECONDLY, TO VISIT A PHARMACY TO PICK UP A PRESCRIPTION;
7   THIRD, TO GO TO THE GROCERY STORE; AND, FOURTH, TO MEET
8   WITH HER LAWYERS AT WHATEVER LOCATION IS REQUIRED BY HER
9   ATTORNEYS, EITHER AT ONE OF THEIR OFFICES OR POSSIBLY AT
10  THE FBI'S REGIONAL OFFICE IN JOHNSON CITY.
11       LET ME GO BACK TO THE RESIDENCE REQUIREMENT.
12  OBVIOUSLY, SHE MUST RESIDE AT A PLACE APPROVED BY THE
13  UNITED STATES PROBATION OFFICE AS A SUITABLE RESIDENCE.
14  AND GIVEN THE FACT THAT INTERNET ACCESS IS USUALLY WIRED
15  INTO THESE APARTMENT COMPLEXES, SHE WILL SURRENDER AND NOT
16  POSSESS ANY DEVICE ON WHICH SHE MIGHT ACCESS THE INTERNET,
17  COMPUTER, CELL PHONE, I-PAD -- I JUST LEARNED RECENTLY
18  THAT YOU CAN CONNECT TO THE INTERNET WITH AN X-BOX, I
19  DIDN'T KNOW THAT -- BUT ANY DEVICE THAT'S CAPABLE OF
20  CONNECTING TO THE INTERNET.
21       DURING THE PERIOD OF THE BOND -- OH, AND
22  BECAUSE IT IS HOME DETENTION, THE LOCATION WILL HAVE TO
23  HAVE A LANDLINE TELEPHONE.  DURING THE PERIOD OF THE BOND,
24  THE DEFENDANT WILL BE REQUIRED TO PLACE A CALL FROM THAT
25  LANDLINE TO HER SUPERVISING UNITED STATES PROBATION

