1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TENNESSEE
2                            GREENEVILLE

3
UNITED STATES OF AMERICA,   .  DOCKET NO. CR-2-19-14
4                                .
          GOVERNMENT,            .
5                                .
            VS.                  .  GREENEVILLE, TN
6                                .  APRIL 9, 2021
XIAORONG YOU,                    .
7                                .
          DEFENDANT.             .
8                                .
.   .   .   .   .   .   .   .   .   .
9

10

11              TESTIMONY OF THOMAS R. MALLEN
              BEFORE THE HONORABLE J. RONNIE GREER
12          UNITED STATES DISTRICT JUDGE, AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   APPEARANCES:

2   FOR THE GOVERNMENT:      U.S. DEPARTMENT OF JUSTICE
                            OFFICE OF U.S. ATTORNEY
3                           TIMOTHY CURTIS HARKER, AUSA
                            220 WEST DEPOT STREET, SUITE 423
4                           GREENEVILLE, TN 37743

5                           U.S. DEPARTMENT OF JUSTICE
                            COMPUTER CRIME AND INTELLECTUAL
6                           PROPERTY SECTION
                            MATTHEW R. WALCZEWSKI, AUSA
7                           950 PENNSYLVANIA AVENUE N.W.
                            ROOM 3509
8                           WASHINGTON, D.C. 20530

9
    FOR THE DEFENDANT:      JESSEE & JESSEE
10                          THOMAS C. JESSEE, ESQ.
                            412 EAST UANAKA AVENUE
11                          JOHNSON CITY, TN 37601

12                          COLLINS SHIPLEY, PLLC
                            COREY B. SHIPLEY, ESQ.
13                          MICHAEL CURTIS COLLINS, ESQ.
                            128 SOUTH MAIN STREET, SUITE 102
14                          GREENEVILLE, TN 37743

15

16

17

18

19

20

21

22  COURT REPORTER:         KAREN J. BRADLEY
                            RPR-RMR
23                          U.S. COURTHOUSE
                            220 WEST DEPOT STREET
24                          GREENEVILLE, TN 37743

