UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:19-CR-00014-1-JRG-CRW |
| | ) | |
| XIAORONG YOU | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on remand from the United States Court of Appeals for the Sixth Circuit. Upon the issuance of the Sixth Circuit's mandate, the Court ordered additional briefing from the parties. The United States filed its Brief on Intended Loss [Doc. 501], and Defendant Xiaorong You filed her Brief on Intended Loss [Doc. 505] and her Response to the United States's Brief [Doc. 510]. For the reasons herein, the Court concludes that a reasonable estimate of Ms. You's intended loss is $30,450,000.

### I.  BACKGROUND

In 2020, a grand jury returned an eleven-count superseding indictment against Ms. You, charging her with conspiracy to commit theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(5); seven counts of possessing stolen trade secrets, in violation of 18 U.S.C. § 1832(a)(3); wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit economic espionage, in violation of 18 U.S.C. § 1831(a)(5); and economic espionage, in violation of 18 U.S.C. § 1831(a)(3). [Superseding Indictment, Doc. 271, at 1–18]. A petit jury later convicted her of all counts after a thirteen-day trial. [Verdict Form, Doc. 301, at 1–4]. At sentencing, her criminal history category was I and her total offense level was 41, which included a twenty-four enhancement under USSG § 2B1.1(b)(1).

Section 2B1.1(b)(1) "is the Guideline used by courts in determining 'loss' for fraud cases," and it "enhances a defendant's sentence to correlate to the amount of loss caused [by her] fraud." *United States v. Triana*, 468 F.3d 308, 319–20 (6th Cir. 2006) (footnotes omitted) (citing USSG § 2B1.1(b)(1))). In short, under § 2B1.1(b)(1), the greater the loss, the greater the enhancement:

| Loss (apply the greatest) | Increase in Level |
| --- | --- |
| . . . | |
| (L) More than $25,000,000 …………………...…………………… add 22 | |
| (M) More than $65,000,000 …………………...…………………… add 24 | |
| (N) More than $150,000,000 ……………………………………….. add 26 | |

USSG § 2B1.1(b)(1); *see United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008) ("Subsection 2B 1.1(b) sets out a table with sixteen ranges of dollar amounts and accompanying base offense level increases. As the amount of money involved in a crime rises, so does the corresponding base offense level.")."[L]oss is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). Intended loss, which is "the pecuniary harm that [she] purposely sought to inflict," *id.* § 2B1.1 cmt. n.3(A)(ii),[1] is in dispute in this case, rather than actual loss.[2]

In calculating intended loss, the probation officer arrived at a "conservative" sum of $121.1 million and applied the 24-level enhancement under § 2B1.1(b)(1)(M). [PSR, Doc. 366, ¶ 24]. Both parties objected to the probation officer's tally, with Ms. You arguing for a lower

---

[1] The Sixth Circuit held that this Court properly relied on the Sentencing Commission's commentary under USSG § 2B1.1. *United States v. You*, 74 F.4th 378, 396–98 (6th Cir. 2023); *see generally United States v. Collins*, No. 23-5585, 2024 WL 3723822, at *5 (6th Cir. Aug. 8, 2024) ("We have repeatedly upheld this commentary as a reasonable interpretation of the guideline." (citations omitted)).

[2] Although the Commission defines "loss" in terms of "actual loss" or "intended loss," USSG § 2B1.1 cmt. n.3(A), the Sixth Circuit noted that "[f]or someone like You, who was arrested before causing actual loss, including losses that she intended is a reasonable way to gauge her culpability," *You*, 74 F.4th at 398.

figure and the United States advocating for a higher one. [Def.'s Objs., Doc. 399, at 7; Def.'s Sent'g Mem., Doc. 400, at 7–18; United States's Objs., Doc. 392, at 4–21]. The Court concluded that Ms. You's intended loss was $121.8 million, which triggered the 24-level enhancement under § 2B1.1(b)(1) and vaulted her total offense level to 41, [Mem. Op. & Order, Doc. 420, at 4–10]. Her criminal history category of I and her total offense level of 41 yielded an advisory guidelines range of 324 to 405 months' imprisonment. [Statement of Reasons, Doc. 423, at 1]. Over the United States's objection, the Court, in response to Ms. You's motion for a variance, varied downward and sentenced her to 168 months. [*Id.* at 3; J., Doc. 422, at 2]. In varying downward, the Court cited her age, her lack of criminal history, including her lack of violent criminal history, a need to avoid unwarranted sentencing disparities among defendants, and a policy disagreement with USSG § 2B1.1. [Statement of Reasons at 3].

Ms. You appealed her convictions and sentence, including the Court's computation of intended loss. The Sixth Circuit recited the facts of her case as follows:

> In 2012, Dr. Xiaorong You, a foreign-born U.S. citizen of Chinese origin, began working as a chemist for the Coca-Cola Company in Atlanta, Georgia. You's job was to test the chemical coatings used in Coca-Cola's beverage cans. For decades, beverage-can coatings contained bisphenol-A ("BPA"). However, Coca-Cola wanted to use safer "BPA-free" coatings. Six chemical companies developed BPA-free formulas, then tried to sell them to Coca-Cola and other beverage manufacturers.[3] To protect their formulas, these companies entered into nondisclosure agreements with Coca-Cola. You was one of only a few Coca-Cola employees with access to these formulas.
>
> While working for Coca-Cola, You planned to start a new company in China that would manufacture the BPA-free chemical. Partnering with a Chinese chemical company, the Weihai Jinhong Group ("WJG"), You applied for, and later received, business grants from the Chinese government. In her application for a national grant through China's Thousand Talents program, You stated that she had developed the world's "most advanced" BPA-free coating technology. She claimed that this technology would enable her new company to "break the international

---

[3] The six companies were AkzoNobel, BASF, Dow Chemical, PPG Industries, Sherwin-Williams, and ToyoChem.

monopoly" on BPA-free coatings, and ensure that international trade regulations on BPA would not block Chinese exports. You's application added that the new company would further the government's "Five Year Plan" and its "Made in 2025" initiative. You and WJG also received a province-level grant from Shandong Province and the Chinese city of Weihai, to whom they had made similar representations. Neither Coca-Cola nor You's subsequent U.S. employer, Eastman Chemical Company ("Eastman"), knew that You had received these grants or made these representations.

On June 30, 2017, Coca-Cola informed You that she would be laid off in sixty days amid company layoffs. You tried to transfer confidential files of the chemical companies' BPA-free formulas to a personal hard drive, but Coca-Cola's network-security protocols blocked the transfer. On her last night as a Coca-Cola employee, You successfully transferred these files to her Google Drive account and then to a USB drive. You certified in her severance agreement that she had not kept any confidential information.

You then joined Eastman in Tennessee. In June 2018, aware that she might lose her job, You copied company files to the same Google Drive account and USB drive holding her Coca- Cola files. Eastman fired You the next day. Eastman knew that You had downloaded company information and asked her to return it. You returned her company laptop and cell phone, on which Eastman found photos of its lab equipment. Eastman employees also accompanied You to her home and retrieved the USB drive. Eastman later reported You to the Federal Bureau of Investigation ("FBI").

Over the next few months, You prepared to start her company in China. Between August and September 2018, she flew to China twice. On both occasions, You escorted WJG representatives and Weihai city officials to Italy, where they met with executives from Metlac, an Italian chemical company. When You returned to the United States after one of these trips, in September 2018, she was stopped at the airport and questioned. Law-enforcement agents seized her computer, on which, after getting a warrant, they found confidential information belonging to Eastman and the other chemical companies.

The FBI arrested You in February 2019. On You's USB drive and Google Drive account, agents found many of the same files that belonged to Eastman and the other companies. Forensic analysts determined that, after her airport stop, You had renamed these files to remove the names of the companies to whom this information belonged.

*United States v. You*, 74 F.4th 378, 384–85 (6th Cir. 2023) (footnote omitted).

Although the Sixth Circuit affirmed Ms. You's convictions, it vacated her sentence,

reasoning that, "in calculating the intended loss, the district court clearly erred by relying on

market estimates that it deemed speculative and by confusing anticipated sales of You's planned business with its anticipated profits." *Id.* at 384. It remanded the case with instructions for this Court to reevaluate its method for calculating intended loss and to resentence Ms. You. *Id.* at 398–99. Once the Sixth Circuit issued its mandate, this Court ordered the parties to re-brief the issue of intended loss in light of the Sixth Circuit's ruling, and the parties have now filed their briefs. The United States moves the Court to find that Ms. You's intended loss is $192.4 million, which would result in a 26-level increase to her base offense level. Ms. You moves the Court to find that her intended loss is zero or, alternatively, $7.15 million, which would result in an 18-level increase. Having carefully considered the parties' arguments, the Court is now prepared to rule on them.