1  OFFICER AT LEAST TWICE DAILY.  AND I'M TOLD THAT THE

2  TECHNOLOGY ALLOWS THE PROBATION OFFICE TO CONFIRM THAT THE

3  CALL, CALL WAS IN FACT MADE FROM THAT LANDLINE.  IN

4  ADDITION, THE PROBATION OFFICER IS AUTHORIZED TO MAKE

5  RANDOM PHONE CALLS TO THE DEFENDANT TO CONFIRM THAT SHE IS

6  PRESENT AT THAT LOCATION.

7          NOW, BECAUSE THE DEFENDANT DOES NOT HAVE A

8  DRIVER'S LICENSE AND WILL NOT BE PERMITTED TO OBTAIN A

9  DRIVER'S LICENSE, SHE WILL HAVE TO ARRANGE FOR ANY

10  NECESSARY TRANSPORTATION.

11          DID I MISS ANYTHING?

12          PROBATION OFFICER:  YOUR HONOR, WILL SHE BE

13  REQUIRED TO PAY FOR HER ELECTRONIC MONITORING?

14          THE COURT:  SHE WILL, THE ELECTRONIC MONITORING

15  WILL BE AT HER EXPENSE.

16          PROBATION OFFICER:  AND GIVEN THE CURRENT

17  SITUATION WITH COVID-19 AND EVERYTHING, WE'RE NOT SURE

18  WHEN WE WILL BE ABLE TO HOOK HER UP.

19          THE COURT:  I'M NOT GOING TO PUT A TIME LIMIT

20  ON THAT, I UNDERSTAND THAT THERE ARE SOME TIME CONSTRAINTS

21  ON GETTING ALL THAT HOOKED UP.

22          PROBATION OFFICER:  THANK YOU, YOUR HONOR.

23          THE COURT:  BUT I WOULD LIKE IT HOOKED UP AS

24  SOON AS POSSIBLE AFTER SHE IS RELEASED, OBVIOUSLY.

25          PROBATION OFFICER:  YES, YOUR HONOR.

1    THE COURT:  BEYOND THAT, SHE WILL BE SUBJECT TO
2  THE USUAL CONDITIONS OF BOND.

3    IN ADDITION TO WHAT I'VE ALREADY SAID ABOUT
4  CONTACT WITH THE PROBATION OFFICE, SHE WILL BE REQUIRED TO
5  REPORT ON A REGULAR BASIS TO THE UNITED STATES PROBATION
6  OFFICE AND TO COOPERATE FULLY WITH ALL PRETRIAL SERVICE
7  OFFICERS OR THEIR DESIGNEES; AND SHE MUST REFRAIN FROM ANY
8  VERBAL OR PHYSICAL ABUSE OF ANY PRETRIAL SERVICE OFFICER
9  OR OTHER OFFICIAL IN THE PERFORMANCE OF HIS OR HER DUTIES.

10    THE DEFENDANT MUST REFRAIN FROM POSSESSING A
11  FIREARM, AMMUNITION, A DESTRUCTIVE DEVICE OR ANY OTHER
12  KIND OF DANGEROUS WEAPON.

13    AND THIS SAYS EXECUTE A BAIL BOND WITH SOLVENT
14  SURETIES IN THE AMOUNT OF $100,000.  I INTEND FOR THERE TO
15  BE A DEPOSIT WITH THE CLERK OF $100,000, ALL RIGHT.

16    AND IF SHE HAS ANY PASSPORT IN HER POSSESSION,
17  THAT MUST BE SURRENDERED TO THE UNITED STATES PROBATION
18  OFFICE, AND SHE IS PROHIBITED FROM OBTAINING ANY NEW
19  PASSPORT.

20    SHE MUST HAVE NO CONTACT WITH KNOWN CONVICTED
21  FELONS, DRUG DEALERS, DRUG USERS, CODEFENDANTS OR ANY
22  PERSON WHO VIOLATES THE LAW.

23    SHE MUST REPORT ANY CONTACT WITH LAW ENFORCE-
24  MENT PERSONNEL, INCLUDING BUT NOT LIMITED TO ANY ARRESTS,
25  QUESTIONING OR TRAFFIC STOP TO THE PRETRIAL OFFICER AS