25  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER.
```

1    MR. HUNTER:  YOUR HONOR, THE UNITED STATES
2  CALLS TOM MALLEN.
3        THOMAS R. MALLEN, GOVERNMENT'S WITNESS, SWORN
4        THE COURT:  MR. MALLEN, WHILE YOU'RE ANSWERING
5  QUESTIONS, YOU MAY REMOVE THE MASK; AND SPEAK INTO THE
6  MICROPHONE, PLEASE.
7  A.    YES, YOUR HONOR.
8        THE COURT:  YOU MAY PROCEED.
9                     DIRECT EXAMINATION
10  BY MR. HUNTER:
11  Q.    GOOD MORNING, MR. MALLEN.
12  A.    GOOD MORNING.
13  Q.    WOULD YOU STATE AND SPELL YOUR NAME FOR THE RECORD.
14  A.    THOMAS R. MALLEN, T H O M A S, R, M A L L E N.
15  Q.    WHERE DO YOU LIVE?
16  A.    I LIVE IN ZELIENOPLE, PENNSYLVANIA.
17        COURT REPORTER:  WAIT A MINUTE.  WHAT'S THE
18  NAME OF THE TOWN?
19  A.    ZELIENOPLE.  I'LL SPELL IT, ZELIENOPLE,
20  Z E L I E N O P L E.
21  Q.    WHO DO YOU WORK FOR?
22  A.    I WORK FOR SHERWIN-WILLIAMS.
23  Q.    WHAT'S YOUR POSITION AT SHERWIN-WILLIAMS?
24  A.    I'M THE VICE-PRESIDENT OF COMPLIANCE AND TECHNOLOGY
25  MARKETING FOR THE PACKAGING GROUP.

1  Q.    AND ARE YOU FAMILIAR WITH THE COMPANY VALSPAR?

2  A.    YES.

3  Q.    WHAT IS VALSPAR, AND HOW DOES THAT RELATE TO

4  SHERWIN-WILLIAMS?

5  A.    SO IN JUNE 1ST OF 2017 SHERWIN-WILLIAMS ACQUIRED

6  VALSPAR, PART OF WHICH WAS THE PACKAGING GROUP WHICH IS

7  WHERE I WORKED.

8  Q.    AND DID YOU COME OVER WITH THE VALSPAR

9  ACQUISITION?

10  A.    YES.

11  Q.    CAN YOU DESCRIBE YOUR ROLE NOW AT

12  SHERWIN-WILLIAMS?

13  A.    SO I MAKE SURE THAT THE PRODUCTS THAT WE PUT INTO

14  THE MARKETPLACE ARE COMPLIANT WITH ALL REGULATORY AGENCY

15  REQUIREMENTS AROUND THE WORLD, AND I ALSO AS PART OF MY

16  TECHNOLOGY MARKETING ROLE REACH OUT TO STAKEHOLDERS IN

17  SOCIETY AND HELP THEM UNDERSTAND THE BENEFITS OF THE

18  TECHNOLOGY AND ITS CLEARANCES WITH THE REGULATORY

19  AGENCIES.

20  Q.    AND AS PART OF THAT ROLE ARE YOU FAMILIAR WITH THE

21  CHEMISTRIES OF COATING AND COATINGS AND THE DEVELOPMENTS

22  OF COATINGS FOR THE INSIDE OF CANS?

23  A.    YES, I AM.

24  Q.    AND HOW LONG HAVE YOU WORKED AT SHERWIN-WILLIAMS/

25  VALSPAR?

1    A.    THIRTY-TWO AND A HALF YEARS.

2    Q.    DID YOU START WORKING THERE AFTER YOU GOT OUT OF

3    COLLEGE?

4    A.    NO.

5    Q.    WHERE DID YOU WORK AFTER YOU GOT OUT OF COLLEGE?

6    A.    SO I HAD A JOB WORKING FOR ARCHER-DANIELS-MIDLAND,

7    WHICH IS A COMMODITY FOOD MANUFACTURER, AND THEN I WENT TO

8    THE UNIVERSITY OF PITTSBURGH FOR A PH.D. IN ORGANIC

9    CHEMISTRY.  I THEN WORKED FOR CALGON FOR A SHORT PERIOD OF

10   TIME IN THEIR PILOT PLANT AREA.  I THEN WORKED FOR A

11   COUPLE OF COMPANIES THAT WERE WORKING ON SUPER FUND SITES

12   AND USING ANALYTICAL CHEMISTRY TO DETERMINE WHAT KIND OF

13   REMEDIATION WAS NECESSARY ON THESE SUPER FUND SITES.

14   Q.    WHAT'S YOUR HIGHEST LEVEL OF EDUCATION?

15   A.    MASTER'S DEGREE.

16   Q.    WHERE DID YOU GET THAT?

17   A.    DUQUESNE UNIVERSITY.

18   Q.    AND WHAT WAS YOUR BACHELOR'S DEGREE IN?

19   A.    CHEMISTRY.

20   Q.    AND YOUR MASTER'S WAS ALSO IN CHEMISTRY?

21   A.    YES.

22   Q.    WHEN DID YOU START WORKING THEN AT VALSPAR?

23   A.    STARTED WORKING OCTOBER OF 1988.

24   Q.    CAN YOU TAKE US THROUGH THE ROLES AND EXPERIENCES

25   YOU'VE HAD AT VALSPAR SINCE THAT TIME?

1   A.    SURE.

2   Q.    JUST BRIEFLY.

3   A.    SO I STARTED OUT AS A SUPERVISOR IN THE ANALYTICAL

4   LABORATORY GROUP IN PITTSBURGH, I SPENT SEVEN YEARS

5   WORKING ON THOSE ACTIVITIES, INCLUDING SPECIAL PROJECTS

6   WITH CUSTOMERS.  I THEN TRANSFERRED INTO THE RESIN

7   RESEARCH GROUP WHERE I HAD PROJECTS TO DEVELOP NEW

8   CHEMISTRIES FOR RESINS AND POLYMERS THAT WOULD BE USED IN

9   OUR PACKAGING COATINGS.  AFTER A YEAR IN THAT POSITION, I

10  WAS PROMOTED TO THE MANAGER OF THAT POSITION, OF THAT

11  GROUP, AND SUBSEQUENTLY WAS WORKING -- WAS TAKING ON MORE

12  RESPONSIBILITY IN TERMS OF PROCESS ENGINEERING AND PROBLEM

13  SOLVING; AND, AND THEN EVENTUALLY I GOT INTO MANAGING

14  FORMULATING GROUPS, WHICH TOOK THE RESINS OR TOOK OTHER

15  MATERIALS AND, AND FORMULATED THEM INTO COATINGS THAT

16  WOULD ACTUALLY WORK FOR OUR CUSTOMERS.

17  Q.    WHEN YOU TALKED ABOUT SOME OF THE MANAGEMENT THAT

18  YOU'VE DONE, WHAT SORT OF PEOPLE AT SHERWIN-WILLIAMS DO

19  YOU MANAGE?

20  A.    SO IT'S ALL TECHNICAL PEOPLE.  IT GOES FROM

21  TECHNICIANS TO ENGINEERS, CHEMISTS, SCIENTISTS, PEOPLE

22  WITH DOCTORATE DEGREES, AND, AND A LOT OF THEM ARE HIGHLY

23  EXPERIENCED IN THIS FIELD.

24  Q.    DO YOU HAVE ANY PATENTS?

25  A.    YES, I DO.

1  Q.    WHAT ARE THOSE PATENTS IN THE FIELD OF?

2  A.    THERE ARE FIVE, BASICALLY FIVE PATENTS IN THE FIELD

3  OF CHEMISTRY AND POLYMER SCIENCE FOR PACKAGING COATING END

4  PIECES, SUCH AS POLYMERIZATION WITHIN AN EXTRUDER, A TWIN

5  SCREW EXTRUDER; A CHEMISTRY THAT USES ANHYDRIDE, THE

6  ANHYDRIDE CHEMISTRY FUNCTIONALITY TO CURE A COATING

7  WITHOUT THE USE OF EXTERNAL CROSS-LINKING UNITS; SOME

8  OTHER CHEMISTRY SUCH AS A PHENOLIC CHEMISTRY THAT IS VERY

9  APPROPRIATELY USED IN A WATER-BASED COATING SITUATION.

10 Q.    OKAY.  HOW MANY COATINGS, LET ME ASK YOU THIS, HOW

11 MANY COATING FORMULATIONS WOULD YOU SAY YOU'VE WORKED FOR

12 DURING YOUR TIME AT VALSPAR, OR WORKED ON?

13 A.    AT THE BENCH AS A CHEMIST I WOULD HAVE WORKED ON

14 SCORES OF DIFFERENT FORMULATIONS FOR DIFFERENT

15 APPLICATIONS.  IN MY SUBSEQUENT ROLES I WAS WORKING AT A

16 HIGHER LEVEL AND PROBABLY WORKING ON HUNDREDS OF DIFFERENT

17 FORMULATIONS.

18 Q.    IS THERE ANY ASPECT OF THE CHEMISTRY OF CHEMICAL

19 COATINGS, INCLUDING THE POLYMER CHEMISTRY AND THE

20 MANUFACTURING, THAT YOU HAVEN'T WORKED ON IN YOUR OVER 30

21 YEARS AT SHERWIN-WILLIAMS?

22 A.    NO.

23 Q.    DO YOU KNOW THE DEFENDANT, DR. YOU?

24 A.    YES.

25 Q.    HOW DO YOU KNOW HER?

A.    AROUND 2013 SHE STARTED WORKING AT COCA-COLA AS A

PACKAGING DEVELOPMENT ENGINEER, AND SHE WAS NOT IN THE SRA

GROUP, YOU KNOW, THE SCIENCE AND REGULATORY AFFAIRS GROUP,

AND SO HER RESPONSIBILITY WAS TO IDENTIFY PACKAGING THAT

WOULD WORK FOR COCA-COLA'S PRODUCTS, AND SO WE INTERACTED

WITH HER AND HER, HER COLLEAGUES WHEN WE WERE INTRODUCING

OUR NEW NON-BPA TECHNOLOGY TO COCA-COLA.

Q.    DID THAT WORK CAUSE YOU TO MEET DR. YOU IN PERSON?

A.    YES.

Q.    ROUGHLY HOW MANY TIMES DID YOU MEET HER IN PERSON?

A.    I WOULD SAY IT WAS PROBABLY TEN TIMES.

Q.    DO YOU SEE HER HERE IN THE COURTROOM TODAY?

A.    YES.

Q.    WHAT'S SHE WEARING?

A.    SHE'S WEARING, I THINK IT'S A BLACK, A BLACK JACKET

WITH A WHITE SHIRT.

          MR. HUNTER:  YOUR HONOR, IF WE COULD LET THE

RECORD REFLECT THAT THE WITNESS HAS IDENTIFIED DR. YOU.

          THE COURT:  IT MAY.

Q.    NOW, ASIDE FROM YOUR TRAVEL AND LODGING HERE TODAY

HAVE YOU BEEN PAID BY THE GOVERNMENT IN ANY WAY FOR YOUR

TESTIMONY?

A.    NO.

Q.    NOTHING AT ALL?

A.    NO.

1    Q.    WHAT KIND OF COMPANY IS SHERWIN-WILLIAMS, JUST

2    GENERALLY SPEAKING?

3    A.    SO SHERWIN-WILLIAMS IS A LARGE COATINGS COMPANY

4    PREDOMINANTLY IN THE PAINT ARENA.  WE DO MAKE OUR OWN

5    CHEMISTRY PRODUCTS IN SOME CASES.  WE ALSO PURCHASE RAW

6    MATERIALS FROM OTHER VENDORS.

7    Q.    JUST GIVE US A SENSE OF THE DIFFERENT TYPES OF

8    COATINGS THAT SHERWIN-WILLIAMS MAKES.

9    A.    SO CONSUMER PAINTS FOR HOUSING, WOOD FURNISHINGS,

10   AND THEN ALSO FOR OTHER TYPES OF SUBSTRATES THAT A

11   CONSUMER MIGHT WANT TO PAINT, MASONRY AND FLOORS AND OTHER

12   THINGS LIKE THAT.

13         THE INDUSTRIAL SIDE OF THE BUSINESS IS VERY

14   BROAD, SO BESIDES PACKAGING FOR METAL PACKAGING,

15   SHERWIN-WILLIAMS ALSO IS INVOLVED IN AUTOMOTIVE COATINGS,

16   SO COATINGS FOR THE, THE SURFACES ON, ON VEHICLES,

17   OFF-ROAD VEHICLES, SUCH AS CONSTRUCTION EQUIPMENT, FARM

18   EQUIPMENT; APPLIANCES, AND SO, FOR INSTANCE, WASHERS,

19   DRYERS, REFRIGERATORS.

20   Q.    DO ALL OF THOSE DIFFERENT COATINGS HAVE DIFFERENT

21   REQUIREMENTS AND DIFFERENT SCIENCE THAT GOES INTO CREATING

22   THEM?

23   A.    EXTREMELY DIFFERENT, YES.

24   Q.    WHAT ARE SOME OF THE MOST HIGH-TECH COATINGS THAT

25   SHERWIN-WILLIAMS DEVELOPS?

1  A.    WELL, OUR NON-BPA COATINGS IN PACKAGING ARE SOME OF

2  THE MOST CHALLENGED AND VALUABLE MATERIALS THAT ARE IN OUR

3  BUSINESS.

4  Q.    AND YOU MENTIONED EARLIER THE DIFFERENT TYPES OF

5  PEOPLE YOU MANAGED, PH.D SCIENTISTS, BACHELOR SCIENTISTS,

6  DO YOU NEED THOSE KIND OF PEOPLE TO CREATE THOSE BPA-FREE

7  COATINGS?

8  A.    YES.

9  Q.    HOW MANY EMPLOYEES -- LET ME ASK YOU THIS FIRST,

10  WHERE IS SHERWIN-WILLIAMS' CORPORATE HEADQUARTERS?

11  A.    CLEVELAND, OHIO.

12  Q.    DO YOU HAVE ANY MANUFACTURING SITES IN TENNESSEE?

13  A.    YES, I BELIEVE THERE ARE THREE PAINT SITES IN

14  TENNESSEE.

15  Q.    AND ROUGHLY HOW MANY WORLDWIDE EMPLOYEES DOES

16  SHERWIN-WILLIAMS HAVE?

17  A.    I THINK IT'S 61,000.

18  Q.    HOW MANY OF THOSE ARE IN THE UNITED STATES?

19  A.    I THINK IT'S SOMETHING LIKE 45,000.

20  Q.    AND WHO ARE SHERWIN-WILLIAMS' COMPETITORS?

21  A.    SO THERE ARE LARGE COMPETITORS AND SMALL COMPETI-

22  TORS.  THE LARGER COMPETITORS ARE PPG AND AKZO-NOBEL.  THE

23  SMALLER COMPETITORS WOULD BE METLAC AND ACTEGA.

24  Q.    ARE THOSE COMPETITORS IN THE VALUE CHAIN WHEN WE

25  TALK ABOUT FORMULATORS FOR COATINGS?

1  A.    PRINCIPALLY, ALTHOUGH PPG AND AKZO DO HAVE ALSO SOME

2  MANUFACTURING CAPABILITY TOO, I MEAN POLYMER MANUFACTURING

3  CAPABILITY.

4  Q.    WHAT'S SHERWIN-WILLIAMS' ANNUAL REVENUE ROUGHLY?

5  A.    EIGHTEEN BILLION.

6  Q.    WHAT IS THE BRAND NAME OF SHERWIN-WILLIAMS' LINE OF

7  BPA-FREE PRODUCTS FOR THE INSIDE OF CANS?

8  A.    IT'S CALLED VALPURE.

9  Q.    HAVE THERE BEEN DIFFERENT VERSIONS OF VALPURE THAT

10 HAVE BEEN DEVELOPED BY SHERWIN-WILLIAMS?

11 A.    YES, DIFFERENT FORMULATIONS.

12 Q.    WHAT ARE THOSE DIFFERENT FORMULATIONS CALLED?

13 A.    SO EACH APPLICATION REQUIRES ITS OWN SPECIFIC

14 FORMULATION.  IF A CAN IS SPRAYED, IT WOULD BE GIVEN A

15 CERTAIN TYPE OF FORMULATION.  IF A COATING HAS TO BE

16 APPLIED BY A ROLL, IT WOULD BE, AGAIN, DIFFERENT.

17 Q.    LET'S JUST GO BY A NAME.  ARE YOU FAMILIAR WITH A

18 COATING CALLED V30?

19 A.    V30, V60, V70, YES, THOSE ARE ALL DIFFERENT VERSIONS

20 OF, OF VALPURE.

21 Q.    WHAT IS V30?

22 A.    SO V30 WOULD BE WHAT WE WOULD CALL A FIRST

23 GENERATION POLYESTER.

24 Q.    AND WHAT IS V40?

25 A.    V40 WAS A, OR IS AN ACRYLIC.

1  Q.    WHAT IS V70?

2  A.    V70 IS THE NON-BPA EPOXY.

3  Q.    DO YOU CLASSIFY THOSE DIFFERENT COATINGS INTO

4  DIFFERENT GENERATIONS?

5  A.    YES.

6  Q.    HOW DO YOU DO THAT, WHICH GENERATION DO THOSE

7  DIFFERENT COATINGS, V30, V40 AND V70, FALL INTO?

8  A.    SO V30 IS A FIRST GENERATION, TYPICALLY A POLYESTER,

9  OR A POLYESTER FIRST GENERATION.  V40 MIGHT BE CALLED A

10  GENERATION ONE AND A HALF, DEPENDS ON WHO YOU TALK TO, AND

11  THEN V70 IS DEFINITELY RECOGNIZED AROUND THE INDUSTRY AS A

12  GENERATION TWO.

13  Q.    WHAT, WHAT'S THE SIGNIFICANCE OF A GENERATION TWO

14  COATING LIKE V70, WHAT DOES THAT MEAN?

15  A.    SO NOT ONLY -- AND THIS IS SORT OF DERIVED FROM

16  COCA-COLA'S NOMENCLATURE AT THE TIME, ALTHOUGH THEY'VE

17  TRIED TO DISTANCE THEMSELVES FROM THIS, I THINK.  THE

18  FIRST GENERATION WERE MATERIALS THAT COULD BE USED TO

19  REPLACE BISPHENOL A EPOXIES TO COMPLY WITH CONSUMER AND

20  REGULATORY PRESSURE ON BPA, BUT THEY HAD SHORTCOMINGS.

21  THEY, THEY HAD CERTAIN PERFORMANCE ISSUES THAT WOULD

22  COMPROMISE THEIR LONG-TERM PERFORMANCE.

23        GENERATION TWO SOUGHT TO OVERCOME AND RECTIFY

24  THOSE SHORTCOMINGS SO THAT THE PERFORMANCE WAS REALLY

25  GETTING US BACK TO THE POINT WHERE WE HAD WITH BPA-BASED

1    EPOXIES.

2    Q.    AND HOW LONG DID IT TAKE SHERWIN-WILLIAMS TO DEVELOP

3    THAT V70 GENERATION TWO COATING?

4    A.    IT TOOK US ABOUT TEN YEARS.

5    Q.    NOW, ARE YOU FAMILIAR WITH -- DID YOU PARTICIPATE IN

6    THAT INTERACTION, THAT BUSINESS BETWEEN SHERWIN-WILLIAMS

7    AND COKE?

8    A.    SOME OF IT, YES.

9    Q.    WHAT TIME PERIOD WERE YOU INVOLVED IN THAT

10   RELATIONSHIP?

11   A.    WELL, FROM 2013 TO 2017.

12   Q.    AND WHAT WAS THE PURPOSE OF SHERWIN-WILLIAMS

13   ENGAGING IN THAT WITH COKE?

14   A.    SO WE NEEDED TO GIVE THEM ALL THE INFORMATION THAT

15   THEY NEEDED TO BE ABLE TO COME TO THE CONCLUSION THAT THIS

16   MATERIAL WAS SOMETHING THAT COULD BE OF GREAT BENEFIT TO

17   COCA-COLA AND THAT THEY SHOULD WORK TOWARDS QUALIFYING IT

18   FOR THEIR PRODUCTS.

19   Q.    WAS THAT IMPORTANT FOR SHERWIN-WILLIAMS' BUSINESS?

20   A.    EXTREMELY IMPORTANT.

21   Q.    WHY, WHY WAS IT SO IMPORTANT?

22   A.    WELL, NOT ONLY IS COCA-COLA ONE OF THE LARGEST USERS

23   OF COATED CANS FOR THEIR PRODUCT, THEY'RE SO BIG THAT THE

24   IMPACT ON THE REST OF THE SUPPLY CHAIN, THE CAN MANUFAC-

25   TURING SUPPLY CHAIN, WAS, YOU KNOW, VERY STRONG, AND IT

1    JUST TRENDED TO GO THE WAY THAT COCA-COLA WANTED IT TO GO.

2    Q.    AND WHAT WERE THE NATURE OF THE DISCLOSURES -- WERE

3    YOU MAKING THOSE DISCLOSURES BEFORE THE DEFENDANT WAS

4    INVOLVED WITH THOSE PRODUCTS, WITH THE PROJECT?

5    A.    ONLY TO THE SRA GROUP.

6    Q.    AND WHAT WERE THE NATURE OF THE DISCLOSURES THAT

7    SHERWIN-WILLIAMS WOULD MAKE TO THE SRA GROUP AT COKE?

8    A.    SO THE SRA GROUP REQUIRED AN MCARF, MATERIAL

9    COMPOSITION -- MCARF, I FORGET WHAT THE REST OF THE

10   ACRONYM STANDS FOR.  BASICALLY IT'S A DISCLOSURE OF THE

11   INDIVIDUAL COMPONENTS OF A COATING, AND IT WOULD NOT

12   CONTAIN PERCENTAGES, IT WOULD ONLY CONTAIN THE NAMES OF

13   THOSE CHEMICALS AND THEIR CAS NUMBER, THE C-A-S NUMBER.

14   Q.    ARE THOSE MCARF DISCLOSURES, THOSE LIST OF

15   MATERIALS, ARE THOSE VALUABLE, IS THAT VALUABLE

16   INFORMATION TO SHERWIN-WILLIAMS?

17   A.    EXTREMELY VALUABLE BECAUSE IT DISCLOSES TRADE

18   SECRETS, NOT JUST THAT WE ARE USING THESE CERTAIN

19   MATERIALS, BUT IT ALSO SAYS WE ARE NOT USING A WHOLE HOST

20   OF OTHER MATERIALS.

21   Q.    AND WERE THOSE DISCLOSURES TO THE SRA GROUP MADE

22   PURSUANT TO A NON-DISCLOSURE AGREEMENT?

23   A.    YES.

24   Q.    WHAT DID THAT NON-DISCLOSURE AGREEMENT REQUIRE COKE

25   TO DO?

1 A. THE NON-DISCLOSURE AGREEMENT WITH THE SRA GROUP

2 PROHIBITED THEM FROM SHARING THAT INFORMATION WITH ANYBODY

3 ELSE WITHIN COCA-COLA, AND SO IT CREATED A FIREWALL, AND

4 SO THEY, THEY WERE PROHIBITED FROM, FROM REVEALING OR

5 DISCLOSING ANY OF THIS INFORMATION TO ANYBODY ELSE WITHIN

6 COCA-COLA.

7 Q. NOW, WHEN THE DEFENDANT CAME AND STARTED WORKING ON

8 THIS PROJECT, WHAT CHANGED?

9 A. SO SHE WAS OBVIOUSLY VERY, VERY INTERESTED IN THE

10 CHEMISTRY TO THE EXCLUSION OF THE PERFORMANCE OF THE

11 COATING, WHICH WAS A STEP CHANGE, A MAJOR STEP CHANGE

12 FROM, FROM PEOPLE THAT HELD THAT POSITION BEFOREHAND.

13 Q. AND WHAT WAS THAT ADDITIONAL INFORMATION THAT YOU'RE

14 SUGGESTING SHE WANTED?

15 A. WELL, SHE OFTEN MADE CLAIMS THAT SHE WAS A POLYMER

16 CHEMIST AND THAT SHE KNEW MORE ABOUT POLYMER CHEMISTRY

17 THAN WE DID AND THAT WE NEEDED TO REVEAL OUR CHEMISTRY TO

18 HER SO THAT SHE COULD KNOW WHETHER THE MATERIAL WAS GOING

19 TO BE WORTH LOOKING AT OR NOT.

20 Q. DID THE DEFENDANT EVER MAKE ANY CLAIMS ABOUT WHERE

21 YOU WERE WITH RESPECT TO YOUR COMPETITORS?

22 A. SHE WOULD SAY, YOU KNOW, ALMOST VERY FREQUENTLY THAT

23 WE WERE BEHIND OUR COMPETITORS AND WE WERE -- THE REASON

24 FOR THAT WAS THAT WE WERE NOT REVEALING THIS INFORMATION.

25 Q. DID YOU KNOW WHETHER THAT WAS TRUE AS A MATTER OF

1    FACT?

2    A.    THE MARKET, THE ACTIVITY IN THE MARKET CONTRADICTED

3    THAT, AND SO WE -- I FELT THAT IT WAS A WAY TO TRY TO

4    LEVERAGE US AND TO EXTRACT THAT INFORMATION THAT AT THAT

5    POINT AT LEAST SHE WAS NOT ABLE TO GET OUT OF THE SRA

6    GROUP.