## II.    LEGAL STANDARD

"[F]or any disputed portion of the presentence report," the Court "must . . . rule on the dispute," i.e., the objection, "or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). A factual dispute will arise only when the party raising the objection "produce[s] some evidence that calls the reliability or correctness of the alleged facts into question," "a burden of production that requires more 'than a bare denial.'" *United States v. Cover*, 800 F.3d 275, 278 (6th Cir. 2015) (quotation omitted).[4] In resolving a factual dispute at sentencing, the Court has license to engage in "judicial-fact finding" under a preponderance-of-the-evidence standard, *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006), "even in cases dealing with large enhancements," *United States v. Jones*, 829 F.3d 476, 477 (6th Cir. 2016)

---

[4] The amount of loss is "a contested and high stakes factual question," *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013), and both parties, in objecting to the probation officer's calculation of intended loss, have easily discharged their burdens of production by citing extensively to the trial record, including testimony and exhibits.

(quotation omitted). Under § 2B1.1, "[t]he government bears the burden to prove the amount of the loss by a preponderance of the evidence." *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021) (citations omitted).

### III. ANALYSIS

Section 2B1.1 arises often at sentencing in criminal cases that involve fraud—e.g., healthcare fraud, bank fraud, wire fraud, and so on—but it arises less frequently in cases that involve the theft of trade secrets. The Sixth Circuit has had occasions to address § 2B1.1 in the context of trade-secret theft only a few times. Section 2B1.1's application in this context is complex, even inordinately so, and the Sixth Circuit has said as much: "Determining the value of a trade secret, we acknowledge, is no easy task." *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013). In performing this task, district courts must affix a dollar sign to something intangible: the harm that a defendant intended to inflict on a company by targeting its trade secrets. *United States v. Xu*, ___ F.4th ___, 2024 WL 4002876, at *10 (6th Cir. Aug 30, 2024); USSG § 2B1.1 cmt. n.3(A)(ii).

The complexity of this task in this case is enormous, because the evidence showed that Ms. You did not target just one company but seven of them—Eastman Chemical Company, Akzo-Nobel Coatings, Inc., PPG Industries, Inc., Valspar/Sherwin Williams, ToyoChem, BASF Corp., and Dow Chemical—all of which are publicly traded and/or multinational companies. *See* [United States's Br. on Intended Loss at 8 n.2 (stating that "accurately determining the size of this market is not straightforward")]. And the evidence showed that Ms. You sought to loosen these companies' footholds not only in the domestic market—that is, in China—but also in international markets. *See* [Nat'l Thousand Talents Program ("TTP") Appl., Doc. 512, at 13–14 (expressing a "professional objective[]" of "identify[ing] and develop[ing] domestic and

6

overseas markets"); *id.* at 14 (seeking "to boost promotion in the Asia Pacific and US markets" through exports)]. Again, no easy task. Just look to the parties' briefs. The United States, for instance, originally called on the Court to compute intended loss by adopting a dizzying calculus that accounts for "lost profits," "future stream[s] of nominal profit/tax estimates," "the Chinese corporate income tax rate," the "USD:CNY exchange rate," a "discount to present value [of] the intended future intended taxes," and "the ten-year, as opposed to the one-year, Treasury yield to discount to present value." [United States's Objs., Doc. 392, at 6, 17, 19, 20].

The federal courts are not laureates in economics, scholars in international trade, or masters in business administration. They are generally not fluent in theories of global market competition, sector or industry analysis, valuation metrics, exchange rates, bond yields, interest rates, or anything of the like. They do not study Form 10-Ks, balance sheets, or other financial statements in executing their daily judicial responsibilities. *Cf. In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) ("In general, the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements.")).

And, thankfully, when conducting an analysis under § 2B1.1, they do not have to be or do any of these things—even if the parties might expect them to. *See Howley*, 707 F.3d at 582 ("[D]istrict courts need not reach an exact figure for the loss a victim suffered or the amount of harm a defendant caused or intended to cause; a 'reasonable estimate' will do." (quoting USSG § 2B1.1 cmt. n.3(C))); *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) ("[A court] does not have to 'establish the value of the loss with precision'; it simply needs to 'publish the resolution of contested factual matters that formed the basis of the calculation.'" (quotation omitted)). In arriving at a reasonable estimate of intended loss, the Court may accept one of the parties' estimates, "a percentage of" one of the parties' estimates, or if it is "dissatisfied" with

7

the parties' estimates, "generate[] its own" estimates. *Howley*, 707 F.3d at 582. The Court may even rely on "hypothetical lost profits to estimate the intended loss." *Xu*, ___ F.4th ___, 2024 WL 4002876 at *10.

In short, the case law is straightforward enough: the Court is not rangebound, and its ample discretion in estimating intended loss is consistent with § 2B1.1. *See Howley*, 707 F.3d at 583 ("The Guidelines require only a 'reasonable' estimate of actual or intended loss within broad ranges." (quoting USSG § 2B1.1 cmt. n.3(C))). But even so, district courts do not have carte blanche to settle on any old number in calculating intended loss. The Sixth Circuit has instructed district courts that they "must explain [their] calculation methods," *Poulsen*, 655 F.3d at 512–13 (citation omitted), and, therefore, district courts often "select and employ a method of computation that will reasonably estimate the monetary cost of that harm," *United States v. Xu*, No. 1:18-cr-043, 2022 WL 16715663, at *4 (S.D. Ohio Nov. 5, 2022), *aff'd*, ___ F.4th ___, 2024 WL 4002876 (6th Cir. Aug 30, 2024). In sum, the Court's ultimate aim in estimating intended loss has to be reasonableness, which it achieves through (1) the identification and use of a calculation method, (2) an explanation of its method, and (3) a consistent application of its method. *See You*, 74 F.4th at 399 ("An internally inconsistent method is not a 'reasonable' one." (quotation omitted)).

### A. Identification of the Court's Calculation Method

As the parties well know, the Court's chosen method of computation was Ms. You's anticipated profits—or, in other words, a reasonable estimate of Eastman's, Akzo-Nobel's, PPG's, Valspar/Sherwin Williams's, ToyoChem's, BASF's, and Dow Chemical's lost profits. The Court's rationale was simple: the profits that Ms. You sought to reap from her can-coating business—profits that she would derive from the use of the stolen trade secrets—were the most

reasonable measure of the harm she intended to inflict on these companies *See Xu*, 2022 WL 16715663 at *4 ("Defendant's intent was to steal profits out of GE Aviation's pocket and place those profits in China's pocket instead. Therefore, the most reasonable method of calculating the intended loss amount in this case is to estimate GE Aviation's potentially lost profits."). The Sixth Circuit has since expressly "endorse[d]" this method's use in calculating the "intended loss from a company targeted for attempted trade-secret theft." *Xu*, ___ F.4th ___, 2024 WL 4002876 at *10 (citing *You*, 74 F.4th at 398–99); *id.* at ("We specifically cited the calculation method used by the district court in the matter presently before us, and explained that the district court in *You* should have used a similar methodology in its calculation." (citing *You*, 74 F.4th at 398–99)).

In calculating anticipated profits, the Court turned to Ms. You's TTP Application, from which it culled much of the information for its analysis. The Court viewed her statements in her application as "clear[]" manifestations of her intent to inflict pecuniary harm on the seven companies whom she victimized. [Mem. Op. & Order at 6]. She stated, for instance, that the can-coating industry is "an international monopoly"[5] and that she "anticipated to break" it by launching her can-coating business, which would "fill the gap in Asia" and, in time, penetrate the "global market." [TTP Appl. at 13–14]. From these statements, the Court reasoned that "whatever existing market share [she] intended to gain, she intended to take it from a victim company," because she "can only gain existing market share if the victim companies forming the monopoly lose that amount of the market." [Mem. Op. & Order at 7].

---

[5] Dan Leschnik, Global Technical Manager of Akzo-Nobel, testified that, worldwide, "maybe a half a dozen [companies] at the most, six at the most" have the ability to make and develop a BPA-free coating for the inside of a can and that the industry is "dominated" by two companies, Azko-Nobel and Sherwin Williams. [Trial Tr., Doc. 309, at 40:20–25, 41:1–4].