1    SOON AS POSSIBLE.

2            AND, OBVIOUSLY, SHE MUST APPEAR AT ANY TIME

3    THAT HER APPEARANCE IS REQUIRED IN CONNECTION WITH THIS

4    CASE.  SHE MUST REMAIN IN CONTACT ON A REGULAR BASIS WITH

5    HER ATTORNEYS AND COOPERATE FULLY WITH HER ATTORNEYS.

6            AND UPON THE ENTRY OF THE COURT'S ORDER, I

7    UNDERSTAND THIS BOND CAN ACTUALLY BE E-MAILED TO HER AT

8    THE DETENTION FACILITY AND SHE CAN SIGN IT FROM THERE?

9            THE CLERK:  YOUR HONOR --

10           THE COURT:  IS THAT WHAT HAPPENS?

11           THE CLERK:  -- WASHINGTON COUNTY DOES NOT ALLOW

12   THAT, THE OTHER ONES DO, AND SO THIS NEEDS TO BE GIVEN TO

13   HER COUNSEL AND THEN TAKEN TO HER, THAT'S MY UNDERSTANDING

14   THAT WASHINGTON COUNTY DOES NOT ALLOW THAT.

15           THE COURT:  MR. SHIPLEY, MR. JESSEE, DID YOU

16   BOTH HEAR THAT?  WASHINGTON COUNTY WON'T ALLOW IT TO BE

17   SIGNED ELECTRONICALLY, AND THIS IS GOING TO REQUIRE THAT

18   IT BE TAKEN TO HER AT THE JAIL TO BE SIGNED, WHICH IS -- I

19   DIDN'T KNOW WASHINGTON COUNTY HAD DONE THAT, BUT THAT'S

20   UNWISE, BUT APPARENTLY THE CONDITIONS THEY HAVE.

21           MR. SHIPLEY:  JUDGE, I'LL TAKE CARE OF IT,

22   ACCORDINGLY.

23           THE COURT:  AND ONCE IT'S SIGNED BY THE

24   DEFENDANT, THEN IT CAN BE SUBMITTED TO THE COURT, AND I

25   WILL SIGN IT.

1          ALL RIGHT.  DID I MISS ANY CONDITION THAT

2    ANYBODY WANTED TO DISCUSS?

3          I THINK, AS MR. HARKER SAID, THAT DOES LARGELY

4    TRACK THE CONDITIONS SUGGESTED BY THE GOVERNMENT.

5          MR. HARKER:  I THINK IT DOES, YOUR HONOR.

6    THANK YOU.

7          THE COURT:  ALL RIGHT.

8          MR. HARKER:  YOUR HONOR, IF I MAY?

9          THE COURT:  YES, YOU MAY.

10         MR. HARKER:  I UNDERSTAND THAT THE COURT HAS

11   ONLY ISSUED A PRELIMINARY ORDER AT THIS TIME --

12         THE COURT:  YES.

13         MR. HARKER:  -- AND THAT IT WILL TAKE THE

14   MATTER UNDER ADVISEMENT AND, AS YOUR HONOR SAID, DISCUSS

15   IT WITH THE CLERK.  IF THE COURT DOES ULTIMATELY ENTER

16   THIS ORDER, I'VE BEEN INSTRUCTED TO MOVE THE COURT THAT

17   THE COURT DELAY THE EXECUTION OF THAT ORDER FOR 72 HOURS

18   SO THAT THE UNITED STATES CAN COMPLETE ITS CONSULTATION

19   WITH THE SOLICITOR GENERAL'S OFFICE WHETHER OR NOT TO SEEK

20   AN APPEAL.

21         THE COURT:  I'LL TAKE THAT REQUEST UNDER

22   ADVISEMENT AS WELL.

23         MR. HARKER:  THANK YOU, YOUR HONOR.

24         THE COURT:  I JUST WAS LOOKING AT A SIXTH

25   CIRCUIT DOCKET SHEET EARLIER TODAY, AND THERE'S AN

1    EMERGENCY MOTION THAT'S BEEN PENDING BEFORE THE SIXTH

2    CIRCUIT FOR ABOUT FOUR WEEKS THAT THEY HAVEN'T RULED ON,

3    SO THE ODDS THAT YOU GET A QUICK RULING OUT OF THE SIXTH

4    CIRCUIT ON ANYTHING ARE PRETTY SLIM, BUT CERTAINLY THE

5    GOVERNMENT CAN DO WHATEVER IT DECIDES TO DO IN THAT

6    RESPECT.

7              MR. HARKER:  THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  ANYTHING ELSE?

9              MR. HARKER:  NO, YOUR HONOR.

10             MR. SHIPLEY:  NOTHING FURTHER, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  LET'S KEEP THIS CASE

12   MOVING AND TRY TO GET THIS CASE TRIED IN JULY, AND THAT

13   MAKES THE NECESSARY ARRANGEMENTS THAT NEED TO BE MADE WITH

14   RESPECT TO THESE DEPOSITIONS OF CONSIDERABLE IMPORTANCE,

15   AND SO I'LL LOOK FORWARD TO YOUR STATUS REPORT IN A WEEK

16   ABOUT THE, ABOUT THE STATUS OF THAT.

17             MR. SHIPLEY:  THANK YOU.

18             THE COURT:  ALL RIGHT.  THANK YOU ALL VERY

19   MUCH.  THAT WILL CONCLUDE THE COURT'S HEARING.

20             MR. HARKER:  THANK YOU, YOUR HONOR.

21             THE DEFENDANT:  THANK YOU, YOUR HONOR.

22             THE COURT:  MR. OVERBEY, GOOD TO SEE YOU.

23             MR. OVERBEY:  GOOD TO SEE YOU.

24        (PROCEEDINGS ARE CONCLUDED AT 3:12 P.M.)

25   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

1    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

2

3

    KAREN J. BRADLEY/S                    04/10/2020
4    SIGNATURE OF COURT REPORTER          DATE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25