7    Q.    WHAT DO YOU MEAN BY THE WORD "LEVERAGE" YOU?

8    A.    THREATEN US.

9    Q.    AND THREATEN YOU IN WHAT WAY, WHAT WOULD HAVE

10   HAPPENED IF YOU DIDN'T PROVIDE THE INFORMATION THE

11   DEFENDANT WANTED?

12   A.    THEN SHE WAS GOING TO STOP ANY QUALIFICATIONS OF OUR

13   MATERIAL OR PROHIBIT THEM FROM EVER OCCURRING.

14   Q.    AND WHAT WOULD HAVE BEEN THE RESULT OF THAT FOR

15   SHERWIN-WILLIAMS?

16   A.    WELL, IT WOULD HAVE BEEN DEVASTATING BECAUSE THIS

17   TECHNOLOGY, THE VALPURE TECHNOLOGY, WOULD NOT HAVE BEEN

18   ADOPTED THE WAY IT, IT TURNS OUT IT HAS BEEN.

19   Q.    SO WHEN THE DEFENDANT STARTED MAKING THESE THREATS,

20   WHAT DID YOU DO?

21   A.    SO I TALKED TO MY MANAGEMENT, AND I SAID, THERE'S,

22   THERE'S SOME KIND OF AN ANOMALY GOING ON HERE THAT THERE'S

23   BEEN A SEA CHANGE IN THE BEHAVIOR OF THE GROUP THAT'S

24   RESPONSIBLE FOR QUALIFYING THIS PACKAGING, AND --

25   Q.    LET ME ASK YOU BEFORE YOU CONTINUE, DID YOU

1    INITIALLY REFUSE TO PROVIDE?

2    A.    ABSOLUTELY.

3    Q.    AND THIS IS -- WHAT WERE YOU REFUSING TO PROVIDE AT

4    THAT POINT?

5    A.    THE, ANY KIND OF A LIST OF THE CHEMICALS OR A MORE

6    IN-DEPTH DESCRIPTION OF THE CHEMISTRY THAT'S USED IN THESE

7    COATINGS.

8    Q.    WHEN YOU SAY "MORE IN-DEPTH CHEMISTRY", DID THAT

9    INCLUDE INFORMATION WITH INGREDIENTS AND AMOUNTS OF

10   INGREDIENTS?

11   A.    YES.

12   Q.    OKAY.  CONTINUE, YOU WERE DESCRIBING WHAT YOU DID

13   AFTER YOU REFUSED INITIALLY.

14   A.    SO WE -- I REFUSED, AND I, I LET MY MANAGEMENT KNOW

15   WHAT THE SITUATION WAS, AND WE STARTED TO TRY TO FIGURE

16   OUT IF THERE WAS A WAY TO GET SHANNON YOU SOME INFORMATION

17   THAT MIGHT, YOU KNOW, HELP HER COME TO A POSITIVE

18   CONCLUSION, AND IT JUST DIDN'T APPEAR TO US THAT WE WERE

19   EVER GOING TO BE ABLE TO SATISFY HER WITHOUT A FULL

20   DISCLOSURE OF THE INFORMATION, WHICH WE COULDN'T DO.

21   Q.    DO YOU REMEMBER ANY SPECIFIC THREATS THAT THE

22   DEFENDANT MADE OR ANY SPECIFIC DISCUSSIONS ABOUT PROVIDING

23   THIS INFORMATION THAT YOU INITIALLY DIDN'T, DID NOT WANT

24   TO PROVIDE?

25   A.    YES.  I MEAN, AT, AT ONE MEETING AND -- IN ATLANTA,

1    AT ANOTHER MEETING IN PITTSBURGH, AND A DINNER IN ATLANTA

2    ONE TIME, SHE BASICALLY SAID THAT WE, WE WERE BEHIND OUR

3    COMPETITION AND WE WERE NOT GOING TO BE APPROVED IF WE

4    DIDN'T GIVE UP THIS INFORMATION.

5    Q.    WHAT WERE THE NATURE OF THOSE DISCUSSIONS, WERE THEY

6    PLEASANT DISCUSSIONS WITH THE DEFENDANT?

7    A.    NO, THEY WERE TENSE.

8    Q.    TENSE IN WHAT WAY?

9    A.    WE STARTED TRYING TO PROBE, OBVIOUSLY, WE WEREN'T

10   GOING TO GIVE HER THE INFORMATION, WE STARTED TO PROBE AS

11   TO WHY SHE NEEDED THAT INFORMATION, AND WHAT SHE SAID WAS

12   THAT, AGAIN, YOU KNOW, SHE WAS A POLYMER CHEMIST WHO KNEW

13   MORE ABOUT COATINGS THAN WE DID AND THAT SHE WAS HELPING

14   OUR COMPETITION, BY HER ADVICE SHE WAS HELPING OUR

15   COMPETITION ACHIEVE BETTER PERFORMANCE, AND THAT SHE

16   WANTED TO DO THE SAME THING FOR US, BUT SHE COULDN'T DO

17   THAT UNLESS WE WERE MORE OPEN.

18   Q.    SO SHE JUST WANTED TO HELP SHERWIN-WILLIAMS?

19   A.    THAT'S -- THAT WAS HER STORY, YES.

20   Q.    DID YOU HAVE ANY REASON TO BELIEVE THAT THE

21   DEFENDANT WAS ACTING AT THE REQUEST OF HER SUPERVISORS AT

22   COKE OR ANYONE ELSE AT COKE IN MAKING THESE REQUESTS FOR

23   THE RECIPE INFORMATION, THE MORE DETAILED INFORMATION AT

24   SHERWIN-WILLIAMS?

25   A.    WE KNOW THAT HER SUPERVISOR YU SHI WAS INVOLVED AND

1    THAT SHE HAD VISITED OUR TECHNICAL CENTER IN PITTSBURGH

2    TOGETHER WITH SHANNON YOU, AND THEY WERE BOTH PUTTING

3    PRESSURE ON US TO REVEAL THE TECHNOLOGY, THE CHEMISTRY OF

4    THE TECHNOLOGY.

5    Q.    AND WHAT HAPPENED THEN, HOW DID VALSPAR/

6    SHERWIN-WILLIAMS DETERMINE WHETHER TO PROVIDE THIS

7    INFORMATION TO COKE AND THE DEFENDANT?

8    A.    SO WE HAD CONVERSATIONS WITH OUR CHIEF TECHNICAL

9    OFFICER, CYNTHIA ARNOLD.

10   Q.    WHEN YOU SAY "CHIEF TECHNICAL OFFICER", JUST HOW

11   HIGH UP OF A PERSON IS THAT AT SHERWIN-WILLIAMS?

12   A.    SHE REPORTS TO THE CEO.

13   Q.    GO AHEAD.

14   A.    AND SHE JUST MADE THE DECISION TO HAVE ANOTHER

15   CONFIDENTIAL, CONFIDENTIAL DISCLOSURE AGREEMENT SET UP

16   WHERE NAMED INDIVIDUALS, LIKE SHANNON YOU AND YU SHI,

17   WOULD HAVE ACCESS TO THIS INFORMATION THAT WE WOULD, WE

18   WOULD GIVE THEM WHERE IT WAS OBVIOUSLY EVERY, YOU KNOW,

19   EVERYTHING WAS UNDER THE DISCLOSURE AND WAS ONLY TO BE

20   USED FOR PURPOSES OF QUALIFYING THESE COATINGS, NO OTHER

21   USE WAS ALLOWED.

22   Q.    SO DO I UNDERSTAND YOU RIGHT, YOU HAD A NON-

23   DISCLOSURE IN PLACE ALREADY WITH COKE FOR THE SRA

24   PURPOSES; IS THAT RIGHT?

25   A.    YES.

1  Q.    SO BECAUSE OF THESE NEW REQUESTS FROM THE DEFENDANT

2  YOU AMENDED THAT DISCLOSURE AGREEMENT TO BE MORE

3  PROTECTIVE, IS THAT FAIR?

4  A.    TO, AND TO INCLUDE THE TWO PEOPLE I MENTIONED, YES.

5  Q.    YOU SPECIFICALLY NAMED THOSE TWO PEOPLE?

6  A.    YES.

7  Q.    IS IT UNUSUAL TO TAKE THIS SORT OF BUSINESS DECISION

8  UP TO THE CHIEF TECHNOLOGY OFFICER OF SHERWIN-WILLIAMS?

9  A.    IT'S HIGHLY UNUSUAL.

10  Q.    HAVE YOU EVER DONE IT BEFORE TO GET A, REQUESTED TO

11  SHARE INFORMATION?

12  A.    NO.

13          MR. HUNTER:  YOUR HONOR, I SEE IT'S PAST 10:30,

14  THIS MIGHT BE A GOOD TIME.

15          THE COURT:  IF THIS IS A GOOD POINT, WE'LL TAKE

16  A MORNING BREAK.

17          LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK, AND

18  WE'LL RESUME AS SOON AS YOU CAN BE BROUGHT BACK UP TO THE

19  COURTROOM.

20      (RECESS AT 10:35 A.M., UNTIL 10:57 A.M.)

21      (JURY PRESENT)

22          THE COURT:  ALL RIGHT.  MR. HUNTER, YOU MAY

23  PROCEED.

24  BY MR. HUNTER:

25  Q.    MR. MALLEN, YOU'RE STILL UNDER OATH.

1        COULD WE PULL UP EXHIBIT 5F FOR THE WITNESS

2   ONLY, PLEASE.

3        MR. MALLEN, DO YOU RECOGNIZE THIS DOCUMENT?

4   YOU ALSO HAVE HARD COPIES OF THESE EXHIBITS AVAILABLE TO

5   YOU IF YOU'D RATHER LOOK AT THEM.

6   A.   OKAY.  THANK YOU.

7   Q.   CAN YOU READ THAT OKAY?

8   A.   THAT'S BETTER.  YES.

9        MR. HUNTER:  AND JUST SCROLL DOWN A LITTLE BIT,

10  COUPLE OF PAGES HERE.

11  Q.   WE JUST SCROLLED THROUGH THAT DOCUMENT.  IT APPEARS

12  TO CONTAIN MULTIPLE DOCUMENTS TOGETHER.  DO YOU RECOGNIZE

13  THOSE DOCUMENTS?

14  A.   YES.

15  Q.   WHAT ARE THEY?

16  A.   SO I BELIEVE THIS IS THE AMENDMENT TO --

17  Q.   WHAT IS THE TOTALITY OF ALL THE DOCUMENTS?

18  A.   THEY'RE CONFIDENTIALITY DISCLOSURE AGREEMENTS WITH

19  COCA-COLA.

20       MR. HUNTER:  YOUR HONOR, AT THIS TIME THE

21  GOVERNMENT MOVES TO PUBLISH AND ADMIT EXHIBIT 5F.

22       THE COURT:  5F IS ADMITTED AND MAY BE

23  PUBLISHED.

24  Q.   NOW, WHAT IS THE PURPOSE OF THESE DOCUMENTS, THESE

25  NON-DISCLOSURE AGREEMENTS BETWEEN COKE AND

1    SHERWIN-WILLIAMS?

2    A.    SO IT DECLARES THAT CONFIDENTIAL INFORMATION IS --

3    WE'RE PLANNING TO, AT THIS TIME IT WAS TVC, THE VALSPAR

4    CORPORATION, WAS GOING TO DISCLOSE TO COCA-COLA SENSITIVE

5    AND CONFIDENTIAL INFORMATION AND THEIR OBLIGATIONS

6    THEREUNDER.

7    Q.    WHAT KIND OF OBLIGATIONS DID COKE HAVE UNDER THIS

8    AGREEMENT, THESE AGREEMENTS?

9    A.    SO THEY WERE PROHIBITED FROM DISCLOSING TO A THIRD

10   PARTY EXCEPT UNDER CERTAIN CONDITIONS.  THEY WERE TO USE

11   IT ONLY FOR THE PURPOSES OF WHATEVER THEIR FUNCTION WAS.

12   Q.    AND UNDER THESE AGREEMENTS WAS THERE ANY LEGITIMATE

13   REASON WHATSOEVER FOR ANY COKE EMPLOYEE TO HAVE

14   SHERWIN-WILLIAMS' INFORMATION AFTER LEAVING COKE?

15   A.    NO.

16   Q.    IF YOU'LL LOOK AT PAGE 5 OF THIS AGREEMENT.

17              CAN YOU ZOOM IN THE TOP.

18              DO YOU SEE THAT?

19   A.    YES.

20   Q.    WHAT IS THIS, WHAT IS THIS PAGE?

21   A.    SO IT'S AN AMENDMENT TO THE NON-DISCLOSURE

22   AGREEMENT, AND IT'S DATED JUNE 27, 2013.

23              MR. HUNTER:  CAN YOU ZOOM IN ON PARAGRAPH A.

24   Q.    WHAT IS THE PURPOSE OF PARAGRAPH A?

25   A.    SO THIS PARAGRAPH DESCRIBES THE INFORMATION THAT

1  WOULD BE AVAILABLE AND SUBMITTED TO PEOPLE WITHIN THE
2  SCIENTIFIC AND REGULATORY AFFAIRS GROUP, THE SRA GROUP.
3  Q.    AND CAN YOU READ THIS PART STARTING, WHO SHALL USE.
4  A.    SO IT SAYS -- IT LOOKS LIKE IT'S CROSSED OUT NOW, I
5  CAN'T READ THROUGH THE RED.
6            YEAH.
7  Q.    WHO SHALL USE, AND JUST READ THE REST OF THAT
8  SENTENCE.
9  A.    SO THEY DO HAVE THE RIGHT TO DISCLOSE THE
10  FORMULATION INFORMATION TO A REGULATORY, A GOVERNMENT
11  REGULATORY BODY STRICTLY FOR PURPOSES OF --
12  Q.    I'M JUST SAYING CAN YOU READ, WHO SHALL USE THE
13  FORMULATION INFORMATION, DO YOU SEE THAT?
14  A.    THE COCA-COLA COMPANY.
15  Q.    WELL, CAN YOU READ THAT, THAT PHRASE RIGHT THERE,
16  YOU SEE WHERE IT SAYS, WHO SHALL USE THE FORMULATION
17  INFORMATION ONLY FOR REGULATORY PURPOSES?
18  A.    YES.
19  Q.    WHAT'S THE MEANING OF THAT, OF THAT PHRASE?
20  A.    SO THIS, THIS INFORMATION IS USED BY COCA-COLA TO
21  ASSESS THE REGULATORY STATUS AROUND THE WORLD OF A COATING
22  THAT IS COMPOSED OF CERTAIN SUBSTANCES.
23            MR. HUNTER:  COULD YOU ZOOM IN ON PARAGRAPH B.
24  Q.    CAN YOU JUST READ THE FIRST SENTENCE OF PARAGRAPH B.
25  A.    TO ALLOW THE COCA-COLA COMPANY TO VALIDATE THE FILM

1  PERFORMANCE PROPERTIES OF CERTAIN VALSPAR CORPORATION BPA

2  NON-INTENT COATING COMPOSITIONS.  IT IS ALSO ANTICIPATED

3  THAT THE VALSPAR CORPORATION WILL DISCLOSE FORMULATION

4  INFORMATION, INCLUDING CURED FILM SAMPLES, TO THE

5  COCA-COLA COMPANY PERSONNEL YU SHI AND SHANNON YOU.

6  Q.    OKAY.  IF YOU'LL STOP RIGHT THERE.  WHY IS THAT

7  PARAGRAPH SEPARATE FROM THE PREVIOUS, PREVIOUS PARAGRAPH?

8  A.    I'M PRESUMING BECAUSE THEY WERE NOT INCLUDED IN THE

9  LISTING OF THE SRA PEOPLE SINCE THEY DON'T WORK, OR DID

10 NOT WORK IN THAT FUNCTION, AND IT, IT SPECIFICALLY STATES

11 WHAT KIND OF INFORMATION WOULD BE DISCLOSED TO THEM.

12 Q.    DID YOU TRUST THAT THIS NDA WOULD ENSURE THAT

13 SHERWIN-WILLIAMS' CONFIDENTIAL INFORMATION WOULD STAY AT

14 COKE?

15 A.    I DID, YES.

16 Q.    NOW, WHEN YOU WOULD SEND INFORMATION TO COKE OR TO

17 THE DEFENDANT, WOULD YOU REMIND THEM OF OBLIGATIONS UNDER

18 THESE NON-DISCLOSURE AGREEMENTS?

19 A.    YES.  WE WOULD MARK THE INFORMATION AS CONFIDENTIAL

20 PER THIS AGREEMENT.

21 Q.    DO YOU REMEMBER THE DEFENDANT EVER CONTESTING ANY OF

22 THAT MARKINGS AND, NO, THIS ISN'T CONFIDENTIAL, WHY ARE

23 YOU MARKING IT THAT WAY?

24 A.    NO.

25 Q.    DID YOU EVER HAVE A DISPUTE ABOUT THAT, WHETHER YOU

1  WERE IMPROPERLY USING CONFIDENTIALITY DESIGNATIONS WITH

2  THE DEFENDANT?

3  A.    NO.

4  Q.    DID YOU EVER RECLASSIFY A CONFIDENTIAL DOCUMENT

5  BASED ON AN INTERACTION WITH THE DEFENDANT SAYING IT

6  WASN'T ACTUALLY CONFIDENTIAL?

7  A.    NO.

8  Q.    NOW, DESCRIBE HOW THIS -- SO THIS -- IS THIS THE

9  NDA, THE ONE WE JUST LOOKED AT, THE AMENDMENT YOU REFERRED

10  TO EARLIER WHEN THE DEFENDANT WAS ASKING FOR MORE

11  INFORMATION THAT YOU TALKED WITH THE CTO ABOUT SIGNING?

12  A.    YES.

13  Q.    SO THIS GETS SIGNED, WHAT HAPPENS THEN?

14  A.    SO THEN WE -- WHENEVER WE WERE HAVING MEETINGS WITH

15  THE DEFENDANT OR CONVERSATIONS OVER E-MAIL, WHENEVER THE,

16  THE REQUEST CAME IN, WE WOULD EVALUATE IT AS TO WHETHER IT

17  WAS IN COMPLIANCE WITH THIS AGREEMENT, AND WE WOULD MARK

18  IT UP AND SEND IT TO HER, PRESENT IT TO HER.

19  Q.    WERE YOUR INTERACTIONS AFTER THIS AGREEMENT WERE

20  SIGNED, DID YOUR OTHERWISE CONTENTIOUS INTERACTIONS BECOME

21  FRIENDLY AT THAT POINT?

22  A.    I WOULD SAY NOT.  SHE CONTINUED TO ASK FOR EVEN MORE

23  INFORMATION THAN WE FELT WAS COVERED BY THIS AGREEMENT,

24  AND SO WE DECLINED TO PROVIDE THAT INFORMATION TO OUR

25  SALES OR MARKETING PEOPLE, WHICH THEN WOULD ESCALATE THE

1    CONVERSATION.

2    Q.    DID YOU COME TO LEARN THAT THE DEFENDANT HAD LEFT

3    COKE?

4    A.    YES.

5    Q.    WHERE DID YOU COME TO LEARN THAT SHE WENT AFTER

6    LEAVING COKE?

7    A.    I THINK SHE CONTACTED OUR RESEARCH, OUR VP OF

8    RESEARCH FOR PACKAGING, ALEX KRUGLOV, WHEN WE WERE SITTING

9    IN A MEETING TOGETHER, AND HE HAD RECEIVED EITHER AN

10   E-MAIL OR A TEXT MESSAGE STATING THAT SHE WAS LEAVING COKE

11   AND WOULD BE INTERESTED IN PURSUING A JOB AT, AT SHERWIN

12   AT THAT TIME.

13   Q.    AND DID SHE END UP GETTING A JOB AT

14   SHERWIN-WILLIAMS?

15   A.    NO.

16   Q.    WHERE DID SHE GO?

17   A.    SHE WENT TO EASTMAN CHEMICAL.

18   Q.    WHEN YOU CAME TO LEARN SHE WENT TO EASTMAN CHEMICAL,

19   WHAT DID YOU DO?

20   A.    WELL, WE HAD A CONVERSATION INTERNALLY, AND WE

21   DECIDED THAT WE SHOULD SEND A LETTER TO EASTMAN REMINDING

22   THEM OF HER OBLIGATION ACCORDING TO THIS AMENDED

23   DECLARATION.

24   Q.    IS THAT COMMON TO SEND A LETTER TO AN EMPLOYER OF

25   SOMEONE WHO WAS NEVER ACTUALLY AN EMPLOYEE OF

1  SHERWIN-WILLIAMS REMINDING THEM OF CONFIDENTIALITY

2  APPLICATIONS?

3  A.    I'VE NEVER KNOWN IT TO HAPPEN.

4  Q.    DID YOU RECEIVE FILES FROM THE FBI AT SOME POINT IN

5  2018?

6  A.    YES.

7  Q.    WHAT DID THE FBI TELL YOU ABOUT THOSE FILES?

8  A.    THAT THEY WERE VALSPAR/SHERWIN-WILLIAMS RELATED

9  DOCUMENTS THAT WERE FOUND IN THE POSSESSION OF SHANNON

10  YOU.

11  Q.    AND IN FRONT OF YOU YOU SHOULD HAVE EXHIBITS MARKED

12  28A THROUGH 28N.

13  A.    YES, SIR.

14  Q.    CAN YOU HOLD THOSE UP SO THE JURY CAN GET A CHANCE

15  TO LOOK AT THEM REAL QUICK.

16  A.    (WITNESS COMPLIES).

17  Q.    AND ARE THOSE THE DOCUMENTS THAT YOU REVIEWED THAT

18  WERE PROVIDED BY THE FBI?

19  A.    YES.

20  Q.    WHAT -- WHEN YOU TOOK A LOOK, WHEN THE FBI PROVIDED

21  THOSE DOCUMENTS TO YOU, WHAT, WHAT WERE YOU DOING, WHAT

22  WAS YOUR INTENT IN LOOKING AT THOSE DOCUMENTS?

23  A.    TRYING TO ASCERTAIN HOW MUCH OF THIS INFORMATION

24  WAS, YOU KNOW, TRADE SECRET INFORMATION VERSUS OTHERWISE

25  DISCLOSED INFORMATION TO MAKE SURE THAT EVERYTHING HAD A,

1    A STAMP ON IT THAT CLAIMED THAT IT WAS CONFIDENTIAL AND

2    TRY TO UNDERSTAND AT WHAT POINT WOULD SHE HAVE BEEN, WOULD

3    SHE HAVE ACCESSED THIS INFORMATION.

4    Q.    CAN YOU JUST SUMMARIZE IN A COUPLE OF FEW SENTENCES

5    WHAT INFORMATION IS CONTAINED IN THOSE DOCUMENTS MARKED

6    23A THROUGH N.

7    A.    SO IN SOME CASES THE INFORMATION IS A REVIEW OF

8    INFORMATION THAT'S ALREADY IN THE PUBLIC DOMAIN, SUCH AS

9    THE, THE MONOMER FOR MAKING A NON-BPA EPOXY, WHICH WE

10   FREELY DISCLOSED, AND THE POLYMER THAT WOULD BE MADE FROM

11   THAT.  IN OTHER CASES IT'S INFORMATION THAT IS KEPT AS A

12   TRADE SECRET AND NOT DISCLOSED TO EVEN PEOPLE

13   INTERNALLY.

14   Q.    I MISSPOKE EARLIER.  I SAID EXHIBIT 23A, IT'S

15   ACTUALLY 28A THROUGH N; CORRECT?

16   A.    28A THROUGH N.

17   Q.    WHAT BRAND OF COATING DID THIS INFORMATION RELATE

18   TO?

19   A.    SO VALPURE MATERIALS WHICH WOULD INCLUDE BEVERAGE

20   COATINGS FOR BEVERAGE CANS.

21   Q.    AND WHEN SHERWIN-WILLIAMS MANUFACTURES AND WHEN IT

22   DEVELOPED THE VALPURE LINE OF COATINGS, WHERE DID IT

23   INTEND TO DISTRIBUTE THAT PRODUCT?

24   A.    GLOBALLY.

25   Q.    DOES THAT INCLUDE THROUGHOUT THE UNITED STATES?

1    A.    YES.

2    Q.    NOW, AS THE GLOBAL DIRECTOR OF PACKAGING AND

3    REGULATORY AFFAIRS AT SHERWIN-WILLIAMS, ARE YOU GENERALLY

4    FAMILIAR WITH WHAT'S IN THE PUBLIC DOMAIN REGARDING THE

5    VALPURE LINE OF COATINGS?

6    A.    YES.

7    Q.    DOES THAT INCLUDE WHAT'S IN PUBLISHED PATENTS

8    REGARDING THOSE COATINGS?

9    A.    YES.

10   Q.    WHY IS THAT AN IMPORTANT PART OF YOUR JOB TO BE

11   FAMILIAR WITH WHAT'S IN THE PUBLIC DOMAIN ABOUT THESE

12   COATINGS?

13   A.    WE HAVE TO HAVE AN OPEN DIALOGUE WITH STAKEHOLDERS