9

Embarking on an analysis of Ms. You's pursuit of market share, the Court confined its inquiry to the Chinese market and excluded the global market, partly because the Court was unaware of any information in the record "regarding global sales of BPA-free versus BPA can coatings, or more importantly, how much of [Ms. You's] intended total gains in market share would come from the global market versus the Chinese market." [*Id.* at 8]. In this vein, the Court also acknowledged that "the trade secrets at issue involved BPA-free coatings, which have not been adopted universally, and there is no indication in the record that they will be adopted universally in the future." [*Id.* at 7 (citing Trial Tr., Doc. 309, at 39:7–25, 40:1–19)]. In homing in on the Chinese market, the Court relied on the testimony of Dan Leschnik, Global Technical Manager of Akzo-Nobel. He testified that Azko-Nobel occupies approximately sixty to sixty-five percent of the market share for internal can coatings in China, [Trial Tr., Doc. 309, at 46:5–6], but that only one percent of its sales in China are "BPA-free," [Trial Tr., Doc. 310, at 15:6–7], the type of coating from which Ms. You sought to profit.[6]

From Mr. Leschnik's testimony, the Court decided that a reasonable and conservative percentage of the existing market share in China for BPA-free coating sales is one percent of the total market, [Mem. Op & Order at 8],[7] and it projected that Ms. You could seize this market share because Chinese companies create about sixty percent of the demand for can coatings in China and prefer to buy from a Chinese supplier like Ms. You rather than a global supplier like

---

[6] Sherwin Williams occupies the remaining market share in China, i.e., the remaining thirty-five to forty percent, [Trial Tr., Doc. 309, at 46:6–7], though Mr. Leschnik did not specify what percentage of Sherwin Williams's sales, if any, consist of BPA-free sales. According to David Bem, Chief Technology Officer at PPG Industries, PPG had begun selling BPA-free cans in China but only within the last twelve months. [Trial Tr., Doc. 314, at 95:8–11].

[7] The United States argues that the Court's reliance on a figure of one percent "does not capture the loss [Ms. You] intended to inflict on the victim companies." [United States's Br. on Intended Loss at 14]. Citing Ms. You's statement that she "expected market share [of] 3-5%"in China, [TTP Appl. at 14], the United States "suggests that four percent is a reasonable and conservative estimate of the market share [Ms. You] intended to capture" because "[f]our percent is the midpoint of that range." [*Id.* at 17]. The Court, however, for the reasons it goes on to mention in this Opinion, does not find Ms. You's statement that she "expected market share [of] 3-5%" to be credible, and it therefore declines to rely on it in computing anticipated profits. *See infra* pt. III.B.1.d.

Azko-Nobel, [Trial Tr., Doc. 309, at 63:23–25, 64:1–2, 74:14–16]. After all, Ms. You's intent was to "fill the gap in Asia," [TTP Appl. at 14], and "due to the monopolistic nature of the market, [she] could only gain existing market share in China by taking it from one of the victim companies," [Mem. Op. & Order at 8–9].

Although the Court had determined that the percentage of the existing market share in China for BPA-free coating sales is one percent of the total market, the question for the Court then became, one percent of what numerical value? In other words, what was the value of the total market share? To find the value of the total market share, the Court again looked to Ms. You's TTP Application, in which she stated that the "[d]omestic market size is estimated to be approximately . . . 20 billion [yuan]," or 2.9 billion dollars. [TTP Appl. at 14]. The Court adopted this number, [Mem. Op. & Order at 9], and then it began its calculations.

Again, as a local supplier, Ms. You would have likely held a competitive advantage among China's state-owned companies, which, again, consume approximately sixty percent of China's $2.9 billion worth of the market share for internal can coatings. [Trial Tr., Doc. 309, at 63:23–25, 64:1–2, 74:14–16]. Sixty percent of $2.9 billion equals $1.74 billion worth of the market share for cans. Of that $1.74 billion, however, only one percent consisted of sales of BPA-free internal can coatings. [Trial Tr., Doc. 310, at 15:6–7]. The total available amount of existing market share for BPA-free coating sales was, therefore, $17.4 million annually. The Court's calculation spanned a seven-year period, from 2021 through 2027, *see* [TTP Appl. at 13–14 (containing Ms. You's description of incremental "professional objectives" for her can-coating business, with production starting in roughly 2021 and increasing into 2027)], and over that seven-year period, Ms. You's "sales total," as the Court phrased it, would have been $121.8

11

million. [Mem. Op. & Order at 9]. The Court used this number as its estimate of Ms. You's intended loss.

### B. Explanation of the Court's Calculation Method

In arriving at this number, the Court, along the way, eschewed certain statements that Ms. You had made in her TTP application, namely her profit and tax estimates. [Mem. Op. & Order at 7]. Ms. You, in her TTP application, stated that the value of the global can-coating market is $7.7 billion. [TTP Appl. at 13]. She also stated that her can-coating company would register annual sales worth three to five percent of China's market share, or roughly $102.5 to $131.7 million in annual sales. The Court found these statements to be "unreliable" because they were likely "the result of puffery and speculation intended to entice the Chinese government into issuing a grant to [her]." [Mem. Op. & Order at 8]. The Court, therefore, did not rely on these statements and the projections they contained in reaching its estimated value of intended loss, $121.8 million.

The Sixth Circuit disapproved of this Court's estimate of intended loss for two reasons. First, the Sixth Circuit determined that this Court clearly erred because it did not "stick to" its calculation method. *You*, 74 F.4th at 398. That is, "[a]lthough [this] court claimed to determine the loss amount based on anticipated profits, the numbers it estimated were of You's anticipated sales." *Id.* at 398–99 (citation omitted). "[B]y confusing anticipated sales of You's planned business with its anticipated profits," this Court's calculation method, the Sixth Circuit ruled, was "internally inconsistent" and, therefore did not produce a reasonable estimate of intended loss. *Id.* at 384, 399. Second, the Sixth Circuit opined that this Court clearly erred because it "used estimates that it had rejected earlier in its analysis." *Id.* at 398. Specifically, it faulted this Court for accepting Ms. You's $2.9-billion estimate of China's market share for can coatings

but rejecting her $7.7-billion estimate of the global market share for can coatings. *Id.* Both estimates came from the TTP application, and the Sixth Circuit viewed as "inconsistent[]" this Court's decision to rely on the $2.9-billion estimate but not to rely on the $7.7 billion estimate. The Sixth Circuit asked this Court to resolve this inconsistency, declining to "take a side" on the question of whether Ms. You inflated any of her statements in the TTP application. *Id.* This Court will now do so.

### 1. Puffery in Ms. You's TTP Application

The Court assumes the role of the fact-finder at sentencing, *Gates*, 461 F.3d at 708, and in this role, it "weigh[s] the evidence," as any fact-finder would, *United States v. Zajac*, 62 F.3d 145, 150 (6th Cir. 1995). "Any question as to the truth of the evidence [at sentencing] is an underlying credibility issue . . . appropriate for the [sentencing] court," *United States v. Washington*, 715 F.3d 975, 983–84 (6th Cir. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), and "[t]he sentencing court's credibility determinations, like other factual findings," are entitled to "great deference," *United States v. Guana*, 485 F. App'x 70, 74 (6th Cir. 2012) (quoting *United States v. Hurst*, 223 F.3d 751, 761 (6th Cir. 2000); *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999))). Simply put, credibility determinations are this Court's province. *See United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (observing that the district court is "in the best position to judge credibility").

At first blush, the Court's reliance on some of Ms. You's representations in her TTP application at the exclusion of others may appear to be an inconsistency, but the Court had simply made a credibility determination, implicit though it may have been, as to which of her representations were truthful and which were not. A credibility determination is not an all-or-nothing decision; some of a party's statements may be credible and others may not be. The Court

was under no obligation to make a black-and-white finding that Ms. You's statements in her TTP application were either credible in their entirety or not credible at all. *See United States v. Griffin*, 530 F.3d 433, 435 (6th Cir. 2008) (noting the district court's finding that a witness was credible "in some respects"). The implication from the Court's treatment of Ms. You's TTP application was clear: the Court had found some of her statements credible and some not. The Sixth Circuit has afforded district courts the benefit of their implied reasoning before. *Cf., e.g.*, *United States v. Khamsouksay*, 580 F. App'x 429, 430 (6th Cir. 2014) ("Although the district court did not specifically mention [the defendant's] motion for a variance . . . . the district court implicitly rejected [the motion]" and "did not commit any error."). In this case, the Court did not receive that benefit, so it will now more thoroughly explain its reasoning.