14   IN SOCIETY IN ORDER TO BE ABLE TO ASSURE THEM AND THE

15   AGENCIES THAT SPEAK FOR THEM THAT THESE MATERIALS ARE SAFE

16   AND EFFECTIVE AND POSE NO CONCERN, NO HEALTH CONCERN TO,

17   TO THEM OR TO THEIR FAMILY.

18          MR. HUNTER:  AND CAN WE PULL UP WHAT'S BEEN

19   ALREADY ADMITTED AS EXHIBIT 28A.

20   Q.    DO YOU RECOGNIZE THIS DOCUMENT?

21   A.    YES.

22   Q.    WHAT IS IT?

23   A.    SO IT'S A DOCUMENT THAT'S MARKED CONFIDENTIAL FROM

24   FEBRUARY 8, 2016.

25   Q.    LET'S JUST STOP RIGHT THERE.  HOW MANY DIFFERENT

1   WAYS IS THIS DOCUMENT MARKED CONFIDENTIAL?

2   A.    TWO.

3   Q.    AND LET'S -- CAN YOU POINT THOSE OUT.  IS THERE ONE?

4   A.    SO IN BOLD UNDER THE DATE IT SAYS, "CONFIDENTIAL

5   PURSUANT TO NON-DISCLOSURE AGREEMENT DATED AUGUST 1,

6   2012".

7   Q.    AND WHAT DOES THIS SAY RIGHT HERE?

8   A.    IT SAYS, "DO NOT COPY".

9   Q.    WHAT DOES IT SAY IN THE WATERMARK?

10  A.    SO THE DIAGONAL WATERMARK ACROSS THE PAGE SAYS,

11  "CONFIDENTIAL, DO NOT COPY, NDA AUGUST 1, 2012".

12  Q.    NDA REFERS TO A NON-DISCLOSURE AGREEMENT?

13  A.    CORRECT.

14  Q.    WHAT IS THE INFORMATION DEPICTED HERE WHERE IT SAYS,

15  "COMPOSITION"?

16  A.    SO THIS IS THE COMPOSITION OF XXXXXX WHICH IS A

17  BEVERAGE END COATING, AND IT'S --

18  Q.    YOU JUST MENTIONED A BEVERAGE END COATING, WHAT'S

19  THE SIGNIFICANCE OF A BEVERAGE END COATING?

20  A.    SO IF YOU LOOK AT A TYPICAL BEVERAGE CAN, THERE'S

21  BASICALLY TWO PARTS TO IT.  THE LARGER PART IS THE

22  CYLINDER WITH THE BOTTOM OF IT ALREADY INTEGRAL TO THAT

23  CYLINDER, AND THE SECOND PART OF IT IS THE CLOSURE OR THE

24  END THAT SEALS THE PRODUCT INTO THAT CAN.

25  Q.    IS THAT BEVERAGE END COATING DIFFERENT THAN THE

1  INTERNAL?

2  A.    VERY DIFFERENT.

3  Q.    IS IT MORE CHALLENGING TO CREATE THAT BEVERAGE END

4  COATING OR LESS CHALLENGING?

5  A.    I WOULD SAY IT'S MORE CHALLENGING BECAUSE THE METAL

6  IS MUCH MORE HIGHLY FABRICATED, MEANING IT'S ESSENTIALLY

7  TORTURED INTO SHAPE.

8  Q.    AND GO AHEAD AND DESCRIBE WHAT THE INFORMATION IS

9  DOWN THE LEFT-HAND SIDE OF THIS DOCUMENT.

10 A.    SO ON THE LEFT-HAND SIDE IT INDICATES THE SPECIFIC

11 CHEMICAL COMPONENTS THAT ARE USED TO MAKE THIS COATING.

12 Q.    AND GO AHEAD AND --

13 A.    AND THE COLUMN NEXT TO IT ON THE RIGHT LISTS HOW

14 MUCH OF EACH OF THOSE INDIVIDUAL COMPONENTS ARE USED IN

15 THE COATINGS.

16 Q.    AND SHOULD THESE ADD UP TO 100 PERCENT?

17 A.    YES.

18 Q.    AND IF I WERE TO REMOVE WATER FROM THE COATING, DOES

19 IT ADD UP TO 100 PERCENT ANYMORE?

20 A.    NO.

21 Q.    WOULD YOU BE ABLE TO FIGURE OUT THOUGH JUST BY DOING

22 SOME SIMPLE SUBTRACTION WHAT THAT NUMBER WAS THAT I JUST

23 DELETED?

24 A.    YES.

25 Q.    DO YOU HAVE TO BE A PH.D. OR POLYMER SCIENTIST TO

1   FIGURE THAT OUT?

2   A.    NO.

3   Q.    DID THE DEFENDANT EVER, DID THE DEFENDANT EVER TELL

4   YOU THAT THIS INFORMATION WAS NOT, DESPITE ALL THE

5   MARKINGS, THAT ANY OF THAT, THOSE MARKINGS WERE INCORRECT,

6   THAT THIS ACTUALLY WAS NOW IN THE PUBLIC DOMAIN?

7   A.    NO.

8   Q.    DID SHE -- DID ANYONE AT COKE EVER TELL YOU THAT

9   THIS INFORMATION WAS NOW IN THE PUBLIC DOMAIN?

10  A.    NO.

11  Q.    YOU MENTIONED BEFORE SHE THREATENED SHERWIN-WILLIAMS

12  TO GET THIS INFORMATION?

13  A.    YES.

14  Q.    DO YOU NOTICE ANYTHING ABOUT HOW THIS DOCUMENT

15  APPEARS?

16  A.    SO IT'S NOT SQUARE TO THE PAGE, IT'S GOT SHADING,

17  WHICH INDICATES A SHADOW SOMEHOW HAS BEEN SHOWN OVER ONE

18  CORNER, AND TO ME IT LOOKS LIKE EITHER A PHOTOGRAPH, A

19  SCAN OR SOME KIND OF A FACSIMILE OF A DOCUMENT.

20  Q.    IS A PHOTO OR A SCAN OR A FACSIMILE HOW

21  SHERWIN-WILLIAMS PROVIDED THIS INFORMATION TO THE

22  DEFENDANT?

23  A.    NO.

24  Q.    WAS A PHOTO, A SCAN OR A FACSIMILE A WAY THAT

25  SHERWIN-WILLIAMS STORES THIS DOCUMENT IN ITS OWN

1   SYSTEMS?

2   A.    NO.

3   Q.    WOULD SHERWIN-WILLIAMS HAVE PROVIDED THIS DOCUMENT

4   AS A PHOTO, SCAN OR FACSIMILE TO ANYBODY?

5   A.    NO.

6   Q.    IS THIS RECIPE -- IS IT FAIR TO CALL THIS, THIS LIST

7   OF INGREDIENTS AND THE AMOUNTS OF THOSE INGREDIENTS A

8   RECIPE?

9   A.    YES.

10  Q.    AND TO WHAT PRECISION IS THE AMOUNTS OF THE

11  INGREDIENTS SPECIFIED IN THAT RECIPE?

12  A.    A TENTH OF A PERCENT.

13  Q.    A TENTH OF A PERCENT?

14  A.    YES.

15  Q.    IS IT FAIR TO CALL THIS RECIPE WITH THIS COMBINATION

16  OF -- WELL, STRIKE THAT.  IS THIS RECIPE WITH THIS

17  COMBINATION OF INGREDIENTS AND THIS AMOUNT OF INGREDIENTS

18  DOWN TO A TENTH OF A PERCENT AVAILABLE IN A PUBLIC DOMAIN

19  IN ANY FORM WHATSOEVER TO THE BEST OF YOUR KNOWLEDGE?

20  A.    NO.

21  Q.    WHAT, JUST GENERALLY SPEAKING, WHAT LEVEL OF

22  SECURITY DOES SHERWIN-WILLIAMS AFFORD THIS TYPE OF

23  RECIPE?

24  A.    WE TAKE GREAT PAINS TO PROTECT THIS KIND OF

25  INFORMATION THROUGH ELECTRONIC MEANS, YOU KNOW, SILOING

1   FUNCTIONS --

2   Q.    AND WE'LL GET INTO THOSE MEASURES LATER, JUST GIVE

3   US A SENSE, IS THIS KIND OF BOTTOM-OF-THE-BARREL

4   INFORMATION OR IS IT SUPER IMPORTANT INFORMATION FOR

5   SHERWIN-WILLIAMS?

6   A.    NO, IT'S EXTREMELY IMPORTANT BECAUSE IT'S -- NOBODY

7   HAS THIS KIND OF TECHNOLOGY.  NONE OF OUR COMPETITION HAS

8   THIS KIND OF TECHNOLOGY THAT PERFORMS THIS WELL.

9   Q.    AND WHAT SORT OF CHALLENGES DID SHERWIN-WILLIAMS

10  OVERCOME DEVELOPING THIS SECRET RECIPE?

11  A.    WELL, WE HAD TO SPEND A LOT OF TIME LOOKING FOR A

12  BISPHENOL WHICH WAS NOT ENDOCRINE ACTIVE BY ANY MEASURE;

13  AND ON TOP OF THAT WE HAD TO DETERMINE IF ANY BISPHENOL

14  THAT WE FOUND THAT MET THAT CRITERIA COULD ALSO MAKE A

15  POLYMER, AND THAT, THAT IS EXTREMELY IMPORTANT, AND HAS TO

16  BE A HIGH MOLECULAR WEIGHT LINEAR POLYMER IN ORDER TO

17  PERFORM THE WAY THIS MATERIAL HAS TO PERFORM.

18  Q.    AND WHAT SORT OF SCIENCE AND EXPERIMENTATION, HOW

19  COMPLEX IS THE SCIENCE AND EXPERIMENTATION THAT GOES IN TO

20  CREATING THIS RECIPE?

21  A.    SO YOU HAVE A LOT OF TOXICOLOGY, REPRODUCTIVE

22  TOXICOLOGY THAT NEEDS TO BE DONE, POLYMER SCIENCE

23  MODELING, COMPUTER MODELING OF THE MOLECULES.

24  Q.    AND UNDER THE NON-DISCLOSURE AGREEMENT WAS THERE ANY

25  LEGITIMATE REASON WHATSOEVER FOR THE DEFENDANT TO HAVE

1  THIS INFORMATION AFTER SHE LEFT HER JOB AT COKE?

2  A.    NO.

3  Q.    WHAT WOULD BE THE VALUE OF A COMPETITOR OR WOULD-BE

4  COMPETITOR OF HAVING THIS SECRET RECIPE?

5  A.    SO AS I SAID BEFORE, NOT ONLY DOES IT TELL A

6  COMPETITOR WHAT WE ARE USING SPECIFICALLY AND THE AMOUNTS,

7  IT ALSO TELLS THE COMPETITOR WHAT WE'RE NOT USING.  SO

8  IT'S A PROCESS OF ELIMINATION THAT WOULD REQUIRE YEARS AND

9  YEARS OF RESEARCH TO GET TO THE SAME POINT WE ARE NOW.

10 Q.    AND COULD A WOULD-BE COMPETITOR CUT OFF THAT YEARS

11 AND YEARS OF RESEARCH BY HAVING THIS INFORMATION?

12 A.    ABSOLUTELY.

13 Q.    AND HOW -- WHAT PERCENTAGE OF THEIR WAY ALONG THE

14 ROAD TO COMMERCIALIZING A COATING WOULD SOMEONE BE IF THEY

15 JUST CAME UPON THIS INFORMATION OR STOLE IT?

16 A.    IF YOU KNEW THAT WE WERE HEADING DOWN THIS PATH AND

17 THAT WE HAD ALREADY DONE ALL THE HOMEWORK TO VET IT OUT,

18 YOU'RE 98 PERCENT OF THE WAY THERE.

19 Q.    IS THIS INFORMATION A TRADE SECRET FOR

20 SHERWIN-WILLIAMS?

21 A.    YES.

22        MR. HUNTER:  COULD YOU PUBLISH THE ELMO,

23 PLEASE.

24 Q.    I'M GOING TO SHOW YOU EXHIBIT 35, WHAT'S BEEN

25 PREVIOUSLY MARKED AS EXHIBIT 35 AS A, AS A DEMONSTRATIVE.

1    WE'RE KEEPING TRACK OF THE TESTIMONY ABOUT WHAT

2    INFORMATION IS A TRADE SECRET, SO I -- MR. MALLEN, CAN I

3    MARK EXHIBIT 28A, IS IT YOUR TESTIMONY THAT 28A IS A TRADE

4    SECRET OF SHERWIN-WILLIAMS?

5    A.    YES.

6              MR. HUNTER:  CAN WE PULL UP EXHIBIT, WHAT'S

7    BEEN PREVIOUSLY ADMITTED AS EXHIBIT 28B.

8    Q.    DO YOU RECOGNIZE THIS DOCUMENT?

9    A.    YES.

10   Q.    WHAT IS THIS?

11   A.    THIS IS A COMPOSITION OF A SPRAY COATING FOR THE

12   INSIDE OF BEVERAGE CANS.

13   Q.    SO THIS ONE IS FOR THE INSIDE OF THE CAN, IS IT FOR

14   THE END OR FOR THE BODY?

15   A.    FOR THE BODY.

16   Q.    AND WAS THIS, WAS THIS DOCUMENT MARKED CONFIDENTIAL

17   IN ANY WAY?

18   A.    YES, SEVERAL, SEVERAL WAYS.

19   Q.    CAN YOU POINT THOSE OUT?

20   A.    SO UNDERNEATH THE DATE IN BOLD LETTERS IT SAYS, IN

21   CAPITAL LETTERS IT SAYS, "CONFIDENTIAL PURSUANT TO

22   NON-DISCLOSURE AGREEMENT DATED AUGUST 1, 2012".  IT NAMES

23   COCA-COLA CORPORATION AND VALSPAR; AND IT SAYS, "DO NOT

24   COPY".

25   Q.    AND ZOOM OUT, WHAT'S THE WATERMARK SAY?

1    A.    THE DIAGONAL WATERMARK SAYS "CONFIDENTIAL" IN

2    CAPITAL LETTERS, "DO NOT COPY" AND THEN NDA,

3    "NON-DISCLOSURE AGREEMENT, AUGUST 1, 2012".

4    Q.    IS THIS ESSENTIALLY THE SAME TYPE OF SECRET RECIPE

5    INFORMATION WE JUST TALKED ABOUT?

6    A.    YES.

7    Q.    IS THIS INFORMATION AVAILABLE IN THE PUBLIC DOMAIN

8    IN ANY FORM WHATSOEVER?

9    A.    NO.

10   Q.    IS THIS A VALSPAR TRADE -- SHERWIN-WILLIAMS TRADE

11   SECRET?

12   A.    YES.

13   Q.    IS IT VALUABLE FOR THE SAME REASONS WE TALKED ABOUT

14   FOR THE OTHER RECIPE?

15   A.    YES.

16   Q.    DOES IT HAVE THE SAME VALUE TO A WOULD-BE COMPETITOR

17   AS THE OTHER RECIPE?

18   A.    YES.

19          MR. HUNTER:  AND SWITCH BACK TO THE ELMO,

20   PLEASE.

21   Q.    IF I UNDERSTAND YOUR TESTIMONY, MR. MALLEN, THAT 28B

22   IS A SHERWIN-WILLIAMS TRADE SECRET; IS THAT CORRECT?

23   A.    YES.

24          MR. HUNTER:  NOW CAN WE GO BACK TO EXHIBIT 28B.

25   Q.    DO YOU NOTICE ANYTHING ABOUT THE APPEARANCE OF THIS

1   DOCUMENT?

2   A.    YES.   IT'S HEAVILY SHADED AS IF IT WAS A PHOTOGRAPH

3   OR OTHER TYPE OF REPRODUCTION TECHNIQUE.

4   Q.    YOU PREVIOUSLY TESTIFIED FOR THE OTHER EXHIBIT THAT

5   THAT'S NOT HOW SHERWIN-WILLIAMS KEEPS OR PROVIDES THIS

6   TYPE OF INFORMATION; IS THAT RIGHT?

7   A.    CORRECT.

8           MR. HUNTER:   IF YOU'LL PULL UP WHAT'S BEEN

9   PREVIOUSLY ADMITTED AS EXHIBIT 28C.

10  Q.    DO YOU RECOGNIZE THIS DOCUMENT?

11  A.    YES.

12  Q.    WHAT IS THIS?

13  A.    THIS IS THE MATERIAL COMPOSITION APPROVAL REQUEST

14  FORM, OTHERWISE KNOWN AS MCARF, THAT THE COCA-COLA COMPANY

15  REQUIRES THEIR SUPPLIERS TO FILL OUT BEFORE MATERIAL CAN

16  BE APPROVED FOR QUALIFICATION.

17  Q.    AND WHAT SORT OF CAN IS THIS FORM FOR, OR THE

18  COATING INFORMATION -- THE COATING THAT'S DESCRIBED IN

19  THIS FORM, WHAT KIND OF COATING IS IT?

20  A.    SO THIS IS A SPRAY COATING, BUT IT'S DIFFERENT FROM

21  THE PREVIOUS SPRAY COATING, AND IT IS DESIGNED FOR THE USE

22  IN WHAT'S KNOWN AS A BOTTLE CAN.

23  Q.    WHAT'S A BOTTLE CAN?

24  A.    SO A BOTTLE CAN IS AN EXTRUDED ALUMINUM CAN THAT IS

25  FASHIONED WITH A NECK SO THAT IT LOOKS LIKE A BOTTLE.

1    Q.    DO THOSE BOTTLE CANS COME WITH THEIR OWN UNIQUE SET

2    OF CHALLENGES FOR THE COATING THAT'S SPRAYED INSIDE OF

3    THEM?

4    A.    YEAH.  IT'S A VERY EXTREME CHALLENGE FOR --

5    TYPICALLY THERE'S A THREAD, A SCREW THREAD AT THE TOP OF

6    THE NECK, AND THAT -- THE COATING HAS TO SURVIVE THAT

7    NECKING PROCESS AND THE THREADING PROCESS.

8    Q.    AND WHAT INFORMATION IS DEPICTED, IF YOU CAN ZOOM IN

9    ON THE TABLE A LITTLE BIT, WHAT INFORMATION IS DEPICTED IN

10   THIS MCARF FORM?

11   A.    SO IT LISTS THE INDIVIDUAL COMPONENTS, IT LISTS

12   THEIR CAS NUMBERS, WHAT THEIR FUNCTION IS, THE STATUS

13   WITHIN THE FDA AND THE EU IS THE NEXT ONE; AND THEN IF

14   THERE'S ANY SPECIFIC MIGRATION LIMITS, THEY'RE LISTED

15   THERE AS WELL.

16   Q.    NOW, THIS INFORMATION DOES NOT HAVE THE AMOUNTS OF

17   THE INGREDIENTS; CORRECT?

18   A.    CORRECT.

19   Q.    IS IT FAIR TO CALL THIS -- WE CALLED THE OTHER

20   INFORMATION A RECIPE BECAUSE IT HAD THE AMOUNTS IN IT, IS

21   IT FAIR TO CALL THIS A COMPOSITION?

22   A.    CORRECT.

23   Q.    IS THIS COMPOSITION EVEN WITHOUT THE AMOUNTS OF THE

24   INGREDIENTS, IS IT A SHERWIN-WILLIAMS TRADE SECRET?

25   A.    I WOULD SAY, I WOULD SAY MOST OF IT IS.  THE

1    DISCLOSURE OF --

2    Q.    I'M ASKING ABOUT THE DOCUMENT IN TOTAL --

3    A.    OKAY, THE DOCUMENT IN TOTAL, YES.

4    Q.    -- ALL THE INFORMATION IN THIS DOCUMENT, IS THAT IN

5    COMBINATION A SHERWIN-WILLIAMS TRADE SECRET?

6    A.    YES.

7    Q.    NOW, YOU'RE NOT ASSERTING IN THIS CASE THAT EVERY

8    PIECE OF INFORMATION IN THE DEFENDANT'S POSSESSION THAT

9    BELONGED TO SHERWIN-WILLIAMS IS A TRADE SECRET; CORRECT?

10   A.    NO, IT'S JUST THERE FOR COMPLETENESS.

11   Q.    IF WE COULD LOOK AT THE TOP OF -- HOW IS THIS

12   DOCUMENT MARKED?

13   A.    IT'S CONFIDENTIAL IN BOLD LETTERS.

14   Q.    DID ANYONE AT COKE EVER TELL YOU YOU SHOULDN'T BE

15   USING A CONFIDENTIALITY DESIGNATION FOR THIS

16   INFORMATION --

17   A.    NO.

18   Q.    -- THAT IT WAS IN THE PUBLIC DOMAIN?

19   A.    NO.

20   Q.    DO YOU NOTICE ANYTHING ABOUT HOW THIS DOCUMENT

21   APPEARS, JUST GENERALLY?

22   A.    IT'S VERY GRAINY.  IT'S GOT RIBS THAT RUN THROUGH

23   THE BACKGROUND AS IF -- AND THEY'RE NOT LINED UP WITH THE

24   PAGE, SHADOWED AT THE BOTTOM.  SO, AGAIN, IT LOOKS LIKE

25   ANOTHER FACSIMILE OF A DOCUMENT.

1    Q.    DOES SHERWIN-WILLIAMS PROVIDE MCARF INFORMATION TO

2    THE SRA GROUP AS A PHOTO OF A DOCUMENT?

3                COURT REPORTER:  CAN YOU REPEAT THAT.

4    Q.    DOES COKE PROVIDE INFORMATION TO THE SRA GROUP IN

5    THESE MCARF FORMS AS A PHOTOGRAPH OF A MCARF FORM?

6    A.    NO.

7    Q.    UNDER THE NON-DISCLOSURE AGREEMENT IS THERE ANY

8    LEGITIMATE REASON FOR THE DEFENDANT TO HAVE THIS

9    INFORMATION AFTER LEAVING COKE?

10   A.    NO.

11   Q.    HOW VALUABLE IS THIS INFORMATION, THIS COMPOSITION,

12   EVEN WITHOUT THE AMOUNT OF INGREDIENTS TO

13   SHERWIN-WILLIAMS?

14   A.    EXTREMELY IMPORTANT.

15   Q.    AND DO YOU NOTICE ANYTHING UP AT THE TOP ON THE, THE

16   DOCUMENT?  I CIRCLED IT HERE ON THE COMPUTER SCREEN.  DO

17   YOU NOTICE ANYTHING?

18   A.    I DON'T SEE ANYTHING THERE.

19                OH, I SEE A LITTLE, ON THE HARD COPY, YEAH, I

20   SEE A CURSOR ERROR.

21   Q.    WHAT DOES THAT INDICATE TO YOU?

22   A.    THAT THIS IS LIKELY BEING PROJECTED ON SOME SORT OF

23   COMPUTER SCREEN OR OTHER SCREEN THAT'S HOOKED TO A

24   COMPUTER.

25   Q.    ARE THERE PHOTOGRAPHS -- WOULD THAT, WOULD THAT

1    PICTURE OF A MOUSE CURSOR BE ON SHERWIN-WILLIAMS' COPY OF

2    THIS DOCUMENT?

3    A.    NO.

4    Q.    WHAT WOULD BE THE VALUE TO A COMPETITOR OR WOULD-BE

5    COMPETITOR HAVING THIS LIST OF INGREDIENTS AND ALL OF THE

6    INGREDIENTS TOGETHER IN ONE PLACE, EVEN WITHOUT THE

7    AMOUNTS OF THOSE INGREDIENTS?

8    A.    IT, IT CERTAINLY GIVES THEM A TREMENDOUS ADVANTAGE

9    IN UNDERSTANDING WHAT THE COMPONENTS ARE THAT ARE

10   NECESSARY TO ACHIEVE THE KIND OF PERFORMANCE THAT WE

11   DISCOVERED.

12   Q.    AND YOU TESTIFIED BEFORE THAT WITH THE INGREDIENTS

13   THEY'D BE OVER 90 PERCENT OF THE WAY TO A COMMERCIAL

14   COATING, HOW FAR ALONG WOULD A WOULD-BE COMPETITOR BE IF

15   THEY STOLE THIS INFORMATION WITHOUT THE INGREDIENTS,

16   WITHOUT THE AMOUNTS OF THE INGREDIENTS?

17   A.    I WOULD SAY YOU WERE 80 PERCENT OF THE WAY THERE.

18            MR. HUNTER:  WOULD YOU PULL UP WHAT'S

19   PREVIOUSLY BEEN ADMITTED AS EXHIBIT 28D.

20   Q.    DO YOU RECOGNIZE THIS E-MAIL?

21   A.    YES.

22   Q.    WHAT'S, WHAT'S HAPPENING IN THIS E-MAIL, WHO SENT

23   THIS?

24   A.    SO DAVID RIDDLE SENT THIS.  DAVID RIDDLE IS A

25   TECHNICAL MANAGER.  HE WAS THE TECHNICAL MANAGER

1    RESPONSIBLE FOR OUR, OUR FORMULATION GROUP THAT FORMULATED

2    THE BEVERAGE COATINGS.

3    Q.    AND WHO WAS HE SENDING THIS E-MAIL TO?

4    A.    TO SHANNON YOU.

5    Q.    DID HE SEND IT TO ANYBODY ELSE?

6    A.    BILL BIRNIE, WHO WAS OUR MARKETING MANAGER FOR