At sentencing, Ms. You argued that the projections in her TTP application were replete with "puffery and ambitious speculation" and "made in hopes of winning the Thousand Talents Award" and "receiv[ing] funds from the Chinese government." [Def.'s Sent'g Mem. at 17]. To support this argument, she cited an oblique reference to "false statements" by one of her co-conspirators, [*id.* at 17–18 (citing United States's Trial Ex. 09-A at 32], and an unpublished district-court case, *United States v. Xue*, No. 16-22, 2020 WL 5645765 (E.D. Pa. Sept. 22, 2020). In *Xue*, the defendant had stolen documents containing trade secrets from a global healthcare and pharmaceutical company in the United States, rebranded the stolen documents so that they appeared to belong to her own corporation, Renopharma, and courted the Chinese government as an investor in Renopharma by presenting it with financial projections, marketing materials, and e-mails. *Xue*, 2020 WL 5645765 at *1–4.

According to the United States, the defendant "planned to use Renopharma to market, sell, and profit from the trade secret information described in the stolen . . . documents." *Id.* at

14

*3. The defendant's attorney, however, portrayed the financial documents, marketing materials, and e-mails as "puffery to encourage investment in [Renopharma] by private investors and the Chinese government." *Id.* at *5. In calculating the intended loss at sentencing, the district court determined that the intended loss in the case was $0 partly because it could not infer intended harm from these documents and materials, which, in its view, were "not convincing evidence of a realistic expectation of gain." *Id.* at *19–20. According to the district court, these documents and materials contained "a rosy outlook on [Renopharma's] value [and] growth prospects" and were "meant to attract attention," and "relying upon what is essentially advertising brochures to determine the fair market value of stolen information is not an appropriate and practicable way to estimate loss." *Id.* at *19.

While a court's reliance on advertising brochures may in some cases be an inappropriate way to estimate intended loss, the *type* of document before a court is not the salient issue when it conducts an analysis under § 2B1.1. Rather, the salient issue is whether a certain document—irrespective of its label—contains evidence of intent, i.e., the "pecuniary harm that the defendant purposely sought to inflict" on the victim or victims. USSG § 2B1.1 cmt. n.3(A)(ii). This Court declines to follow *Xue* by ruling that an advertising brochure, or a document akin to one, cannot contain this type of evidence and is "not . . . appropriate" for consideration under § 2B1.1. *Xue*, 2020 WL 5645765 at *19. This ruling would be antithetical to "the individualized nature of sentencing," *United States v. Axline*, 93 F.4th 1002, 1013 (6th Cir. 2024) (citation omitted), throughout which the case's specific facts and circumstances must guide the Court's hand, *see Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study[.]").

15

As is true with Ms. You's TTP application, a document containing financial projections, marketing materials, or other advertisement-like qualities can consist of both exaggerative *and* realistic representations, and the latter may be useful in measuring intent. To distinguish the exaggerative from the realistic, the Court asks itself, what evidence is there really of Ms. You's intent to entice the Chinese government with grandiose representations in her TTP application? Despite having signed the TTP application with an affirmation that its contents were "true and valid," [TTP Appl. at 15], she now says that her representations in the application were "mere puffery," [Def.'s Sent'g Mem. at 17]. By arguing that her representations were untruthful, she borders on asking the Court to find that her criminal conduct—her intent to defraud—did not begin and end with the seven victim companies but extended to the Chinese government. Ms. You stood trial for defrauding the victim companies, not the Chinese government, and the jury made no finding that she defrauded the Chinese government. Nor was it called on to do so.

Still, for the purposes of sentencing, the Court may, as the fact-finder, draw reasonable inferences under a preponderance-of-the-evidence standard, *United States v. Blackman*, 625 F. App'x 231, 238–39 (6th Cir. 2016) ("[A] sentencing judge is permitted to make reasonable inferences from the evidence when determining whether to impose an enhancement[.]" (citing *United States v. Vandewege,* 561 F.3d 608, 609 (6th Cir. 2009))), and the evidence shows that Ms. You, on at least one occasion, made representations that—when in juxtaposition with publicly available market data—were inflated. For instance, in attempting to form a business partnership with Pier Ugo Bocchio, CEO of Metlac, [Bocchio Dep., Doc. 501-1, at 11:17–20, 15:6–7, 21:2–3], she provided him with a marketing report of the Chinese market for metal packaging and coatings, [United States's Trial Ex. 19-B at 1]. Smithers Information Ltd. had prepared the report, [*id.* at 3–6], which, in part, read, "Red Bull's sales in China are now in the

16

region of 150 million cans per year," [*id.* at 5]. Ms. You, though, believed this figure was low—much too low, in fact—and she shared her belief with Mr. Bocchio: "The actual market is larger than the reported numbers. [F]or instance, Red [B]ull cans is about 5 billion, [*id.* at 1]. By Ms. You's estimation, Smithers Information had underestimated the Chinese market by a factor of *thirty-three*. In the end, Mr. Bocchio, who testified that he was intimately familiar with the industry, [Bocchio Dep., Doc. 241-1, at 15:22–23], was dismissive of Ms. You's estimates, [*id.* at 17:4–21], and he elected not to partner with her, citing a lack of "trust," [*id.* at 26:7–8].[8]

Ms. You, therefore, appears to have had the audacity to embellish the size of China's market even while interacting with one of the industry's titans,[9] and her aggrandizement of China's market to Mr. Bocchio lends some support to her argument that she could have done the same in her TTP application, though the inferential leap is a large one. The Court is willing

---

[8] Ms. You not only exalted the size of the Chinese market during her communications with Mr. Bocchio but also lied to him outright in an attempt to snooker him into a business partnership:

Q: Mr. Bocchio, did the Defendant come to visit you in September or November 2018?

A: I don't remember the date. But September/November, yes. Yeah.

Q: And did she bring anyone with her?

A Probably, yes. If she came—you mean to Metlac?

Q: To Metlac, correct.

A: Oh, yes, of course. Normally she used to come with somebody. But I don't remember in September who was—the name of the people because I never cared—and the position of the people that were coming.

Q: You said you don't remember the names of the people, but do you remember who they represented or who—if they were with companies, for example?

A Yeah. Once—I tell you I don't know if it was September or if it's November because I don't remember at all. But somebody was supposed to be my partner, in her mind, in China, who came to see us. And he brought some brochures showing that he was producing for—even for Dow. I checked with Dow, but they said, 'No way.'

[Bocchio Dep., Doc. 241-1, at 20:9–25, 21:1–7].

[9] Mr. Bocchio testified that his familiarity with the market for can coatings is "part of [his] life." [*Id.* at 15:21–22].

17

to make this inferential leap and dismiss as puffery certain estimates in her TTP application as a show of leniency. *See Xu*, ___ F.4th ___ 2024 WL 4002876 at *10 ("We endorse . . . a conservative calculation method" under § 2B1.1); *Xu*, 2022 WL 16715663 at *8 (affording the defendant "the benefit of lenity" and "conduct[ing] [a] loss computation estimate in [her] favor"). In short, the Court will give Ms. You the benefit of the doubt, as it often does for defendants at sentencing. The question, though, still remains: which statements in the TTP application does the Court view as inflated and which does it view as credible?

  a. *Ms. You's $2.9-Billion Estimate of the Chinese Market*

  Ms. You's $2.9-billion estimate of China's market share for can coatings is probably credible. If Ms. You's objective in submitting the TTP application was, as she claims, "to win the awards and receive funds from the Chinese government," [Def.'s Sent'g Mem. at 17], she would have been foolish—if not reckless—to have stretched her valuation of China's market share. Few individuals or entities could have been better positioned to authenticate Ms. You's $2.9-billion estimate of China's market share for can coatings than the Chinese government. After all, the Chinese government itself consumed the majority of the market share in China through its state-owned companies. [Trial Tr., Doc. 309, at 63:23–25, 64:1–2, 74:14–16]. The Court therefore takes at face value Ms. You's $2.9-billion estimate of China's market share for can coatings.

  b. *Ms. You's $7.7-Billion Estimate of the Global Market*

  Her $7.7-billion estimate of the *global* market share for can coatings is more dubious, however, because the global market for can coatings is opaque—that is, it is hard to quantify— and she would have, therefore, had more flexibility to exaggerate her estimates, maybe even aggressively, without the risk of the Chinese government's detection. *See* [Mem. Op. & Order

18

at 7 (recognizing that "the trade secrets at issue involved BPA-free coatings," that they "have not been adopted universally," and that "there is no indication in the record that they will be adopted universally in the future" (citing Trial Tr., Doc. 309, at 39:7–25, 40:1–19)]. Again, the global market for BPA-free can coatings is a dense nucleus of just a few players. Mr. Leschnik testified to this point at trial, stating that, worldwide, "maybe half a dozen [companies] at the most, six at the most" have the ability to make a BPA-free coating for the inside of a can, and that the industry is "dominated" by two companies, Azko-Nobel and Sherwin Williams. [Trial Tr., Doc. 309, at 40:20–25, 41:1–4]. Another executive officer in the industry, David Bem, Chief Technology Officer at PPG Industries, suggested he was not fully familiar with his competitor's behaviors in the industry, specifically with regard to their sales of BPA-free coatings. [Trial Tr., Doc. 314, at 95:12–17]. And Mr. Leschnik now maintains that profit margins are "highly sensitive information for coatings companies, who treat that information as confidential." [Leschnik Decl., Doc. 501-2, at ¶ 13].