7    BEVERAGE.

8    Q.    WHERE DOES HE WORK?

9    A.    HE'S NO LONGER WITH US, BUT HE DID WORK IN

10   ENGLAND.

11   Q.    FOR SHERWIN-WILLIAMS?

12   A.    FOR VALSPAR.

13   Q.    FOR VALSPAR.  SO SHANNON YOU WAS THE ONLY PERSON AT

14   COKE WHO RECEIVED THIS E-MAIL; IS THAT CORRECT?

15   A.    YES.

16   Q.    AND I SEE THERE'S AN ATTACHMENT HERE; IS THAT RIGHT?

17   A.    YES.

18   Q.    HOW IS THIS E-MAIL MARKED?

19   A.    CONFIDENTIAL.

20   Q.    WHERE DID IT INDICATE CONFIDENTIALITY?

21   A.    IN THE ATTACHMENTS, IN THE ATTACHMENT LINE, AS WELL

22   AS AT THE HEAD OF THE TEXT OF THE E-MAIL.

23   Q.    AND WHAT DOES IT SAY DOWN HERE AT THE BOTTOM, CAN

24   YOU READ THAT?

25   A.    IT SAYS, THIS TRANSMISSION MAY CONTAIN CONFIDENTIAL

1    OR PRIVILEGED INFORMATION.  UNAUTHORIZED USE IS

2    PROHIBITED.  TRANSACTIONS ARE SUBJECT TO THE TERMS FOUND

3    AT HTTP WWW.COATINGS.COM NOTICE.JSP.

4    Q.    CAN YOU JUST READ THE FIRST SENTENCE OF THE E-MAIL.

5    A.    "PLEASE FIND THE INFO YOU REQUESTED ON SLIDE 2."

6    Q.    IT SAYS, "YOU REQUESTED", WHO IS HE REFERRING TO TO

7    YOUR KNOWLEDGE?

8    A.    SHANNON YOU.

9          MR. HUNTER:  CAN WE OPEN EXHIBIT, WHAT HAS

10   PREVIOUSLY BEEN ADMITTED AS 28E.

11   Q.    IS THIS THE ATTACHMENT TO THE E-MAIL WE JUST

12   REVIEWED?

13   A.    YES.

14   Q.    NOW, THIS IS -- WHAT IS THIS, WHAT IS THIS DOCUMENT?

15   A.    THIS IS A PRESENTATION TO A CAN MAKER WHO NO LONGER,

16   WHO HAS BEEN ACQUIRED BY ANOTHER COMPANY.  IT'S CALLED

17   REXAM OUT OF CHICAGO.

18         MR. HUNTER:  AND CAN WE GO TO SLIDE 2.

19   Q.    WHAT IS THE INFORMATION DEPICTED HERE ON SLIDE 2?

20   A.    SO THIS IS A COMPOSITION WITH AMOUNTS OF, CHEMICAL

21   COMPOSITION WITH THE RELATIVE AMOUNTS FOR XXXXX, WHICH IS

22   A BEVERAGE SPRAY COATING.  WE CALL IT THE GENERATION ONE

23   AND A HALF BEVERAGE COATING.

24   Q.    IS THIS THE V40?

25   A.    YES.

1    Q.    AND YOU REFERRED TO THIS AS A COMPOSITION, BUT THIS

2    IS ACTUALLY -- IN THE TERMS WE DEFINED THIS IS ACTUALLY A

3    RECIPE, CORRECT, BECAUSE IT INCLUDES THE AMOUNTS OF THE

4    INGREDIENTS?

5    A.    YES.

6    Q.    SO LET'S JUST GO THROUGH THAT.  WHAT IS THE

7    INFORMATION ON THE LEFT?

8    A.    SO ON THE LEFT IT'S THE CHEMICALS, THE CHEMICAL

9    DESCRIPTION OF THE INDIVIDUAL COMPONENTS.

10   Q.    AND WHAT'S THE INFORMATION IN THIS MIDDLE COLUMN?

11   A.    THE MIDDLE COLUMN IS ON A 100 PERCENT BASIS THE

12   AMOUNT OF EACH OF THESE COMPONENTS.

13   Q.    AND WHAT'S THE INFORMATION IN THE RIGHT-HAND

14   COLUMN?

15   A.    THE RIGHT-HAND COLUMN SPLITS THE, THE COMPOSITION

16   BETWEEN THE MATERIALS THAT ARE GOING TO GIVE WHAT WE CALL

17   SOLIDS, SOLID MATERIAL WITHIN THE COATING, AND THEN

18   UNDERNEATH THAT THE LIQUID PART PORTION OF THE COATING,

19   AND BREAKS THEM OUT.

20   Q.    AND THESE -- THIS INFORMATION IN THE MIDDLE ALL ADDS

21   UP TO 100 PERCENT; IS THAT RIGHT?

22   A.    YES.

23   Q.    IS THIS INFORMATION A TRADE SECRET FOR

24   SHERWIN-WILLIAMS?

25   A.    YES.

1          MR. HUNTER:  ALL RIGHT.  COULD WE PULL UP THE

2    ELMO AGAIN, PLEASE.

3    Q.    AND I THINK YOU PREVIOUSLY TESTIFIED THAT THE MCARF

4    AT EXHIBIT 28C IS A SHERWIN-WILLIAMS TRADE SECRET; IS THAT

5    CORRECT?

6    A.    YES.

7    Q.    AND YOU JUST TESTIFIED THAT THE EXHIBIT ATTACHED TO

8    THE E-MAIL AT 28D, THE ATTACHMENT WHICH WAS 28E, THAT 28E

9    IS A TRADE SECRET; IS THAT CORRECT?

10   A.    YES.

11         MR. HUNTER:  OKAY.  PULL UP EXHIBIT 8F.

12   Q.    ANY -- MR. MALLEN, THIS EXHIBIT HAS BEEN PREVIOUSLY

13   ADMITTED AS EXHIBIT 8F, AND WHAT YOU HAVE IN FRONT OF YOU

14   IN PAPER, I BELIEVE, HAS SOME REDACTIONS ON IT; IS THAT

15   RIGHT?

16   A.    28F, NO.

17   Q.    8F, SORRY. 8F.

18   A.    OH, 8F.  8F.

19         OH, YES, HERE IT IS.  IT'S ALL REDACTED.

20   Q.    RIGHT.  NOW, THIS DOCUMENT CONTAINS OTHER COMPANIES'

21   INFORMATION, BUT IF YOU GO TO THE BOTTOM, TO THE END OF

22   THE DOCUMENT, I BELIEVE YOU'LL FIND VALSPAR INFORMATION.

23   I THINK IF YOU GO TO PAGE 24.

24   A.    YEAH.

25   Q.    DO YOU RECOGNIZE THE INFORMATION STARTING AT PAGE 24

1    AND GOING TO THE END OF THE DOCUMENT?

2    A.    YES.

3              MR. HUNTER:  IF WE COULD JUST SCROLL TO THE

4    BOTTOM.

5    Q.    WHAT IS THIS INFORMATION?

6    A.    SO IT LOOKS LIKE A CONVERSATION, AN E-MAIL

7    CONVERSATION BETWEEN CHUCK SKILLMAN, WHO WAS THE MANAGER

8    OF OUR TECHNICAL FORMULATING GROUP FOR BEVERAGE ENDS, WITH

9    SHANNON YOU, A COPY TO MARK HESSELING, WHO WAS A MARKET

10   MANAGER FOR BEVERAGE.

11   Q.    IF WE START AT THE VERY BOTTOM OF THE DOCUMENT, THEN

12   TO THE TOP, VERY BOTTOM OF THE DOCUMENT AND WORK OUR WAY

13   UP, IF WE COULD GO TO PAGE 29, WHAT'S THIS AT THE BOTTOM,

14   MARCH 15, 2014?

15   A.    IT'S A QUESTION FROM SHANNON YOU ABOUT WHAT IS XXXXX

16   XXXX IN YOUR FORMULATION.

17   Q.    WHY WOULD SHE ASK THAT QUESTION?

18   A.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXX.

21   Q.    AND DID DAVE RIDDLE ANSWER HER QUESTION?

22   A.    HE SAID, SORRY FOR USING OUR SHORTHAND TERM WE USE

23   AT VALSPAR.  IT'S XXXXXXXXXXXXXXXXXXXXXXXXXXX.

24             MR. HUNTER:  AND IF WE COULD GO TO THE TOP OF

25   THE PAGE, MAYBE SCROLL DOWN SO WE'LL SEE THE HEADER.

1    Q.    WHAT IS THIS NEXT E-MAIL?

2    A.    SO THIS IS FROM SHANNON YOU.

3    Q.    WHAT'S THE DATE OF THAT?

4    A.    FEBRUARY 10, 2016.

5    Q.    AND WHAT DOES SHE -- WHAT'S THE CONTENTS OF THIS

6    E-MAIL?

7    A.    SHE ACKNOWLEDGES THAT, OKAY, IS THERE ANY -- AND

8    THEN SHE ASKS ANOTHER QUESTION, IS THERE ANY CATALYST USED

9    IN THE CURING PROCESS.

10   Q.    SHE'S ASKING TECHNICAL QUESTIONS ABOUT THE

11   FORMULATION?

12   A.    YES.

13             MR. HUNTER:  SCROLL UP TO THE NEXT.

14   Q.    CAN YOU SEE THIS E-MAIL FROM DAVE RIDDLE?

15   A.    YEAH.

16   Q.    WHEN DID HE SEND THAT E-MAIL?

17   A.    FEBRUARY 10, 2016.

18   Q.    WHO DID HE SEND IT TO?

19   A.    THE DEFENDANT.

20   Q.    HOW DID HE MARK HIS RESPONSE?

21   A.    IN RED, CONFIDENTIAL, COCA-COLA/VALSPAR.

22   Q.    WHAT DID HE SAY JUST GENERALLY?

23   A.    HE SAID --

24   Q.    IS HE ANSWERING HER QUESTION FROM THE PREVIOUS

25   E-MAIL?

1    A.    YES.

2          MR. HUNTER:  GO UP TO THE NEXT, AND IF WE CAN

3    JUST SCROLL UP UNTIL THERE'S ANOTHER E-MAIL THAT'S MARKED

4    CONFIDENTIAL.  CONTINUE SCROLLING UP.  ALL RIGHT, STOP.

5    SCROLL DOWN A LITTLE BIT, AND DOWN A LITTLE MORE.

6    Q.    DO YOU SEE THIS E-MAIL FROM SHANNON YOU?

7    A.    YES.

8    Q.    WHAT'S THE DATE ON THAT E-MAIL?

9    A.    FEBRUARY 9, 2016.

10   Q.    AND WHAT IS THE CONTENTS OF THAT E-MAIL FROM SHANNON

11   YOU TO DAVE RIDDLE?

12   A.    SO SHE'S LOOKING FOR SOME INFORMATION ABOUT THE

13   INSIDE SPRAY COATING, WHAT IS THE CROSS-LINKER FOR THIS

14   COATING, AND WHAT IS THE FUNCTION FOR XXXXXXXXXXXX.

15         MR. HUNTER:  CAN WE GO UP.

16   Q.    DID DAVE RIDDLE RESPOND TO HER?

17   A.    YES.

18   Q.    WHEN DID HE RESPOND TO HER?

19   A.    FEBRUARY 10TH.

20   Q.    DID HE MARK HIS RESPONSE AS CONFIDENTIAL?

21   A.    YES.

22   Q.    WHAT DID HE TELL HER?  DID HE ANSWER HER QUESTION?

23   A.    YES.

24   Q.    WAS THAT TECHNICAL INFORMATION THEY WERE SPEAKING

25   ABOUT?

1    A.    YES.

2    Q.    WAS THE INFORMATION MARKED CONFIDENTIAL IN THIS

3    EXHIBIT 8F THAT'S CALLED COMBINE.DOCX --

4    A.    YES.

5    Q.    -- A VALSPAR TRADE SECRET?

6    A.    YES.

7              MR. HUNTER:  IF YOU CAN PULL UP THE ELMO AGAIN,

8    PLEASE.

9    Q.    YOU JUST TESTIFIED THAT THE VALSPAR INFORMATION

10   MARKED CONFIDENTIAL IN EXHIBIT 8F IS A

11   VALSPAR/SHERWIN-WILLIAMS TRADE SECRET?

12   A.    YES.

13   Q.    NOW, TO THE BEST OF YOUR KNOWLEDGE DO YOUR

14   COMPETITORS HAVE ANY OF THE INFORMATION, THE RECIPES, THE

15   SECRET RECIPES OR THE MCARF INFORMATION THAT WE'VE MARKED

16   AS EXHIBITS 28A, B, C AND D AND 8F THAT YOU JUST TESTIFIED

17   WERE TRADE SECRETS, DO YOUR COMPETITORS HAVE ANY OF THAT,

18   THOSE TRADE SECRETS?

19   A.    NO.

20   Q.    AND YOU HAVE SOME PRETTY FIERCE COMPETITION; DON'T

21   YOU?

22   A.    YES.

23   Q.    WHO ARE SOME OF YOUR MAIN COMPETITORS?

24   A.    PPG, AKZO-NOBEL, METLAC, ACTEGA.

25   Q.    ARE YOU INVOLVED WITH ANY LITIGATION REGARDING, WITH

1    ANY OF THOSE COMPETITORS REGARDING THESE COATINGS?

2    A.    WE'RE INVOLVED IN A PATENT INFRINGEMENT CASE WITH

3    PPG.

4    Q.    WHAT'S THE NATURE OF THE COMPETITION BETWEEN

5    SHERWIN-WILLIAMS AND PPG?

6    A.    IT'S VERY INTENSE.

7    Q.    HOW INTENSE?

8    A.    WELL, IT'S -- WE'RE COMPETING OVER EVERY SINGLE BIT

9    OF BUSINESS THAT IS IN THE MARKETPLACE.

10   Q.    DESPITE THAT FIERCE COMPETITION, IF I PULLED UP FOR

11   YOU RIGHT NOW A PPG RECIPE THAT SHOWED ALL THE INGREDIENTS

12   AND ALL THE AMOUNTS OF THOSE INGREDIENTS THAT MAKE A PPG

13   COATING, WOULD YOU THINK YOU'RE LOOKING AT A TRADE SECRET?

14   A.    YES.

15   Q.    EVEN THOUGH THEY'RE YOUR FIERCE COMPETITOR, YOU

16   WOULD SAY THAT THAT WAS A TRADE SECRET?

17   A.    YEAH, THAT WOULD BE ESSENTIALLY THE JEWELS TO THE

18   KINGDOM AND AN UNETHICAL PERSON WOULD BE ABLE TO EXPLOIT

19   THAT.

20   Q.    NOW, HOW MUCH MONEY DID PP, PP -- ALL RIGHT,

21   SWITCHING COMPANIES.  HOW MUCH MONEY DID SHERWIN-WILLIAMS

22   INVEST IN CREATING THE VALPURE LINE OF BPA-FREE COATINGS?

23   A.    OVER $30,000,000.

24   Q.    AND THAT WAS JUST RESEARCH AND DEVELOPMENT EXPENSE?

25   A.    CORRECT.

1    Q.    HOW MUCH MONEY HAS PPG INVESTED IN CREATING

2    FACTORIES AND MANUFACTURING FACILITIES TO CREATE AND

3    MANUFACTURE AT MASS SCALE THE VALPURE LINE OF COATINGS?

4    DID I SAY PPG?

5    A.    DO YOU MEAN SHERWIN?

6    Q.    DID SHERWIN-WILLIAMS -- I'M SORRY, THERE'S A LOT OF

7    COMPANIES IN THIS CASE.  HOW MUCH MONEY HAS

8    SHERWIN-WILLIAMS INVESTED IN CREATING FACTORIES AND

9    MANUFACTURING FACILITIES TO PRODUCE VALPURE ON THAT

10   SCALE?

11   A.    XXXXXXXXXXXXXXXXX.

12   Q.    I'D LIKE TO TALK BRIEFLY ABOUT THE MEASURES THAT

13   SHERWIN-WILLIAMS EMPLOYS TO PROTECT ITS INTELLECTUAL

14   PROPERTY.  ARE YOU FAMILIAR WITH THE PHYSICAL OR

15   ELECTRONIC AND NETWORK SECURITY --

16   A.    YES.

17   Q.    -- MEASURES THAT THE COMPANY USES?

18   A.    YES, AS A LAY PERSON.

19   Q.    WHAT, WHAT SORT OF PHYSICAL SECURITY MEASURES WOULD

20   YOU ENCOUNTER IF YOU WERE TRYING TO GET INTO A

21   SHERWIN-WILLIAMS' BUILDING THAT, WHERE YOU COULD ACCESS

22   THIS TYPE OF INFORMATION, THE SECRET PRECIPICE WE

23   REVIEWED?

24   A.    SO THE, ALL THE OUTDOOR DOORS ARE, EXTERNAL DOORS OF

25   THE BUILDINGS ARE KEY CARD ACCESS ONLY; AND THEN

1  INTERNALLY, ESPECIALLY IN THE LAB AREAS, THE DOORS TO THE

2  LABORATORY ARE ALSO KEY ACCESS, KEY CARD ACCESS ONLY.

3  Q.    ARE THERE GUARDS USED AT ANY TIME TO PROTECT THOSE

4  FACILITIES?

5  A.    YES, AT OFF HOURS WHEN THERE'S NOT A LOT OF PEOPLE

6  AROUND.

7  Q.    WHAT ABOUT LABORATORY NOTEBOOKS THAT SCIENTISTS USE,

8  ARE THOSE PROTECTED IN ANY WAY?

9  A.    YES.  AS SOON AS THOSE ARE FILLED UP THOSE ARE

10  COLLECTED AND SECURED IN A, WITH A COMPANY CALLED IRON

11  MOUNTAIN THAT STORES THEM IN AN OLD MUSHROOM MINE

12  SOMEWHERE.

13  Q.    AND HOW ABOUT PHOTOGRAPHY, ARE PEOPLE PERMITTED TO

14  TAKE PHOTOGRAPHS WITHIN SHERWIN-WILLIAMS' FACILITIES OR

15  LABORATORIES?

16  A.    NOT WITHOUT SPECIFIC PERMISSION.

17  Q.    WHY NOT?

18  A.    WELL, FIRST AND FOREMOST, IT CAN BE A SAFETY HAZARD

19  WHERE WE ARE DEALING WITH CHEMICALS, VOLATILE CHEMICALS,

20  SOLVENTS, THINGS LIKE THAT, AND SO ANY KIND OF

21  PHOTOGRAPHIC EQUIPMENT WOULD NEED TO BE INTRINSICALLY

22  SAFE; BUT ALSO THOSE PHOTOGRAPHS CAN, YOU KNOW, CAPTURE

23  MATERIAL -- CAPTURE INFORMATION THAT WE WOULD RATHER NOT

24  HAVE IN THE PUBLIC DOMAIN.

25  Q.    HOW EASY IS IT TO GET A WET SAMPLE OF A VALPURE

1  COATING?

2  A.    UNLESS THERE'S SOME EXTRAORDINARY AGREEMENT FOR

3  PURPOSES OF, YOU KNOW, SOMETHING OF INTEREST TO US, WE

4  DON'T PROVIDE WET SAMPLES OF OUR COATINGS TO ANYONE OTHER

5  THAN OUR DIRECT CUSTOMERS.

6  Q.    ARE YOU FAMILIAR WITH THE TERM "NON-ANALYSIS

7  AGREEMENT"?

8  A.    YES.

9  Q.    WHAT IS A NON-ANALYSIS AGREEMENT?

10  A.    SO IT PROHIBITS THE SIGNER FROM HAVING SOMEONE TAKE

11  A LOOK AT THE COATING TO TRY TO DETERMINE WHAT ITS

12  COMPONENTS ARE THROUGH WET CHEMISTRY OR INSTRUMENTAL

13  ANALYSIS.

14  Q.    AND EVEN IF SOMEONE VIOLATED ONE OF THOSE AGREEMENTS

15  AND TRIED TO DO SOME OF THAT ANALYSIS, COULD THEY EASILY

16  RECREATE THE SECRET RECIPES THAT WE REVIEWED?

17  A.    NO.  IT'S VERY DIFFICULT.

18  Q.    IS IT EVEN POSSIBLE TO GET TO THAT SAME LEVEL OF

19  DETAIL?

20  A.    NO.  I MEAN, THE, THE AMOUNT OF EFFORT THAT IT WOULD

21  REQUIRE WOULD BE PROHIBITIVE.

22  Q.    NOW, HOW ABOUT NETWORK AND COMPUTER SECURITY AT

23  SHERWIN-WILLIAMS, WHAT DOES IT TAKE TO LOG INTO A COMPUTER

24  AT SHERWIN-WILLIAMS, COMPANY COMPUTER?

25  A.    SO YOU HAVE TO HAVE A BOOT PASSWORD THAT PREVENTS

1  ANYONE FROM HACKING INTO THE COMPUTER UNLESS THEY HAVE

2  THAT PASSWORD, AND THEN SUBSEQUENTLY YOU NEED A PASSWORD

3  THAT IS SPECIFIC TO YOU, AND IT'S CHANGED EVERY XXXXXXX.

4  Q.    AND ARE YOU ALLOWED TO SEND FORMULATIONS, SECRET

5  RECIPE INFORMATION LIKE WE REVIEWED OVER E-MAIL?

6  A.    NO.

7  Q.    HOW ABOUT DO THE COMPUTERS JUST STAY ON, IF YOU

8  LEAVE A COMPUTER ON, WILL IT -- IF YOU HAVE A SECRET

9  RECIPE ON THERE, WOULD IT JUST STAY ON YOUR SCREEN FOR A

10 LONG TIME?

11 A.    NO.  THERE'S A SCREEN SAVER, WHICH IF IT DOESN'T

12 DETECT ANY KIND OF ACTIVITY, IT WILL SWITCH TO A SCREEN

13 THAT REQUIRES YOU TO LOG BACK IN.

14 Q.    TYPE IN YOUR PASSWORD AGAIN?

15 A.    YES.

16 Q.    HOW ABOUT USB PERSONAL DEVICES, STORAGE DEVICES THAT

17 YOU MIGHT PLUG INTO A COMPUTER, CAN YOU USE THOSE ON A

18 SHERWIN-WILLIAMS COMPUTER?

19 A.    NO.  THOSE HAVE BEEN BANNED, AND EVERYTHING IS

20 NETWORKED TO PREVENT THAT.

21 Q.    ARE YOU FAMILIAR WITH THE XXXXXX SYSTEM?

22 A.    YES.

23 Q.    WHAT'S THE XXXXXX SYSTEM?

24 A.    IT'S A FORMULATION SYSTEM WHICH ALLOWS FORMULATORS

25 TO SELECT FROM RAW MATERIALS TO BUILD A FORMULA AND THEN

1    TO SEARCH FOR ALTERNATIVES THEY MIGHT CONSIDER USING.

2    Q.    DOES EVERYONE IN THE COMPANY HAVE ACCESS TO THAT

3    SYSTEM?

4    A.    NO.

5    Q.    DOES EVERYONE IN THE COMPANY HAVE ACCESS TO THE

6    SECRET RECIPES THAT WE REVIEWED?

7    A.    NO.

8    Q.    DOES SHERWIN-WILLIAMS' IT DEPARTMENT USE ANY

9    SOFTWARE TO DETECT SUSPICIOUS BEHAVIOR ON THE NETWORK?

10   A.    YEAH.  THERE'S A SOFTWARE PROGRAM CALLED XXXXXXX

11   XXXXXXXX WHICH MONITORS EVERY KEYSTROKE THAT'S MADE, AND

12   IF THERE ARE SUSPICIOUS, IF THERE IS SUSPICIOUS ACTIVITY,

13   THEY WILL FOLLOW UP ON IT.

14   Q.    HOW ABOUT TRAINING AT SHERWIN-WILLIAMS, DOES

15   SHERWIN-WILLIAMS REQUIRE TRAINING OF ITS EMPLOYEES IN

16   INFORMATION SECURITY?

17   A.    YES.

18   Q.    WHAT SORT OF TRAINING?

19   A.    WELL, ONE OF THE THINGS IS THAT THEY HAVE US ALL GO

20   THROUGH CODE OF CONDUCT TRAINING WHICH INVOLVES OUR

21   RESPONSIBILITIES IN TERMS OF PROTECTING SENSITIVE

22   INFORMATION.

23   Q.    AND WOULD SHERWIN-WILLIAMS EVER PROVIDE THE SECRET

24   RECIPE COMPOSITIONS THAT WE REVIEWED TO ANYONE OUTSIDE OF

25   THE COMPANY WITHOUT A NON-DISCLOSURE AGREEMENT IN PLACE?

1    A.    NO.

2    Q.    I JUST WANT TO SWITCH YOUR ATTENTION TO CHINA FOR A

3    MOMENT.  DOES SHERWIN-WILLIAMS HAVE FACTORIES IN CHINA?

4    A.    YES.

5    Q.    DO ANY OF THOSE FACTORIES MANUFACTURE THE VALPURE

6    LINE OF BPA-FREE PRODUCTS?

7    A.    NO.

8    Q.    WHY NOT?

9    A.    THEY'RE TOO SENSITIVE TO, TO HAVE AT THE