So, the absence of any universal standards in the global market for BPA-free coatings, the covertness in the global market, and the fact that none of the few companies in the global market were Chinese all would have given Ms. You license to exaggerate her estimate of that market to the Chinese government, maybe even grossly so. The Court will therefore dismiss as puffery her $7.7-billion estimate of the global market share, not only because her estimate was susceptible to exaggeration but also because the Court's reliance on that estimate—a massive number—in calculating intended loss would create a stratospheric increase in her total offense level. *See Xu*, ___ F.4th ___ 2024 WL 4002876 at *10 (endorsing the use of conservative methods of calculation).

### c. *Ms. You's Taxes on Profit*

Because Ms. You's estimate of the global market share for can coatings is unreliable, the Court also considers unreliable her representations as to the taxes that she would have paid on her sales in the global market. *See* [United States's Trial Ex. 08-C at 24].

### d. *Ms. You's Three-to-Five Percent Estimate of Expected Market Share*

Next, the Court considers the credibility of Ms. You's representation that she expected to obtain three to five percent of China's market share. [TTP Appl. at 14]. Ms. You intended to achieve "industrial production in May 2020," and "[o]nce production is up and running," she wrote, "[t]he expected market share is 3-5%." [*Id.*]. She therefore appeared to estimate that she could acquire three to five percent of China's market share almost instantaneously, i.e., upon launching her product. Mr. Leschnik, however, testified that Akzo-Nobel obtained just a one-percent share of China's market within approximately a year of launching its BPA-free product in 2020 or so. [Trial Tr., Doc. 310, at 14:15–25, 15:1–7]. At that pace, Azko-Nobel—a major blue-chip company that had been well-established in China, having entered the Chinese market in 2002, [Trial Tr., Doc. 309, at 44:22–23]—would have needed roughly three to five years to carve out a three-to-five percent market share. Ms. You's estimation that she could reap a three-to-five percent market share upon launching her product therefore seems far too bullish, even in a market that favors local suppliers, and it is not particularly credible.

### 2. <u>The TTP Application as Evidence of Ms. You's Intent to Harm</u>

Having now fully explained why some of Ms. You's projections are credible and some are not, the Court recommits its focus to the question of Ms. You's intent to inflict pecuniary harm on the victims. USSG § 2B1.1 cmt. n.3(A)(ii). Ms. You stated in her TTP application that the purpose of her new can-coating company was to "break the international monopoly" in the

market. [TTP Appl. at 14]. Her statement is not only an acknowledgment of her understanding that only a select few companies—the seven victim companies—dominated the market but also an expression of her intent to harm, or "break," them.[10] And when the Court considers that she delivered this statement within days or weeks of arming herself with some of these companies' trade secrets, her intent to harm them resonates as completely credible. Indeed, as Mr. Bocchio said, "[O]n recipes and formulation, if you lose this, you lose the company." [Bocchio Dep., Doc. 241-1, at 26:12–13]. The Court therefore views Ms. You's TTP application as undeniable evidence of her intent to harm the victim companies, and her financial projections in her TTP application—those that the Court has found to be credible—are a translation of her intended harm into pecuniary values.

Ms. You disagrees. The TTP Application "does not establish [her] requisite intent to harm the Victim Companies," she argues, [Def.'s Br. on Intended Loss at 11],[11] and to support this argument, she posits a hypothetical scenario for the Court's consideration. She cites the vast potential for growth in China's can-coatings market and claims that if she could have expanded the market with her product by reaching corridors of the market that the victim companies had yet to reach themselves, then the victim companies would have suffered no pecuniary harm. [*Id.*]. Her hypothetical suffers from two shortcomings. First, it reads as an argument that harm was possible but not necessarily likely. That argument is of no consequence to an analysis of intended loss. *See United States v. Pu*, 814 F.3d 818, 824 (7th Cir. 2016) ("'Intended loss . . . turns upon how much loss the defendant actually intended to impose' on the victim, *regardless of whether*

---

[10] The verb "break" is synonymous with the verb "harm." *See Break*, *Webster's Third New International Dictionary* (1993) (defining the verb "break" as "to prevent effective operation or performance of by disruptive action").

[11] Ms. You appears to contradict her argument by also arguing, later in her brief, that her "intent arises entirely from the TTP Application." [Def.'s Br. on Intended Loss at 19].

21

*the loss actually materialized*[.]" (emphasis added) (quotation omitted))); *United States v. Vysniauskas*, 593 F. App'x 518, 524 (6th Cir. 2015) ("An intended loss need not be likely or even possible[.]" (citing USSG § 2B1.1 cmt. n.3(A)(iii)); USSG § 2B1.1 cmt. n.3(A)(iii) (stating that intended pecuniary harm includes loss that is "unlikely" or even "impossible"). Second, if Ms. You wishes to speak in hypotheticals, the Court can just as easily visualize a hypothetical under which she could have chosen to target one or more of the victim companies' established customer bases—a hypothetical that fits with her stated intent to "break" the victim companies. Azko-Nobel had, at the time, been in China for about eighteen years and, with control of sixty to sixty-five percent of the market, had likely built an established customer base for internal can coatings there. [Trial Tr., Doc. 309, at 44:22–23, 46:5–6].

Ms. You also contends that the record cannot support a finding of her "'intent' to cause the Victim Companies any loss" because "the Court already reasoned that the Chinese local market might 'prefer to buy coatings *from Chinese suppliers*, were they available.'" [Def.'s Br. on Intended Loss at 11–12 (emphasis in original) (quoting Mem. Op. & Order at 8)]. "[I]f that were true," she asserts, "[her] anticipated profits would merely represent a business opportunity available to her that would *not have been available to the Victim Companies*." [*Id.* at 12 (emphasis in original)]. Mr. Leschnik, however, testified that Chinese can-makers' preference for buying coatings from state-owned companies was just that—a *preference*, not a foregone conclusion. Ms. You's effort to twist his testimony into a zero-loss finding is hyperbole in the extreme. The Court relied on Mr. Leschnik's testimony about Chinese companies' preference for state-manufactured coatings as general guidance in forming an *estimate* of intended loss, which  is not an exact science. *See You*, 74 F.4th at 398 (stating that a calculation of intended loss "need not" be "an exact figure"); *see also United States v. Kraus*, 656 F. App'x 736, 742 (6th

Cir. 2016) (referring to the "generous latitude afforded to sentencing courts by the reasonable estimate standard" under § 2B1.1).

In sum, Ms. You's argument that her TTP application, and the record as a whole, lacks evidence of her intent to inflict pecuniary harm on the victim companies is a nonstarter, and the Court will rely on the credible estimates in her TTP application to compute intended loss. The Court's chosen method of calculation, as was the case originally, will be Ms. You's anticipated profits from her new can-coating company. The Court emphasizes again that the Sixth Circuit has expressly "endorse[d]" this method's use in calculating the "intended loss from a company targeted for attempted trade-secret theft." *Xu*, ___ F.4th ___, 2024 WL 4002876 at *10 (citing *You*, 74 F.4th at 398–99); *see You*, 74 F.4th at 399 (calling on this Court to "tweak," rather than to abandon, its intended-loss calculation and "again look to anticipated profits"). But this time, the Court—to arrive at anticipated profits rather than anticipated sales—must factor anticipated costs into its arithmetic. *See You*, 74 F.4th at 399 ("For profit to match revenue, there must be zero cost."). The question for the Court now becomes, what evidence does the United States, as the party with the burden under § 2B1.1, have of Ms. You's anticipated costs for her new can-coating company?