10   MANUFACTURING SITES IN THAT REGION.

11   Q.    AND WHY, WHY IS IT TOO SENSITIVE TO HAVE IN THAT

12   REGION?

13   A.    THE, THE INTEGRITY OF THE, THE FORMULAS ARE AT RISK.

14   Q.    HOW COME?

15   A.    BECAUSE IF OPERATORS ARE PUTTING THESE PRODUCTS

16   TOGETHER, THEN THEY KNOW THE INGREDIENTS AND THEY KNOW HOW

17   MUCH IS USED, THEY HAVE A RECIPE TO WORK FROM IN ORDER TO

18   MAKE THE PRODUCT.

19   Q.    SO YOU DON'T ALLOW THAT TO BE MANUFACTURED IN CHINA,

20   BUT YOU DO ALLOW IT TO BE MANUFACTURED IN THE UNITED

21   STATES?

22   A.    IN THE UNITED STATES AND IN SINGAPORE IN THE ASIAN

23   REGION.

24   Q.    DO ANY EMPLOYEES AT THE FACTORY IN CHINA HAVE ACCESS

25   TO THE SECRET RECIPES WE REVIEWED?

1    A.    ONLY ONE, THE DIRECTOR OF TECHNOLOGY WHO IS LOCATED

2    IN SINGAPORE, HE HAS ACCESS TO IT.

3    Q.    DOES HE ACCESS THAT THROUGH THE XXXXXX SYSTEM?

4    A.    YES.

5    Q.    IS THAT A SECURE SYSTEM?

6    A.    YES.

7    Q.    NOW, IN YOUR ROLE AS A VICE-PRESIDENT OF COMPLIANCE

8    AND TECHNOLOGY MARKETING, ARE YOU FAMILIAR WITH HOW

9    SHERWIN-WILLIAMS USES PATENTS AND TRADE SECRETS TO PROTECT

10   ITS INTELLECTUAL PROPERTY AND COATINGS?

11   A.    YES.

12   Q.    AND ARE THE SECRET PRECIPICE THAT WE REVIEWED AND

13   THE COMPOSITIONS, THAT INFORMATION CONSIDERED ALTOGETHER,

14   IS THAT IN ANY PATENT THAT SHERWIN-WILLIAMS PUBLISHES?

15   A.    NO.

16   Q.    WHAT, WHAT KIND OF INFORMATION DOES SHERWIN-WILLIAMS

17   PUT IN PATENTS AS, THAT MAKES IT DIFFERENT FROM THE TRADE

18   SECRETS THAT WE REVIEWED?

19   A.    SO SHERWIN-WILLIAMS PATENTS AT A VERY EARLY STAGE OF

20   DEVELOPMENT, AND USUALLY AT THAT TIME THE ONLY THING

21   THAT'S DEVELOPED AND FOR CERTAIN ARE, IS THE POLYMER, SO

22   THE MAIN POLYMER, AND WE ONLY PATENT IT, AND WE ARE ONLY

23   ALLOWED TO PATENT IT IF IT'S NOVEL, AND SO THE PATENTS

24   HAVE TO TEACH THAT INFORMATION TO THE GENERAL -- TO THE

25   PUBLIC IN ORDER TO GET A PATENT; AND THEN EVERYTHING ELSE

1   THAT COMES AFTER THAT IN TERMS OF DEVELOPMENT, WHICH IS

2   THE, THE COINGREDIENTS, THE WAY THE MATERIAL IS MADE, THE

3   WAY IT'S MANUFACTURED, WHICH INGREDIENT IS PUT IN FIRST,

4   WHICH INGREDIENT IS COOKED AT A CERTAIN TEMPERATURE UNTIL

5   IT'S READY TO BE MADE, ALL OF THAT INFORMATION IS TRADE

6   SECRET INFORMATION THAT IS NOT DISCLOSED IN THE PATENTS.

7   Q.   AND IS THAT INFORMATION IN THE WORK TO GET TO THAT

8   INFORMATION, IS THAT REFLECTED IN THE TRADE SECRETS THAT

9   WE REVIEWED?

10  A.   SOME OF IT IS.

11  Q.   HOW MUCH WORK DOES IT TAKE TO GO FROM WHAT'S IN A

12  SHERWIN-WILLIAMS PATENT TO GET TO THE FINAL PRODUCT, AN

13  ACTUAL COATING, HOW MUCH SCIENCE IS INVOLVED IN THAT?

14  A.   YEARS AND YEARS.

15       MR. HUNTER:  CAN WE PULL UP FOR THE WITNESS

16  ONLY EXHIBIT 320.

17  Q.   ARE YOU FAMILIAR WITH THIS DOCUMENT?

18  A.   YES.

19  Q.   WHAT IS IT?

20  A.   THIS IS A, A PATENT BY THE COCA-COLA COMPANY NAMING

21  THE DEFENDANT, YU SHI AND LINDA LIU.

22  Q.   AND THEIR NAMES IS IN WHAT CAPACITY ON THIS PATENT?

23  A.   AS INVENTORS.

24       MR. HUNTER:  YOUR HONOR, AT THIS TIME THE

25  GOVERNMENT MOVES TO PUBLISH AND ADMIT 320.

1     THE COURT:  ALL RIGHT.  32O IS ADMITTED AND MAY

2  BE PUBLISHED.

3  Q.   HAVE YOU REVIEWED THIS PATENT PRIOR TO THIS CASE?

4  A.   YES.

5  Q.   WHAT'S THE, WHAT'S THE TITLE OF THIS PATENT?

6  A.   POLYMER COMPOSITIONS AND COATINGS FOR FOOD AND

7  BEVERAGE PACKAGING.

8  Q.   WHAT DATE WAS THIS PATENT ISSUED?

9  A.   IT WAS ISSUED APRIL 23, 2019.

10  Q.   AND YOU MENTIONED PREVIOUSLY THE NAMED INVENTORS ON

11  THIS PATENT, WHO ARE THEY AGAIN?

12  A.   THE DEFENDANT -- WELL, THEY'RE ALL COCA-COLA

13  EMPLOYEES, THE DEFENDANT, HER BOSS, YU SHI, AND LINDA

14  LIU.

15  Q.   NOW, THOSE ARE THE OWNERS -- SORRY, THOSE ARE THE

16  INVENTORS OF THE PATENT, WHO OWNS THE PATENT?

17  A.   COCA-COLA, COCA-COLA COMPANY.

18  Q.   TO THE BEST OF YOUR KNOWLEDGE DOES XIAORONG YOU HAVE

19  ANY RIGHTS TO THIS PATENT?

20  A.   NO.

21  Q.   DOES YU SHI?

22  A.   NO.

23  Q.   WHAT -- DID YOU REVIEW THIS PATENT TO TRY TO

24  DETERMINE WHAT WAS THE SUPPOSED INVENTION?

25  A.   YES.

1  Q.    WHAT DID YOU DETERMINE -- WHAT INVENTION DOES THIS,

2  OR PURPORTED INVENTION DOES THIS PATENT DESCRIBE?

3  A.    WELL, IT --

4  Q.    OR LET ME REPHRASE THAT.  WHAT PURPORTED INVENTION

5  DOES THIS PATENT CLAIM AS A LEGAL RIGHT?

6  A.    IT CLAIMS THAT TWO INGREDIENTS, ONE A CYCLIC ETHER

7  AND ONE AN ACRYLATE, IN COMBINATION WITH OTHER MATERIALS

8  COULD BE USED AS A BEVERAGE COATING TO LIMIT THE AMOUNT OF

9  SCALPING THAT OCCURS OUT OF THE FLAVOR OF A, OF A

10 BEVERAGE.

11 Q.    AND WHEN YOU REVIEWED THIS PATENT, WHAT WAS YOUR

12 IMPRESSION OF THE INFORMATION DISCLOSED IN THIS PURPORTED

13 INVENTION?

14 A.    SO ON THE ONE HAND THE DESCRIPTION WITHIN THE BODY

15 OF THE PATENT IS VERY BROAD, VERY AMORPHOUS, WHEREAS THE

16 CLAIMS ARE VERY SPECIFIC, AND IT, IT LOOKED TO ME LIKE IT

17 WAS SORT OF A JUMBLED-UP GRAB BAG OF INFORMATION STUFFED

18 INTO A PATENT THAT EVENTUALLY ENDED UP PROVIDING ALMOST

19 NOTHING AT THE END.

20 Q.    WHEN YOU SAY "PROVIDE ALMOST NOTHING", WHAT DO YOU

21 MEAN BY THAT?

22 A.    NO MATERIAL WOULD ACTUALLY PERFORM AS IT WOULD NEED

23 TO PERFORM.

24 Q.    IN YOUR OPINION DID THIS PATENT DISCLOSE OR CLAIM A

25 COMMERCIALLY VIABLE COATING?

1    A.    NOT IN MY OPINION, NO.

2    Q.    AND HOW -- JUST DID YOU -- HOW DOES THIS PATENT

3    COMPARE TO OTHER PATENTS, FOR EXAMPLE, THAT

4    SHERWIN-WILLIAMS --

5            COURT REPORTER:  COULD YOU REPEAT THAT.

6    Q.    HOW DOES THIS PATENT OWNED BY COCA-COLA COMPARE TO

7    PATENTS THAT SHERWIN-WILLIAMS HAS IN THE FIELD OF

8    COATINGS?

9    A.    SO OUR PATENTS ARE VERY FOCUSED ON GENERATING, YOU

10   KNOW, THE ABILITY TO PRACTICE IN A SPECIFIC AREA, AND

11   THERE'S, YOU KNOW, THERE'S A CERTAIN AMOUNT OF BREADTH TO

12   THEM, BUT NOT TO THE EXTENT THAT THIS ONE HAS, AND THERE

13   ARE MANY CLAIMS THAT ARE VALUABLE TO US FROM AN

14   INTELLECTUAL PROPERTY STANDPOINT.

15   Q.    AND NOW JUST TO SUMMARIZE SOME OF YOUR OPINIONS,

16   GIVEN THE VALUABLE TRADE SECRET INFORMATION THAT WE

17   DISCUSSED, WHAT WOULD BE THE VALUE TO A WOULD-BE

18   COMPETITOR OF HAVING THE SECRET RECIPES FROM

19   SHERWIN-WILLIAMS THAT WE REVIEWED?

20   A.    SO IT WOULD ALLOW THEM TO SHORT-CUT YEARS AND YEARS

21   OF RESEARCH AND THE MONEY THAT'S ASSOCIATED WITH THAT.  IT

22   WOULD INDICATE TO THEM EXACTLY THE PATHWAY THAT THEY

23   NEEDED TO FOLLOW TO HAVE A COMMERCIAL PRODUCT IN A VERY

24   SHORT PERIOD OF TIME.

25   Q.    WHAT WORK WOULD REMAIN FOR SOMEONE WHO STOLE THIS

1    INFORMATION TO GET TO A COMMERCIAL PRODUCT?

2    A.    THEY WOULD HAVE TO FIGURE OUT, IN SOME CASES LIKE,

3    FOR INSTANCE, THE ACRYLIC IS NOT SPECIFIC, IT'S DESCRIBED

4    AS AN ACRYLIC RESIN, HOWEVER, IN SOME OTHER PIECES OF THIS

5    INFORMATION THE ACRYLIC IS ACTUALLY EXPLICITLY DESCRIBED;

6    SO THEN IT COMES DOWN TO A COUPLE OF EXPERIMENTS TO SEE

7    HOW WOULD THAT ACRYLIC, FOR INSTANCE, BE PUT TOGETHER, IS

8    IT STARTED OFF WITH ONE MONOMER OR TWO MONOMERS, DO YOU

9    START WITH A WHOLE POLYMER OR DO YOU START WITH A RANDOM

10   COPOLYMER, AND SO THOSE QUESTIONS CAN BE RAPIDLY ANSWERED

11   AND, AND END UP WITH A FINAL FORMULA.

12   Q.    AND WOULD THAT WOULD-BE COMPETITOR HAVE TO FIGURE

13   OUT HOW TO SCALE UP MANUFACTURING TO MANUFACTURE A COATING

14   AT SCALE?

15   A.    YES.

16   Q.    WOULD IT BE HELPFUL IN DOING THAT TO HAVE A COMPANY

17   LIKE METLAC JOIN YOUR TEAM?

18   A.    YES.

19   Q.    NOW, ONCE A COMPETITOR OR WOULD-BE COMPETITOR

20   DEVELOPED A NEW COATING AND SCALED IT UP, WOULD THEY BE

21   ABLE TO COMPETE GLOBALLY IN THE COATINGS MARKETPLACE?

22   A.    YES.

23   Q.    WOULD THEY BE ABLE TO TAKE AWAY MARKET SHARE FROM

24   SHERWIN-WILLIAMS?

25   A.    YES.

1    Q.    WOULD THEY POTENTIALLY BE ABLE TO SELL THEIR COATING

2    MORE CHEAPLY THAN SHERWIN-WILLIAMS?

3    A.    YES, BECAUSE --

4    Q.    HOW COME?

5    A.    -- THEY DIDN'T HAVE THE UP-FRONT COSTS.

6    Q.    NOW I WANT TO ASK YOU A HYPOTHETICAL QUESTION.  IF

7    YOU HAD ACCESS TO A LARGE CHEMICAL MANUFACTURER FOR RAW

8    MATERIALS, YOU HAD SOME SEED FUNDING OF SEVERAL MILLION

9    DOLLARS AND A LABORATORY WITH ALL THE RELEVANT LAB

10   EQUIPMENT AND THEN YOU ADDED IN SHERWIN-WILLIAMS' SECRET

11   RECIPES AND POTENTIALLY A MID-SIZED FORMULATOR LIKE

12   METLAC, WHAT WOULD YOU BE ABLE TO DO WITH ALL OF THAT?

13   A.    WELL, YOU'D BE ABLE TO RAPIDLY ENTER THE MARKET WITH

14   A PRODUCT THAT WOULD COMPETE AGAINST OUR MATERIAL.

15            MR. HUNTER:  WOULD YOU PULL UP WHAT'S BEEN

16   PREVIOUSLY MARKED AS EXHIBIT 8B AND ADMITTED AS 8B.

17   Q.    CAN YOU JUST READ THE TITLE OF THIS DOCUMENT,

18   MR. MALLEN?

19   A.    THE NATIONAL THOUSAND TALENTS PROGRAM APPLICATION,

20   LONG-TERM PROGRAM FOR INNOVATIVE TALENTS-ENTERPRISE.

21   Q.    AND WHOSE NAME IS ON THIS DOCUMENT?

22   A.    XIAORONG YOU.

23   Q.    WHAT ORGANIZATION IS REPRESENTED THERE?

24   A.    THE WEIHAI JINHONG GROUP COMPANY, LIMITED.

25            MR. HUNTER:  IF WE COULD SCROLL TO PAGE 14,

1    SECTION 4.   JUST BLOW THAT UP.

2    Q.    COULD YOU JUST READ THAT PARAGRAPH UP UNTIL THE LINE

3    I DREW THERE.

4    A.    SO EXPECTED CONTRIBUTIONS.  DOMESTIC MARKET SIZE IS

5    ESTIMATED TO BE APPROXIMATELY CHINESE 20 BILLION YUAN.

6    THE COMPANY WILL BUILD THE FIRST BPANI, MEANING BISPHENOL

7    A NON-INTENTIONALLY ADDED, COATING PRODUCTION LINE IN

8    CHINA WITH A PROJECTED INVESTMENT OF 180 MILLION JUAN AND

9    EXPECTED INDUSTRIAL PRODUCTION IN MAY OF 2020.  ONCE

10   PRODUCTION IS UP AND RUNNING, PROMOTION WILL BE CARRIED

11   OUT NATIONWIDE WHILE COCA-COLA PRODUCT APPLICATIONS

12   CONTINUE TO BE FULFILLED.

13   Q.    AND YOU CAN STOP RIGHT THERE.  CAN YOU START READING

14   WHERE IT SAYS, EVERY EFFORT.

15   A.    EVERY EFFORT WILL BE MADE TO BOOST PRODUCT PROMOTION

16   IN THE ASIA PACIFIC AND U.S. MARKETS AND ACHIEVE MORE THAN

17   80 MILLION U.S. DOLLARS IN ANNUAL EXPORT EARNINGS.  UPON

18   ITS COMPLETION THE PROJECT IS ANTICIPATED TO BREAK THE

19   INTERNATIONAL MONOPOLY AND FILL THE GAP IN ASIA.

20   Q.    YOU CAN STOP RIGHT THERE.  IF SOMEONE WERE ABLE TO

21   ACHIEVE THOSE GOALS, WOULD THEY BE ABLE TO HARM

22   SHERWIN-WILLIAMS?

23   A.    YES.

24   Q.    WOULD THEY HARM OTHER COMPANIES IN THE FIELD LIKE

25   PPG, AKZO-NOBEL?

1    A.    YES.

2              MR. HUNTER:  IF YOU CAN SCROLL TO PAGE 18.

3    Q.    COULD YOU READ THIS PARAGRAPH STARTING AT DR. YOU.

4    A.    DR. YOU HAS APPLIED FOR 41 PATENTS AND PUBLISHED

5    MANY PAPERS IN WELL-KNOWN JOURNALS AND CONFERENCES

6    INTERNATIONALLY.  THE BPANI COATING PRODUCT SHE HAS

7    DEVELOPED ARE CURRENTLY THE MOST ADVANCED PRODUCTS IN THE

8    WORLD AND ARE ALTERNATIVES FOR EXISTING INNER WALL

9    COATINGS.  SHE IS BRINGING ALONG THIS TECHNOLOGY AS A PART

10   OF AN EXTENSIVE COOPERATION WITH OUR COMPANY.  THE

11   IMPLEMENTATION OF THIS PROJECT WILL ADVANCE CURRENT

12   PACKAGING TECHNOLOGIES OF THE DOMESTIC FOOD AND BEVERAGE

13   INDUSTRY AS A WHOLE AND ENSURE THAT RELATED CHINESE

14   INDUSTRIES WILL NOT BE PUT UNDER A BLOCKADE BY GREEN AND

15   TECHNICAL INTERNATIONAL TRADE BARRIERS, AVERTING HUGE

16   ECONOMIC LOSSES FOR ITS MANUFACTURERS.  IN VIEW OF THESE

17   FACTS, THE COMPANY RECOMMENDS THE SELECTION OF DR. YOU

18   XIAORONG BY THE THOUSAND TALENTS PROGRAM.

19   Q.    MR. MALLEN, TO THE BEST OF YOUR KNOWLEDGE HAS

20   DR. YOU DEVELOPED ANY BPANI COATING PRODUCTS?

21   A.    NO.

22   Q.    HAS SHE DEVELOPED ANY THAT ARE THE MOST ADVANCED

23   PRODUCTS IN THE WORLD?

24   A.    NO.

25   Q.    HAS SHERWIN-WILLIAMS DEVELOPED SOME BPANI COATINGS

1    PRODUCTS THAT ARE AMONG THE MOST ADVANCED IN THE WORLD?

2    A.    YES.

3             MR. HUNTER:  FINALLY, CAN WE PULL UP THE ELMO.

4    Q.    I JUST WANT TO CONFIRM THE DOCUMENTS THAT YOU

5    RECEIVED FROM THE FBI AND ARE REPRESENTED AS FOUND ON THE

6    DEFENDANT'S HARD DRIVE THAT YOU TESTIFIED ARE

7    SHERWIN-WILLIAMS' TRADE SECRETS ARE EXHIBITS 28A, 28B,

8    28C, 28E, WHICH IS AN ATTACHMENT TO EXHIBIT 28D, AND

9    INFORMATION FOUND IN EXHIBIT 8F; IS THAT CORRECT?

10   A.    YES.

11            MR. HUNTER:  NO FURTHER QUESTIONS AT THIS

12   TIME.

13            THE COURT:  ALL RIGHT.  CROSS EXAMINATION.

14            MR. SHIPLEY:  YOUR HONOR, BEFORE I BEGIN, WOULD

15   THE COURT LIKE ME TO REACH A STOPPING POINT SOMETIME

16   BEFORE 12:30?

17            THE COURT:  AROUND 12:30, YES.

18            MR. SHIPLEY:  THANK YOU.

19                      CROSS EXAMINATION

20   BY MR. SHIPLEY:

21   Q.    MR. MALLEN, GOOD MORNING, OR I GUESS I SHOULD SAY

22   GOOD AFTERNOON.

23   A.    GOOD AFTERNOON.

24   Q.    I'M COREY SHIPLEY, AND I'M ONE OF DR. YOU'S

25   ATTORNEYS IN THIS CASE.

1          LET'S BEGIN BEFORE WE BREAK FOR LUNCH TO TALK A

2   LITTLE BIT ABOUT, I THINK YOU CAN AGREE WITH ME THAT

3   YOU'RE HERE TODAY CLAIMING THAT DR. YOU HAS MISAPPRO-

4   PRIATED OR TAKEN MATERIAL FROM YOUR COMPANY; IS THAT

5   RIGHT?

6   A.    YES.

7   Q.    AND AS OF TODAY -- WHAT DID YOU SAY YOUR COMPANY'S

8   ANNUAL REVENUE IS, HOW MANY BILLION, 118?

9   A.    EIGHTEEN BILLION.

10  Q.    EIGHTEEN BILLION.  AND FROM THE TIME THAT MOST OF

11  THE STUFF WE'VE TESTIFIED TO OR YOU'VE TESTIFIED TO TODAY,

12  HAS YOUR COMPANY BEEN, HAVE YOU SEEN ANY DROP IN REVENUE

13  FROM LACK OF MARKET SHARE WHEN IT COMES TO CAN COATING?

14          MR. HUNTER:  OBJECTION, YOUR HONOR, RELEVANCE.

15  THE DEFENDANT WAS CAUGHT BEFORE SHE COULD PUT HER

16  SCHEME --

17          THE COURT:  I'M NOT SURE IT HAS ANY RELEVANCE,

18  BUT I'LL LET HIM ANSWER.  IT MIGHT HAVE SOME REMOTE

19  RELEVANCE.

20          SO THE QUESTION IS, MR. MALLEN, HAS

21  SHERWIN-WILLIAMS SEEN ANY DROP IN ITS REVENUES SINCE, SAY,

22  2017, GLOBAL REVENUE IN THE COATING FIELD?

23  A.    I WOULD SAY THAT WE HAVE SEEN NEGATIVE IMPACTS IN

24  TERMS OF REVENUE GROWTH AND, IN CERTAIN AREAS, YES.

25  BY MR. SHIPLEY:

1  Q.    AS YOU SIT HERE TODAY AS FAR AS THE MATERIAL THAT

2  YOU TESTIFIED TO HERE TODAY THAT MR. HUNTER PUT UP ON THE

3  ELMO THAT YOU'VE IDENTIFIED AS TRADE SECRETS --

4  A.    YES.

5  Q.    -- YOU DON'T HAVE ANY INFORMATION THAT ANY OF THOSE

6  MATERIALS HAVE EVER BEEN GIVEN TO ANYBODY; DO YOU?

7  A.    COULD YOU REPEAT THE QUESTION, PLEASE.

8  Q.    AS YOU SIT HERE TODAY, THOSE DOCUMENTS THAT

9  MR. HUNTER PUT ON THE ELMO HERE --

10 A.    YES.

11 Q.    -- THE PROJECTOR, AS YOU SIT HERE TODAY, YOU HAVE NO

12 INFORMATION THAT THOSE DOCUMENTS HAVE EVER GONE ANYWHERE;

13 DO YOU?

14         MR. HUNTER:  OBJECTION, YOUR HONOR, SAME

15 OBJECTION.  THE DEFENDANT WAS CAUGHT BEFORE --

16         THE COURT:  IT'S HER ATTEMPT THAT'S IMPORTANT

17 HERE, MR. SHIPLEY.  I DON'T BELIEVE THAT IS RELEVANT.

18 SUSTAINED.

19         MR. SHIPLEY:  YOUR HONOR, I'LL SWITCH GEARS.

20 Q.    MR. MALLEN, WHO IS TERESA MCGRATH AND BOB ISRAEL?

21 A.    SO TERESA MCGRATH WAS A, WELL, STILL IS, SORRY, IS A

22 TOXICOLOGIST, AND BOB ISRAEL WAS THE VICE-PRESIDENT OF

23 REGULATORY AFFAIRS FOR VALSPAR, BOTH OF WHICH WORKED IN

24 THE MINNEAPOLIS OFFICE.  TERESA HAS SINCE LEFT OUR COMPANY

25 AND WORKS FOR A ARCHITECTURAL PRODUCTS COMPANY.

1  Q.    AND YOU AS THE, THE VICE-PRESIDENT OF COMPLIANCE AND

2  TECHNICAL MARKETING, DO YOU SEE WHAT ARTICLES ARE

3  PUBLISHED THAT COME OUT OF YOUR COMPANY IN PERIODICALS,

4  MAGAZINES, NEWSPAPERS?

5  A.    SOMETIMES I DO.

6  Q.    WOULD IT, WOULD IT SURPRISE YOU THAT AS EARLY AS

7  2017 ARTICLES, OR THOSE TWO INDIVIDUALS THAT YOU JUST

8  IDENTIFIED HAVE PUBLISHED INFORMATION STATING THAT THIS