### C. Application of the Court's Calculation Method

The United States maintains that the Court should apply a profit margin of forty percent when calculating Ms. You's anticipated profits,[12] and it relies on two pieces of evidence: a declaration from Mr. Leschnik and a research report entitled *Coating Resins Market: Global Forecast to 2027* [Doc. 503], which, the United States argues, corroborates the information in

---

[12] In *You*, the Sixth Circuit noted that the correct way to calculate anticipated profits is by multiplying revenues by the profit margin. 74 F.4th at 399.

Mr. Leschnik's declaration. [United States's Br. on Intended Loss at 10–11]. According to Mr. Leschnik, "40%-50% would be a conservative estimate of the profit margin a new coatings company could expect in the beverage-can market," and this estimate is "the margin that a company achieves on top of its variable costs, which are primarily the costs of raw materials to produce." [Leschnik Decl. ¶ 13]. In response, Ms. You asserts that Mr. Leschnik's estimates are "wildly fluctuating" and invite the Court to "engage in guesswork," and that, therefore, the "intended loss amount should be '0.'" [Def.'s Br. on Intended Loss at 14, 14 n.5, 15].

1. The Credibility of Mr. Leschnik's Declaration

The Court may accept Mr. Leschnik's estimates, reject them, or "generate[] its own." *Howley*, 707 F.3d at 582. Mr. Leschnik provides the Court with several estimates of the global can-coating market's size and China's can-coating market's size, and some of these estimates are indeed wide-ranging. Quoting GlobeNewswire's website, he states, for instance, that China's market for can coatings will approach $313 million by 2026, [Mr. Leschnki's Decl. ¶ 5], but he then goes on to offer his independent estimate that China's market had a value of $37.1 million in 2023, [*id.* ¶ 12]. He does not attempt to explain the gulf between the $313-million figure and the $37.1-million figure, which stray from each other by a factor of about 8.4.

In addition—and maybe more importantly—the Court is skeptical of the sources of his estimates, which lack any real indicia of reliability. Most of the estimates in his declaration are not in fact *his* estimates but estimates that are available for public consumption on various websites: MarketsAndMarkets, GlobeNewswire, Fortune Business Insights, Spherical Insights, Reports and Data, Fact.MR, Statista.com, and Growth Market Reports. The material on these websites is authorless—or at least has no authors that the Court can readily identify—and when the Court visits these websites, it is accosted with pop-up ads, free-standing ads, solicitations

24

to "buy now," and requests from support agents to "chat now." Also, one of the website's links that Mr. Leschnik has copied and pasted into his declaration is broken. The Court is unwilling to enhance Ms. You's sentence by twenty-six levels, as the United States requests, by relying on questionable information accompanied by clickbait. *See Xu*, 2022 WL 16715663 at *7 (performing a "profit loss computation" based on the victim company's annual report, which contained a certification under 18 U.S.C. § 1350).[13]

Not all of Mr. Leschnik's declaration is unreliable, though. *See* [Def.'s Br. on Intended Loss at 14 n.5 (conceding that Mr. Leschnik provides "concrete numbers" in "paragraph 12 of his declaration")]. In paragraph thirteen of his declaration, Mr. Leschnik appears to draw on his professional experience and expertise in the industry—forty-four years in total, [Trial Tr., Doc. 309, at 3:23–24]—to estimate that "the profit margin a new coatings company could expect in the beverage-can market" is forty to fifty percent, [Leschnik's Decl. ¶ 13]; *see* [*id.* (stating that "[t]he government also asked *me* to provide an estimate of the profit margins a can-coatings company might expect to achieve" (emphasis added)). The report entitled *Coating Resins Market: Global Forecast to 2027*, which the United States has filed alongside Mr. Leschnik's declaration, generally confirms Mr. Leschnik's estimate of a forty to fifty percent profit margin for a fledging can-coating company:

---

[13] The United States also encourages the Court to rely on other questionable information in the record, including "[a]n article published in October 2017," which "included a picture of [Ms. You] and described financial estimates . . . . that [Ms. You's] company would 'realize an annual sales income of eight hundred forty million yuan and a foreign exchange earning of ten million US dollars.'" [United States's Br. on Intended Loss at 16 (quoting United States's Trial Ex. 08-N at 1)]. But like Mr. Leschnik's online sources, this article lacks any identifiable author, and the Court therefore harbors concerns about its reliability as a manifestation of Ms. You's intent. Ms. You's own words are the best evidence of her intent—words that the record evidence captures in her TTP application, her e-mails, her text messages, and her conversations with witnesses.



FIGURE 22  VALUE CHAIN ANALYSIS (COATING RESINS): COST POINTS IN DIFFERENT SEGMENTS

| | RAW MATERIALS | RESINS | FINISHED PRODUCTS (COATINGS) |
|---|---|---|---|
| COST POINTS | Cost of raw materials | Manufacturing and processing; base resin | Finished product development |
| INDUSTRY STRUCTURE | Semi-concentrated | Concentrated | Concentrated |
| AVERAGE PROFIT GROSS MARGIN (%) | 15-20% | 20-25% | 35-45% |
| AVERAGE EBIT (%) | 6-12% | 8-14% | 10-20% |

Source: Secondary Literature, Interviews with Experts, and MarketsandMarkets Analysis

[Coating Resins Mkt. Rep., Doc. 503, at 70]. In this report, the authors[14] estimate an "average profit gross margin (%)" of "35–45%" for "finished products (coatings)," [*id.*], and this estimate is within the low end of Mr. Leschnik's estimate of forty to fifty percent.

The Court finds no reason to discredit Mr. Leschnik's estimate, especially when it views it in tandem with the estimates in *Coating Resins Market: Global Forecast to 2027*. During Ms. You's trial, the Court found Mr. Leschnik to be a knowledgeable, believable witness—indeed, it has relied on much of his trial testimony here in this Opinion—and it has no misgivings about counting on estimates that he forms from his years of professional experience and expertise in the industry. Ms. You, however, does not hold Mr. Leschnik's estimate of profit margin in the same regard as the Court, for two reasons. First, she argues that *Coating Resins Market: Global Forecast to 2027* actually "undercuts the credibility of Mr. Leschnik's statement." [Def.'s Br. on Intended Loss at 15]. According to Ms. You, Mr. Leschnik needs to "explain the discrepancy

---

[14] The report has two authors: Lakshmi, Narayanan, "[a] technically proficient and result-driven professional with over 15 years of experience and has been associated on key roles with firms like IPCL, Anabond Ltd., Frost & Sullivan, Bussetti Gmbh, and Jet Airways," and Dr. A.P. Joshi, "PhD in Chemical Technology with over 25 years of experience in bio-chemicals, specialist having a detailed knowledge of the broad spectrum of chemical products and material derivatives that can be produced from crude oil-based feedstocks." [Coating Resins Mkt. Rep. at 410].

26

between his number" and the "10% to 20%" number in *Coating Resins Market: Global Forecast to 2027*. [*Id.*]. The "10–20%" number in *Coating Resins Market: Global Forecast to 2027* is "Average EBIT," whereas the "35–45%" number i is "Average Profit Gross Margin." [Coating Resins Mkt. Rep. at 70]. EBIT is earnings before interest and taxes, and average profit gross margin is the average profit a company generates for each dollar of revenue after deducting the direct costs that come from producing or purchasing goods.

Mr. Leschnik is clear that his profit-margin estimate of forty to fifty percent resembles average profit gross margin, not EBIT. *See* [Leschnik Decl. ¶ 13 ("As I use the term here, 'profit margin' represents the margin that a company achieves *on top of* its variable costs, which are primarily the costs of raw materials to produce a coating." (emphasis added)]. Mr. Leschnik's conception of profit margin is therefore, at a minimum, substantively similar to the calculation of average gross profit margin that appears in *Coating Resins Market: Global Forecast to 2027*, so no meaningful discrepancy exists between the two. And again, his estimate of profit margin (forty to fifty percent) overlaps with the estimate of average profit gross margin in *Coating Resins Market: Global Forecast to 2027* (thirty-five to forty-five percent), so no discrepancy exists there either.