9  V70 FORMULA AND OTHER OF THIS VALPURE FORMULA SHOULDN'T

10 EVEN BE CONSIDERED A TRADE SECRET?

11 A.    IT WAS BROUGHT TO MY ATTENTION THAT THEY HAD

12 PRESENTED SOME INFORMATION TO AN ORGANIZATION CALLED GREEN

13 BIZ ABOUT, SPECIFICALLY ABOUT A PHENOLIC THAT WE'RE USING

14 FOR NON-BPA AND THE EPOXY RESIN THAT'S MADE FROM IT, BUT

15 NO OTHER COMPONENTS OF ANY OF THOSE COATINGS, WHICH NOT

16 EVEN THEY HAD ACCESS TO.

17        MR. SHIPLEY:  NOW, COULD WE JUST GO FOR THE

18 WITNESS ONLY, PLEASE.

19        PULL UP EXHIBIT 77, PLEASE.

20 Q.    MR. MALLEN, DO YOU RECOGNIZE THAT ARTICLE?

21 A.    YES.

22 Q.    AND IS THAT AN ARTICLE AT THE TOP UP THERE THAT'S

23 FROM MS. MCGRATH AND BOB ISRAEL?

24 A.    YES.

25        MR. SHIPLEY:  YOUR HONOR, AT THIS TIME I'D LIKE

1   TO PUBLISH THIS TO THE JURY, DEFENSE EXHIBIT NUMBER 77.

2           THE COURT:  ALL RIGHT.  IT'S ADMITTED, IT'S

3   NUMBER 77, AND LET IT BE PUBLISHED.

4   Q.   AND LET'S -- IF YOU COULD GO TO THE TOP OF PAGE 2,

5   PLEASE.  MR. MALLEN, COULD YOU READ FOR THE JURY THE

6   SECOND PARAGRAPH THERE WHERE IT STARTS "TO DEVELOP".

7   A.   TO DEVELOP THIS INNOVATIVE TECHNICAL SOLUTION,

8   VALSPAR ENGAGED IN A HOLISTIC STRATEGY PARTNERING WITH A

9   RANGE OF NGOS, ACADEMICS, TOXICOLOGISTS AND BRAND OWNERS,

10  FOLLOWING THIS WITH EXTENSIVE TESTING AND UNCONVENTIONAL

11  COMMUNICATION STRATEGY.

12  Q.   AND WHAT'S THAT REFER TO?

13  A.   SO THAT REFERS TO, AGAIN, THE BISPHENOL FOR THE

14  VALPURE V70 NON-BPA EPOXY, ALL OF THE TOXICOLOGY TESTING,

15  ALL OF THE CONSULTATION ON THAT MATERIAL WITH EXPERTS IN

16  THE FIELD, SO THAT WAS OUR OUTREACH PROCESS IS WHAT

17  THEY'RE TALKING ABOUT.

18  Q.   NOW, DURING THAT OUTREACH PROCESS FROM ALL THOSE

19  PEOPLE, IS THAT SOMETHING THAT YOU WOULD TYPICALLY, AS WE

20  DISCUSSED IN THE EXHIBIT 5 SERIES EARLIER TODAY, IS THAT

21  SOMETHING THAT YOU WOULD HAVE THEM SIGN A NON-DISCLOSURE

22  AGREEMENT?

23  A.   NO.

24  Q.   ALL RIGHT, BECAUSE IF YOU LOOK ON PAGE 3, IF YOU

25  COULD JUST READ THE, THE PARAGRAPH BEGINNING "EMBRACING

1  TRANSPARENCY".

2  A.   EMBRACING TRANSPARENCY.  LAST, RATHER THAN CLAIM

3  THIS NEW MOLECULE AND COATING AS TRADE SECRET, VALSPAR

4  THOROUGHLY PROTECTED THE INTELLECTUAL PROPERTY WHICH

5  INCLUDES 49 PATENTS.  THIS ALLOWED US TO INVITE THE PUBLIC

6  TO REVIEW THE DATA THEMSELVES BY MAKING THE V70 POLYMER

7  CHEMICAL IDENTITY AND HAZARD DATA PUBLICLY AVAILABLE ON

8  VALSPAR'S WEBSITE.

9  Q.   AND LET'S GO BACK TO PAGE 2.  NOW, I'LL TALK WITH

10  YOU MORE ABOUT THIS AFTER LUNCH, BUT WE'VE TALKED A LOT

11  ABOUT MONOMERS TODAY; IS THAT RIGHT?

12  A.   A LITTLE BIT.

13  Q.   OKAY.  AND ONE OF THOSE MONOMERS THAT WE'VE TALKED

14  ABOUT IS THIS TETRAMETHYL BISPHENOL F?

15  A.   CORRECT.

16  Q.   AND IF YOU LOOK AT THE, JUST IN GENERAL ON THAT

17  PAGE, YOU CAN HAVE TIME TO READ IT IF YOU'D LIKE, BUT

18  THERE IS A LOT OF INFORMATION ON THAT PAGE DISCUSSING THAT

19  TETRAMETHYL BISPHENOL F; ISN'T THERE?

20  A.   YEAH, AND THAT'S BY DESIGN.

21  Q.   OKAY, AND AS A -- AND AS THIS, YOU WOULD AGREE WITH

22  ME THAT THAT IS A -- HOW WOULD YOU DESCRIBE THAT AS A --

23  WE'VE TALKED ABOUT MONOMERS AND POLYMERS AND CROSS-LINKING

24  AGENTS, HOW WOULD YOU DESCRIBE THAT, WHAT'S THAT REFER

25  TO?

1   A.    TMBPF ACTUALLY ISN'T A MONOMER THE WAY WE USE IT,

2   IT'S A PRECURSOR TO A MONOMER THAT WE USE.

3   Q.    OKAY, AND AS FAR AS THAT TMBPF, THAT'S ONE OF THE

4   COMPONENTS IN SOME OF THESE DOCUMENTS THAT YOU HAVE SAID

5   ARE TRADE SECRETS TODAY; IS THAT RIGHT?

6   A.    THAT'S A COMPONENT OF THE EPOXY.

7   Q.    A COMPONENT, A LARGE COMPONENT, IN TWO OF THESE

8   DOCUMENTS THAT YOU CLAIM TO BE A TRADE SECRET TODAY?

9   A.    IT'S, IT'S A, IT'S A WAY TO GET TO MAKE AN EPOXY

10  RESIN WITHOUT USING BPA, AND THEN THERE'S A LOT OF OTHER

11  MATERIALS WHICH ARE NEEDED IN ORDER TO BE ABLE TO MAKE IT

12  PERFORM.

13  Q.    SO LET'S JUST, SINCE I MAY NOT HAVE ASKED A GOOD

14  QUESTION THERE, BUT LET'S, LET'S, YOU KNOW, WHEN WE'RE

15  TALKING ABOUT 23A, 23B THAT HAVE BEEN ADMITTED, WE'VE GOT

16  TMBPF-DGE XXXXXXXXXXXXXX, OR IS THAT ONE OF THE --

17          COURT REPORTER:  COULD YOU REPEAT, YOU SAID THE

18  TMBPF, AND THEN I DIDN'T UNDERSTAND YOU AFTER THAT.

19          MR. SHIPLEY:  ALL RIGHT, MS. BRADLEY.

20  Q.    XXXXXXXXXXXXXXXXXXXX, IS THAT THE CORRECT NUMBER?

21  A.    YEAH; IF IT'S ON THAT PAGE, YES.

22  Q.    AND THAT'S ONE OF THE LARGEST PORTIONS OF THE

23  COMPOSITION OF THAT --

24          MR. HUNTER:  OBJECTION, YOUR HONOR.  CAN WE

25  SIDE BAR, PLEASE?

1                    THE COURT:  ALL RIGHT.

2          (SIDE BAR CONFERENCE)

3                    THE COURT:  I SHOW EVERYBODY CONNECTED AT THIS

4     POINT.  CAN YOU HEAR ME?

5                    MR. SHIPLEY:  YES, YOUR HONOR.

6                    THE COURT:  ALL RIGHT.  MR. HUNTER, WHAT'S THE

7     ISSUE?

8                    MR. HUNTER:  YOUR HONOR, MR. SHIPLEY IS

9     REFERRING TO PRECISE AMOUNTS OF INGREDIENTS AND

10    PERCENTAGES THAT THE WITNESS JUST TESTIFIED ARE TRADE

11    SECRETS, AND WE WOULD PREFER THAT HE REFER TO THOSE IN

12    MORE GENERAL FASHION RATHER THAN THE EXACT NUMBERS.

13                   THE COURT:  MR. SHIPLEY, ARE YOU SUGGESTING

14    THESE NUMBERS ARE IN THIS ARTICLE?

15                   MR. SHIPLEY:  NO, YOUR HONOR, THAT'S NOT WHAT I

16    WAS SUGGESTING AT ALL.  I'M JUST SUGGESTING THAT TALKING

17    ABOUT THE -- ONE OF THE COMPOSITION ELEMENTS WAS LISTED IN

18    THE ARTICLE AND DESCRIBED IN THE ARTICLE AND IS A HUGE

19    PORTION OF THE COMPOSITION OF THE ALLEGED TRADE SECRET,

20    AND I DON'T HAVE ANY PROBLEM WITH NOT REFERRING TO THE

21    NUMBERS.

22                   THE COURT:  ALL RIGHT.  I THINK YOU CAN DO ALL

23    THAT WITHOUT REFERRING TO THE NUMBER.

24                   DOES THAT COVER YOUR OBJECTION, MR. HUNTER?

25                   MR. HUNTER:  YEAH, I THINK SO.  IF HE NEEDS TO

1  PULL UP A DOCUMENT THAT'S ONE OF OUR EXHIBITS AND HOLD IT

2  UP AND POINT TO A NUMBER AND JUST SAY, THIS NUMBER RIGHT

3  HERE, THAT'S FINE.

4          THE COURT:  ALL RIGHT.  THANK YOU.

5      (END OF SIDE BAR)

6          THE COURT:  MR. SHIPLEY, YOU CAN CONTINUE.

7          MR. SHIPLEY:  THANK YOU, SIR.

8  BY MR. SHIPLEY:

9  Q.   MR. MALLEN, I'M GOING TO SWITCH GEARS A BIT AND TALK

10 TO YOU A LITTLE BIT ABOUT SOME OF THE TESTIMONY THAT

11 YOU'VE TALKED ABOUT EARLIER ABOUT YOUR EXPERIENCE SPEAKING

12 WITH DR. YOU AND COCA-COLA.  I BELIEVE YOU DESCRIBED

13 EARLIER AS HER BEING AGGRESSIVE OR HER BEING, EXCUSE ME,

14 HER JUST WANTING MORE INFORMATION, IS THAT RIGHT, FROM

15 YOU?

16 A.   I POSSIBLY SAID, YOU KNOW, DEMANDING IN AN AREA

17 WHICH WAS INCONSISTENT WITH THE ROLE OF HER POSITION.

18 Q.   NOW, AS FAR AS THE ROLE OF HER POSITION, THAT ROLE

19 WOULD BE DEFINED BY COCA-COLA; WOULDN'T IT?

20 A.   IT, IT WOULD.

21 Q.   SO WITH REGARD TO HER BEING, WITH REGARD TO HER

22 WANTING ADDITIONAL INFORMATION, THAT'S SOMETHING THAT SOME

23 OF THESE COMPANIES THAT YOU'RE SUBMITTING THIS, THESE

24 FORMULAS TO, SO THOSE COMPANIES NEED INFORMATION; WOULDN'T

25 YOU AGREE WITH THAT?

1  A.   WHEN WE CONTACTED OTHER PEOPLE WITHIN COCA-COLA AND

2  ASKED THEM IF SHE NEEDED THIS INFORMATION, THEY TOLD US

3  NO.

4  Q.   BUT ONE OF HER SUPERVISORS, ONE OF HER SUPERVISORS I

5  THINK YOU SAID EARLIER WAS, WAS THREATENING YOU; IS THAT

6  RIGHT?

7  A.   NO, SHE WASN'T THREATENING US, SHE WAS SUPPORTING

8  SHANNON IN HER DEMANDS.

9  Q.   OKAY.  SO JUST FOR THE SAKE OF ARGUMENT, YOU'RE

10 SAYING THAT DR. YOU WAS THREATENING, AS YOU SAY, AND HER

11 SUPERVISOR IS SUPPORTING THAT, ISN'T THAT PERSON ADOPTED,

12 IN ESSENCE, JUST DOING THE SAME THING?

13 A.   BUT I WOULD SAY FROM A STEP BACK.  IN OTHER WORDS,

14 SHE --

15 Q.   FROM A HIGHER POSITION; RIGHT?

16 A.   A HIGHER POSITION AND IN THE BACKGROUND.

17 Q.   FROM A HIGHER POSITION AT COCA-COLA; RIGHT?

18 A.   YES.

19 Q.   HOW FAMILIAR ARE YOU WITH THE SUBSTANCE OF, OF

20 PATENTS REGARDING SOME OF THESE MONOMERS AND OTHER, OTHER

21 INGREDIENTS TO THESE RECIPES, HOW FAMILIAR ARE YOU WITH --

22 I KNOW WE'VE TALKED ABOUT ONE PATENT, HOW FAMILIAR ARE YOU

23 WITH JUST PATENTS IN GENERAL?

24 A.   I'M RELATIVELY FAMILIAR WITH THE PATENTS IN OUR

25 FIELD.

1          MR. SHIPLEY:  NOW, IF WE CAN BRING UP EXHIBIT

2     NUMBER 71, I BELIEVE.

3          THE CLERK:  WITNESS ONLY?

4          MR. SHIPLEY:  YES, WITNESS ONLY.  I'M SORRY,

5     MS. HOPSON.

6     Q.    NOW, MR. MALLEN, DO YOU RECOGNIZE THIS PATENT?

7     A.    I BELIEVE SO.

8     Q.    HAVE YOU READ THIS PATENT BEFORE?

9     A.    I BELIEVE SO.

10          MR. SHIPLEY:  YOUR HONOR, AT THIS TIME I'D LIKE

11     TO ADMIT AND PUBLISH EXHIBIT NUMBER 71.

12          THE COURT:  ANY OBJECTION?

13          MR. HUNTER:  NO OBJECTION.

14          THE COURT:  ALL RIGHT.  DEFENSE EXHIBIT NUMBER

15     71 IS ADMITTED, AND IT MAY BE PUBLISHED.

16     Q.    NOW, IF I WERE TO TELL YOU THAT MANY OF THESE

17     COMPOSITIONS AND MANY OF THIS, MUCH OF THIS INFORMATION

18     THAT YOU'VE TESTIFIED TO HERE TODAY IS FOUND WITHIN THIS

19     PATENT, WOULD YOU AGREE WITH ME?

20     A.    NOT THE SPECIFIC COMMERCIALLY AVAILABLE MATERIAL

21     BECAUSE THIS WAS AS OF 2009, FILED IN 2005, FINAL FORMULA

22     WASN'T EVEN SET YET.

23     Q.    SO -- BUT WHAT WAS?  IF YOU'RE SAYING THE FINAL

24     FORMULA WASN'T SET, WAS IT STARTING SOME OF THAT RESEARCH

25     AND DEVELOPMENT THAT WAS PUT IN HERE?

1  A.    THE BASE POLYMER WAS, WAS DISCLOSED IN HERE, BUT NOT

2  ALL OF THE OTHER INGREDIENTS.

3  Q.    SO THE BASE POLYMER, SO THAT WOULD BE IMPORTANT

4  RESEARCH FOR ONE TO KNOW WHEN GETTING A PATENT ON

5  SOMETHING; WOULDN'T IT?

6  A.    OH, YEAH.

7  Q.    SO -- AND WHAT AMOUNT OF MONEY DID YOU SAY EARLIER

8  THAT YOUR COMPANY HAS SPENT ON R&D, EXCUSE ME, RESEARCH

9  AND DEVELOPMENT TO CREATE THIS RECIPE?

10 A.    NOT JUST THIS RECIPE, BUT THE WHOLE PORTFOLIO OF

11 NON-BPA PRODUCTS.

12 Q.    SO BY DISCLOSING, WHAT YOU'RE SAYING BY DISCLOSING A

13 POLYMER, WHICH TYPE OF POLYMER TO USE IN THIS PATENT, THAT

14 WOULD REDUCE THAT AMOUNT OF MONEY THAT YOU'RE TALKING

15 ABOUT; WOULDN'T IT?

16 A.    NO, BECAUSE IT STILL DOESN'T WORK AS A COATING UNTIL

17 MANY YEARS OF DEVELOPMENT LATER.

18 Q.    BUT IT'S AN INGREDIENT THOUGH IN THE COATING?

19 A.    IT'S ONE INGREDIENT.

20 Q.    RIGHT.  SO YOU HAVE TO DECIDE WHICH INGREDIENT TO

21 USE?

22 A.    WE HAVE TO DECIDE WHICH -- IN PATENTING WE HAVE TO

23 DECIDE WHICH AREA OF TECHNOLOGY WE NEED TO CLAIM IN ORDER

24 TO BE ABLE TO MOVE FORWARD IN THE DEVELOPMENT OF THIS, OF

25 THIS MATERIAL.

1    Q.    BUT AS FAR AS PICKING THE TYPE OF POLYMER THAT ONE

2    WOULD USE IN THIS, ISN'T THAT -- DOESN'T THAT TAKE

3    SIGNIFICANT RESEARCH AND DEVELOPMENT TO DECIDE WHICH

4    POLYMER YOU WANT TO USE?

5    A.    SURE, YES.

6    Q.    AND YOU'RE SAYING THAT BY THAT ALONE, BY PICKING THE

7    POLYMER TO USE, THAT WOULDN'T HAVE ANY EFFECT ON WHAT YOU

8    SAID EARLIER ABOUT HOW MUCH MONEY IS SPENT FOR RESEARCH

9    AND DEVELOPMENT, IS THAT WHAT YOU'RE TELLING THE JURY?

10   A.    CAN YOU REASK THE QUESTION OR RESTATE IT?

11   Q.    WELL, LET'S START OVER.  I ASKED YOU EARLIER ABOUT

12   YOU SAID A CERTAIN AMOUNT THAT YOUR COMPANY VALSPAR HAS

13   SPENT ON RESEARCH AND DEVELOPMENT?

14   A.    YES.

15   Q.    RIGHT.  THEN I WENT AND ASKED YOU ABOUT, I THINK YOU

16   TESTIFIED EARLIER THAT ONE OF THE POLYMERS AND FOR THE

17   RECIPE WAS DISCLOSED IN THIS PATENT; IS THAT RIGHT?  ARE

18   WE ON THE SAME PAGE?

19   A.    IT'S, IT'S DISCLOSED IN A WAY THAT WOULD MAKE IT

20   VERY DIFFICULT FOR SOMEONE TO KNOW THAT IS AN ACTUAL

21   MATERIAL IN THE COMPOSITION.

22   Q.    DISCLOSED IN A WAY THAT WOULD MAKE IT VERY DIFFICULT

23   FOR SOMEONE TO KNOW, SO IS IT DISCLOSED OR NOT DISCLOSED?

24   A.    IT'S, IT'S DISCLOSED IF YOU UNDERSTAND WHAT PORTION

25   OF IT IS DISCLOSED IN ONE AREA AND WHAT PORTION IS

1   DISCLOSED IN ANOTHER AREA, AND THEN TO BRING THOSE

2   TOGETHER IT WOULD TAKE A LOT OF RESEARCH TO FIGURE OUT

3   FROM ALL OF THOSE OPTIONS HOW IT WOULD, HOW -- WHAT YOU

4   WOULD NEED TO DO IN ORDER TO GET IT TO WORK.

5   Q.    SO THE PROCESS AS YOU'RE TELLING ME RIGHT NOW AND

6   YOU'RE TELLING THE JURY IS A PROCESS OF SOMETHING THAT YOU

7   CAN GO AND FIND IT, AND YOU MAY HAVE TO WORK A LITTLE

8   HARDER TO GET IT, BUT YOU CAN FIND IT BECAUSE IT'S

9   PUBLICLY AVAILABLE?

10  A.    FOR THIS POLYMER.

11  Q.    SO YOU CAN FIND THE POLYMER IN THIS PATENT?

12  A.    NOT EXPLICITLY, BUT PIECES OF IT THAT COME TOGETHER

13  AS A PUZZLE.

14  Q.    SO, SO PUTTING THAT PIECE -- SO LET'S JUST SAY THAT

15  HYPOTHETICALLY, MR. MALLEN, YOU'VE GOT A PIECE OF THE

16  PUZZLE OVER HERE ON PAGE 1, YOU'VE GOT A PIECE OF THE

17  PUZZLE ON PAGE 8, YOU'VE GOT A PIECE OF THE PUZZLE ON PAGE

18  20, ARE YOU TELLING ME YOU CAN'T PUT THOSE TOGETHER?

19  A.    AND THEN WHAT YOU HAVE TO DO IS YOU HAVE TO HAVE THE

20  OTHER PIECES --

21  Q.    CAN YOU PUT THOSE TOGETHER?

22        THE COURT:  LET HIM ANSWER THE QUESTION,

23  MR. SHIPLEY.

24  A.    AND THEN WITH ALL OF THOSE VARIABLES, YOU HAVE TO

25  ADD VARIABLES THAT AREN'T EVEN DISCUSSED IN THIS PATENT IN

1    ORDER TO SEE WHETHER ANYTHING ACTUALLY WORKS OR NOT, DOES

2    IT SPRAY, DOES IT HOLD, DOES IT ADHERE TO THE METAL, DOES

3    IT HOLD THE PRODUCT, DOES IT LAST ON THE SHELF FOR A YEAR,

4    OR DOES IT SCAVENGE THE FLAVOR, ALL OF THOSE THINGS HAVE

5    TO COME TOGETHER.

6              MR. SHIPLEY:  YOUR HONOR, I THINK I MAY BE

7    MOVING ONTO A DIFFERENT SUBJECT IF THE COURT WOULD LIKE TO

8    PAUSE.

9              THE COURT:  ALL RIGHT.  THIS IS PROBABLY A GOOD

10   TIME TO BREAK FOR LUNCH.

11             LADIES AND GENTLEMEN, I DON'T KNOW HOW LONG IT

12   TOOK YOU ANY OTHER DAY THIS WEEK, BUT IF WE COULD RESUME

13   IN ABOUT AN HOUR, IT WOULD HELP US TRY TO GET YOU OUT OF

14   HERE A LITTLE BIT EARLY THIS AFTERNOON.  WE HAVE ONE MORE

15   WITNESS AFTER MR. MALLEN; SO IF YOU CAN BE BACK IN ABOUT

16   50 MINUTES OR SO SO THAT WE CAN START RIGHT AROUND 1:30,

17   IT WOULD BE HELPFUL; BUT I DON'T WANT ANYBODY TAKING ANY

18   RISKS OR GET A SPEEDING TICKET OR ANYTHING LIKE THAT

19   TRYING TO DO THAT.  I GUESS WHAT I'M SAYING IS GET BACK AS

20   SOON AS YOU CAN, AND IF YOU'RE HERE AND IF WE'RE READY, WE

21   CAN TRY TO GET STARTED BACK AT 1:30 AND TRY TO MOVE ON

22   THROUGH THIS SO THAT WE CAN RECESS TODAY A LITTLE BIT

23   EARLIER THAN USUAL.

24             PLEASE REMEMBER MY INSTRUCTIONS ABOUT YOUR

25   CONDUCT AS JURORS.  YOU ARE NOT TO DISCUSS THIS CASE WITH

1  ANYONE NOR ARE YOU TO PERMIT ANYONE TO DISCUSS THE CASE

2  WITH YOU.  DO NOT ALLOW ANYONE TO DISCUSS THE CASE IN YOUR

3  PRESENCE.  DO NOT READ OR LISTEN TO ANYTHING TOUCHING ON

4  THIS CASE IN ANY WAY.  DO NOT DO ANY RESEARCH OR

5  INVESTIGATION ABOUT THE CASE ON YOUR OWN, AND, VERY

6  IMPORTANTLY, KEEP AN OPEN MIND ABOUT THE ISSUES IN THE

7  CASE UNTIL YOU HAVE HEARD ALL THAT THERE IS TO HEAR AND

8  YOU RETIRE TO THE JURY ROOM TO DELIBERATE YOUR VERDICT.

9          ALL RIGHT.  I'LL SEE YOU AS CLOSE TO 1:30 AS WE

10  CAN GET STARTED.

11      (JURY NOT PRESENT)

12          THE COURT:  ALL RIGHT.  LET'S TRY TO START BACK

13  AROUND 1:30.

14      (RECESS AT 12:34 P.M., UNTIL 1:42 P.M.)

15      (JURY NOT PRESENT)

16          THE COURT:  ALL RIGHT.  IT LOOKS LIKE WE'RE

17  READY FOR THE JURY.

18      (JURY PRESENT)

19          THE COURT:  ALL RIGHT, LADIES AND GENTLEMEN, I

20  HOPE YOU ENJOYED YOUR LUNCH.  WE'RE READY TO GET BACK TO

21  WORK.

22          MR. SHIPLEY, CONTINUE WITH YOUR CROSS

23  EXAMINATION.

24          MR. SHIPLEY:  THANK YOU, JUDGE.

25  BY MR. SHIPLEY:

1    Q.    NOW, MR. MALLEN, COULD YOU EXPLAIN A LITTLE BIT IN

2    DETAIL ABOUT A NOTICE, A 287 NOTICE FOR PATENTS, COULD YOU

3    TALK A LITTLE BIT ABOUT THAT, PLEASE?

4    A.    I DON'T KNOW WHAT THAT IS.

5    Q.    SO AS FAR AS, YOU KNOW, WE TALKED A LITTLE BIT

6    EARLIER ABOUT YOUR FAMILIARITY WITH PATENTS, BUT AS FAR AS

7    HAVING A 287 NOTICE, DO YOU KNOW IF THAT'S A REQUIREMENT

8    OR NOT WHEN FILING A PATENT?

9    A.    NO, I DON'T.

10   Q.    AND I THINK ONE OF THE, YOU KNOW, ONE OF THE

11   PRODUCTS THAT WE'VE BEEN TALKING ABOUT HERE TODAY IS YOUR

12   COMPANY'S, I THINK IT'S V40; IS THAT RIGHT?

13   A.    CORRECT.

14   Q.    AND WOULD IT SURPRISE YOU TO KNOW THAT ON ONE OF

15   THESE 287 NOTICES THAT THIS V40, THE PROCESS IS LISTED ON

16   THAT 287 NOTICE AS PUBLICLY AVAILABLE?

17   A.    I DON'T KNOW WHAT IT IS.

18   Q.    NOW, SPEAKING OF THE PATENT I'M JUST TALKING

19   ABOUT -- WOULD YOU PULL UP EXHIBIT NUMBER 71.  NOW, WOULD

20   YOU AGREE WITH ME THAT THIS PATENT HERE, THAT YOU CAN MAKE

21   A COMMERCIAL PRODUCT WITH THIS PATENT?

22   A.    WITH THOUSANDS OF VARIABLES I WOULD SAY THAT YOU

23   COULD GET VERY CLOSE, HOWEVER, I'LL ANSWER THAT BECAUSE

24   THE V40Q SYSTEM YOU'RE TALKING ABOUT EXISTS RIGHT NOW IN

25   ABOUT 13 DIFFERENT VARIANTS, ALL OF WHICH HAVE BEEN

1    DEVELOPED LONG AFTER THIS PATENT WAS PUT IN FORCE.

2    Q.    SO IF YOU WILL, IF YOU'LL LOOK WITH ME, LET'S GO

3    OVER IT A LITTLE BIT.  WITH REGARD TO -- NOW, I'LL BACK UP

4    A SECOND.  SO DID YOU SAY YOU CAN MAKE A COMMERCIAL

5    PRODUCT WITH THIS, THIS PATENT?

6    A.    IF YOU WORK THROUGH THOUSANDS, MAYBE EVEN TENS OF

7    THOUSANDS OF VARIATIONS.

8    Q.    SO, I MEAN, SO THIS IS -- SO THIS PATENT HERE, IT

9    DESCRIBES A PROCESS; IS THAT RIGHT?

10   A.    YES.

11   Q.    SO IF YOU'LL LOOK WITH ME AND JUST MAKE SURE I'M

12   READING THIS CORRECTLY ON 21, IF YOU'LL LOOK AT -- IF

13   YOU'LL LOOK AT THIS CHART RIGHT HERE WHEN WE TALK ABOUT

14   THE PROCESS, WOULD YOU DESCRIBE, WOULD YOU AGREE WITH ME

15   THAT THESE RIGHT HERE ARE COMPONENTS THAT WOULD GO INTO

16   THIS FORMULA?

17   A.    IN THE 40Q60 -- THIS IS NOT THE ACTUAL FORMULA.

18   Q.    NO, I'M ASKING, THIS IS, BASICALLY THIS WOULD BE,

19   THIS WOULD BE WHERE TO BUY THIS STUFF; IS THAT RIGHT?

20   A.    I'M SORRY?

21   Q.    WHERE TO BUY -- LET ME BACK UP A SECOND.  ON THE

22   LEFT SIDE OVER HERE IT SAYS, CHEMICAL NAME, SO THESE ARE

23   SOME COMPONENTS IN THIS FORMULA; CORRECT?

24   A.    SOME OF THEM ARE, YES.

25   Q.    SO RAW MATERIALS; FAIR ENOUGH?

1   A.    SOME OF THEM ARE RAW MATERIALS.

2   Q.    AND WHAT THIS DOES OVER HERE, IF YOU LOOK OVER HERE

3   IN THIS COLUMN, IT SHOWS YOU WHERE TO BUY IT; IS THAT

4   RIGHT?

5   A.    IT SHOWS YOU AN OPTION AT THAT TIME, YES.

6   Q.    OKAY, AND THEN IF YOU TURN OVER TO, AND I'M TALKING

7   ABOUT THE PROCESS, SO IF YOU TURN OVER TO PAGE 23, WHAT

8   YOU LOOK AT HERE IS THAT IN EXAMPLE 1, IT ACTUALLY SAYS,

9   THE PREPARATION OF THE ACID AND THE ACRYLIC, THAT'S RIGHT,

10  ISN'T IT, SO IT ACTUALLY TELLS YOU THROUGH THESE

11  PARAGRAPHS HOW TO MAKE THE ACID AND THE ACRYLIC?

12  A.    IT TELLS YOU HOW TO MAKE AN ACID FUNCTIONAL ACRYLIC,

13  NOT NECESSARILY THE FUNCTIONAL, ACID FUNCTIONAL ACRYLIC.

14  Q.    OKAY, AND GOING BACK TO THESE Q40 PRODUCTS THAT

15  WE'RE TALKING ABOUT AND -- WELL, STRIKE THAT, I'M NOT

16  GOING TO GET INTO 287 ANYMORE.

17          GOING AND CHANGING GEARS A BIT TALKING ABOUT

18  TESTING, WOULD IT BE YOUR TESTIMONY THAT CERTAIN, CERTAIN

19  TESTING CAN BE CONSIDERED TRADE SECRET?

20  A.    CERTAIN TESTING AND THE WAY IT'S APPLIED AND THE WAY

21  IT'S INTERPRETED AND THE RESULTS ARE CONSIDERED TRADE

22  SECRET, YES.

23  Q.    SO HOW DO YOU -- HOW DOES ONE DO THAT, HOW DOES YOUR

24  COMPANY DO THAT AS FAR AS THE MANNER AND THE WAY -- THE

25  MANNER IN WHICH SOMETHING IS TESTED, DO YOU JUST SEND IT

1   TO THESE COMPANIES FOR TESTING?

2   A.    SOMETIMES WE SEND IT OUT TO COMPANIES FOR TESTING,

3   OTHER -- BUT MAINLY WE TEST IN-HOUSE.

4   Q.    MAINLY YOU TEST IN-HOUSE, BUT SOME PRODUCTS YOU DO

5   SEND OUT?

6   A.    YES.

7   Q.    NOW, ARE YOU AWARE OF THE AMERICAN SOCIETY FOR

8   TESTING AND MATERIALS?

9   A.    YES.

10  Q.    OKAY.  NOW, WHAT IS THAT?  WOULD YOU EXPLAIN THAT TO

11  THE JURY.

12  A.    IT'S A -- ASTM IS A STANDARD FOR CERTAIN TESTS THAT

13  HAVE BEEN VALIDATED THROUGH MULTIPLE LABORATORIES AND HAVE

14  BEEN PUBLISHED SO THAT THE INDUSTRY OR ANYONE CAN USE

15  THOSE AS STANDARD TEST METHODS.

16  Q.    NOW, DO YOU USE THEM?

17  A.    SURE.

18  Q.    OKAY.  AND WITH REGARD TO PRODUCTS THAT WE'VE TALKED

19  TODAY ABOUT, V40 AND V70, DO YOU USE THE ASTM TO TEST

20  THOSE PRODUCTS?

21  A.    WE USE A FEW, YES.

22  Q.    AND CAN ANYONE SUBMIT MATERIAL TO THAT ORGANIZATION

23  FOR TESTING?

24  A.    SO I DON'T BELIEVE THAT ORGANIZATION DOES ANY

25  TESTING, PER SE.  THEY SET THE STANDARDS FOR THE TESTING,

1    BUT YOU CAN SEND IT OUT AND SPECIFY TO THE TESTING

2    CONTRACT LAB THAT WE WANT THIS DONE, WE WANT THIS TESTED

3    ACCORDING TO ASTM 95C OR WHATEVER IT IS.

4    Q.    AND TELL ME ABOUT THOSE RESULTS FROM THOSE TESTING,

5    DO YOU SEND OUT NON-DISCLOSURE AGREEMENTS WITH THEM ON THE

6    FINDINGS, OR, YOU KNOW, CAN ANYONE JUST SUBMIT ANY TESTING

7    MATERIAL?

8    A.    WE -- ANY CONTRACT RESEARCH ORGANIZATION HAS TO SIGN

9    A NON-DISCLOSURE STATEMENT IN ORDER TO RECEIVE OUR

10   BUSINESS.

11   Q.    AND I WANT TO DRAW YOUR ATTENTION TO EXHIBIT 28A

12   THAT'S ALREADY BEEN ADMITTED.

13             MAY I HAVE A MOMENT, YOUR HONOR?

14             THE COURT:  YOU MAY.

15   Q.    NOW, WITHOUT GETTING INTO THE INTRICACIES OF WHAT'S

16   LISTED HERE, ARE THOSE ACTUAL INGREDIENTS?  YOU CALLED

17   THIS A RECIPE, SO ARE THOSE ACTUAL INGREDIENTS?

18   A.    SO --

19   Q.    OR ARE THEY A TYPE OF INGREDIENT?

20   A.    THEY ARE -- SO, FOR INSTANCE, IT SAYS, TMBPF-DGE.

21   THAT IS A, A RESIN, AND IT IS REACTIVE WITH PARTS OF WHAT

22   THE REST OF THIS MATERIAL IS.

23   Q.    SO, AND DESCRIBE TO THIS JURY WHAT IS THE IMPORTANCE

24   OF A CAS NUMBER?

25   A.    IT'S A, AN INDEX NUMBER THAT IDENTIFIES A PARTICULAR

1    CHEMICAL OR IN SOME CASES A CHEMICAL CLASS.

2    Q.    SO --

3    A.    IT STANDS FOR CHEMICAL ABSTRACT SERVICE.

4    Q.    SO GOING DOWN, I THINK YOU SAID THE FIRST INGREDIENT

5    THERE, DID YOU SAY THAT THAT WAS AN INGREDIENT OR TYPE OF

6    INGREDIENT?

7    A.    IT WOULD BE AN INGREDIENT THAT IS, IS REACTIVE WITH

8    A FORM OF POLYMER.

9    Q.    NOW, GOING DOWN, YOU SEE WHERE IT SAYS, I GUESS,

10   ONE, TWO, THREE, THE THIRD ONE?

11   A.    XXXXXXXXXXXXXXXXXXXXXXXXXXXX.

12   Q.    SO WHEN WE TALK ABOUT THAT, DOES THAT HAVE A CAS

13   NUMBER?

14   A.    IT DEPENDS, SOMETIMES THEY DO AND SOMETIMES THEY

15   DON'T.

16   Q.    FOURTH ONE DOWN, DOES IT HAVE A CAS NUMBER?

17   A.    NO, THAT'S A TYPE OF A, A CHEMICAL.

18   Q.    NOW, COULD A SKILLED CHEMIST REPRODUCE WHAT WE SEE

19   HERE, COULD THEY REPRODUCE V70 FROM JUST THIS EXHIBIT

20   HERE?

21   A.    YOU COULD GET VERY, VERY CLOSE.

22   Q.    BECAUSE I THINK YOU'VE ALREADY STATED THAT IT'S A

23   PROCESS; ISN'T IT?

24   A.    THERE'S A PROCESS INVOLVED.

25   Q.    RIGHT.  AND THE PROCESS IS IMPORTANT; ISN'T IT?

1  A.    YES.

2  Q.    BECAUSE THE PROCESS IS, IS THAT WE'VE GOT XXXXXXXXX

3  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX INGREDIENTS IN THIS,

4  BUT YOU CAN'T JUST PUT ALL THOSE INGREDIENTS IN AT ONE

5  TIME; CAN YOU?

6  A.    SOME CHEMISTS WOULD.  IT DOESN'T WORK THAT WAY WITH

7  THIS.  SO, FOR INSTANCE, THIS EXPLAINS THAT THERE'S AN

8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, THE QUESTION SOMEONE WOULD

9  HAVE TO ANSWER IS, WELL, HOW DOES THAT GET PUT TOGETHER.

10  Q.    SO JUST TO MAKE SURE WE'RE CLEAR, YOU SAID THAT SOME

11  CHEMISTS WOULD, BUT YOU DON'T WITH THIS; IS THAT RIGHT?

12  A.    CORRECT.

13  Q.    SO THE PROCESS ON THIS RIGHT HERE REGARDING THE

14  ORDER, IT'S IMPORTANT WHICH INGREDIENT GOES IN FIRST?

15  A.    AND THAT'S WHY IT'S A TRADE SECRET.

16  Q.    BUT MY QUESTION IS IS IT IMPORTANT WHICH ONES GOES

17  IN FIRST?

18  A.    WHICH ONE GOES IN FIRST?

19  Q.    YES.

20  A.    WHICH ONE OF THESE INGREDIENTS GOES IN FIRST?

21  Q.    YES, SIR.

22  A.    SO THE TMBPF-DGE AND THE HYDRO -- WELL --

23  Q.    WELL, AS FAR AS THE ORDER, I MEAN, I'M NOT ASKING

24  YOU ABOUT THE ORDER, MR. MALLEN, AND I THINK THAT THE

25  GOVERNMENT PROBABLY WOULD OPPOSE THAT ABOUT THE ORDER,

1    WHAT I'M ASKING IS, IS JUST IT'S IMPORTANT TO KNOW WHAT

2    THE PROCESS IS AND WHICH INGREDIENT TO PUT IN AT WHICH

3    PARTICULAR TIME?

4    A.    OH, ABSOLUTELY.

5              MR. SHIPLEY:  OKAY.  YOUR HONOR, MAY I HAVE

6    JUST A MOMENT, PLEASE?

7              THE COURT:  YOU MAY.

8              MR. SHIPLEY:  YOUR HONOR, NO FURTHER QUESTIONS.

9    THANK YOU, SIR.

10             THANK YOU, MR. MALLEN.

11   A.    THANK YOU, SIR.

12             THE COURT:  ALL RIGHT, MR. HUNTER, YOU MAY

13   REDIRECT.

14             MR. HUNTER:  THANK YOU, YOUR HONOR.

15             PULL UP EXHIBIT 28A, PLEASE, IF YOU WOULD.

16                    REDIRECT EXAMINATION

17   BY MR. HUNTER:

18   Q.    MR. MALLEN, YOU REMEMBER THIS DOCUMENT?

19   A.    YES.

20   Q.    YOU SAID THIS WAS A TRADE SECRET?

21   A.    YES.

22   Q.    NOW, WE JUST LOOKED AT SOME PATENTS, DO YOU REMEMBER

23   THAT?

24   A.    YES.

25   Q.    ANYWHERE IN THOSE PATENTS DID YOU SEE THIS

1    INGREDIENT LISTED AT 21.7 PERCENT?

2    A.    NO.

3    Q.    DID YOU SEE THE NEXT INGREDIENT LISTED XXXXXX

4    XXXXXXX?

5    A.    NO.

6    Q.    DID YOU SEE THE NEXT INGREDIENT LISTED AT XXX

7    XXXXXXX?

8    A.    NO.

9    Q.    DID YOU SEE THE NEXT INGREDIENT LISTED AT X

10   XXXXXXX?

11   A.    NO.

12   Q.    DID YOU SEE THE NEXT INGREDIENT AND ITS

13   PERCENTAGE?

14   A.    NO.

15   Q.    HOW ABOUT WATER AND ITS PERCENTAGE?

16   A.    NO.

17   Q.    HOW ABOUT ORGANIC SOLVENTS AND ITS PERCENTAGE?

18   A.    NO.

19   Q.    WE TALKED BRIEFLY ABOUT ASTM TESTS, DO YOU REMEMBER

20   THAT?

21   A.    YES.

22   Q.    I'LL SHOW YOU DEMONSTRATIVE EXHIBIT 35.

23           IF WE COULD SWITCH TO THE ELMO.

24           NOW, YOU TESTIFIED THAT EXHIBITS 28A, B, C,

25   28E, WHICH WAS AN ATTACHMENT TO EXHIBIT 28D, AND 8F WERE

1  SHERWIN-WILLIAMS TRADE SECRETS; CORRECT?

2  A.    YES.

3  Q.    WERE ANY OF THOSE ASTM TESTS?

4  A.    NO.

5  Q.    I'D LIKE TO SHOW YOU WHAT THE DEFENSE MARKED AS

6  EXHIBIT 77.  DO YOU REMEMBER THIS?

7  A.    YES.

8  Q.    WHO ARE THE, WHO ARE THE AUTHORS OF THIS ARTICLE?

9  A.    TERESA MCGRATH IS A TOXICOLOGIST WHO WORKED FOR

10 VALSPAR IN THE MINNEAPOLIS OFFICE IN THE REGULATORY

11 AFFAIRS GROUP AND BOB ISRAEL WAS THE VICE-PRESIDENT OF

12 THAT REGULATORY AFFAIRS GROUP.

13 Q.    DO THEY STILL WORK FOR SHERWIN-WILLIAMS?

14 A.    TERESA DOES NOT.  BOB ISRAEL DOES.

15 Q.    LET'S GO TO PAGE 3 OF THIS DOCUMENT.  SEE WHERE IT

16 SAYS, LAST, RATHER THAN CLAIM THIS NEW MOLECULE AND

17 COATING AS TRADE SECRET, VALSPAR THOROUGHLY PROTECTED THE

18 INTELLECTUAL PROPERTY WHICH INCLUDES 49 PATENTS.  IS IT

19 TRUE AS STATED HERE THAT VALSPAR DOESN'T USE TRADE SECRETS

20 TO PROTECT THESE COATINGS?

21 A.    NO.

22 Q.    WHY DON'T THESE PEOPLE KNOW THAT, THEY WORK AT

23 SHERWIN-WILLIAMS; RIGHT?

24 A.    CORRECT.  THEY DO NOT HAVE INTIMATE KNOWLEDGE OF THE

25 PACKAGING BUSINESS AND THE PACKAGING METHOD OF PROTECTING

1   ITS INTELLECTUAL PROPERTY.

2   Q.    DO THEY EVEN KNOW THAT THOSE EXHIBITS WE JUST

3   REVIEWED AND YOU TESTIFIED WERE TRADE SECRETS EXIST?

4   A.    NO.

5   Q.    SO THOSE TRADE SECRETS ARE SO SECRET THAT THOSE

6   OTHER SHERWIN-WILLIAMS EMPLOYEES WHO PUBLISHED THIS

7   ARTICLE AND SAID SHERWIN-WILLIAMS DOESN'T USE TRADE

8   SECRETS, THEY DON'T EVEN KNOW THAT THOSE TRADE SECRETS

9   EXIST?

10   A.    CORRECT.

11   Q.    AND ONE OF THEM IS STILL A SHERWIN-WILLIAMS

12   EMPLOYEE; CORRECT?

13   A.    YES.

14          MR. HUNTER:  NO FURTHER QUESTIONS, YOUR

15   HONOR.

16          THE COURT:  ANY RECROSS ON THOSE SUBJECTS, MR.

17   SHIPLEY?

18          MR. SHIPLEY:  YES, YOUR HONOR.

19                    RECROSS EXAMINATION

20   BY MR. SHIPLEY:

21   Q.    YOU SAID THOSE TWO INDIVIDUALS, ARE YOU A HIGHER UP

22   EMPLOYEE THAN THOSE INDIVIDUALS?

23   A.    I'M AT THE SAME LEVEL AS BOB ISRAEL RIGHT NOW.

24   Q.    SO WERE THOSE, WERE THOSE EMPLOYEES -- I MEAN, ARE

25   YOU INSINUATING THAT WHAT WAS STATED IN THAT PARAGRAPH

1   MR. HUNTER JUST READ TO YOU, THAT THAT'S FALSE?

2   A.    SO IT'S PARTIALLY TRUE IN THAT WE CHOSE NOT TO

3   MAINTAIN THE, THE MONOMER THAT WE TALKED ABOUT, THE TMBPF,

4   THE PRECURSOR, THE TMBPF-DGE, AND THE COMONOMER AS, TO

5   MAKE THE EPOXY RESIN AS A TRADE SECRET, THAT WAS AN

6   INTENTIONAL POSITION AND POSTURE ON OUR PART TO MAKE SURE

7   THAT PEOPLE WERE AWARE OF THIS MATERIAL AND HOW SAFE IT

8   WAS AND THAT THEY DIDN'T FEEL LIKE THEY WERE BEING

9   DECEIVED OR UNCOMFORTABLE USING IT.  THE REST OF THE

10  COATING, AS I'VE SAID BEFORE, IS HIGHLY TRADE SECRET

11  BASED.

12  Q.    NOW, YOU SAID PARTIALLY TRUE, DID I HEAR YOU SAY

13  THAT?

14  A.    YES.

15  Q.    JUST BY SIMPLE, I'M GOING TO CALL IT MATH, JUST BY

16  WHAT MAKES SENSE, I GUESS IT'S PARTIALLY TRUE, SO IT'S GOT

17  TO BE PARTIALLY FALSE, DO YOU AGREE WITH THAT?

18  A.    LIKE I SAID, IT WAS PARTIALLY TRUE BECAUSE THEY SAID

19  THAT THE, THE POLYMER AND THE BISPHENOL WERE NOT GOING TO

20  BE KEPT AS TRADE SECRETS.

21  Q.    SO --

22  A.    THE FALSE PART WAS THE COATING.

23  Q.    IF SOMETHING IS PARTIALLY TRUE, IT MEANS IT'S EITHER

24  PARTIALLY FALSE OR IT'S NOT FULLY TRUE; FAIR ENOUGH?

25  A.    NO.  THE FIRST PART --

1  Q.    SO WHAT --

2            THE COURT:  BOTH OF YOU CAN'T TALK AT ONCE.

3  ASK YOUR QUESTION AGAIN, MR. SHIPLEY.

4  Q.    SO IF SOMETHING IS PARTIALLY TRUE, THAT WOULD MEAN

5  THAT IT'S NOT FULLY TRUE; RIGHT?

6  A.    CORRECT.

7  Q.    SO SOMETHING IS MISSING FROM THAT; RIGHT?

8  A.    CORRECT.

9  Q.    SO, I MEAN, IS SHERWIN-WILLIAMS IN THE BUSINESS OF

10 SENDING ARTICLES OUT THAT ARE JUST PARTIALLY TRUE?

11           MR. HUNTER:  OBJECTION, YOUR HONOR, MISSTATES

12 THE TESTIMONY.

13           MR. SHIPLEY:  WITHDRAW.  NO FURTHER QUESTIONS.

14           THE COURT:  ALL RIGHT.  MR. MALLEN, THANK YOU

15 VERY MUCH.  YOU MAY BE EXCUSED.

16 A.    THANK YOU, YOUR HONOR.

17 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

18 THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

19

20
   KAREN J. BRADLEY/S                        04/17/2021
21 SIGNATURE OF COURT REPORTER               DATE

22

23

24

25

1                              INDEX

2    WITNESS ON BEHALF OF THE GOVERNMENT              PAGE
     THOMAS MALLEN
3      DIRECT EXAMINATION BY MR. HUNTER               3
       CROSS EXAMINATION BY MR. SHIPLEY               67
4      REDIRECT EXAMINATION BY MR. HUNTER             90
       RECROSS EXAMINATION BY MR. SHIPLEY             93
5

6                             EXHIBITS

7        (EXHIBITS PREMARKED UNLESS OTHERWISE DESIGNATED)

8    GOVERNMENT'S:                          MARKED  ADMITTED
     5F              NON-DISCLOSURE AGREEMENT         21
9                    BETWEEN VALSPAR AND
                     COCA-COLA
10   32O             POLYMER COMPOSITIONS AND         59
                     COATINGS FOR FOOD AND
11                   BEVERAGE PACKAGING PATENT
                     APRIL 23, 2019
12
     DEFENDANT'S:                           MARKED  ADMITTED
13   77              MCGRATH/ISRAEL ARTICLE           71
     71              2009 PATENT FILED 2005           77
14

15

16

17

18

19

20

21

22

23

24

25