Second, Ms. You assails Mr. Leschnik's estimate by arguing that the analysis of Scott Bushnell, who has submitted a report on Ms. You's behalf, is superior to Mr. Leschnik's. [Def.'s Br. on Intended Loss at 17]. In Ms. You's words, Mr. Bushnell "calculates the potential profits Ms. You's intended company would have had in the Chinese BPA-free can-coating market over the same seven-year period this Court previously used," and over these seven years, he estimates that she would have gained $7.15 million in profit. [*Id.* at 17–18]. Ms. You lauds his analysis because he "relies on public financial information from the Victim Companies themselves to

arrive at a reasonable estimate of the net profits available in the BPA-free can-coating market in China." [*Id.* at 18].

But Ms. You acknowledges that Mr. Bushnell, in arriving at his estimate, makes certain assumptions about the "process by which Ms. You's new company would enter the market," [*id.*]—assumptions that she characterizes as "reasonable," [*id.*]. According to Mr. Bushnell, "a critical consideration for any estimate of lost Net Operating Profit as the opportunity to make sales must be based on the ability to produce a product in a state that it can be sold in the marketplace." [Bushnell Rep., Doc. 505-2, at 7]. He assumes that Ms. You's new can-coating company would have needed "ramp-up time," by which he means that she "could not [have] immediately beg[u]n producing BPA-free can coatings." [Def.'s Br. on Intended Loss at 18]. In his view, her new company lacked the infrastructure and the customers to allow her to sell a finished product until July 2023—at the earliest. [Bushnell Rep. at 10]. Although he recognizes that she "was partnered with WJG," he asserts that "it is not clear that WJG had the expertise, ready physical assets, or chemical plant processes available that would allow the production of BPA-free can coatings." [*Id.* at 8]. He concludes "there is no indication that any of the steps that would be necessary to move this project forward on a design level had been taken," and "[a]s such it is very unlikely that the company that Ms. You was trying to develop would have been viable" and "unlikely that any Net Operating Profits would have been diverted to Ms. You's company." [*Id.* at 9].

### 2. The Credibility of Mr. Bushnell's Report

Mr. Bushnell's methodology—that is, his focus on Ms. You's company's "ability to produce a product," [*id.* at 7], and the prospect of her company's viability, [*id.* at 9]—is wholly inconsistent with an analysis under § 2B1.1 The Court stresses, once again, that the question of

28

whether harm to the victim companies could have materialized is irrelevant under § 2B1.1, *see Pu*, 814 F.3d at 824; *Vysniauskas*, 593 F. App'x at 524; USSG § 2B1.1 cmt. n.3(A)(iii), and yet Mr. Bushnell states that he "base[s]" his analysis "on [Ms. You's] *ability* to produce a product in a state that it can be sold in the marketplace," [Bushnell Rep. at 7 (emphasis added)]. Again, Ms. You, within days or weeks of stealing some of the victim companies' trade secrets, stated her intent to "break" them, and again, the Court views this statement as credible, unmistakable evidence of her intent to harm them. Whether she actually could have done so by creating a brick-and-mortar company that was capable of cutting into their profits is irrelevant. Her intent is what matters. *See United States v. Middlebrook,* 553 F.3d 572, 578 (7th Cir.2009) ("[T]he true measure of intended loss [is] in the mind of the defendant.")

Also, Mr. Bushnell's various assumptions about the "process by which Ms. You's new company would enter the market," [Def.'s Br. on Intended Loss at 18]—the groundwork for his methodology—are not reasonable because they belie the record. Mr. Bushnell assumes that Ms. You's company would not have had the infrastructure and customers to start earning revenue until July 2023, and in making this assumption, he, again, dismisses her partnership with WJG, claiming "it is not clear" that WJG had "the expertise," "assets," or "chemical plant processes" to help her initiate production and achieve sales any sooner. [Bushnell Rep. at 7– 10]. Ms. You herself thought differently. In her TTP application, she stated that the "set up" of her company would take three years' time, from 2017 to 2020, [TTP Appl. at 13], and that she "expected industrial production in May 2020," a much faster timeline than Mr. Bushnell's, [*id.* at 14]. To justify her timeline, she touted her union with WJG, specifically referring to its "advanced production equipment," its status a "Fortune 500 company," its "technical and

management teams," and its "Research and Development Center [that] has more than CNY 70 million worth of advanced instruments and equipment." [*Id.* at 15].

So contrary to Mr. Bushnell's claim that WJG lacked the expertise and infrastructure to breathe life into Ms. You's company, Ms. You believed, or at least represented, that she could set her business in motion with WJG's help by 2020 or so. And although Ms. You is hardly a model of credibility, the Court is mindful of her purpose in submitting the TTP application: "to win the awards and receive funds from the Chinese government." [Def.'s Sent'g Mem. at 17]. Ms. You would have been foolish—if not reckless—to portray WJG as something it was not. Few individuals or entities could have been better suited to verify Ms. You's statements about WJG's employees, equipment, production capacity, and its overall standing in the industry than the Chinese government. After all, WJG is a "local Chinese company." [Trial Tr., Doc. 309, at 130:15].

In addition, Mr. Leschnik's testimony about WJG's expertise and infrastructure casts a pall of doubt over Mr. Bushnell's assumptions about the "process by which Ms. You's new company would enter the market." [Def.'s Br. on Intended Loss at 18]. Mr. Leschnik testified that WJG is "a big, big company," is "multi-dimensional," "could potentially be a raw-materials supplier," could make BPA-free coatings, and could help another company develop "a position in the marketplace in an extremely short period of time." [Trial Tr., Doc. 309, at 130:15–25, 131:1–7, 131:19–25, 132:1–6]. Mr. Bushnell's failure to reconcile his report with Mr. Leschnik's testimony is damning to his report's credibility, and in sum, his methodology and underlying assumptions are neither in line with the evidence nor comport with an analysis under § 2B1.1. The Court therefore places no stock in Mr. Bushnell's report, and it rejects his $7.15-million estimate of Ms. You's intended loss.

### 3. The Court's Computation of Anticipated Profits

Having now rejected Mr. Bushnell's $7.15-million estimate of profits and accepted Mr. Leschnik's low-end estimate of a forty-percent profit margin, the Court is prepared to perform its calculation of Ms. You's anticipated profits, but before doing so, it must address one final argument: an argument, by Ms. You, that Mr. Leschnik's "profit margin[] is irrelevant unless the Government can establish that Ms. You *subjectively expected* to earn a 40-50% profit margin." [Def.'s Br. on Intended Loss at 20 (emphasis in original)]. "Mr. Leschnik offers no such evidence," Ms. You says, [*id.*], and the United States does not disagree, "acknowledg[ing] that there is no evidence the defendant was aware of Mr. Leschnik's personal margin estimates," [United States's' Br. on Intended Loss at 12]. Ms. You's argument and the United States's acknowledgment in response to it strike at the fundamental issue before the Court: intent. *See* USSG § 2B1.1 cmt. n.3(A)(ii) (stating that intended loss "the pecuniary harm that the defendant *purposely sought* to inflict" (emphasis added))]. In Ms. You's view, the Court cannot possibly rely on Mr. Leschnik's estimate without evidence of her intent to capture forty percent of the victim companies' profits.

Ms. You's argument—shrewd though it is—places an exacting task on the Court's shoulders. *Cf. United States v. Boring*, 557 F.3d 707, 711 (6th Cir. 2009) ("[I]ntent to defraud is difficult to prove by direct evidence[.]"); *see United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (referring to "the difficulties often associated with attempting to calculate loss in a fraud case"). In *United States v. Wendlandt*, the Sixth Circuit teed up, but declined to address, whether "the optimal measure of 'intended loss' should be . . . an objective or [a] subjective analysis, and whether constructive, as opposed to actual, intent will suffice." 714 F.3d. at 396 (citation omitted). Since then, it has imparted "generous latitude" to district courts when they

engage in intended-loss analyses. *Kraus*, 656 F. App'x at 742. For instance, a district court's calculation of intended loss need only be a "reasonable estimate," *Howley*, 707 F.3d at 582, and it "need not" be "exact," *You*, 74 F.4th at 398, or "precis[e]," *Poulsen*, 655 F.3d at 513. A district court may "generate[] its own estimates," *Howley*, 707 F.3d at 582, shun calculation methods that are "impossible or exceedingly impractical," *United States v. Petlechkov*, Case Nos. 21-5174/5199, 2022 WL 168651, at *3 (6th Cir. Jan. 19, 2022), and even create "hypothetical" scenarios to arrive at an estimate, *Xu*, ___ F.4th ___, 2024 WL 4002876 at *10. The only real caveats are that a district court's estimate must not be so detached from the evidence that it is "outside the permissible realm of computations," *Wendlandt*, 714 F.3d at 396 (quotation omitted); in other words, it must be reasonable. Again, a district court's estimate is reasonable when the district court (1) identifies and uses a calculation method, (2) explains its method, and (3) consistently applies its method. *You*, 74 F.4th at 399; *Poulsen*, 655 F.3d at 512–13.

With the capacious language that the Sixth Circuit has used to describe district courts' discretion in estimating intended loss, an objective rather than a subjective measure of intended loss would, arguably, fit more cleanly with that language. *Cf. Boring*, 557 F.3d at 711; *see Wendlandt*, 714 F.3d at 393. And at times, the Sixth Circuit's measure of intended loss has in fact come across as an objective one. *See Poulsen*, 655 F.3d at 513 (stating that district courts, when calculating intended loss, "simply need[] to 'publish the resolution of contested factual matters that formed the basis of the calculation'" (quotation omitted)); *see also Xu*, ___ F.4th ___, 2024 WL 4002876 at *10 (affirming the district court's use of the victim company's annual report to estimate intended loss even though the report "was not introduced as evidence [of the defendant's intent] at trial or during the evidentiary hearing"). But at other times, the Sixth Circuit's measure of intended loss has had echoes of a subjective one. *United States v. Murphy*,

815 F. App'x 918, 922 (6th Cir. 2020) (stating that even an "impossible or unlikely loss must still be intended" (citation omitted)). The Sixth Circuit's jurisprudence, therefore, appears to have shades of both an objective measure *and* a subjective measure. Maybe, then, the best summation of its jurisprudence is: "the defendant's objective conduct, taken as a whole," must "corroborate the required subjective intent." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999).

Relying on Ms. You's objective conduct to corroborate her subjective intent, the United States contends that "[i]t is reasonable to conclude" that she "grounded her expected margins in industry norms," [United States's Br. on Intended Loss at 12], and it argues that evidence of her familiarity with industry norms is sufficient to show that she expected a profit margin of forty percent. The United States's argument, on its face, is entirely legitimate. *See Wendlandt*, 714 F.3d at 396 (noting that a district court's calculation method for intended loss was a "reasonable proxy for culpability" when it took into account the defendants' status as "veterans of the real estate industry" (quoting *United States v. Appolon*, 695 F.3d 44, 69 (1st Cir. 2012))); *see also United States v. Peppel*, 707 F.3d 627, 643–45 (6th Cir. 2013) (affirming the district court's calculation of intended loss when the district court relied on an announcement of an SEC investigation as a "highly relevant proxy by which to measure the price effects of fraudulent conduct").

As the United States correctly argues, "[e]vidence from trial established that [Ms. You] was a consumer of information about the market for cans and [can] coatings, especially in China." [United States's Br. on Intended Loss at 12]. The United States cites evidence of her conversations with Mr. Leschnik about opportunities in China, the market report that she e-mailed to Mr. Bocchio, and a text message that she sent to Mr. Bocchio about the Chinese

33

market. [*Id.*]. Her $2.9-billion estimate of China's market share for can coatings—which the Court found to be credible—is further evidence of her familiarity with the industry's norms. Her statements about WJG's expertise and infrastructure are further evidence still, and importantly, as the Court has already noted, Mr. Leschnik substantiated Ms. You's statements about WJG.

The Court can, if reasonable, view Ms. You's objective familiarity with the industry's norms as evidence of her subjective intent to earn a profit margin in line with the industry's norms. *Wendlandt*, 714 F.3d at 396; *Peppel*, 707 F.3d at 643–45. The question is whether the record contains a reasonable proxy for her culpability. It does: Mr. Leschnik, who is himself intimately familiar with the industry's norms, has provided the Court with a relevant, credible, and reasonable proxy by which to measure Ms. You's intent to earn a profit margin that typifies the industry's norms for a new can-coating company. The Court will therefore incorporate his estimate of a forty-percent profit margin into its calculation of anticipated profit. When the Court applies a forty-percent profit margin to its $121.8-million estimate of anticipated revenue (40% x $121.8 million), Ms. You's anticipated profits come to $48,720,000.

But the Court must make one key adjustment to its calculation of anticipated profits. Mr. Leschnik's forty-percent estimate of profit margin is specific to the *global* market, not the *Chinese* market. *See* [Leschnik Decl. ¶ 13 (providing his estimate of profit margin for "the beverage-can market"); United States's Br. on Intended Loss at 11 (arguing that *Coating Resins Market: Global Forecast to 2027*, which by its title is a global report, "corroborated" Mr. Leschnik's profit-margin estimate)]. The Court previously declined to perform a calculation of anticipated profits based on a global market share because the record's numbers were unreliable:

> Calculations with respect to the portion of the global market share Defendant intended to take are too speculative. The only information the Court has to this

34

effect is that Defendant reported the total value of the can-coating market to be over $7 billion dollars annually in her TTP Application, and her projections anticipated that her new company would take 3% to 5% of the market share. As explained before, the Court finds this projection unreliable, as it is likely the result of puffery and speculation intended to entice the Chinese government into issuing a grant to Defendant and her co-applicants.

[Mem. Op. & Order at 8]. The record's numbers are still unreliable: the Court has carefully explained why Ms. You's $7.7-billion estimate of the global market is unreliable; it has also explained why Mr. Leschnik's estimates of the global market—estimates that, again, are not *his* estimates but estimates publicly available for consumption on websites—are unreliable; and it has explained why it rejected Mr. Bushnell's report. In the absence of reliable estimates of the global-market share for BPA-free can coatings, the Court will do as it did before and limit its calculation of anticipated profits to the Chinese market.

Ms. You specifically identified three markets in which she intended to sell her product: China, the Asian Pacific more broadly, and the United States. [TTP Appl. at 14].[15] The Court could assume that she would collect a third of her profit margin from each of these markets—roughly thirteen percent from each market, for a total profit margin of forty percent—but rather than divide her profit margin into thirds, the Court will assume that she would have realized a greater market share in China because of Chinese can-makers' preference for buying coatings from local suppliers. *See Xu*, ___ F.4th ___, 2024 WL 3688438 at *10 (recognizing that a district court is free to rely on "hypothetical lost profits to estimate the intended loss"); *see also Howley*, 707 F.3d at 582 (stating that a district court may "generate[] its own estimates"). The Court will

---

[15] *Coating Resins Market: Global Forecast to 2027* contains estimates of the market share for packaging coatings in the Asian Pacific and in North America, but these estimates lack any reference to BPA-free can coatings in these regions, [Coating Resins Mkt. Rep. at 168], and the United States admits that these estimates are "not straightforward" because they consist of a seven-page methodology, [United States's Br. on Intended Loss at 8 n.2]; *see Petlechkov*, 2022 WL 168651 at *3 (recognizing that district courts need not engage in calculations that are "exceedingly impractical").

35

therefore allocate a higher profit margin to her sales in China: a profit margin of twenty-five percent. When the Court applies a profit margin of twenty-five percent to its $121.8-million estimate of anticipated revenue (25% x $121.8 million), Ms. You's anticipated profits come to $30,450,000, which is the Court's finding of her intended loss.[16]

## IV. CONCLUSION

The United States fails to meet its burden of demonstrating, by a preponderance of the evidence, that a reasonable estimate of Ms. You's intended loss is $192.4 million. Based on the Court's review of the evidence and its calculation method, a reasonable estimate of Ms. You's intended loss is $30,450,000. Because Ms. You's intended loss is greater than $25 million but less than $65 million, the Court will apply a twenty-two level enhancement to Ms. You's base offense level at her resentencing hearing. *See* USSG § 2B1.1(b)(1)(L)–(M) Her resentencing hearing remains scheduled for Monday, September 16, 2024, at 9:00 a.m.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[16] The United States argues that the Court's estimate of intended loss "should not be substantially lower than the cost that the victim companies incurred in developing the trade secrets," [United States Br. on Intended Loss at 18]—a cost that the United States Probation Office estimated as $121.1 million, [PSR ¶ 14]. The United States, however, does not attempt to define "substantially lower," and it cites no case law for its argument, claiming only that it "makes good sense." *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)). Besides, the Sixth Circuit implicitly rejected the United States's argument when it stated that "[a] 'reasonable reduction' that accounted for You's anticipated profit margin might well have brought You's total intended loss below $65 million," which is where Ms. You's intended loss now stands. *You*, 74 F.4 th at 399.

36